## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **BATES ENERGY OIL & GAS, LLC** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION:  SA:17-CV-00808-XR** |
| | § | |
| **COMPLETE OIL FIELD SERVICES** | § | |
| **LLC AND SAM TAYLOR** | § | |

**DEFENDANT/COUNTER-PLAINTIFF COMPLETE OIL FIELD SERVICE, LLC'S FIRST AMENDED COUNTERCLAIM, APPLICATION FOR WRIT OF ATTACHMENT AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

NOW COMES Complete Oil Field Services, LLC ("COFS" or "Defendant/Counter-Plaintiff"), and files this First Amended Counterclaim, Application for Writ of Attachment, and Application for Temporary Restraining Order and Preliminary Injunction, respectfully showing the Court as follows:

### I.
### NATURE OF ACTION

1.      Defendant/Counter-Plaintiff Complete Oil Field Services, LLC ("COFS") seeks damages, declaratory, equitable and injunctive relief against Plaintiff/Counter-Defendant Bates Energy Oil & Gas, LLC ("Bates Energy") and similar relief against Counter-Defendants Equity Liaison Company ("ELC") and its principal/agent Dewayne D. Naumann ("Naumann"), by and through whom ELC acted.  Bates Energy made material misrepresentations and fraudulently induced COFS to enter into an operating agreement for the delivery of 80,000 tons of frac sand, and wholly failed to deliver any of the promised product.  Upon COFS's termination of that agreement, ELC and Naumann were obligated to disburse escrowed funds of up to $1 million to COFS.  ELC and

Naumann refuse to disburse the funds to COFS in contravention of the express terms of the parties'
escrow agreement.

2.      ELC and Naumann also refuse to disclose to COFS the balance of the escrow account, or
to provide COFS with any statement of activity for the account.

3.      This amended counterclaim is supported by the declaration of Janis Kline and Lamont
Jefferson and other exhibits, all contained in the attached appendix.

## II.
### JURISDICTION AND VENUE

4.      This Court has diversity jurisdiction under 28 U.S.C. §§ 1332(a) and 1441(a).  COFS seeks
a temporary restraining order, preliminary injunctive relief, and declaratory relief under 28 U.S.C.
§ § 2201 and 2202. Diversity of citizenship exists between the parties to this action pursuant to
and in accordance with the requirements of 28 U.S.C. § 1332, which confers original subject matter
jurisdiction upon this Court.

5.      The amount in controversy in this matter exceeds $75,000.00, as required for diversity
jurisdiction under 28 U.S.C. § 1332.  In its state court petition, Plaintiff alleges monetary relief
over $1,000,000 and non-monetary relief.  In this amended counterclaim, the funds at stake exceed
$900,000, and non-monetary relief is also sought.

6.      The Court is authorized to award the requested declaratory relief under the Declaratory
Judgment Act, 28 U.S.C. § § 2201-2202, and is authorized to award the requested injunctive relief
under Federal Rule of Civil Procedure 65.

7.      The Court is authorized to award the requested declaratory relief under the Declaratory
Judgment Act, 28 U.S.C. § § 2201-2202, and is authorized to award the requested injunctive relief
under Federal Rule of Civil Procedure 65.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to COFS's claims occurred in this District.

**III.**
**PARTIES**

**Plaintiff/Counter-Defendant**

9.      Plaintiff/Counter-Defendant Bates Energy Oil & Gas, LLC ("Bates Energy") is a limited liability company duly organized and existing under the laws of the State of Texas.  Its sole member, Blair Bates, an individual, resides in, and is a citizen of the State of Texas.  The company's principal place of business is San Antonio, Bexar County, Texas.  It has already appeared in this case.

**Defendant/Counter-Plaintiff**

10.     Defendant/Counter-Plaintiff Complete Oil Field Services, LLC is a foreign limited liability company duly organized and existing under the laws of the State of Utah, and registered to do business in Texas.  Its three members, Perry Taylor, Janis Kline, and Sam Taylor, are all individuals, and all of them reside in, and are citizens of the State of Utah.  The company's principal place of business is Sandy, Utah.  It has already appeared in this lawsuit.

11.     Defendant Sam Taylor is an individual residing in the State of Utah.  For purposes of diversity jurisdiction, Taylor is a citizen of Utah.

**Counter-Defendants**

12.     Counter-Defendant Equity Liaison Company, LLC is a limited liability company duly organized and existing under the laws of the State of Texas.  The sole member of ELC, Dewayne D. Naumann, is a citizen of the State of Texas. The company's principal place of business is Austin, Travis County, Texas.  ELC's agent for service is Dewayne D. Naumann, whose business

address is 3303 Northland Drive, Austin, Texas 78731, and whose residential address is 5018 Highland Court, Austin, Texas 78731.

13.     Counter-Defendant Dewayne D. Naumann is a natural person residing at 5018 Highland Court, Austin, Texas 78731.  He may be served at his business or residential address.

**IV.**
**P**ROCEDURAL **B**ACKGROUND

14.     On July 20, 2017, Plaintiff/Counter-Defendant Bates Energy sued Defendant/Counter-Plaintiff COFS and Defendant Sam Taylor ("Taylor") in the Bexar County district court, asserting claims of breach of contract and tortious interference, in Cause No. 2017-CI-13215 ("State Court Action").  The state court judge entered an *ex parte* temporary restraining order that same day restraining COFS and Taylor from access to escrowed funds COFS had deposited with ELC, and from communicating with suppliers of frac sand.  The TRO was amended on July 26, 2017.

15.     On August 2, 2017, COFS filed a counterclaim and application for writ of attachment against Bates Energy in the State Court Action.  COFS alleged claims of breach of contract, fraud and theft, and is seeking rescission, an equitable accounting, declaratory relief, and a state law writ of attachment.

16.     On August 4, 2017, the state court judge orally denied Bates Energy's application for a temporary injunction, and the written order was entered on August 8, 2017.

17.     COFS and Taylor removed the case to federal court on August 23, 2017 based on diversity grounds (Docket No. 1, 1-1).

18.     On August 30, 2017, the Court entered a Show Cause Order (Docket No. 3), ordering Defendants to file an amended Notice of Removal that adequately alleged diversity jurisdiction.

19.     Also on August 30, 2017, Defendant COFS filed an Original Third-Party Complaint, alleging various claims, and seeking declaratory and injunctive relief, against non-parties ELC and

Naumann (Docket No. 4).  COFS also filed an Application for Temporary Restraining Order and Preliminary Injunction with respect to ELC and Naumann (Docket No. 5).

20.     On August 31, 2017, the Court entered an Order (Docket No. 6) denying without prejudice the request for a TRO or injunction, and ordering Defendant COFS to show cause why the Third-Party Complaint should not be dismissed because it was filed without leave of Court and it failed to comply with Rule 14's substantive requirements.

21.     On September 1, 2017, COFS and Taylor filed Defendants' Amended Notice of Removal (Docket No. 7), in response to the Court's August 30, 2017 Show Cause Order.

22.     On September 5, 2017, COFS filed its Response to the Court's 8/31/2017 Order Regarding Third Party Complaint (Docket No. 8), which included a request for leave of Court to file an amended counterclaim in order to join ELC and Naumann to the lawsuit.

23.     On September 7, 2017, the Court entered an Order (Docket No. 9) that struck the existing Original Third-Party Complaint (Docket No. 4), and granted COFS leave to file an amended counterclaim to join ELC and Naumann.  The Court also found that the Defendants' Amended Notice of Removal (Docket No. 7) sufficiently plead the existence of diversity jurisdiction.

24.     Pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, and Rules 13(h) and 20 of the Federal Rules of Civil Procedure, and this Court's leave, Defendant/Counter-Plaintiff COFS files this First Amended Counterclaim.

## V.
## FACTS

25.     COFS sells frac sand.  It was created for the purpose of acquiring frac sand for its one customer, ProPetro Servicing, Inc. ("ProPetro").  ProPetro is an oil and gas drilling and exploration company that requires substantial quantities of frac sand to conduct its operations.

26.     COFS and ProPetro entered into a Supply Agreement on April 13, 2017 whereby COFS agreed to procure large amounts of sand for ProPetro's fracking operations in and around West Texas.  A copy of the Supply Agreement is attached as Exhibit 1.

27.     Bates Energy is a company newly created on February 14, 2017 ostensibly to procure frac sand for its customers.[1]  A copy of the Certificate of Formation is attached as Exhibit 2.  Stan P. Bates ("Bates") is the CEO of Bates Energy, although he claims to be a "W-2 employee" who has received no salary during his employment.[2]

28.     Shortly after Bates Energy was created, in April 2017, the company, through its principal and CEO Bates, approached COFS.  Bates represented his company had the capacity to supply the substantial amount of frac sand required by ProPetro.

29.     More specifically, Bates and Bates Energy represented they had rights with mines in Wisconsin to buy 370,000 tons of sand a month (its "allocation"), and that the company was actually delivering about 88,000 tons to customers every month.  Bates represented that Bates

---

[1] Bates Energy's CEO Stan Bates ("Bates") testified at the August 3-4, 2017 temporary injunction hearing in the State Court Action that the company had seven or eight customers.  He could name only two other customers besides COFS and ProPetro, and did not know the full names of any contact person at the other customers.

[2] The governing person shown on the Certificate, Blair Bates, is Stan Bates' college student son who Bates testified has returned to live in Texas after attending school in Colorado.  Nobody signed the Certificate so it is unknown if Blair Bates was aware of the formation of this company. Stan Bates refers to himself in documents as Bates Energy's CEO.

Energy had the capacity to acquire and deliver the type and tonnage of frac sand required by COFS. Relying upon these representations, COFS entered a Memorandum of Understanding (Operating Agreement) ("MOU") with Bates Energy on or about April 18, 2017.  A copy of the MOU is attached as Exhibit 3.

30.     Under the MOU, Bates Energy was obligated to deliver the following type and quantity of frac sand to COFS, at specified due dates:

**Total of approximately 80,000 tons of sand**

**Due Dates**:

- By **May 10, 2017**:
  - 10,000 tons

- By **July 12, 2017**:
  - Total of 80,000 tons

31.     The type of sand was required to be either 40/70 or 100 mesh.

32.     Each type of frac sand had to be in grades "API compliant," and Bates Energy was obligated to provide COF with "customary reporting of Gradation and Turbudity," demonstrating compliance to API standards known as Stim-Lab and/or Prop-Test.

33.     Bates Energy was also obligated to deliver the frac sand to one of seven rail terminals in Texas: Seagraves, Pecos, Big Springs, San Angelo, Odessa, Midland, or Monahans.

34.     The price of the sand frac under the MOU was $99.00 per FOB WTX which included transloading expenses.

35.     COFS was obligated to accept delivery of materials "of each grade and quantity" as set forth in the MOU or pertinent purchase orders, and provide for timely payment upon presentation and audit of appropriate sand ownership and delivery paperwork.  As the middleman and trustee

of ProPetro, COFS intended to transport compliant sand to ProPetro upon delivery by Bates Energy.

36.     Under the Supply Agreement, ProPetro agreed to deposit $4 million into an escrow account to pay COFS's sand supplier for purchase and delivery of sand.  The sand supplier would have the right to draw down on the amount upon verification by the escrow agent that sand had actually been acquired and was being transported to COFS.

37.     Similarly, the MOU provided for an escrow account whereby Bates Energy, as the sand supplier, or a substitute, could draw down on the $4 million deposited by ProPetro upon successful performance of the terms of the MOU.

38.     In other words, both COFS and Bates Energy understood that the $4 million was funded by COFS's customer, ProPetro, as a prepayment towards its expected receipt of the 80,000 tons of frac sand.  Consequently, once COFS could confirm through bills of lading ("BOL"), rail car receipts, invoices, purchase orders, and other documentation that Bates Energy had delivered the correct type of sand to the correct location, that documentation would be sent to the escrow account manager for audit.  If the audit showed proper delivery, then the escrow account manager was authorized to release payment funds to Bates Energy for the sand delivered to COFS.

39.     Bates Energy originally insisted that the $4 million be held in escrow by what COFS later learned was a close associate, ELC, and overseen by its principal, Naumann.  Because ELC was not a financial institution, and was unknown to COFS, the parties ultimately agreed to set up a second escrow account with Amegy Bank.  Of the $4 million, $1 million was deposited in escrow with ELC serving as the escrow agent.  Amegy Bank served as the escrow agent for the remaining $3 million.

40.     On April 14, 2017, COFS entered an Escrow and Disbursement Agreement (the "Escrow Agreement") with Bates Energy and ELC for the deposit of $1 million of ProPetro funds to be held in trust by ELC.  A copy of the Escrow Agreement is attached as Exhibit 4.

41.     As noted above, ELC's principal, Naumann, has a close relationship with Bates. As recently reported by the San Antonio Express-News, counsel for Bates Energy represented Naumann in a local high-profile criminal matter involving allegations that Bates was closely related to a Ponzi scheme that bought and sold frac sand.[3]  )Counsel withdrew from her representation on or about August 25, 2017.)

42.     Under the express terms of the Escrow Agreement, if the MOU was terminated, ELC was obligated to return the balance of the funds in the escrow account to COFS:

> **1.4     Termination**.  This Escrow Agreement shall terminate upon the first to occur of any of the following events:
>
> A.     The disbursement of the balance of the Funds in accordance with the provisions of Section 1.3 hereof.
>
> B.     **The expiration or termination of the [MOU], in which case the remaining balance**, accrued interest or excess funds of the Fund **shall be disbursed to the Buyer [COFS]**…(emphasis added)

---

[3] The newspaper reported that ELC served as an escrow agent for FourWinds Logistics, of which Bates is the former CEO.  Bates is under criminal indictment related to his role for fraud and a multitude of other crimes.  "Like Bates Energy, FourWinds traded frac sand."  See "More frac sand woes for Uresti co-defendant Bates," San Antonio Express-News, July 21, 2017, http://www.mysanantonio.com/business/local/article/More-frac-sand-woes-for-Uresti-co-defendant-Bates-11306273.php
An investor in the FourWinds matter lost all but $100,000 of her $900,000 investment.  Dewayne Naumann's ELC was listed as the third-party escrow agent in the investor's MOU with FourWinds. It appears her money, however, went straight to FourWinds/Bates rather than through Naumann's escrow account.

*See* Exhibit 4, ¶ 1.4(B).[4]

43.     Bates Energy wholly failed to perform under the MOU at any time, despite its multiple claims that sand was on its way.

44.     For example, by April 17, 2017, even before the formal MOU had been executed, Bates was encouraging COFS to complete the escrow deposit, representing that Bates Energy had already acquired a substantial amount of sand for delivery to COFS:

> Please let us know the Status of the [escrow] wire this morning…my operations Chief lands in WI [Wisconsin] at 10:30 a.m.!  I will be paying for a lot of Sand today and Locking on the Trains…I'll feel a whole lot better knowing your money is sitting in escrow to replace mine in a few weeks! Lol.

45.     When COFS confirmed that funding of the escrow account was imminent, Bates again represented his company's purported acquisition of sand and its preparations for delivery:

> Just wanted to ensure everything is a Go!  Once again I'm ordering Trains and Paying for a tremendous amount of sand today and I wanted to ensure of Wire transfer to Escrow and P/O [Purchase Order] being issued…just wanted that warm and fuzzy that your money was sitting safe in Escrow!  Thank you

46.     No sand was delivered, despite Bates' repeated representations Bates Energy had bought substantial amounts of sand and arranged for its delivery.

47.     Several days later, Bates pulled the same act again.  On April 27, Bates promised that railcars were currently in Iowa and would be leaving for Texas on April 29.  Further:

> Please see the attachment, which is the trace Numbers and RailCar list that will be launching this weekend and early next week!  Also the assignment letter and verification of inspection sir.  I just wanted to take a minute and keep you in the loop.

---

[4] The Escrow Agreement refers to a "Purchase and Sale Agreement," or "PSA."  COFS and Bates Energy did not enter into a formal PSA or any other operating agreement beyond the MOU.

Counsel for Bates Energy's recent out-of-court contention that the Escrow Agreement is unenforceable because no PSA exists is without merit, given all of the parties' reliance on the MOU as the operative contract.

Dewayne, please File sir.

Respectfully submitted

Stan Bates
USMC

Chief Executive Officer
Bates Energy Oil & Gas, LLC

48.     Bates "anticipated" the sand would be delivered to COFS on or about May 5, and again requested a purchase order.  Once again, no sand was delivered.  Once again Bates Energy was unable to produce any BOLs or other supporting documents showing it ever loaded any railcar with sand.

49.     Bates Energy's false representations, coupled with its failures to perform, triggered concern by COFS about the company's ability to meet its obligations under the MOU.  COFS began investigating Bates Energy's purported mines and other sources of frac sand product.  On or about May 9, 2017, COFS's president Sam Taylor, over great resistance from Bates, traveled to Wisconsin to visit several mines from which Bates Energy represented it obtained its frac sand allocation.  Bates was a no-show, but he sent "company representative" Mark Sylla ("Sylla").  Sylla is also in the frac sand business, and operates Unlimited Frac Sand, LLC, d/b/a Frac Sand Unlimited, a company Sylla incorporated on May 12, 2017, and co-manages with Bates' girlfriend.  The third member of Frac Sand Unlimited is David Bravo, who also purports to serve as Bates Energy's COO and logistics manager.

50.     Sylla took Sam Taylor on a winding tour around Wisconsin, stopping at two mines along the way.  Neither mine had the capacity to deliver any appreciable amount of frac sand and neither permitted Sylla/Bates Energy access to its premises.  Bates Energy later asserted that the price in

Wisconsin had become "too high," and suggested COFS would have to pay a higher amount than under the MOU.  COFS rejected this proposition, as contrary to the parties' agreement.

51.     Ultimately, Bates Energy wholly failed to meet the MOU's May 10, 2017 delivery deadline; it had failed to deliver even a pound of frac sand, much less the 10,000 tons promised.

52.     In June 2017, Bates Energy changed its strategy, but still failed to deliver any frac sand. To string COFS along, Bates Energy emailed and texted COFS that it could deliver noncomplying frac sand, for example sand that was 30/50 rather than 40/70 or 100-mesh.  It also offered through emails and texts to sell COFS "brown" sand, rather than Northern White sand which the pertinent purchase order required.  COFS had no obligation to accept any of this sand, and it did not.  Bates Energy never delivered any of the noncompliant sand.

53.     Bates Energy next began "offering" sand from Arkansas.  But, once again, Bates resisted Sam Taylor's attempts to travel to Arkansas to inspect the mines that purportedly were Bates Energy's sources of product.

54.     Bates Energy did not successfully deliver any compliant sand to COFS. Bates gave no explanation for his company's failure to perform or why he was demanding payment for sand he knew he was not going to deliver. Upon information and belief, Bates Energy may not have had a mine or other sand supplier who could provide the tonnage and type of sand COFS required under the MOU.  Its contentions about any sand supplier appear to be unreliable.

55.     In early June 2017, Bates finally came clean and admitted that Bates Energy had never scheduled any sand for delivery to COFS since the initiation of the MOU in April.  Bates claimed that COFS, as a new client, had never been put into "rotation" with Bates Energy's other established clients.  In other words, Bates Energy placed COFS "at the back of the line" and

consequently it never got any sand because Bates Energy's established clients received sand first out of Bates Energy's monthly allocation.  There was no sand left to deliver to COFS.

56.     This concession by Bates Energy revealed a 2-month pattern of lying, fraud and misrepresentations. Moreover, it demonstrated multiple attempts by Bates Energy and Bates to steal money from the escrowed funds, by demanding payment when it knew no sand would be delivered.

57.     Bates Energy's first real attempt to deliver compliant frac sand occurred on or around June 9, 2017, when certain sand was purportedly at a transloading facility in Odessa.  But even this attempt was defective.  First, the amount of sand differed from the purchase order.  Second, Bates Energy failed to deliver any BOLs, the critical document that would prove it was the owner of the product.  Third, the railcar documentation indicated that the consignee of the product was "High Crush" rather than Bates Energy; Bates insisted Sam fix that problem by falsely representing to railroad officials that Sam was with Frac Sand Unlimited, the new company managed by Sylla, Bravo, and Bates' girlfriend.  And fourth, after hours of searching the Odessa transloading facility for the sand, Sam Taylor could never confirm the sand was ever there.

58.     Because of its failures, Bates Energy agreed that COFS could acquire sand from an alternate supplier so it could meet its own commitment to ProPetro.  COFS identified CSI Sands (Wisconsin) Ltd. ("CSI"), one of Bates Energy's potential suppliers in Wisconsin.

59.     Bates Energy was fully aware it could not meet the terms of the MOU.  It was also aware that its conduct had forced COFS to arrange for substitute services with CSI under the MOU in order to obtain the frac sand it needed for ProPetro.  Consequently, on June 15, 2017, Bates Energy executed a Disbursement Letter that expressly permitted payment to CSI from the COFS/Bates escrow account.  Bates/Bates Energy agreed to expenditures of up to $1 million.  A copy of Bates

Energy's Disbursement Letter is attached as Exhibit 6. CSI immediately began delivering compliant frac sand to COFS, which COFS then delivered to ProPetro. ELC and Naumann reviewed and audited invoices, bills of lading, and other transportation documents submitted by CSI and COFS and found all to be in order. CSI was then paid from escrowed funds.

60.     Despite the Disbursement Letter, and Bates Energy's complete failure to perform, Bates Energy sued COFS and its president, Sam Taylor, in the State Court Action on July 20, 2017, complaining that COFS was refusing delivery of sand. It obtained an *ex parte* TRO that shut down COFS's ability to communicate with CSI or any other sand supplier. It asserted frivolous contentions that COFS had improperly attempted to access the escrowed funds, a claim that was shown to be false at the hearing on Bates Energy's unsuccessful application for temporary injunction, on August 3-4, 2017.

61.     Immediately before bringing this lawsuit, in July 2017, Bates Energy absconded with approximately $40,000 of escrowed funds without delivering any sand to COFS. Bates Energy sent what appeared to be documentation showing that it had placed as many as 18 railcars of CSI sand for delivery to Seagraves, Texas, one of the proper rail destinations under the MOU. Delivery of the sand was due July 23. In accordance with the terms of the MOU, COFS authorized payment to Bates Energy under the ELC escrow account. ELC and Naumann purportedly "audited" the paperwork and disbursed the $40,000 to Bates Energy, representing the first half of the payment; the second payment would be due upon delivery of the sand to COFS.

62.     July 23 came and went; it is now September 8, 2017, and the sand has never been delivered. COFS has attempted to track or trace the railcars on which Bates purportedly placed to sand, to no avail. In spite of repeated requests, neither Bates Energy nor ELC has provided information sufficient to allow COFS to take possession of the sand that was supposed to have been delivered.

63.     Stan Bates testified vaguely at the August 3-4 temporary injunction hearing in the State Court Action that the missing sand was "sitting there," but provided no definitive information.  On August 4, COFS's counsel emailed opposing counsel requesting information about the "lost" railcars of sand.  A copy of this email is attached as Exhibit 7.  COFS sent a follow-up email on August 8, asking that Bates Energy respond by August 9 or COFS would otherwise assume that none of the sand in as many as 18 railcars was available for delivery to COFS.  A copy of this email is attached as Exhibit 8.  There was no substantive response.  Bates Energy never requested the final payment for the "delivery" of the sand, thereby almost conclusively showing no sand was ever placed on railcars for delivery to COFS.

64.     Upon information and belief, Bates Energy likely forged one or more of the documents delivered to COFS that COFS relied upon in authorizing payment. ELC's "audit" of the paperwork failed to discover the forged or deficient documentation.

65.     CSI has now delivered an estimated six shipments of sand to ProPetro.  Approximately $1 million in product has been delivered, but as of August 2, 2017, CSI was still owed money from the escrowed funds.  Charges for transload expenses of approximately $98,000, and taxes of an estimated $106,000 are due immediately.  These sums were all payable from escrow funds under Bates Energy's Disbursement Letter.  Bates Energy has admitted that the CSI funds are properly payable from escrowed monies.

66.     The sticking point was Bates Energy's insistence that payment be through the Amegy escrow account, and not the ELC account managed by Bates' friend and colleague, Dewayne Naumann.  Bates Energy gave no reason for wanting to "preserve" the funds held in the ELC account.

67.     The State Court Action TRO unilaterally prevented COFS from paying any of the amounts it continued to owe CSI.  Moreover, it prohibited COFS from continuing to procure additional frac sand for its customer ProPetro because it had no ability to pay suppliers with any available funds.  Consequently, Bates Energy's conduct, both in taking money for undelivered sand, and in unlawfully freezing funds belonging to an innocent non-party, placed COFS in dire risk of being sued by both CSI and ProPetro.

68.     Bates Energy's unlawful taking of the $40,000, as well as other facts set forth herein, have caused great concern by COFS about the security of the funds it deposited in the ELC escrow account.

69.     For example, ELC and Naumann are closely tied to Bates' May 2017 federal court indictment for wire fraud, securities fraud, engaging in monetary transactions with property derived from specified unlawful activity, conspiracy to commit wire fraud, and conspiracy to commit money laundering.[5]  The indictment alleges that Bates, as CEO of FourWinds, and others developed an investment Ponzi scheme to market frac sand.  If also alleges that Bates made false statements and representations to solicit investors, and that corporate funds were used for personal expenses.[6]  The third-party escrow company for FourWinds, for safeguarding "profits" from the investments, was none other than ELC; the funds were not protected, leading to devastating losses to investors after investigators concluded that Bates had used the business funds for personal expenses.  One investor lost all but $100,00 of her $900,000 investment.  Stated differently,

---

[5]      https://www.justice.gov/usao-wdtx/pr/federal-grand-jury-indicts-texas-state-senator-carlos-uresti

[6] Stan Bates' former employee has testified in the criminal matter that Bates instructed him to alter a bank statement.  A copy of the San Antonio Express-News article detailing this is attached as Exhibit 9.

A copy of the indictment is attached as Exhibit 10.

allegations in the criminal case show that monies intended to be deposited into the ELC escrow account were conveyed to Bates, which he used to enjoy a lavish lifestyle.

70.     Naumann has twice sought to quash subpoenas issued for information about the ELC escrow accounts in the criminal action.  Counsel for Bates Energy in this case filed the first Motion to Quash on behalf of Naumann on July 18, 2018.  See Exhibit 11.  She continued to represent Naumann until August 25, 2017.  Substituted counsel John Convery filed the second Motion to Quash on behalf of Naumann and ELC on or about August 24, 2017.

71.     Bates was arrested in the middle of him trying to take money from COFS, on May 17, 2017.  He was released on a $50,000 bail.  Bates apparently claimed to have no money because he is represented by a court-appointed lawyer.  But, within 2 months of his arrest in the criminal Ponzi frac sand matter, Bates had successfully absconded with approximately $40,000 of escrowed funds, without delivery of frac sand, in this civil matter.

72.     There is more.  In the trial of Bates' 2015 Chapter 7 involuntary bankruptcy proceeding, the Hon. Craig Gargotta made numerous findings that do not bode well for the preservation of the funds in the ELC account.[7]  The court found that Bates was paying debt incurred on new vehicles and jewelry, but not on multiple past final judgments rendered against him.  Moreover, one bank account balance summary showed a balance of over $18 million; when asked if that account ever had a balance in excess of $18 million, Bates asserted his Fifth Amendment right, suggesting that the bank account record had been doctored.  Records from the trial show Bates invoked the Fifth Amendment approximately 75 times relating to the propriety of financial transactions.  Judge

---

[7] Memorandum Opinion of the Order for Relief, *In re: Stan P. Bates*, Relator, Case No. 15-52459-cag, In the United States Bankruptcy Court for the Western District of Texas, San Antonio Division, January 26, 2016.

Gargotta found Bates' overall conduct in his financial affairs "troubling," including his funneling money out of a business account for his own benefit.[8]  Further, "[t]here is evidence of financial misconduct, but moreover the record is replete with evidence of [Bates'] attempts to cover his tracks.  When examined about these questionable acts, [Bates] continually asserted his Fifth Amendment right."  See Exhibit 12, p. 13.

73.     Naumann is also experiencing financial difficulties.  He and his wife were sued in the Western District of Texas in February 2017 after failing to pay a home equity loan since January 2013.  On June 16, 2017, the Hon. Lee Yeakel entered a default judgment against Naumann and his wife for $387,931, plus pre and postjudgment interest, to be satisfied through foreclosure.  A copy of the default judgment is attached as Exhibit 13.  Naumann has appealed the judgment. Naumann's affidavit in a motion for reconsideration demonstrates his lack of intent to pay the loan, based on constitutional grounds.[9]

74.     In the past, Naumann was highly responsive to inquiries by COFS about the ELC escrow account.  That changed, concurrent with the time period that Bates Energy absconded with the $40,000 out of the ELC account.  On July 24, 2017, COFS asked Naumann about the balance in the ELC escrow in order to compare ELC's number to its own accounting.  A copy of texts and emails are attached as Exhibit 15; verbal requests were made prior to the written requests, beginning in mid-July.  On all occasions, ELC and Naumann either ignored the requests, represented they would have it ready "in a few days," or "as soon as humanly possible," or gave an unacceptable excuse for not providing the information.

---

[8] A copy of Judge Gargotta's opinion is attached as Exhibit 12.
[9] Naumann's affidavit is attached as Exhibit 14.

75.     ELC purports to claim that providing a balance or statement of the escrow account requires a complex "reconciliation" of the account.  See Exhibit 15.  However, the escrow account has only existed since April 2017, and has undergone little activity.  Moreover, transactions affecting the escrow account are presumably handled electronically, meaning that a balance or statement of the account could be generated expeditiously.

76.     COFS learned for the first time at the August 3-4, 2017 temporary injunction hearing in the State Court Action that ELC and Naumann also serve as the escrow agent for Bates Energy.  Bates testified that, in an unusual use of an escrow account, his company uses funds in its ELC "escrow" account for it regular business transactions, instead of a bank account.  Naumann claims to hold the escrow accounts for both COFS and Bates Energy in the same bank, JP Morgan Chase.  Several accounts in that bank were used by Bates as part of the claims alleged in the criminal indictment.

77.     Also as part of the State Court Action injunction proceedings, COFS requested that Bates Energy authorize payment of approximately $400,000 to CSI, the substitute sand supplier.  Bates Energy's TRO had frozen COFS's ability to get CSI paid from escrowed funds.  Bates Energy agreed payment was due, but would authorize payment only if the monies were disbursed from the Amegy Bank escrow account, and not the ELC escrow.  Bates Energy was adamant it wanted to "preserve" the funds held by ELC.  Because of ELC's refusal to provide information about the account, COFS does not know if $400,000 even remains in the ELC escrow account; COFS's records show that as much as $1 million should be in the account.

78.     On August 15, 2017, COFS formally terminated the MOU.  A copy of COFS's notice to Bates Energy is attached as Exhibit 16, and a copy of the notice to ELC and Naumann is attached as Exhibit 17.

79.     As set forth above, under the express terms of the Escrow Agreement, the remaining balance of the ELC escrow account "shall be disbursed" to COFS upon termination of the MOU. Exhibit 4, ¶ 1.4(B).  On August 15, 2017, as part of its declaration of termination of the MOU, COFS directed that disbursement of the balance of the escrow account should be made to its account no later than 4:00 p.m. on August 16, 2017.  ELC failed to comply with this direction and, to date, has not disbursed the funds, in contravention of the Escrow Agreement.

80.     At one point, counsel for ELC and Naumann suggested the escrowed funds would be interpleaded into the court, which would have safeguarded the monies, plus divulged the balance in the account.  No interpleader action has been filed.

81.     COFS has confirmed from the leasing agent and postal officials that Bates Energy moved out of its Cherry Ridge office building during the week of July 24 – 28, 2017, which was the week after the State Court Action was filed, and the same week Naumann was refusing to provide account balance information about the ELC escrow account.  Neither the website for Bates Energy nor its Facebook page are operational.  It does not appear that ELC has a website or a Facebook page; if it did, they do not appear to exist today.

82.     Public records show that ELC's business address, 3303 Northland Drive, Suite 307, in Austin, Texas, is the same address as an investment-oriented business, ECO1 Operating Company, owned or managed by a Jonathan Patton.  Mr. Patton was sanctioned in South Carolina in 2012 for possible violations of the South Carolina Uniform Securities Act.

83.     COFS has no knowledge of any other person or entity for whom ELC or Naumann serve as an escrow agent.  COFS notes that their Escrow Agreement has a prominent typo in its title, spelling "disbursement" as "disbursement."

84.   ELC's recalcitrance for almost 8 weeks, and other factors as set forth herein, have led COFS to conclude that some or all of the funds in the escrow account have likely been unlawfully disbursed or transferred.

## VI.
### CAUSES OF ACTION

85.   This is an action for damages, and declaratory and injunctive relief pursuant to 28 U.S.C. § § 2201-2202, and Federal Rule of Civil Procedure 65, and other equitable relief, to enforce COFS's contractual rights, and to prevent any, or further, transfers of funds from the ELC escrow account.

**COUNT 1:   DECLARATORY JUDGMENT (against Bates Energy, ELC and Naumann)**

86.   Each allegation contained in the above paragraphs is re-alleged as if fully stated herein.

87.   Justiciable issues exist regarding the rights and status of the Defendant/Counter-Plaintiff COFS in relation to the Plaintiff/Counter-Defendant Bates Energy and in connection with the MOU and ancillary contracts and agreements.  Pursuant to Chapter 65 of the Federal Rules of Civil Procedure, COFS seeks declaratory relief including but not limited to the following:

  a.  A declaratory judgment that the transactions or agreements contemplated by the MOU and ancillary agreements are void for lack of consideration and illusory promises, void because they were procured by fraud, unenforceable for failure of consideration, and/or terminated by Bates Energy's invocation of force majeure.

  b.  Defendant/Counter-Plaintiff COFS is entitled to a declaratory judgment that clarifies the exact nature of the relationship between the parties resulting from the void or terminated agreements and transactions, namely that the agreements

and transactions provide Plaintiff/Counter-Defendant no contractual or tort rights against either Defendant, and no rights relating to any funds that were placed in the two escrow accounts.

88.    In addition, in light of ELC and Naumann's refusal to disburse the funds to COFS, and their other wrongful acts as alleged herein, there is a justiciable, substantial and continuing controversy between the parties.  Moreover, there is both an actual present harm and a significant possibility or likelihood of future harm to the extent ELC and Naumann's actions place COFS at risk of additional litigation by failing to disburse the escrowed funds so that COFS may return the funds to their rightful owner, ProPetro, and to the extent ELC and Naumann disburse or convey the escrowed funds to persons or entities other than COFS.

89.    Consequently, COFS respectfully requests the additional following declarations from the Court:

a.  A declaratory judgment that the MOU and Escrow Agreement are enforceable contracts between the subject parties to the agreements.

b.  A declaratory judgment that funds in the ELC escrow account belong to COFS, as trustee of ProPetro.

c.  A declaratory judgment that the MOU has been terminated.

d.  A declaratory judgment that termination of the MOU triggered ELC and Naumann's obligation to disburse the funds in the ELC escrow account to COFS.

e.  Such other declaratory relief necessary to further establish COFS's rights to the funds in the ELC escrow account, and obligations by ELC and Naumann to promptly disburse those funds to COFS.

### COUNT 2:     RESCISSION (against Bates Energy)

90.     Each allegation contained in the above paragraphs is re-alleged as if fully stated herein.

91.     Alternatively, in the event that the Court finds that an enforceable agreement exists in the MOU or ancillary agreements, Defendant/Counter-Plaintiff seeks the complete rescission of those contracts based on principles of equity or otherwise.  Defendant/Counter-Plaintiff entered into the MOU and the ancillary agreements under the justified but mistaken belief that Plaintiff/Counter-Defendant intended to comply with the terms of the agreements, including its obligation to deliver frac sand of the type, nature and quantities called for in the MOU and corresponding purchase orders.  Plaintiff/Counter-Defendant made numerous material misrepresentations or omissions to Defendant/Counter-Plaintiff to induce it to enter into the MOU and ancillary agreements.  These representations were false and/or were made recklessly, as positive assertions, and without knowledge of their truth.  Plaintiff/Counter-Defendant made these representations and omissions with the intent that Defendant/Counter-Plaintiff rely on them, and Defendant/Counter-Plaintiff did rely on them to its detriment.

92.     Defendant/Counter-Plaintiff has no adequate remedy at law that would compensate it for the harm caused by Plaintiff/Counter-Defendant's conduct.  A failure to grant rescission would result in the complete loss of the company COFS because it would, and still may, lose its one client.  The loss of COFS would permanently and irreparably harm not only Defendant/Counter-Plaintiff but also its owners and customer.  Consequently, Defendant/Counter-Plaintiff asks for the complete rescission of any agreement found to exist between the parties, and the return of the parties to the positions they held prior to entering into this failed deal.

### COUNT 3:     FRAUD (against Bates Energy)

93.     Each allegation contained in the above paragraphs is re-alleged as if fully stated herein.

94.     Alternatively, Plaintiff/Counter-Defendant, through its CEO Bates, made misrepresentations or omissions of material facts to induce Defendant/Counter-Plaintiff to enter into the MOU and ancillary agreements.  These representations were false and/or were made recklessly, as positive assertions, and without knowledge of their truth.  Plaintiff/Counter-Defendant made these false representations and omissions with the intent that Defendant/Counter-Plaintiff rely upon them.

95.     Defendant/Counter-Plaintiff had no knowledge of the falsity of Plaintiff/Counter-Defendant's representations and omissions of material fact.  Defendant/Counter-Plaintiff reasonably and justifiably relied upon the representations and omissions in deciding to enter into the relationships and agreements referred to herein, to its detriment.

96.     Plaintiff/Counter-Defendant's misrepresentations and omissions directly and proximately caused Defendant/Counter-Plaintiff to suffer injuries and substantial damages in an amount in excess of the minimum jurisdictional limits of this Court.  Additionally, these acts were committed willfully, wantonly, and were otherwise fraudulent, malicious, and/or were grossly negligent, and, accordingly, Defendant/Counter-Plaintiff is entitled to recover compensatory and punitive damages in an amount to be determined by a trier of fact.

**COUNT 4:   BREACH OF CONTRACT (against Bates Energy, ELC and Naumann)**

97.     Each allegation contained in the above paragraphs is re-alleged as if fully stated herein.

98.     If the Court finds that the MOU is a valid agreement, then Defendant/Counter-Plaintiff performed its obligations under the MOU or, in the alternative, Plaintiff/Counter-Defendant's conduct prevented or hindered Defendant/Counter-Plaintiff's performance.

99.    Plaintiff/Counter-Defendant has failed to perform pursuant to the terms of the MOU, including but not limited to wholly failing to deliver frac sand in accordance with specifications and deadlines.

100.    All conditions precedent have been performed.

101.    As a result of Plaintiff/Counter-Defendant's breach of the MOU, Defendant/Counter-Plaintiff has been damaged in an amount that exceeds the minimum jurisdictional limits of this Court.

102.    Further, COFS, ELC and Naumann, whether individually or as the principal/agent of ELC, are parties to the Escrow Agreement.  Upon termination of the MOU, ELC and Naumann were obligated to disburse to COFS the funds held in the escrow account.  ELC and Naumann's failure to disburse the funds constitutes a breach of the Escrow Agreement.  ELC's failure to disburse the funds is willful and intentional.[10]

103.    At all times, COFS was ready, willing and able to perform its obligations pursuant to the terms of the MOU and the Escrow Agreement.

104.    All conditions precedent have been performed.

105.    ELC/Naumann's breach has caused damages and injury to COFS for which COFS seeks to recover herein.  By refusing to provide the funds to COFS, COFS, as trustee of the funds for ProPetro, cannot return the funds to ProPetro.

**COUNT 5:    EQUITABLE ACCOUNTING (against Bates Energy, ELC and Naumann)**

106.    Each allegation contained in the above paragraphs is re-alleged as if fully stated herein.

---

[10] *Alexander O&G, LLC v. Nomad Land & Energy Res., LLC*, 2017 U.S. Dist. LEXIS 130415 (S.D. Tex. Aug. 16, 2017).

107.    Defendant/Counter-Plaintiff is entitled to an order requiring an accurate accounting of the ELC escrow account, and to disgorge any profits or amounts removed therefrom, such that the balance is restored to its original balance of $1,000,000.   Defendant/Counter-Plaintiff further requests that the Court appoint a qualified expert to conduct and certify the accuracy of the accounting.

**COUNT 6:     THEFT (against Bates Energy)**

108.    Each allegation contained in the above paragraphs is re-alleged as if fully stated herein.

109.    Plaintiff/Counter-Defendant wrongfully assumed dominion and control over property belonging to Defendant/Counter-Plaintiff.  Plaintiff/Counter-Defendant's actions constitute theft as that term is defined in the Texas Theft Liability Act, Chapter 134, Texas Civil Practice & Remedies Code.

110.    As a result of Plaintiff/Counter-Defendant's actions, Defendant/Counter-Plaintiff has been damaged in an amount in excess of the minimum jurisdictional limits of this Court.

**COUNT 7:     BREACH OF FIDUCIARY DUTY (against ELC and Naumann)**

111.    Each allegation contained in the above paragraphs is re-alleged as if fully stated herein.

112.    To the extent the MOU is a valid agreement, it underlies the Escrow Agreement in which COFS and Bates Energy agreed to definite escrow terms.

113.    An escrow was established when COFS deposited funds with ELC and Naumann, as third parties, and agreed to the terms in which ELC and Naumann would deliver the funds deposited.

114.    A fiduciary relationship exists between COFS and ELC/Naumann, as escrow agents under the Escrow Agreement.

115.    Consequently, ELC/Naumann owed duties of loyalty, to make full disclosure, and to exercise a high degree of care to conserve the funds and pay them only to those entitled to receive them.

116.    By failing to (1) release the funds to COFS in accordance with the terms of the Escrow Agreement; (2) disclose activity in and related to the escrow account; and (3) pay the funds only to COFS, who is entitled to the funds, ELC and Naumann have breached their fiduciary duty.

117.    ELC/Naumann's conduct has resulted in both injury to COFS for which COFS seeks to recovery, and a benefit to ELC/Naumann.  Upon information and belief, the funds in the escrow account have not been preserved for the benefit of COFS, but have been transferred or otherwise conveyed out of the account.  Upon information and belief, such transfer or conveyance has served as a benefit to ELC/Naumann, whether the funds have been loaned to others, or used for ELC and Naumann's personal expenses, or used for some other purpose not provided for in the Escrow Agreement.  Such funds should be disgorged and returned to COFS.  In addition, COFS has been precluded from reporting the status of the escrow account it has held in trust for ProPetro, and has been unable to return the fuds to ProPetro upon termination of the MOU.

**COUNT 8:    RESTITUTION OR MONEY HAD AND RECEIVED (against ELC and Naumann)**

118.    Each allegation contained in the above paragraphs is re-alleged as if fully stated herein.

119.    ELC and Naumann, or those to whom escrow funds were conveyed, hold money that in equity and good conscience rightfully belong to COFS as trustee for ProPetro.  Neither ELC nor Naumann, or any other transferee, holds any claim of ownership or rights to the funds.

120.    Consequently, COFS seeks restitution and return of such funds, in the approximate sum of $960,000 - $1,000,000.

**COUNT 9:    APPLICATION FOR WRIT OF ATTACHMENT (against Bates Energy, ELC and Naumann)**

121.    Each allegation contained in the above paragraphs is re-alleged as if fully stated herein.

122.    Pursuant to Chapter 61 of the Texas Civil Practice & Remedies Code, Defendant/Counter-Plaintiff asks this Court to protect the ELC escrow account against any disbursements, whether pursuant to requests by Plaintiff/Counter-Defendant or its principals or agents, or by ELC or its principal or agents.  As shown herein, Bates has already absconded with $40,000 of the funds in that account, he is under criminal indictment for another frac sand Ponzi scheme here in San Antonio, in conjunction with an ELC escrow account, and has recently been arrested, has a court-appointed attorney, he has recently closed down and abandoned his office of Bates Energy, he owns no home in Bexar County, his counsel objected to him giving a deposition in this case because his answers would primarily be an assertion of the Fifth Amendment, he invoked the Fifth Amendment numerous times at the December 2015 trial of his involuntary bankruptcy brought by several judgment creditors, where evidence showed he was paying for personal cars and jewelry but not towards the judgments, where the bankruptcy court was highly critical of Bates' credibility and handling of financial affairs, referring to Bates' funneling of business funds to his personal use, where Bates repeatedly deceived Defendant/Counter-Defendant into believing frac sand was going to be delivered, and demanding payment for the sand while knowing no sand would be delivered.

123.    Moreover, in June 2017, the federal court rendered a default judgment against Dewayne Naumann, the manager of the ELC escrow fund, for failure to pay his home mortgage debt for 4 years, of almost $400,000.  Naumann has repeatedly ignored Defendant/Counter-Plaintiff's attempts to communicate and has wholly refused to provide a simple balance of the ELC account

or other information about the status of the ELC account, and Naumann and ELC and an ELC escrow account were involved in the criminal Ponzi scheme for which Bates was recently arrested.

124.     Plaintiff/Counter-Defendants are justly indebted to Defendant/Counter-Plaintiff for the funds in the ELC account.  In accordance with the terms of that agreement, once the MOU is terminated, Naumann is obligated to return all funds to Defendant/Counter-Plaintiff.  His recent conduct, i.e., closing off communications with Defendant/Counter-Plaintiff and refusing to provide balance information, plus his close alliance with Bates, with whom he has shared a lawyer, raises grave concerns about his compliance with those terms of the MOU.

125.     Defendant/Counter-Plaintiff may lose the monies owed it unless a writ of attachment is issued because of these issues.  The actions of Plaintiff/Counter-Defendants and their agents and affiliates, including but not limited to Counter-Defendants ELC and Dewayne Naumann, could very well deprive Defendant/Counter-Plaintiff of satisfaction of any judgment against Plaintiff/Counter-Defendant Bates Energy and Counter-Defendants ELC and Naumann in this lawsuit.  Consequently a writ should be issued ordering the parties to place into the registry of the court the sums in the ELC escrow account.

126.     Defendant/Counter-Defendant does not seek this writ of attachment for the purpose of injuring or harassing Plaintiff/Counter-Defendant Bates Energy or Counter-Defendants ELC and Naumann.  Defendant/Counter-Plaintiff has been in contact with counsel for Plaintiff/Counter-Defendant and she is aware of Defendant/Counter-Plaintiff's position in light of those discussions plus past court appearances.

**COUNT 10:   ATTORNEYS FEES (against Bates Energy, ELC and Naumann)**

127.     Each allegation contained in the above paragraphs is re-alleged as if fully stated herein.

128.    As a result of Plaintiff/Counter-Defendant's and Counter-Defendants ELC and Naumann's breach of contract, Defendant/Counter-Plaintiff requests reimbursement of attorneys' fees and costs incurred in the prosecution of this case pursuant to § § 37.009 and 38.001 of the Texas Rules of Civil Procedure as well as other statutory and common law grounds permissible for the recovery of fees.

### COUNT 11:   APPLICATION FOR TEMPORARY INJUNCTIVE RELIEF[11]

129.    Each allegation contained in the above paragraphs is re-alleged as if fully stated herein.

130.    COFS asks this Court to enter a Temporary Restraining Order granting the relief requested herein pursuant to Federal Rule of Civil Procedure 65, such relief to include but not be limited to injunctive relief enjoining ELC and Naumann, and all persons acting on their behalf, including Bates or Bates Energy, from disbursing, transferring, conveying, encumbering, or otherwise removing funds on deposit with ELC/Naumann in the escrow account pursuant to the Escrow Agreement and any ancillary agreements, pending entry by the Court of an order compelling ELC to disburse the monies to COFS, or to transfer the monies to the registry of the Court, or some other order or final judgment affecting ownership and/or control over the funds.

131.    As a fiduciary to COFS, ELC and Naumann owe COFS the duty of full disclosure, including disclosure of all material facts known to them that might affect COFS's rights.[12] Consequently, COFS further requests injunctive relief compelling ELC and Naumann to conduct an accounting of the funds in the ELC escrow account, which accounting shall set forth a

---

[11] Pursuant to the Western District of Texas Local Rules, a separate application for injunctive relief has been, and will be re-filed, with the Court and it is incorporated by reference.

[12] *Corral Group, LP v. SMIC, Ltd*., 2013 Bankr. Lexis 3359, 2013 WL 4078704, at *30 (N.D. Tex. Aug. 13, 2013), citing *Home Loan Corp. v. Tex. Am. Title Ins*., 191 S.W.3d 728, 731 (Tex. App. – Houston [14th Dist.] 2006, pet. denied).

description of all activity in the escrow account since its April 2017 inception, a showing of all amounts added to the account and all disbursements, and a final total balance.  In addition, ELC and Naumann should be compelled to produce business books and records, including electronically stored information, to COFS that support the account and activity of the ELC escrow account.[13]

132.    It is probable that COFS will prevail against ELC and Naumann on the merits and obtain preliminary injunctive relief precluding ELC and Naumann from disbursing funds held in the escrow account, and ordering ELC and Naumann to fully disclose information about the balance and activity of the escrow account.

133.    If COFS's Application for Temporary Restraining Order and Injunctive Relief is not granted, irreparable harm is imminent because, on information and belief, ELC and Naumann will continue to hold or disburse the funds in the escrow account to the wrong persons or entities, and will continue to refuse to provide information about the account to which COFS is entitled, which would allow COFS to pursue persons or entities who have unlawfully obtained possession or some or all of the funds.

134.    COFS has no adequate remedy at law because substantial damages and injury from ELC and Naumann's conduct are incalculable, and a money judgment could not serve as adequate compensation for the wrong inflicted by their conduct.  Moreover, upon information and belief, neither ELC nor Naumann have the financial ability to satisfy a money judgment.

135.    COFS requests that the Court set its request for a TRO/preliminary injunction for hearing and, after hearing, enter a preliminary injunction granting the relief requested herein.

---

[13] *Travelers Cas. & Sur. Co. of Am. v. Padron*, 2015 U.S. Dist. Lexis 57265 (W.D. Tex. May 1, 2015).

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant/Counter-Plaintiff Complete Oil Field Service, LLC respectfully requests that Defendant/Counter-Plaintiff be awarded the following:

a.  Judgment against Plaintiff/Counter-Defendant Bates Energy, and against Counter-Defendants ELC and Naumann in excess of the minimum jurisdictional limits of this Court for actual, special and consequential damages;

b.  Punitive damages;

c.  Declaratory judgment as set forth herein;

d.  Rescission of the MOU and ancillary agreements;

e.  Equitable accounting of the ELC escrow account;

f.  Statutory damages;

g.  Injunctive relief as set forth herein and in COFS's Amended Application for TRO and Preliminary Injunction;

h.  Writ of attachment;

i.  Pre-judgment interest at the highest rate allowed by law;

j.  Post-judgment interest at the highest rate allowed by law;

k.  Reasonable and necessary attorneys' fees through the trial of this cause as well as conditional awards of fees on appeal;

l.  Costs of court and costs of suit;

m.  Such other and further relief, both special and general, at law or in equity, to which Defendant/Counter-Plaintiff may be justly entitled.

Respectfully submitted,

_____/s/ Lamont A. Jefferson_____
Lamont A. Jefferson
State Bar No. 10607800
Lisa S. Barkley
State Bar No. 17851450
JEFFERSON CANO
112 East Pecan Street, Suite 1650
San Antonio, Texas  78205
Telephone:  (210) 988-1811
Facsimile:  (210) 988-1811
LJefferson@jeffersoncano.com
LBarkley@jeffersoncano.com

**ATTORNEYS FOR
DEFENDANTS/CROSS-PLAINTIFF**

## CERTIFICATE OF SERVICE

I certify that on this 11th day of September, 2017, I electronically filed the foregoing

instrument with the Clerk of the Court using the CM/ECF system and served the following counsel

of record in accordance with the Federal Rules of Civil Procedure:

Tiffanie S. Clausewitz
Shellie R. Reyes
THE ROSENBLATT LAW FIRM, P.C.
16719 Huebner Road, Bldg. 1
San Antonio, Texas 78248
tiffanie@rosenblattlawfirm.com
shellie@rosenblattlawfirm.com

_____/s/ Lisa S. Barkley_____
Lisa S. Barkley