**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **BATES ENERGY OIL & GAS, LLC** | § | |
| | § | |
| | § | |
| **v.** | § | **CIVIL ACTION SA:17-CV-00808-XR** |
| | § | |
| **COMPLETE OIL FIELD SERVICES** | § | |
| **LLC AND SAM TAYLOR** | § | |

## DECLARATION OF JANIS KLINE

I, Janis Kline, hereby declare as follows:

1.      I am the chief financial officer of Complete Oil Field Services, LLC ("COFS"). I am over the age of twenty-one and have never been convicted of a felony or crime of moral turpitude, and am competent to make this declaration.

2.      COFS was created for the purpose of acquiring frac sand for its one customer, ProPetro Services, Inc. ("ProPetro"). COFS and ProPetro entered into a Supply Agreement on or about April 13, 2017 whereby COFS agreed to procure large amounts of sand for ProPetro's fracking operations.  A true and correct copy of the Supply Agreement is attached as Exhibit 1.

3.      In the March/April 2017 time frame, Stan Bates ("Bates") of Bates Energy Oil & Gas, LLC ("Bates Energy") represented to COFS that the company had rights with mining companies to buy about 370,000 tons of sand a month, and that the company was already delivering about 88,00 tons to customers every 45 days.  Bates represented to COFS that Bates Energy had the capacity to acquire and deliver the type and tonnage of frac sand required by COFS.

4.      On or about April 18, 2017, COFS and Bates Energy entered into a Memorandum of Understanding (Operating Agreement) ("MOU") whereby Bates Energy promised to deliver to COFS specified tonnage and types of frac sand.  A true and correct copy of the MOU is attached

as Exhibit 2. As the middleman and trustee for ProPetro, COFS intended to transport compliant sand to ProPetro upon delivery by Bates Energy.

5.      Under the MOU COFS was required to deposit $4 million in an escrow account whereby the account could be drawn down upon performance with the terms of the MOU.

6.      Bates Energy originally insisted that the $4,000,000 be held in escrow by what COFS later learned was a close associate, ELC, and overseen by its principal Dewayne Naumann. Because ELC was not a financial institution, and was unknown to COFS, the parties ultimately agreed to set up a second escrow account with Amegy Bank. Of the $4,000,000, $1,000,000 was deposited in escrow with ELC serving as the escrow agent. Amegy Bank served as the escrow agent for the remaining $3,000,000.

7.      COFS, Bates Energy and ELC, through Naumann, entered into an Escrow and Disbursement Agreement (the "Escrow Agreement") for the $1,000,000 ELC was to hold in trust. A true and correct copy of the Escrow Agreement is attached as Exhibit 3. Under its terms, if the MOU was terminated, ELC was obligated to return the balance of the funds in the escrow account to COFS:

> **1.4     Termination.** This Escrow Agreement shall terminate upon the first to occur of any of the following events:
>
> A.      The disbursement of the balance of the Funds in accordance with the provisions of Section 1.3 hereof.
>
> B.      **The expiration or termination of the [MOU], in which case the remaining balance**, accrued interest or excess funds of the Fund **shall be disbursed to the Buyer [COFS**]…(emphasis added)

8.      Bates Energy failed to perform under the MOU despite claims that sand was on its way. It did not successfully deliver any compliant frac sand to COFS. Bates Energy made several

overtures trying to convince COFS to take delivery of noncompliant frac sand. COFS refused. Bates Energy also complained that weather-related events excused its failure to perform.

9.      Bates Energy agreed that COFS could acquire sand from CSI Sands (Wisconsin) Ltd. ("CSI) as a substitute supplier under the MOU, up to $1,000,000. A true and correct copy of Bates Energy's letter authorizing this disbursement is attached as Exhibit 4. CSI quickly began delivering compliant frac sand to COFS, which COFS then delivered to ProPetro. ELC and Naumann reviewed and audited invoices, bills of lading, and other transportation documents submitted by CSI and COFS and found them to be in order. CSI was paid from escrowed funds

10.     Despite its agreement regarding sand delivery by CSI and Bates Energy's performance failures, Bates Energy sued COFS and its president, Sam Taylor on July 20, 2017. The TRO it obtained shut down COFS' ability to communicate with CSI or any other supplier. Bates Energy's contentions that COFS had improperly attempted to access the escrowed funds were false.

11.     Right before suing COFS and Sam Taylor, Bates Energy absconded with approximately $40,000 of escrowed funds without delivering any sand to COFS. Bates Energy sent paperwork purportedly showing that it had procured seven railcars of sand for delivery to COFS. Delivery of the sand was due July 23, 2017. In accordance with the terms of the MOU, COFS authorized payment to Bates Energy under the ELC escrow account. We understand ELC and Naumann "audited" the paperwork, and they then disbursed the $40,000 to Bates Energy, representing the first payment for the sand.

12.     The sand has never been delivered. COFS was unsuccessful in tracking or tracing the railcars on which Bates purportedly placed the sand. Neither Bates Energy nor ELC has

provided information sufficient to allow COFS to take possession of the sand that is supposed to have been delivered. Bates Energy never requested the final payment for the delivery of the sand.

13.    This has caused COFS great concern about the security of the funds it deposited in the ELC escrow account.

14.    On multiple occasions since mid-July 2017, COFS requested that ELC or Naumann provide the balance of the escrow account, or for a statement of the account, in order to compare it to its own records which show that approximately $960,000 should be in the account. A true and correct copy of these communications is attached as Exhibit 5. ELC and Naumann either ignored the requests, represented they would have it ready "in a few days" or "as soon as humanly possible," or gave an unacceptable excuse for not providing the information. ELC/Naumann suggest that a "reconciliation" of the escrow account would be complex or time-consuming. However, the escrow account has only existed since April 2017, and has undergone relatively little activity. I have presumed transactions affecting the escrow account are handled electronically, meaning that a balance or a statement of the account could be generated expeditiously.

15.    COFS learned for the first time at the August 3-4, 2017 temporary injunction hearing in state court that ELC and Naumann also serve as the escrow agent for Bates Energy.

16.    As part of the suit in state court, COFS requested that Bates Energy authorize payment of approximately $400,000 to CSI, the substitute sand supplier. Bates Energy agreed, but would authorize payment only if the monies were disbursed from the Amegy Bank escrow account, and not the ELC escrow. Because of ELC's refusal to provide information about the account, COFS does not know if $400,000 even remains in the ELC escrow account.

17.    On August 15, 2017, COFS formally terminated the MOU. COFS directed that disbursement of the balance of the escrow account should be made to its account no later than 4:00

on August 16, 2017. ELC failed to comply with this direction and, to date, has not disbursed the funds.

My name is Janis Kline. My date of birth is September 26, 1955, and my address is 8731 S. Sandy Parkway, Suite 103, Sandy, Utah  84070. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Salt Lake County, State of Utah, on the 30 day of August, 2017.

_____
Janis Kline

SUPPLY AGREEMENT

This Supply Agreement (the "Agreement"), dated as of April __13__, 2017 (the "Effective Date"), is by and between ProPetro Services, Inc. ("Buyer") and Complete Oil Field Services, LLC ("Seller").

The parties hereby mutually agree as follows:

1.      Term

The term of this Agreement shall commence on the Effective Date and shall continue in effect until the supply of 80,000 tons of sand has been delivered, unless sooner terminated as provided herein (the "Term").

2.      Definitions

For purposes of this Agreement:

(a) "Materials" (individually and collectively, as applicable by use herein) shall mean each of the following grades of frac sand: 40/70 Northern White and 100 Mesh Northern White sand as acquired by Seller.

3.      Sale and Purchase

(a) Beginning on the commencement of this contract, Seller will sell to Buyer, and Buyer will purchase from Seller each of the Materials, in the volumes, at the prices and on the delivery terms set forth in Paragraph 4 of this agreement, all in accordance with the terms and conditions set forth in this Agreement. Each of the Materials will be purchased and sold in bulk with no packaging. Other than 100 mesh, each of the above grades of Materials will conform to Seller's applicable standard specifications, which conform to the applicable requirements of International Standard ISO 13503-2, Measurement of Properties of Proppants Used in Hydraulic Fracturing Operations, or such other specifications as may be established by written agreement of the parties (the "Specifications"). The 100 mesh will conform to Seller's applicable standard specifications, or such other specifications as may be established by written agreement of the parties (also, the "Specifications").

(b) Buyer will purchase from Seller, and Seller will sell to Buyer, an aggregate amount of each of the Materials up to 50,000 tons of 40/70 and 30,000 tons of 100 mesh, subject to adjustment as provided in this Agreement.

(c) During the Term, Buyer may purchase from Seller, and Seller may sell to Buyer, additional short tons or pounds, as the case may be, of each of the Materials in excess of the volume of such Materials as described in 3.(b), subject to availability of such Materials as determined solely by Seller at the time of Buyer's request for the same, pursuant to the terms and conditions of this Agreement.

# EXHIBIT 1

(d) Orders for Materials under this Agreement will be made by written or oral releases issued by Buyer to Seller (the "Releases"). Buyer will submit Releases to Seller at least ten (25) business days prior to the desired date of delivery at the applicable F.O.B. point, which F.O.B. point shall be designated as provided in Section 4, below. Each of the Releases will identify the type, grade and quantity (in short tons or pounds, as applicable) of the Materials then being ordered, and the desired date of delivery at the applicable F.O.B. point. Buyer will order each of the Materials hereunder from Seller in generally even proportions. Subject to the availability of sufficient transportation units (railcars or trucks, as appropriate), shipments of Materials purchased and sold hereunder will be scheduled in reasonably equal proportions.

(e) All Materials purchased by Buyer under this Agreement will be used solely for Buyer's use and consumption in connection with its business operations and Buyer will not re-sell any Materials to any third party.

4.   Delivery Terms and Pricing

(a)   The initial quantity shall be approximately 10,000 plus tons of Materials delivered to the to the applicable terminal located at Seagraves, Pecos, Big Springs, San Angelo, Odessa, Midland, or Monahans, Texas (WTX) or as otherwise designated in writing by agreement of the parties (each, a "Designated Terminal"). Such amount to be purchased no later than May, 10th, 2017 and increase such quantity up to 80,000 tons of Materials within 90 days of April 12, 2017.

(b)   The price for the Materials shall be $104.50 USD per ton including costs of rail delivery on existing tracks to Designated Terminal and transloading of Material into the trucks of Buyers designated trucking company.   Such price shall be locked for 90 days from the effective date of this agreement with an adjustment for a change in FRC as provided in paragraph 4.(e).

(c)   A demurrage allowance of 1.5 days of storage for every 1,000 tons from the date of arrival in the of rail cars to WTX.   All material held over the initial 1.5 days shall incur a daily storage fee equal to $3.00 per ton per Day.

(d)   Risk of loss will pass to Buyer when Materials are delivered to the applicable carrier at the Designated Terminal for transportation to the applicable Buyer Location. F.O.B. Designated Terminal.

(e)   For purposes of this Agreement, "FRC" shall mean the freight related costs assessed by carriers and terminals, respectively, in connection with the transportation and handling of Materials. FRC are subject to changes in base rates as well as the applicability of related charges. When charges are assessed, or when base rates or charges are increased, by the carrier or terminal, Seller will change the then F.O.B. Designated Terminal price by the same amount. Any such change will become effective on the date implemented by the carrier or terminal. Seller will not incur any liability in the event of any delay or failure of carriers or terminals to perform services in connection with the movement of Materials from any Seller Plant to any Designated Terminal.

5.   Payment Terms

   (a) Upon execution of this agreement, Buyer shall deposit funds in a qualified escrow account as agreed with Seller, the amount of $4,000,000 USD.   Such amount shall be drawn upon by Sellers supplier, upon verification by independent escrow agent, to pay for the initial purchases of Materials included in this agreement.   After the escrowed funds are exhausted, Buyer shall remit funds to Seller upon terms outlined in paragraph 5.(b).

   (b) Payment for Materials and surcharges, if any, will be made by Buyer to Seller, in good funds, by wire transfer net twenty-seven (27) days after the date of confirmed rail shipment of the subject Materials from the origin point (in Wisconsin) or the date of invoice from Seller's supplier. Production based energy surcharges may be imposed from time to time by Seller as agreed with Buyer. Such surcharges, if any, will be added to invoices as separate line items and paid by Buyer to Seller.

6.   Warranties

   (a) Seller warrants to Buyer that Seller has title to the Materials when delivered to the carrier at the applicable Designated Terminal for shipment to Buyer. Seller further warrants to Buyer that, when delivered to such carrier, the Materials shall conform to the applicable Specifications and shall be free and clear of all liens and encumbrances. Provided Buyer gives Notice, as set forth in the Notice section below, of any Materials sold under this Agreement fail to conform to the applicable Specifications and such defect is demonstrated to Seller's reasonable satisfaction to have existed prior to the Materials being delivered to the carrier for departure from the Designated Terminal, Seller, reserving the right to inspect the subject Materials in Buyer's possession, will, at Seller's option, either replace at Seller's expense, F.O.B. Buyer Location, or give Buyer proper credit for, such nonconforming Materials. The foregoing shall not apply to Materials that shall have been subjected to alteration, contamination, improper maintenance or storage, misapplication, misuse, negligence or accident after being delivered to the carrier for departure from the Designated Terminal or to Materials to which Buyer's tests use an unrepresentative sample.

   (b) EXCEPT AS EXPRESSLY PROVIDED HEREIN, SELLER MAKES NO OTHER WARRANTY OF ANY KIND WITH RESPECT TO THE MATERIALS SOLD UNDER THIS AGREEMENT, WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE WARRANTY OF MERCHANTABILITY AND THE WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE WHICH ARE HEREBY SPECIFICALLY DISCLAIMED.

   (c) The remedies set forth herein shall be the sole and exclusive remedy available to Buyer in the event of any breach of warranty in lieu of all other remedies. In no event shall Seller be liable for any direct, incidental, special, consequential or other damages (including, without limitation, lost profits) even if Seller has been previously advised of the possibilities of such damages. In no event will Seller's liability exceed the contract (purchase) price for the Materials, for which liability is claimed, plus, in the event replacement Materials are provided by Seller, freight costs to ship the same to the Buyer Location.

7.    Force Majeure

Each party shall be relieved of its obligation to perform any part of this Agreement, other than the obligation to pay money, to the extent its performance is prevented by events beyond its reasonable control, which events may include, without limitation, fire, lightning, flood, wind storm, earthquake and other Acts of God, epidemic, quarantine, accident, explosion, hostilities, war, revolution, act of terrorism, acts of the public enemy, maritime border or boundary dispute, riot and other civil disturbances, sabotage, strike, labor disputes, work stoppages, court injunctions, transportation embargos, general unavailability of electric power or other utilities, laws, acts, regulations, orders or other requirements of federal, state, county, municipal or local governments or branches, subdivisions or agencies thereof, including but not limited to any temporary or permanent government restriction or moratorium on hydraulic fracturing ("Force Majeure"). The party claiming the Force Majeure shall promptly notify the other party of the occurrence of any Force Majeure (which shall include a description of the subject Force Majeure) that affects or may affect its performance of this Agreement and, subsequently, will promptly notify the other party upon the termination of such Force Majeure. The party claiming the Force Majeure shall use commercially reasonable efforts thereafter to overcome the effects of the Force Majeure as promptly as possible and resume performance hereunder; provided, however, neither party shall be required to resolve a strike, lockout or other labor problem in a manner which it alone, in the exercise of its sole discretion, does not deem proper and advisable.

8.    Safety Warning, Handling and Indemnity

WARNING: FRACTURING SAND COATED PROPPANTS - MAY CAUSE DELAYED LUNG INJURY AND CANCER HAZARD. BOTH MATERIALS CONTAIN FREE CRYSTALLINE SILICA. DO NOT BREATHE DUST. PROLONGED INHALATION CAN CAUSE DELA YED LUNG INJURY, INCLUDING SILICOSIS, A PROGRESSIVE DISABLING AND SOMETIMES FATAL LUNG DISEASE. IARC HAS DETERMINED THAT CRYSTALLINE SILICA INHALED FROM OCCUPATIONAL SOURCES CAN CAUSE CANCER IN HUMANS. AVOID CREATING DUST WHEN HANDLING, USING OR STORING. FOLLOW OSHA OR OTHER RELEVANT SAFETY AND HEALTH STANDARDS AND USE GOOD HOUSEKEEPING AND ADEQUATE VENTILATION TO KEEP EXPOSURE BELOW RECOMMENDED EXPOSURE LIMITS. AVOID PROLONGED OR REPEATED SKIN CONTACT UNLOADING OPERATIONS - DO NOT EXCEED FIVE (5) PSI WHEN UNLOADING THIS MATERIAL TO MINIMIZE THE CREATION OF AIRBORNE DUST AND POSSIBLE DUST EXPLOSION HAZARD.

SELLER WILL NOT BE LIABLE TO BUYER FOR ANY HARMFUL HEALTH EFFECTS WHICH MAY BE CAUSED BY EXPOSURE TO SILICA CONTAINING MATERIALS SUPPLIED BY SELLER HEREUNDER. Buyer warrants that it will adequately warn all of its employees and customers who may come in contact with silica containing materials supplied by Seller of the above described health hazards. Further, Buyer warrants it will fully comply with all applicable health and safety regulations and orders relating to the workplace handling of materials supplied by Seller.

Buyer specifically acknowledges and agrees that it has the expertise and knowledge in the intended use of materials supplied by Seller and any use or other product or material made therefrom, and that it assumes all risk and liability for results obtained by the use of such materials, whether used singly or in combination with other substances or in any process. Upon acceptance of materials supplied by Seller or in the absence of any written notice, as set forth in the Notice section below, of the nonconformity of such materials BUYER AGREES TO FULLY RELEASE, INDEMNIFY, DEFEND AND HOLD SELLER AND ITS SUPPLIERS HARMLESS from and against any and all liability, claims, penalties and suits it may possess or that may be asserted against Seller and/or any of its suppliers by any third party (including but not limited to its employees, any contractors, subcontractors, government agencies or entities, or property owners, or insurers of any of such parties or of the Buyer) in any manner arising in whole or in part, out of: (i) any breach by Buyer of the duties or warranties set forth in this Section 8 and/or (ii) the use, whether used singly or in combination with other substances or in any process, exposure to and/or residual effects of any of the materials supplied by Seller under this Agreement. The provisions of this Section 9 shall survive the expiration, or earlier termination as provided herein, of this Agreement.

9.      Assignment

This Agreement may not be assigned, in whole or in part, by Buyer without the prior written consent of Seller. Any attempted assignment shall be void and ineffective for all purposes unless in conformity with this Section 9. This Agreement will be binding upon and inure to the benefit of the parties hereto and their successors- in-interest and any permitted assigns.

10.     Entire Agreement

This Agreement sets forth the entire agreement and understanding of the parties with respect to the subject matter of this Agreement and supersedes and replaces all prior agreements and understandings, oral or written, with respect to the same. Failure or delay by a party to exercise any right or remedy under this Agreement shall not be deemed a waiver thereof or diminish such party's right thereafter to fully exercise such right or remedy or any other right or remedy of a like or different kind. Waiver of any breach or default of any provision of this Agreement must be in writing and signed by the waiving party to be effective. A waiver on one occasion shall not operate or be construed as a waiver of any subsequent breach or default of a same or similar kind.

11.     Amendment

No modification or amendment of this Agreement shall be effective unless reduced to writing and signed by both Seller and Buyer. For the avoidance of doubt, this Agreement shall not be modified or amended by any terms or conditions contained in any of the Releases submitted by Buyer to Seller.

12.     Applicable Law

This Agreement will be governed by and construed in accordance with the laws of the State of Texas, notwithstanding the principles, if any, that would otherwise govern the choice of applicable law.

13.   Notice

All notices required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered by hand, by fax (with written confirmation of transmission), by e-mail delivery confirmed by rpost.com, or by a nationally recognized private courier service (proof of delivery requested) as provided in this Section. Notices delivered by hand, by fax, by e-mail or by a nationally recognized private courier service shall be deemed received on the day of receipt. Any notice delivered by hand or fax shall be followed by a confirmation letter sent by a nationally recognized private courier, no later than one (1) business day after it is delivered by hand or sent by fax. Notices will be addressed as shown below. Either party may change its address by giving the other party written notice as provided in this Section 14.

If to Buyer:
ProPetro Services, Inc.
Attn: _Mark Howell_
1706 S. Midkiff, Bldg. B
Midland TX 79701
Fax: *(432) 688-3976*
E-mail: mark.howell@propetroservices.com

If to Seller:
Complete Oil Field Services, LLC
Attn: _____
8731 South Sandy Parkway, Suite 103
Sandy, UT 84070
Fax:
E-mail _____

14. Confidentiality

Buyer will hold the contents of this Agreement in confidence.

15. Miscellaneous

(a) Seller may terminate this Agreement upon written notice to Buyer: (i) if Buyer fails to remit payment to Seller within the time specified in this Agreement, or any extension thereof authorized in writing by Seller.   Either party ("Non-breaching Party") may terminate this Agreement upon written notice to the other party ("Breaching Party"); (ii) if the Breaching Party is in breach of a material obligation under this Agreement and fails to cure such breach within thirty (30) days after the Breaching Party's receipt of written notice thereof from the Non-Breaching Party, or (iii) if the Breaching Party becomes insolvent, or voluntarily files a petition, or has an involuntary petition filed against it, under the Federal Bankruptcy Code or any other Federal or State bankruptcy or insolvency law, or a trustee, receiver or liquidator is appointed for its business or all or a substantial part of its assets, or if any assignment is made of its business equipment for the benefit of creditors, other than in the normal course of business.

(b) Buyer shall inspect the Materials purchased from Seller. All claims of any nature relating to the Materials, including but not limited to claims of defect in Materials, non-conforming discrepancy in quantity or delivery date, shall be made in writing to Seller's Customer Service Department within fifteen (15) days of receipt of the subject Materials by Buyer. Notwithstanding anything to the contrary in this Agreement, failure to make any such written claim within the above-prescribed period shall constitute waiver of any such claims and shall be deemed acceptance of such Materials, including but not limited to any quantities and delivery dates relating to such Materials.

(c) In the event that any of the provisions of this Agreement is held invalid, illegal or unenforceable, that will in no way affect, impair or invalidate any other provision, and all other provisions of this Agreement will remain in full force and effect.

(d) This Agreement may be executed in separate counterparts, each of which when so executed and delivered shall be an original, but all of which together shall constitute one and the same instrument. Each counterpart may consist of a number of copies hereof, each signed by less than all but together signed by all of the parties hereto. Exchange of executed copies of this Agreement, including any executed counterparts, via fax or via e-mail in pdf (or similar) format shall constitute execution and delivery of this Agreement and any such counterparts.

(e) This Agreement is being entered into among competent and experienced businesspersons, represented by legal counsel, and has been negotiated and reviewed by the parties and their respective legal counsel. Therefore, the language in this Agreement will not be construed against any particular party as the drafter of such language.

(f) The headings contained at the beginning of each Section of this Agreement are inserted solely for the convenience of the parties and shall not affect the meaning or interpretation of this Agreement.

The above is hereby agreed to and accepted as of the Effective Date.

PROPETRO SERVICES, INC.                          COMPLETE OIL FIELD SERVICES, LLC

By _____                       By _____

____Dale Redmon____                              _____
Written Name                                     Written Name

Title ____CEO____                                Title _____

(b) Buyer shall inspect the Materials purchased from Seller. All claims of any nature relating to the Materials, including but not limited to claims of defect in Materials, non-conforming discrepancy in quantity or delivery date, shall be made in writing to Seller's Customer Service Department within fifteen (15) days of receipt of the subject Materials by Buyer. Notwithstanding anything to the contrary in this Agreement, failure to make any such written claim within the above-prescribed period shall constitute waiver of any such claims and shall be deemed acceptance of such Materials, including but not limited to any quantities and delivery dates relating to such Materials.

(c) In the event that any of the provisions of this Agreement is held invalid, illegal or unenforceable, that will in no way affect, impair or invalidate any other provision, and all other provisions of this Agreement will remain in full force and effect.

(d) This Agreement may be executed in separate counterparts, each of which when so executed and delivered shall be an original, but all of which together shall constitute one and the same instrument. Each counterpart may consist of a number of copies hereof, each signed by less than all but together signed by all of the parties hereto. Exchange of executed copies of this Agreement, including any executed counterparts, via fax or via e-mail in pdf (or similar) format shall constitute execution and delivery of this Agreement and any such counterparts.

(e) This Agreement is being entered into among competent and experienced businesspersons, represented by legal counsel, and has been negotiated and reviewed by the parties and their respective legal counsel. Therefore, the language in this Agreement will not be construed against any particular party as the drafter of such language.

(f) The headings contained at the beginning of each Section of this Agreement are inserted solely for the convenience of the parties and shall not affect the meaning or interpretation of this Agreement.

The above is hereby agreed to and accepted as of the Effective Date.

PROPETRO SERVICES, INC.                    COMPLETE OIL FIELD SERVICES, LLC

By _____                   By _____

    Dale Redmon                                Sam Taylor
    Written Name                               Written Name

Title _____LEO_____                     Title __Manager_____

*Final - MOU*



## Memorandum of Understanding

## (Operating Agreement)

THIS MEMORANDUM OF UNDERSTANDING ("MOU"), is formed and shall become effective on the date executed hereinafter, to detail the relationships between **BATES Energy Oil & Gas, LLC**, a Texas limited liability company (hereinafter referred to as **"BATES Energy"**) whose principal office is located at 3201 Cherry Ridge, Bldg. B Suite: 210B, San Antonio, TX. 78230 and **Complete Oil Field Services, LLC.** a Utah limited liability company, a wholly owned subsidiary of Sam Taylor, a UTAH corporation (hereinafter referred to as **"COFS"**) whose principal office is 8731 S. Sandy Pkwy Ste: 103, Sandy UTAH 84070.

### Recitals

**WHEREAS**, BATES ENERGY operates a business for the purpose of procurement, marketing, distribution, and logistics of Silica Proppant for the Hydraulic Fracturing process;

**WHEREAS**, COFS operates a business for the receiving of Silica Proppant for the Hydraulic Fracturing process; and,

**WHEREAS**, BATES Energy and COFS desire to engage in a relationship to provide and accept Silica Proppants respective of their individual interests; and,

**WHEREAS**, the purpose of this MOU is to set forth certain binding understandings with respect to the matters covered herein and serve as an agreement until any final details may be defined in a final agreement.

**NOW, THEREFORE**, in reliance upon the foregoing facts, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and for the mutual promises contained herein, the parties agree as follows:

1. **BATES Energy obligations:** $99.00 per FOB WTX w/ Trans-Loading included:
   a. Shall procure FRAC sand in grades to include API compliant approximately **50,000 tons of 40/70 and 30,000 tons of 100 mesh Proppant.**
   b. Initial quantity of approximately 10,000 plus Tons of each grade delivered to the rail terminal located at <u>Seagraves, Pecos, Big Springs, San Angelo, Odessa, Midland, or Monahans, Texas</u> (**"WTX"**) no later than May 10th, 2017, and increase such quantity up to 80,000 tons of each grade within 90 days of the date of execution of this MOU.
   c. Shall contract for rail logistics for delivery to WTX via existing train trackage to rail the Proppant.
   d. Demurrage allowance of 1.5 days of storage for every 1,000 tons from the date of arrival in the

## EXHIBIT 2

rail cars to WTX. All material held over the initial 1.5 days shall incur a daily storage fee equal to $3.00 per ton per DAY.

e. Shall provide COFS with customary reporting of Gradation and Turbidity, demonstrating compliance to API standards know as a Stim-Lab and/or Prop-Test.

f. Shall provide trans loading and storage of up to 15 **days per 10,000 Tons** in WTX.

g. Shall Have a 90 Locked pricing on all pricing with a 1st Right of refusal for 180 days.

h. <u>**AFTER The Initial deposit of $4M in Escrow has been Exhausted on Orders, BATES Energy will PROVIDE**</u> TERMS: Net 30 Days from the time of Bill Of Ladings "BOL's" are issued to COFS at the Departure Point "Mine"...

2. **COFS obligations:**

   a. Accept delivery of the materials of each grade and quantity as set forth herein.

   b. Shall provide the in a timely manner for material from "WTX" facilities as defined.

   c. Provide for timely payment of the material in the form and under the terms hereinafter defined.

   d. COFS shall be solely responsible for all demurrage to Union Pacific Rail Company (**"UP"**) for non-complying with agreed above Storage policy within 30 days.

3. Payments and Terms:

   a. COFS shall make an initial deposit $4,000,000.00 USD into an escrow account with **Equity Liaison Company, LLC. Austin, TX**. With such an amount of funding the payment for initial orders as agreed. Disbursements from this account shall be made athurized upon the conditions as described in items (b.) below. Any monies placed into the escrow account must have BATES Energy's written approval prior to withdrawal, to ensure that no material invoice is tied to such funds.

   b. BATES Energy shall receive by wire transfer from the escrow company 50% of the invoice total upon delivery of the Bill of Lading (**"BOL"**). If this wire transfer comes from an account other than the escrow account, then a credit voucher will be issued from BATES Energy authorizing either a) for the amount of the credit to be withdrawn from the escrow account, or b) for the amount of the credit to be applied to secure more material to be loaded out.

   c. BATES Energy shall receive via wire transfer the outstanding balance within three (3) business days or less after the material is loaded into the COFS or designated trucking company, and the BOL of the load-out are issued with the final invoice. The parties understand and agree the prepayments described herein shall be deducted from the total amount due and COFS shall only be required to remit payment for the balance for all Proppant delivered pursuant to BOL from loaded rail cars. These final balances will reflect the total owed from the balance of the BOL, showing a credit of the amount already held in escrow.

   d. **TERMS and LATE FEE's: "COFS" will comply with the Strict Payment terms issued in (1.h.) and will be responsible for a $2.00 per ton, per day LATE FEE on Any & All unpaid Invoices within the agreed NET 30 day pay terms!**

   e. Neither party is liable for failure to perform, except with respect to payment obligations, solely caused by:
   - unavoidable casualty,
   - delays in delivery of materials,

- embargoes,
- government orders,
- acts of civil or military authorities,
- acts by common carriers, emergency conditions (including weather conditions) incompatible with safety or good quality workmanship, or any similar unforeseen event that renders performance commercially implausible.

If an event of force majeure occurs, the party injured by the other's inability to perform may elect one of the following remedies: (a) to terminate this agreement in whole or in part; or (b) to suspend the Agreement, in whole or part, for the duration of the force majeure circumstances. The party experiencing the force majeure circumstances shall cooperate with and assist the injured party in all reasonable ways to minimize the impact of force majeure on the injured party, which may include locating and arranging substitute services if necessary

This agreement and any dispute arising hereunder shall be subject to the laws of the State of Texas and exclusive jurisdiction shall be in San Antonio, Bexar County, Texas.

*By signing this MOU you agree to be bound by all of the terms and conditions described herein subject to the mutually agreed and executed Purchase Agreement ("Agreement") to be executed between the parties.*

For **BATES Energy Oil & Gas, LLC**                    For: **COFS-Complete Oil Field Services**


                                                       **SAM TAYLOR:**

By: _____                    By: _____

Printed Name:  STAN P. BATES                           Printed Name: _____

Chief Executive Office                                 Authorized Officers Signature:

Date:  April 18, 2017                                  Date: _____

# Complete Oil Field Service, LLC.

# PURCHASE ORDER

P.O.# 1001
DATE: APRIL 24, 2017

| VENDOR | Complete OFS<br>8731 S. Sandy Pkwy<br>Ste: 103<br>Sandy, Utah 84070<br>POC: Sam Taylor<br>701.570.5891 | SUPPLIER: | BATES Energy Oil & Gas<br>3201 Cherry Ridge<br>Bldg.B Ste:210B<br>San Antonio, TX.78230<br>Customer ID: BATES |
|---|---|---|---|

| SHIPPING METHOD | SHIPPING TERMS | DELIVERY DATE |
|---|---|---|
| Pneumatic Railcars | Escrow - Prepaid | 05-12-2017 |

| QTY | ITEM # | DESCRIPTION | JOB | UNIT PRICE | LINE TOTAL |
|---|---|---|---|---|---|
| 7,000 Tons | 1 | 40/70 Northern White | 1 | $99.00 | $693,000.00 |
| 3,100 Tons | 1 | 100 Northern Mesh | 1 | $99.00 | $306,900.00 |
| | | Funds are held in escrow with Equity Liaison Company, LLC and Amegy Bank pursuant to the MOU and Escrow Agreement.  Such funds shall be transferred to Bates Energy as follows | | | |
| | | 50% of cost paid upon verification of product in railcars and such cars having left the origin for destination in Texas as agreed and as verified by UP bill of lading and upon receipt of invoice from Bates Energy. | | | |
| | | Remaining cost to be invoiced by separate BOL offloading the railcars into the last mile delivery truck.  The BOL's shall be invoiced every 3 days, COFS shall have 2 days to approve then payment shall be funded to Supplier. | | | |
| | | There is a Professional Standing Non-Circumvent in place with BATES Energy's supplier Funding sources. | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | SUBTOTAL | $999,900.00 |
| | | | | SALES TAX | Exempt Resale |
| | | | | TOTAL | $999,900.00 |

1.  Please send your invoice to ACCEPT this Irrevocable P/O.

2.  This order in accordance with the prices, terms, delivery method, and specifications listed above.

3.  Please notify us immediately if you are unable to ship as specified.

4.  Send all correspondence to:
    **Sam Taylor and Janis Kline, Managers**
    8731 S. Sandy Pkwy. Ste 103, Sandy, Utah 84070

_Authorized by_                                    _Date_

ELS Escrow

## ESCROW AND DISBURESEMENT AGREEMENT

WHEREAS, _Complete Oil Field Services, LLC_ a _Utah_ _LLC_ corporation, ("Buyer"), whose address is _8731 Sandy Parkway, Ste 103, Sandy Utah_ and _BATES Energy Oil & Gas, LLC._ , a _TEXAS_ corporation, ("Seller"), whose address is _3201 Cherry Ridge Bldg. B Ste: 210B , San Antonio, TX. 78230_ , have caused or will cause certain funds to be deposited in escrow with Equity Liaison Company, LLC, a Texas limited liability company ("Escrow Agent or ELC" either individually or collectively), whose address is 3303 Northland Drive, Suite 307, Austin, Texas 78731, on terms and conditions more particularly described herein in this Escrow and Disbursement Agreement ("Agreement"). The financial institution designated for this Agreement shall be JP MORGAN CHASE BANK, N.A. a national banking association ("Bank")

**NOW, THEREFORE,** in consideration of the premises, the undersigned hereby agree as follows:

## ARTICLE I
## TERMS AND CONDITIONS

**1.1      Establishment of Fund.** The undersigned Buyer has caused or will cause to be deposited with ELC those certain amounts, from time to time, pursuant to that certain Purchase and Sale Agreement ("PSA") by and between the Buyer and Seller, dated ___April 14, 2017___ (such sum, or the balance thereof remaining from time to time being referred to herein as the "Fund").

**1.2      Treatment of Fund.** The monies constituting the Fund shall be deposited in a segregated account pursuant to the terms of this Escrow Agreement. Such account shall be styled **Equity Liaison Company, LLC – Escrow Account**. At the written direction of the Buyer, ELC shall place all or part of the finds held in escrow in an "interest-bearing" account similarly styled with Bank.

**1.3      Escrow Procedure and Payment Instruction.** The Fund, together with all interest earned thereon, if any, which interest shall become and remains a part of the Fund, shall be held and disbursed in accordance with the terms of this Escrow Agreement and PSA as follows:

Upon receipt by ELC of the Disbursement Authorization (Exhibit A) executed by Buyer, ELC is hereby authorized and directed to deliver the Escrow Fund only (i) to the undersigned against their joint receipt, or (ii) to any of the undersigned upon written direction of each other of the undersigned, or (iii) in accordance with the joint written instruction of all of the undersigned, or (iv) if there is only one undersigned, to the undersigned.

**1.4      Termination.** This Escrow Agreement shall terminate upon the first to occur of any of the following events:

   A.     The disbursement of the balance of the Fund in accordance with the provisions of Section 1.3 hereof.

   B.     The expiration or termination of the PSA, in which case the remaining balance, accrued interest or excess finds of the Fund shall be disbursed to the Buyer. In the event of Termination prior to disbursements being made under this or any PSA terms and conditions, the entire amount place in the Fund shall be returned to the Buyer without deduction of any fee.



**EXHIBIT 3**

E.      In the event that any controversy should arise among the parties with respect to this Agreement, or should ELC resign and the parties fail to select another escrow agent to act in its stead, the ELC shall have the right to institute a bill of interpleader in any court of competent jurisdiction to determine the rights of the parties.

2.3     Compensation/Indemnification.

A.      ELC shall be compensated by the product seller at a rate agreed to by and between ELC and such supplier which will cover all bank fees, wire transfer fees, accounting, audit, reporting to the Buyer and Seller, and all other fees, including but not limited to courier, mail and delivery fees, printing, electronic and reproduction fees. Compensation contained in this Section shall not cover any third party CPA review outside of the services provided by this agreement, or any third party legal review performed by any attorney directed to do so by the Buyer or Seller. The parties hereto agree that escrow fees shall be due and payable to ELC upon deposit into the specified account with Bank. Such amount shall be deducted from the Fund upon the receipt of the escrow and on each deposit thereafter, if any, of the date hereof.

B.      The parties to this Agreement (other than ELC) hereby jointly and severally agree to indemnify and hold ELC, its affiliates and their officers, employees, successors, assigns, attorneys and agents (each an "Indemnified Party") harmless from all losses, costs, claims, demands, expenses, damages, penalties and attorney's fees suffered or incurred by any Indemnified Party or ELC as a result of anything which it may do or refrain from doing in connection with this Agreement or any litigation or cause of action arising from or in conjunction with this Agreement or involving the subject matter hereof or Funds or monies deposited hereunder or for any interest upon any such monies, including, without limitation, arising out of the negligence of ELC; provided that the foregoing indemnification shall not extend to the gross negligence or willful misconduct of ELC. This indemnity shall include, but not be limited to, all costs incurred in conjunction with any interpleader which ELC may enter into regarding this Agreement.

2.4     Miscellaneous.

A.      ELC shall make no disbursement, investment or other use of funds until and unless it has collected all funds pursuant to the PSA, as the same may be amended or modified from time to time. ELC shall not be liable for collection items until the proceeds of the same in actual US Dollars have been received or the Federal Reserve has given ELC credit for the Funds.

B.      ELC may resign at any time by giving written notice 30 days prior to its intended date of resignation to the parties hereto, whereupon the parties hereto will immediately appoint a successor escrow agent. Until a successor escrow agent has been named and accepts its appointment or until another disposition of the subject matter of this Agreement has been agreed upon by all parties hereto, ELC shall be discharged of all of its duties hereunder save to keep the subject matter whole.

C.      All representations, covenants, and indemnifications contained in this Article II shall survive the termination of this Agreement.

### ARTICLE III
### GENERAL PROVISIONS

3.2     **Discharge of ELC.** Upon the delivery of all of the subject matter or monies pursuant to the terms of this Agreement and the PSA, the duties of ELC shall terminate and ELC shall be discharged from any further obligation hereunder.

3.3     **Escrow Instructions.** Where directions or instructions from more than one of the undersigned are required, such directions or instructions may be given by separate instruments of similar tenor. Any of the undersigned may act hereunder through an agent or attorney-in-fact, provided satisfactory written evidence of authority is first furnished to any party relying on such authority.



**3.4** **Notice.** Any payment, notice, request for consent, report, or any other communication required or permitted in this Agreement shall be in writing and shall be deemed to have been given when delivered to the party hereunder specified, by hand delivery, by email delivery, or other such delivery method acceptable to all parties, or when placed in the United States mail, registered or certified, with return receipt requested, postage prepaid and addressed as follows:

If to ELC:

> Equity Liaison Company, LLC
> 3303 Northland Drive, Suite 307
> Austin, TX 78731
> Attn: Dewayne Naumann, Principal

If to _Complete Oil Field Services, LLC_ (Buyer)

> 8731 S Sandy Parkway Ste 103
> Sandy, UT 84070
>
> Attn: Janis Kline

If to _BATES Energy Oil & Gas, LLC,_ : (Seller)

> 3201 Cherry Ridge
> Bldg. B Ste: 210B
> San Antonio, TX, 78230
> Attn: STAN P. BATES                April 14, 2017

Any party may unilaterally designate a different address by giving notice of each such change in the manner specified above to each other party. Notwithstanding the foregoing, no notice to the ELC shall be deemed given to or received by the ELC unless actually delivered to an officer of the ELC having responsibility under this Agreement.

**3.5** **Governing Law.** This Agreement is being made in and is intended to be construed according to the laws of the State of Texas. It shall inure to and be binding upon the parties hereto and their respective successors, heirs and assigns. Jurisdiction and venue for all matters under this Agreement shall be Travis County, Texas.

**3.6** **Construction.** Words used in the singular number may include the plural and the plural may include the singular. The section headings appearing in this instrument have been inserted for convenience only and shall be given no substantive meaning or significance whatsoever in construing the terms and conditions of this Agreement.

**3.7** **Amendment.** The terms of this Agreement may be altered, amended, modified or revoked only by an instrument in writing signed by the undersigned and ELC.

**3.8** **Force Majeure.** ELC shall not be liable to the undersigned for any loss or damage arising out of any acts of God, strikes, equipment or transmission failure, war, terrorism, or any other act or circumstance beyond the reasonable control of ELC.

**3.9** **Written Agreement.** This Agreement represents the final agreement between the parties, and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.



EXECUTED as of the dates set forth below, but effective the date executed by ELC.

Buyer:

Complete Oil Field Services, LLC

Date: 4/14/2017

By: Janis R. Kline

Name: Janis R. Kline

Title: CFO/Manager

Seller:

BATES Energy Oil & Gas, LLC.

Date: April 14, 2017

By:

Name: STAN P. BATES

Title: Chief Executive Officer

Equity Liaison Company, LLC, Escrow Agent, hereby accepts its appointment as Escrow Agent as described in the foregoing Agreement, subject to the terms and conditions set forth therein.

Date: 14 APR 2017

Equity Liaison Company, LLC, a Texas limited liability company

By:

Name: Dewayne Naumann
Title:   Managing Member



# Equity Liaison Company, LLC
3303 Northland Drive • Suite 307 • Austin, TX • 78731

TO WHOM IT MAY CONCERN:

This letter is to inform you that Equity Liaison Company, LLC serves as the escrow and distribution company for Bates Energy Oil & Gas, LLC, and Mr. Stan Bates.

The specific escrow account has been set up to receive and disburse funds for Bates Energy Oil & Gas, LLC and the wiring instructions are as follows:

## WIRING INSTRUCTIONS FOR:

**Receiving Bank Name:** JP Morgan Chase Bank, NA

**Account Name:** Equity Liaison Company, LLC
**Nickname:** Bates Energy OAG
**Account #:**        596292917
**ABA Routing #:**    111000614
**Swift:**            CHASUS33

If you require additional information, please feel free to contact me at the number listed below.

Sincerely,

Dewayne Naumann

Principal



3201 CHERRY RIDGE Bldg. "B" Suite: 210B
San Antonio, TX. 78230
Office: 432.272.8347 Email: Sbates@TSSoil.com

TO: Dewayne Naumann
    Equity Liaison Company, LLC.
    3303 Northland Dr. Suite: 307
    Austin, TX. 78731

FROM: Stan Bates – CEO
    BATES Energy Oil and Gas, LLC.

SUBJ: Distribution of Funds                                    June 15, 2017

Mr. Naumann,
I'm authorizing the distribution of Funds per the escrow agreement with BATES Energy. The following Parties will be required to submitted a current W-9 to "ELC" and sign an individual agreement with your company. Please not all Payees are responsible for their own Taxes and reporting to the I.R.S. via a 1099 for "ELC" at the end of the Year. Please distribute and transfer the below funds to Payees when all w-9's and agreements are in your care.

Distribution amounts and PAYEES:  $99.00 per ton at 80,000 Tons of 40/70 and 100mesh into Seagraves, TX and or West, TX. Payment received from COMPLETE OFS in the amount of $4,000,000.00 in the Trust with ELC out of the Amegy Bank Escrow Account. Apply to Purchase Order# 1001

| Flat Fee | For: CSI Sand Wisconsin, LTD. | One Time Transfer |
|---|---|---|
|  | 40/70 and 100mesh NW |  |
|  | Requested BOL's per Load |  |

TRANSFER:                                            $1,000,000.00

Please provide a distribution receipt of funds and Applicable Bills Of Lading's applied to Transfers from COMPLETE OFS and BATES EOG, and the each Payee. Balance retained into BATES Energy Oil & Gas, LLC.'s operating account for Travel to Verify Cost of Goods and or Product.

Respectfully Submitted,

STAN P. BATES                                      Sam Taylor "or" Janis Kline
Chief Executive Officer                            Authorized Signature:
BATES Energy Oil & Gas, LLC.                       Complete Oil Field Services, LLC.

**EXHIBIT 4**

**Janis kline**

| | |
|---|---|
| **From:** | dnaumann@equityliaison.com |
| **Sent:** | Monday, August 14, 2017 2:12 PM |
| **To:** | Janis kline |
| **Cc:** | dmartinez@equityliaison.com |
| **Subject:** | RE: FW: Scanned image from Agility Energy |

Just as quick as humanly possible.

-----Original Message-----
From: "Janis kline" <janis@cpakline.com>
Sent: Monday, August 14, 2017 3:10pm
To: dnaumann@equityliaison.com
Cc: dmartinez@equityliaison.com
Subject: RE: FW: Scanned image from Agility Energy

Understand.  Any projected ETA?

**From:** dnaumann@equityliaison.com [mailto:dnaumann@equityliaison.com]
**Sent:** Monday, August 14, 2017 1:25 PM
**To:** Janis kline <janis@cpakline.com>
**Cc:** dmartinez@equityliaison.com
**Subject:** RE: FW: Scanned image from Agility Energy

We manage many accounts for multiple customers so our day is filled with tracking down lazy clients who fail to send in supporting documents, locating incoming wires, and the like.  That is what eats up time we can use to be productive otherwise.

The standard agreement I have with Bates Energy is $0.50 per ton of traded sand I manage escrow on their behalf.

-----Original Message-----
From: "Janis kline" <janis@cpakline.com>
Sent: Monday, August 14, 2017 2:20pm
To: dnaumann@equityliaison.com
Cc: dmartinez@equityliaison.com
Subject: RE: FW: Scanned image from Agility Energy

Dewayne,
Thank you for the response and sorry to hear about the fun you've had today.

I'm very anxious to get at least what you are showing as the balance and have been asking since about mid July so I think I've been pretty patient.  I guess I don't understand, if this is a segregated account, why it is taking so long and why 30 days would be needed because this seems like a pretty standard request.  How much longer do you think it's going to take?

**EXHIBIT 5**

Also, what are the fees on the CSI transactions so we know what to plan on?

Please let me know what to expect as I do really need the information.

Thanks,
Janis



**From:** dnaumann@equityliaison.com [mailto:dnaumann@equityliaison.com]
**Sent:** Monday, August 14, 2017 1:04 PM
**To:** Janis kline <janis@cpakline.com>
**Cc:** dmartinez@equityliaison.com
**Subject:** RE: FW: Scanned image from Agility Energy

Janis:

Sorry for the delay in getting back to you.  The office next to us had a water leak from an air conditioner and it effected theirs and our offices.  The building management had us evacuate until it could be cleaned up and the floor dried out.

In other words, we've lost the majority of the day today.

We are working on the report you requested.  As I stated earlier, company policy is 30 days from the date of a special request.

Please be patient and we will get you the report as quickly and accurately as possible.

Respectfully,

Dewayne Naumann, Principal
Equity Liaison Company, LLC
3303 Northland Drive, Suite 307
Austin, TX 78731

Office:  512-206-4499
Mobile:  512-627-0877
dnaumann@equityliaison.com
Skype:  dnaumannELC

*"Excellence in Service"*

**Confidentiality Notice:** This email, including attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, or disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender immediately and destroy all copies of the original message.

DISCLAIMER: Sender is NOT a United States Securities Dealer or Broker or U.S. Investment advisor. Sender is a Consultant and makes no warranties or representations as to the Buyer, Seller or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgement is not accepted, Recipient must return any and all documents in their original receipted condition to Sender.
This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521, 2701-2710, 3121-3126.

Also see: http://www.ftc.gov/privacy/glbact/glbsub1.htm
Gramm-Leach-Bliley Act 15 USC, Subchapter1, Sec. 6801-6809

-----Original Message-----
From: "Janis kline" <janis@cpakline.com>
Sent: Monday, August 14, 2017 10:48am
To: dnaumann@equityliaison.com
Cc: dmartinez@equityliaison.com
Subject: RE: FW: Scanned image from Agility Energy

Dewayne,
I hope you had a great weekend.  On the sales tax, don't worry about it because it's not a big deal and I don't want to pull anything that's could be a potential issue. We'll just pay it directly.   I wasn't sure so that's why I asked in the transmittal about how we should handle.

Also, can you please, please, please send me a statement of the account and the fees on the CSI transactions?   We need to send an accounting to ProPetro and that's the last thing I need to report to them.  Would it be possible to get this information today?  I've asked a number of times over the last two weeks so think I've been pretty patient.  I have all of the statements from Amegy so I'm just waiting for this one.

Thanks,
Janis

From: dnaumann@equityliaison.com [mailto:dnaumann@equityliaison.com]
Sent: Thursday, August 10, 2017 12:42 PM
To: Janis kline <janis@cpakline.com>
Cc: dmartinez@equityliaison.com
Subject: RE: FW: Scanned image from Agility Energy

Janis:

Denise and I are working through the data and we are looking for a correlation between the "rail" BOL's on the invoices paid, versus the listed BOL's on the attachment.  Can you shed any light on this?

-----Original Message-----
From: "Janis kline" <janis@cpakline.com>
Sent: Thursday, August 10, 2017 11:08am
To: dnaumann@equityliaison.com, dmartinez@equityliaison.com
Subject: FW: Scanned image from Agility Energy

Good morning Dewayne and Denise,
Thank you again for getting yesterday's transactions done. Attached is documentation for the payment of the sales tax related to the CSI loads for July. We need to pay the tax next week so I wondered if we can do a distribution out of the fund for this as well. It's $12k+. Please let me know now to handle this. Also, I'll have to get you the transfer account information because it needs to be paid to the Texas on our account either directly or through us. Thanks and let me know what you think.
Thanks,

Janis

-----Original Message-----
From: Mark Foy On Behalf Of administrator@
Sent: Thursday, August 10, 2017 9:30 AM
To: Janis Kline <jkline@agilityenergyinc.com>
Subject: Scanned image from Agility Energy

Reply to: administrator@agilityenergyinc.com
<administrator@agilityenergyinc.com>
Device Name: Agility Energy
Device Model: MX-3640N
Location: 1st Floor Hallway

File Format: PDF (High)
Resolution: 200dpi x 200dpi

Attached file is scanned image in PDF format.
Use Acrobat(R)Reader(R) or Adobe(R)Reader(R) of Adobe Systems Incorporated
to view the document.
Adobe(R)Reader(R) can be downloaded from the following URL:
Adobe, the Adobe logo, Acrobat, the Adobe PDF logo, and Reader are
registered trademarks or trademarks of Adobe Systems Incorporated in the
United States and other countries.

http://www.adobe.com/

**Janis kline**

| | |
|---|---|
| **From:** | dnaumann@equityliaison.com |
| **Sent:** | Tuesday, August 8, 2017 1:19 PM |
| **To:** | Janis kline |
| **Cc:** | dmartinez@equityliaison.com |
| **Subject:** | RE: RE: CSI invoice and supporting documents |

Many Thanks Janis!

Respectfully,

Dewayne Naumann, Principal
Equity Liaison Company, LLC
3303 Northland Drive, Suite 307
Austin, TX 78731

Office:  512-206-4499
Mobile: 512-627-0877
dnaumann@equityliaison.com
Skype:  dnaumannELC

## *"Excellence in Service"*

**Confidentiality Notice:** This email, including attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, or disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender immediately and destroy all copies of the original message.

DISCLAIMER: Sender is NOT a United States Securities Dealer or Broker or U.S. Investment advisor. Sender is a Consultant and makes no warranties or representations as to the Buyer, Seller or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgement is not accepted, Recipient must return any and all documents in their original receipted condition to Sender.
This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521, 2701-2710, 3121-3126.
Also see: http://www.ftc.gov/privacy/glbact/glbsub1.htm
Gramm-Leach-Bliley Act 15 USC, Subchapter1, Sec. 6801-6809

-----Original Message-----
From: "Janis kline" <janis@cpakline.com>
Sent: Tuesday, August 8, 2017 1:59pm
To: dnaumann@equityliaison.com
Cc: dmartinez@equityliaison.com
Subject: RE: RE: CSI invoice and supporting documents

Thanks Dewayne.  I was told this morning that they would release the funds upon receipt of the order.  I wasn't aware there would be a delay.  I should have read the entire string before I sent my reply a minute ago.  I will call Amegy and push this along so you can be reimbursed.

Thanks,
Janis

**From:** dnaumann@equityliaison.com [mailto:dnaumann@equityliaison.com]
**Sent:** Tuesday, August 8, 2017 12:17 PM
**To:** janis@cpakline.com
**Cc:** dmartinez@equityliaison.com
**Subject:** FW: RE: CSI invoice and supporting documents

Janis:

Are you aware of this?

Respectfully,

Dewayne Naumann, Principal
Equity Liaison Company, LLC
3303 Northland Drive, Suite 307
Austin, TX 78731

Office:  512-206-4499
Mobile: 512-627-0877
dnaumann@equityliaison.com
Skype:  dnaumannELC

## *"Excellence in Service"*

**Confidentiality Notice:** This email, including attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, or disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender immediately and destroy all copies of the original message.

DISCLAIMER: Sender is NOT a United States Securities Dealer or Broker or U.S. Investment advisor. Sender is a Consultant and makes no warranties or representations as to the Buyer, Seller or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgement is not accepted, Recipient must return any and all documents in their original receipted condition to Sender.
This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521, 2701-2710, 3121-3126.
Also see: http://www.ftc.gov/privacy/glbact/glbsub1.htm
Gramm-Leach-Bliley Act 15 USC, Subchapter1, Sec. 6801-6809

-----Original Message-----
From: "Arla Scott" <Arla.Scott@amegybank.com>
Sent: Tuesday, August 8, 2017 12:18pm
To: "dmartinez@equityliaison.com" <dmartinez@equityliaison.com>
Cc: "DeWayne Naumann" <dnaumann@equityliaison.com>
Subject: RE: CSI invoice and supporting documents

Denise,

I do have that information and I forwarded it to my counsel.  I'm awaiting a response from them now.

Thank you,

*Arla*

I've been trying to reach you in order to coordinate where we are and to get a copy of the account statement.  The TRO was lifted today and is in the process of being documented.  Therefore, it is our understanding that we return to the status quo as we have handled these transactions.  Attached is an invoice from CSI along with the supporting BOL's as we've previously handled these.  As such, please prepare a disbursement in the amount of $122.712.87 which is 60% of the invoice amount as required.  Please review the documentation and complete the required documentation for us to execute with ELC and Amegy to make the payment and transfer of funds.

In addition, please provide the statement of the account as soon as possible.

Thanks,
Janis

JANIS R. KLINE  | CPA
PHN: 801.558.9993
FAX:  801.590.6597
**Janis@cpakline.com**



*"Never doubt that a small group of thoughtful, committed people can change the world.  Indeed, it is the only thing that ever has."  ~Margaret Mead*

THIS ELECTRONIC MESSAGE, INCLUDING ANY ACCOMPANYING DOCUMENTS, IS CONFIDENTIAL and may contain information that is privileged and exempt from disclosure under applicable law. If you are neither the intended recipient nor responsible for delivering the message to the intended recipient, please note that any dissemination, distribution, copying or the taking of any action in reliance upon the message is strictly prohibited. If you have received this communication in error, please notify the sender immediately. Thank you.

## Janis kline

| | |
|---|---|
| **From:** | dnaumann@equityliaison.com |
| **Sent:** | Friday, July 28, 2017 2:33 PM |
| **To:** | Janis kline |
| **Subject:** | Re: I know you've been tied up so this is a quick update |

Janis:

As you know, I've been traveling this week and dealing with many issues.

I'll be back in the office on Monday and, considering the "legal" circumstances we are all under a the current time, I will have to consult and seek the advise of legal counsel as well. This was not something I took into consideration when this relationship began.

Generally speaking, company policy has always been to do a reconciliation for year end only. In the case of a special reconciliation, our policy is to give ourselves a minimum of 30 days to respond to the request. I cannot drop everything at one time and simply focus on a singular account and let all others languish.

With that said, I will begin the process of compiling the data to prepare the reconciliation you requested, and seeking guidance from counsel.

Thank you,

SGM Dewayne Naumann
512-627-0877 Direct
Sent from my iPad

On Jul 25, 2017, at 5:25 PM, Janis kline <janis@cpakline.com> wrote:

> Dewayne,
> I hope the proceedings went ok that you were involved. Legal matters are always painful...as we are well aware of right now. I'm sure you are aware of the TRO that Mr. Bates filed on the escrow accounts on Friday. We have engaged counsel in both Utah and Texas to pursue a remedy to this action on our behalf. If you could send me the statement so I can confirm balances tomorrow, I'd appreciate it greatly.
> Thanks and take care,
> Janis
>
>
> **JANIS R. KLINE | CPA**
> **PHN: 801.558.9993**
> **FAX: 801.590.6597**
> **Janis@cpakline.com**
>
> <image003.jpg>
> *"Never doubt that a small group of thoughtful, committed people can change the world. Indeed, it is the only thing that ever has." ~Margaret Mead*

Arla K  Scott
Vice President
ZB, National Association dba Amegy Bank
Corporate Trust & Escrow Dept.
1801 Main Street, Suite 850
Houston, TX 77002
Telephone: (713)232-1919
Facsimile: (713)571-5010
Email: arla.scott@amegybank.com


**From:** dmartinez@equityliaison.com [mailto:dmartinez@equityliaison.com]
**Sent:** Tuesday, August 08, 2017 12:13 PM
**To:** Arla Scott <Arla.Scott@amegybank.com>
**Cc:** DeWayne Naumann <dnaumann@equityliaison.com>
**Subject:** FW: CSI invoice and supporting documents

[External Email]

See below. This was to be included with the reimbursement request email.

Thank you,

Respectfully,

Denise Martinez
Executive Assistant
Equity Liaison Company, LLC
3303 Northland Drive, Suite 307
Austin, TX 78731

Office:  512-206-4499
dmartinez@equityliaison.com

## *"Excellence in Service"*


**Confidentiality Notice:**This email, including attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, or disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender immediately and destroy all copies of the original message.
 DISCLAIMER: Sender is NOT a United States Securities Dealer or Broker or U.S. Investment advisor. Sender is a Consultant and makes no warranties or representations as to the Buyer, Seller or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgement is not accepted, Recipient must return any and all documents in their original receipted condition to Sender.
This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521, 2701-2710, 3121-3126.
Also see: http://www.ftc.gov/privacy/glbact/glbsub1.htm
Gramm-Leach-Bliley Act 15 USC, Subchapter1, Sec. 6801-6809


-----Original Message-----
From: "Janis kline" <janis@cpakline.com>
Sent: Friday, August 4, 2017 3:10pm
To: dnaumann@equityliaison.com, dmartinez@equityliaison.com
Subject: CSI invoice and supporting documents

Dewayne and Denise,



●○○○ Verizon 📶    1:14 PM    🔆 90% 🔋

**Dewayne**

...as I have an opportunity.

Thank you for responding and I hope that your legal can clear quickly for you.

**Thu, Jul 27,** 4:49 PM

I hope things are going better for you. Can you please provide a statement of account. I need to verify prior to the next hearing on Mr Bates TRO. I know nothing can move, we need to verify balance. Thanks.



**Fri, Jul 28,** 11:20 AM

Dewayne are you alive? I need to get confirmation of the account for our

   iMessage 

●●○○○ Verizon 📶          1:14 PM          ⚡ 89% 🔋

**‹**              **DN**              **ⓘ**

**Dewayne**

Fri, Jul 28, 11:20 AM

Dewayne are you alive? I need to get confirmation of the account for our attorney.



Confirmation of account balance.

Mon, Jul 31, 1:24 PM

What have you found out?  I'm still mystified as to why you need to talk to your lawyer?  If you don't have a reply yet please send me the name and contact information of your attorney and our attorney will contact them directly. We have a hearing in a couple of days and absolutely need confirmation.



     iMessage                



•• ○○○ Verizon 🛜          1:15 PM          ⚡ 89% ▬▬ ›

‹          **DN**          ⓘ

**Dewayne**

~~days and absolutely need~~
**confirmation.**

**Fri, Aug 4,** 12:00 PM

Can you please call, text,
email a statement on our
account? I need to
confirm the balance.



**Mon, Aug 7,** 10:11 AM

Please call me asap. Or
respond in any form. I've
been trying to reach you
for a week and there is no
reason you can't
communicate.

Is Denise gone? She isn't
answering the phone at
your office.

I will be back in the office

     iMessage          



I will be back in the office this afternoon late.

Thank you so much for responding. Let's connect then. I will be available.

Ok

Mon, Aug 7, 4:47 PM

Are you back? Can I call you?

Did you see the csi invoice sent to you? Where we on getting payments going again? Should we go direct with Amegy?

I'm still 3 hours out. I've

   iMessage 



Dewayne

I'm still 3 hours out.  I've been driving in really bad weather and won't be back until 8:00 my time and I'm exhausted.  Can we discuss it first thing on the am?

Gets a illegal to text or talk and drive.

Got it. Thanks and be careful. Let's talk in the morning. Can I call you at about 8:30 mtn/9:30 central? Or tell me when works. Take care.

OK

Tue, Aug 8, 8:31 AM

In a short meeting. Give

   iMessage 



•• Verizon 🔆                    3:55 PM                    🗱 77% ▪️ ›

‹                              **DN**
                            **Dewayne**                        ⓘ

Tue, Aug 8, 8:31 AM

In a short meeting. Give
me 10 minutes

                                                              **K**

Will call at 8:45 to give a
little extra time.

I'm in the office now

Tue, Aug 8, 2:12 PM

I've left messages for Arla
and will stalk away. Also
there is another payment
we are putting together
so will supply that soon.
It's related to the back
end 40% and some sales
tax.

     iMessage              



●●○○○ Verizon 📶     **3:55 PM**     ✳ 77% ▬▶

‹     DN     ⓘ

**Dewayne**

It's related to the back end 40% and some sales tax.

Outstanding! We are ready!

Wed, Aug 9, 10:09 AM

Just got approval from Amegy attorneys and sent you a copy of the email from Arla. I've also sent you the additional disbursement we need to get done. I sent Arla a heads up to watch for it. Please let me know if you need anything else. Thanks and hope you have a great day.

Thank you Janis! I am

       iMessage     



**Dewayne**

Thank you Janis! I am glad things are back to normal, whatever that is!

Wahoo!!!!

Call him down! I'm hoping we get to the point to where we can get paid on some of these deals.

Oh I forgot to mention. Please charge us your fees on these csi transactions. We should be responsible. Thanks.

Ok, let's discuss this this afternoon when you're available.

Sounds good.

Delivered

   iMessage