*ProPetro Supply Agreement* (handwritten annotation)

# SUPPLY AGREEMENT

This Supply Agreement (the "Agreement"), dated as of April __13__, 2017 (the "Effective Date"), is by and between ProPetro Services, Inc. ("Buyer") and Complete Oil Field Services, LLC ("Seller").

The parties hereby mutually agree as follows:

1. <u>Term</u>

The term of this Agreement shall commence on the Effective Date and shall continue in effect until the supply of 80,000 tons of sand has been delivered, unless sooner terminated as provided herein (the "Term").

2. <u>Definitions</u>

For purposes of this Agreement:

(a) "Materials" (individually and collectively, as applicable by use herein) shall mean each of the following grades of frac sand: 40/70 Northern White and 100 Mesh Northern White sand as acquired by Seller.

3. <u>Sale and Purchase</u>

(a) Beginning on the commencement of this contract, Seller will sell to Buyer, and Buyer will purchase from Seller each of the Materials, in the volumes, at the prices and on the delivery terms set forth in Paragraph 4 of this agreement, all in accordance with the terms and conditions set forth in this Agreement. Each of the Materials will be purchased and sold in bulk with no packaging. Other than 100 mesh, each of the above grades of Materials will conform to Seller's applicable standard specifications, which conform to the applicable requirements of International Standard ISO 13503-2, Measurement of Properties of Proppants Used in Hydraulic Fracturing Operations, or such other specifications as may be established by written agreement of the parties (the "Specifications"). The 100 mesh will conform to Seller's applicable standard specifications, or such other specifications as may be established by written agreement of the parties (also, the "Specifications").

(b) Buyer will purchase from Seller, and Seller will sell to Buyer, an aggregate amount of each of the Materials up to 50,000 tons of 40/70 and 30,000 tons of 100 mesh, subject to adjustment as provided in this Agreement.

(c) During the Term, Buyer may purchase from Seller, and Seller may sell to Buyer, additional short tons or pounds, as the case may be, of each of the Materials in excess of the volume of such Materials as described in 3.(b), subject to availability of such Materials as determined solely by Seller at the time of Buyer's request for the same, pursuant to the terms and conditions of this Agreement.

**EXHIBIT 1**

(d) Orders for Materials under this Agreement will be made by written or oral releases issued by Buyer to Seller (the "Releases"). Buyer will submit Releases to Seller at least ten (25) business days prior to the desired date of delivery at the applicable F.O.B. point, which F.O.B. point shall be designated as provided in Section 4, below. Each of the Releases will identify the type, grade and quantity (in short tons or pounds, as applicable) of the Materials then being ordered, and the desired date of delivery at the applicable F.O.B. point. Buyer will order each of the Materials hereunder from Seller in generally even proportions. Subject to the availability of sufficient transportation units (railcars or trucks, as appropriate), shipments of Materials purchased and sold hereunder will be scheduled in reasonably equal proportions.

(e) All Materials purchased by Buyer under this Agreement will be used solely for Buyer's use and consumption in connection with its business operations and Buyer will not re-sell any Materials to any third party.

4. Delivery Terms and Pricing

(a) The initial quantity shall be approximately 10,000 plus tons of Materials delivered to the to the applicable terminal located at Seagraves, Pecos, Big Springs, San Angelo, Odessa, Midland, or Monahans, Texas (WTX) or as otherwise designated in writing by agreement of the parties (each, a "Designated Terminal"). Such amount to be purchased no later than May, 10th, 2017 and increase such quantity up to 80,000 tons of Materials within 90 days of April 12, 2017.

(b) The price for the Materials shall be $104.50 USD per ton including costs of rail delivery on existing tracks to Designated Terminal and transloading of Material into the trucks of Buyers designated trucking company. Such price shall be locked for 90 days from the effective date of this agreement with an adjustment for a change in FRC as provided in paragraph 4.(e).

(c) A demurrage allowance of 1.5 days of storage for every 1,000 tons from the date of arrival in the of rail cars to WTX. All material held over the initial 1.5 days shall incur a daily storage fee equal to $3.00 per ton per Day.

(d) Risk of loss will pass to Buyer when Materials are delivered to the applicable carrier at the Designated Terminal for transportation to the applicable Buyer Location. F.O.B. Designated Terminal.

(e) For purposes of this Agreement, "FRC" shall mean the freight related costs assessed by carriers and terminals, respectively, in connection with the transportation and handling of Materials. FRC are subject to changes in base rates as well as the applicability of related charges. When charges are assessed, or when base rates or charges are increased, by the carrier or terminal, Seller will change the then F.O.B. Designated Terminal price by the same amount. Any such change will become effective on the date implemented by the carrier or terminal. Seller will not incur any liability in the event of any delay or failure of carriers or terminals to perform services in connection with the movement of Materials from any Seller Plant to any Designated Terminal.

5.  Payment Terms

(a) Upon execution of this agreement, Buyer shall deposit funds in a qualified escrow account as agreed with Seller, the amount of $4,000,000 USD. Such amount shall be drawn upon by Sellers supplier, upon verification by independent escrow agent, to pay for the initial purchases of Materials included in this agreement. After the escrowed funds are exhausted, Buyer shall remit funds to Seller upon terms outlined in paragraph 5.(b).

(b) Payment for Materials and surcharges, if any, will be made by Buyer to Seller, in good funds, by wire transfer net twenty-seven (27) days after the date of confirmed rail shipment of the subject Materials from the origin point (in Wisconsin) or the date of invoice from Seller's supplier. Production based energy surcharges may be imposed from time to time by Seller as agreed with Buyer. Such surcharges, if any, will be added to invoices as separate line items and paid by Buyer to Seller.

6.  Warranties

(a) Seller warrants to Buyer that Seller has title to the Materials when delivered to the carrier at the applicable Designated Terminal for shipment to Buyer. Seller further warrants to Buyer that, when delivered to such carrier, the Materials shall conform to the applicable Specifications and shall be free and clear of all liens and encumbrances. Provided Buyer gives Notice, as set forth in the Notice section below, of any Materials sold under this Agreement fail to conform to the applicable Specifications and such defect is demonstrated to Seller's reasonable satisfaction to have existed prior to the Materials being delivered to the carrier for departure from the Designated Terminal, Seller, reserving the right to inspect the subject Materials in Buyer's possession, will, at Seller's option, either replace at Seller's expense, F.O.B. Buyer Location, or give Buyer proper credit for, such nonconforming Materials. The foregoing shall not apply to Materials that shall have been subjected to alteration, contamination, improper maintenance or storage, misapplication, misuse, negligence or accident after being delivered to the carrier for departure from the Designated Terminal or to Materials to which Buyer's tests use an unrepresentative sample.

(b) EXCEPT AS EXPRESSLY PROVIDED HEREIN, SELLER MAKES NO OTHER WARRANTY OF ANY KIND WITH RESPECT TO THE MATERIALS SOLD UNDER THIS AGREEMENT, WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE WARRANTY OF MERCHANTABILITY AND THE WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE WHICH ARE HEREBY SPECIFICALLY DISCLAIMED.

(c) The remedies set forth herein shall be the sole and exclusive remedy available to Buyer in the event of any breach of warranty in lieu of all other remedies. In no event shall Seller be liable for any direct, incidental, special, consequential or other damages (including, without limitation, lost profits) even if Seller has been previously advised of the possibilities of such damages. In no event will Seller's liability exceed the contract (purchase) price for the Materials, for which liability is claimed, plus, in the event replacement Materials are provided by Seller, freight costs to ship the same to the Buyer Location.

7.  Force Majeure

Each party shall be relieved of its obligation to perform any part of this Agreement, other than the obligation to pay money, to the extent its performance is prevented by events beyond its reasonable control, which events may include, without limitation, fire, lightning, flood, wind storm, earthquake and other Acts of God, epidemic, quarantine, accident, explosion, hostilities, war, revolution, act of terrorism, acts of the public enemy, maritime border or boundary dispute, riot and other civil disturbances, sabotage, strike, labor disputes, work stoppages, court injunctions, transportation embargos, general unavailability of electric power or other utilities, laws, acts, regulations, orders or other requirements of federal, state, county, municipal or local governments or branches, subdivisions or agencies thereof, including but not limited to any temporary or permanent government restriction or moratorium on hydraulic fracturing ("Force Majeure"). The party claiming the Force Majeure shall promptly notify the other party of the occurrence of any Force Majeure (which shall include a description of the subject Force Majeure) that affects or may affect its performance of this Agreement and, subsequently, will promptly notify the other party upon the termination of such Force Majeure. The party claiming the Force Majeure shall use commercially reasonable efforts thereafter to overcome the effects of the Force Majeure as promptly as possible and resume performance hereunder; provided, however, neither party shall be required to resolve a strike, lockout or other labor problem in a manner which it alone, in the exercise of its sole discretion, does not deem proper and advisable.

8.  Safety Warning, Handling and Indemnity

WARNING: FRACTURING SAND COATED PROPPANTS - MAY CAUSE DELAYED LUNG INJURY AND CANCER HAZARD. BOTH MATERIALS CONTAIN FREE CRYSTALLINE SILICA. DO NOT BREATHE DUST. PROLONGED INHALATION CAN CAUSE DELAYED LUNG INJURY, INCLUDING SILICOSIS, A PROGRESSIVE DISABLING AND SOMETIMES FATAL LUNG DISEASE. IARC HAS DETERMINED THAT CRYSTALLINE SILICA INHALED FROM OCCUPATIONAL SOURCES CAN CAUSE CANCER IN HUMANS. AVOID CREATING DUST WHEN HANDLING, USING OR STORING. FOLLOW OSHA OR OTHER RELEVANT SAFETY AND HEALTH STANDARDS AND USE GOOD HOUSEKEEPING AND ADEQUATE VENTILATION TO KEEP EXPOSURE BELOW RECOMMENDED EXPOSURE LIMITS. AVOID PROLONGED OR REPEATED SKIN CONTACT UNLOADING OPERATIONS - DO NOT EXCEED FIVE (5) PSI WHEN UNLOADING THIS MATERIAL TO MINIMIZE THE CREATION OF AIRBORNE DUST AND POSSIBLE DUST EXPLOSION HAZARD.

SELLER WILL NOT BE LIABLE TO BUYER FOR ANY HARMFUL HEALTH EFFECTS WHICH MAY BE CAUSED BY EXPOSURE TO SILICA CONTAINING MATERIALS SUPPLIED BY SELLER HEREUNDER. Buyer warrants that it will adequately warn all of its employees and customers who may come in contact with silica containing materials supplied by Seller of the above described health hazards. Further, Buyer warrants it will fully comply with all applicable health and safety regulations and orders relating to the workplace handling of materials supplied by Seller.

Buyer specifically acknowledges and agrees that it has the expertise and knowledge in the intended use of materials supplied by Seller and any use or other product or material made therefrom, and that it assumes all risk and liability for results obtained by the use of such materials, whether used singly or in combination with other substances or in any process. Upon acceptance of materials supplied by Seller or in the absence of any written notice, as set forth in the Notice section below, of the nonconformity of such materials BUYER AGREES TO FULLY RELEASE, INDEMNIFY, DEFEND AND HOLD SELLER AND ITS SUPPLIERS HARMLESS from and against any and all liability, claims, penalties and suits it may possess or that may be asserted against Seller and/or any of its suppliers by any third party (including but not limited to its employees, any contractors, subcontractors, government agencies or entities, or property owners, or insurers of any of such parties or of the Buyer) in any manner arising in whole or in part, out of: (i) any breach by Buyer of the duties or warranties set forth in this Section 8 and/or (ii) the use, whether used singly or in combination with other substances or in any process, exposure to and/or residual effects of any of the materials supplied by Seller under this Agreement. The provisions of this Section 9 shall survive the expiration, or earlier termination as provided herein, of this Agreement.

9. Assignment

This Agreement may not be assigned, in whole or in part, by Buyer without the prior written consent of Seller. Any attempted assignment shall be void and ineffective for all purposes unless in conformity with this Section 9. This Agreement will be binding upon and inure to the benefit of the parties hereto and their successors- in-interest and any permitted assigns.

10. Entire Agreement

This Agreement sets forth the entire agreement and understanding of the parties with respect to the subject matter of this Agreement and supersedes and replaces all prior agreements and understandings, oral or written, with respect to the same. Failure or delay by a party to exercise any right or remedy under this Agreement shall not be deemed a waiver thereof or diminish such party's right thereafter to fully exercise such right or remedy or any other right or remedy of a like or different kind. Waiver of any breach or default of any provision of this Agreement must be in writing and signed by the waiving party to be effective. A waiver on one occasion shall not operate or be construed as a waiver of any subsequent breach or default of a same or similar kind.

11. Amendment

No modification or amendment of this Agreement shall be effective unless reduced to writing and signed by both Seller and Buyer. For the avoidance of doubt, this Agreement shall not be modified or amended by any terms or conditions contained in any of the Releases submitted by Buyer to Seller.

12. Applicable Law

This Agreement will be governed by and construed in accordance with the laws of the State of Texas, notwithstanding the principles, if any, that would otherwise govern the choice of applicable law.

13. Notice

All notices required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered by hand, by fax (with written confirmation of transmission), by e-mail delivery confirmed by rpost.com, or by a nationally recognized private courier service (proof of delivery requested) as provided in this Section. Notices delivered by hand, by fax, by e-mail or by a nationally recognized private courier service shall be deemed received on the day of receipt. Any notice delivered by hand or fax shall be followed by a confirmation letter sent by a nationally recognized private courier, no later than one (1) business day after it is delivered by hand or sent by fax. Notices will be addressed as shown below. Either party may change its address by giving the other party written notice as provided in this Section 14.

| If to Buyer: | If to Seller: |
|---|---|
| ProPetro Services, Inc. | Complete Oil Field Services, LLC |
| Attn: _Mark Howell_ | Attn: _____ |
| 1706 S. Midkiff, Bldg. B | 8731 South Sandy Parkway, Suite 103 |
| Midland TX 79701 | Sandy, UT 84070 |
| Fax: *(432) 688-3976* | Fax: |
| E-mail: _mark.howell@propetroservices.com_ | E-mail _____ |

14. Confidentiality

Buyer will hold the contents of this Agreement in confidence.

15. Miscellaneous

(a) Seller may terminate this Agreement upon written notice to Buyer: (i) if Buyer fails to remit payment to Seller within the time specified in this Agreement, or any extension thereof authorized in writing by Seller. Either party ("Non-breaching Party") may terminate this Agreement upon written notice to the other party ("Breaching Party"); (ii) if the Breaching Party is in breach of a material obligation under this Agreement and fails to cure such breach within thirty (30) days after the Breaching Party's receipt of written notice thereof from the Non-Breaching Party, or (iii) if the Breaching Party becomes insolvent, or voluntarily files a petition, or has an involuntary petition filed against it, under the Federal Bankruptcy Code or any other Federal or State bankruptcy or insolvency law, or a trustee, receiver or liquidator is appointed for its business or all or a substantial part of its assets, or if any assignment is made of its business equipment for the benefit of creditors, other than in the normal course of business.

(b) Buyer shall inspect the Materials purchased from Seller. All claims of any nature relating to the Materials, including but not limited to claims of defect in Materials, non-conforming discrepancy in quantity or delivery date, shall be made in writing to Seller's Customer Service Department within fifteen (15) days of receipt of the subject Materials by Buyer. Notwithstanding anything to the contrary in this Agreement, failure to make any such written claim within the above-prescribed period shall constitute waiver of any such claims and shall be deemed acceptance of such Materials, including but not limited to any quantities and delivery dates relating to such Materials.

(c) In the event that any of the provisions of this Agreement is held invalid, illegal or unenforceable, that will in no way affect, impair or invalidate any other provision, and all other provisions of this Agreement will remain in full force and effect.

(d) This Agreement may be executed in separate counterparts, each of which when so executed and delivered shall be an original, but all of which together shall constitute one and the same instrument. Each counterpart may consist of a number of copies hereof, each signed by less than all but together signed by all of the parties hereto. Exchange of executed copies of this Agreement, including any executed counterparts, via fax or via e-mail in pdf (or similar) format shall constitute execution and delivery of this Agreement and any such counterparts.

(e) This Agreement is being entered into among competent and experienced businesspersons, represented by legal counsel, and has been negotiated and reviewed by the parties and their respective legal counsel. Therefore, the language in this Agreement will not be construed against any particular party as the drafter of such language.

(f) The headings contained at the beginning of each Section of this Agreement are inserted solely for the convenience of the parties and shall not affect the meaning or interpretation of this Agreement.

The above is hereby agreed to and accepted as of the Effective Date.

PROPETRO SERVICES, INC.                              COMPLETE OIL FIELD SERVICES, LLC

By _____[signature]_____                              By _____

_____Dale Redmon_____                                 _____
Written Name                                          Written Name

Title _____CEO_____                                   Title _____

(b) Buyer shall inspect the Materials purchased from Seller. All claims of any nature relating to the Materials, including but not limited to claims of defect in Materials, non-conforming discrepancy in quantity or delivery date, shall be made in writing to Seller's Customer Service Department within fifteen (15) days of receipt of the subject Materials by Buyer. Notwithstanding anything to the contrary in this Agreement, failure to make any such written claim within the above-prescribed period shall constitute waiver of any such claims and shall be deemed acceptance of such Materials, including but not limited to any quantities and delivery dates relating to such Materials.

(c) In the event that any of the provisions of this Agreement is held invalid, illegal or unenforceable, that will in no way affect, impair or invalidate any other provision, and all other provisions of this Agreement will remain in full force and effect.

(d) This Agreement may be executed in separate counterparts, each of which when so executed and delivered shall be an original, but all of which together shall constitute one and the same instrument. Each counterpart may consist of a number of copies hereof, each signed by less than all but together signed by all of the parties hereto. Exchange of executed copies of this Agreement, including any executed counterparts, via fax or via e-mail in pdf (or similar) format shall constitute execution and delivery of this Agreement and any such counterparts.

(e) This Agreement is being entered into among competent and experienced businesspersons, represented by legal counsel, and has been negotiated and reviewed by the parties and their respective legal counsel. Therefore, the language in this Agreement will not be construed against any particular party as the drafter of such language.

(f) The headings contained at the beginning of each Section of this Agreement are inserted solely for the convenience of the parties and shall not affect the meaning or interpretation of this Agreement.

The above is hereby agreed to and accepted as of the Effective Date.

PROPETRO SERVICES, INC.

By _____

Dale Redmon
Written Name

Title _____CEO_____

COMPLETE OIL FIELD SERVICES, LLC

By _____

Sam Taylor
Written Name

Title _____Manager_____