Case 5:17-cv-00808-XR  Document 12-11  Filed 09/11/17  Page 1 of 21

7/24/2017          A bankrupt frac-sand company, millions in losses, a Texas state senator and the FBI - San Antonio Express-News

Business

# A bankrupt frac-sand company, millions in losses, a Texas state senator and the FBI

State Sen. Uresti plays a major role in the drama

**By Patrick Danner**  |  August 20, 2016  |  Updated: September 19, 2016 8:58am

26

**EXHIBIT 9**



Photo: Jerry Lara /San Antonio Express-News

IMAGE 1 OF 23
Denise Cantu, 36, center, and her family visit the gravesite of her children, Annissa Marie Salazar and Johnathon Dominic Cortez at the Monte Meta Cemetery near San Benito in January. The two children were ... more

About 10 months after a legal team including state Sen. Carlos Uresti secured a substantial settlement for Denise Cantu in a wrongful-death lawsuit, she invested $900,000 — the bulk of the proceeds — with a San Antonio frac-sand company that was paying the senator commissions for attracting investors.

Uresti helped represent the Harlingen woman in the case after the rear tire on her Ford Explorer blew out, causing the SUV to veer into a grassy median,

roll over and kill her 13-year-old daughter, 4-year-old son and two friends in August 2010.

Now, most of Cantu's money is gone, along with at least $5 million the frac-sand company, FourWinds Logistics, raised from three other investors, a filing in federal bankruptcy court here shows. Total claims against the company exceed $14 million, another document states.

Some investors have accused FourWinds, which now is in bankruptcy and out of business, of fraud. At least one has called it an illegal Ponzi scheme.

FourWinds isn't a typical oil-patch implosion. While sinking crude oil prices may have sped the company's failure, its collapse is rooted in allegations of fraud and misused corporate funds.

Uresti said in an interview last week that he received a 3 percent commission on Cantu's May 2014 investment plus a 10 percent stake in her joint venture with FourWinds.

In sworn testimony, Cantu said she didn't know Uresti was taking a cut off the top, though Uresti disputed that.

Within a month of Cantu's investment, FourWinds extended Uresti a $40,000 loan, court records show. The firm hired him to perform legal services and he later acted as the firm's outside general counsel, Uresti said.

Uresti, a San Antonio Democrat, disclosed owning between 100 and 499 shares of FourWinds on his personal financial statement filed with the Texas Ethics Commission, but not his other financial dealings with FourWinds or Cantu's joint venture.

Ethics rules require lawmakers to file an annual financial statement disclosing sources of income, stock holdings, assets, debts and other information.

Uresti said the omission was an "oversight and we'll have to amend" the disclosures. But violation of the law, if proven, can lead to both civil and criminal penalties. Uresti signed the form "under penalty of perjury" that it was correct and included all information required to be reported.

**Wasted money**

Some FourWinds investors accuse CEO Stan Bates of wasting their money on personal expenses, expensive gifts, exotic car rentals and a wild lifestyle spiced by flying women in to meet him and lavish vacations, a court filing states. Those investors claim Bates lured them in, in part, by presenting allegedly forged bank documents and financial statements that vastly inflated the company's cash holdings and receivables.

Bates has disputed the allegations, including charges that FourWinds was a Ponzi scheme. Bates was personally forced into bankruptcy by some of his creditors in October.

An eclectic cast of characters and local politicians figure in the company's rapid rise and fall, including Uresti, his friend Bexar County District Attorney Nico LaHood and Gary Cain, a former client of LaHood's law firm and the DA's current business partner.

Cain was indicted — but later found not guilty — of four felony charges, including two counts of theft in connection with a 2007 land deal involving Rackspace Hosting Inc.

No one has been charged with wrongdoing in connection with FourWinds, but the FBI has seized corporate records and is looking into the company, according to Bates' personal bankruptcy lawyer.

An FBI agent also was in court following Bates' bankruptcy proceedings in which he invoked his Fifth Amendment right to not incriminate himself 73 times over two days of testimony in December. In an order the following month, U.S. Bankruptcy Judge Craig Gargotta said Bates was "evasive," exhibited a "lack of honesty" about his financial affairs and often tried to "cover his tracks."

Uresti said he was contacted a couple of weeks ago by the FBI "as a witness" in an investigation of FourWinds and Bates. Bates said in an interview that he met with the FBI for four days, but he said the topic was focused on Uresti.

"They've been after Uresti a long, long, long time," Bates said. Uresti fired back, "That's ridiculous, that's absurd. It's offensive."

FBI Special Agent Michelle Lee, the agency's spokeswoman in San Antonio, declined to comment. Daryl Fields, spokesman for the U.S. attorney's office in San Antonio, also had no comment.

## The deal

Court records show that Bates founded FourWinds, also known as FWLL LLC, to trade frac sand, which is used in fracking to extract oil and gas from shale rock.

Bates owned 51 percent of FourWinds with business partner, Shannon Smith, who controlled 48 percent of the company. Bates testified in court that Uresti owned 1 percent of the company, although the senator said the company's stock certificates never were transferred to him or registered with the secretary of the state in Texas.

It's unclear whether Uresti, who's not a registered securities broker, needed that certification to help find investors. Uresti said in an interview that he consulted with an attorney who told him he didn't need to register with the Texas State Securities Board.

"I was not selling a security," he said.

Former Securities and Exchange Commission senior enforcement attorney Jacob Frenkel in Washington said that may not be so clear.

Frenkel, who couldn't comment specifically on FourWinds, said an investment is usually considered a security "if a seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit" from the investment.

Under the terms of Cantu's deal, her money was supposed to be held in escrow until Bates found a buyer for the frac sand — at which point he would buy it and resell it at a markup, redepositing the proceeds into the escrow account, according to the documents.

## Conflicts of interest?

FourWinds set up separate limited liability companies for each new investor, taking a 60 percent stake in Cantu's — called FWL-DC — with her retaining 40 percent of the interest, according to a copy of an unsigned joint venture agreement submitted in court.

Uresti, who's listed as an FWL-DC manager in state corporate records, said in an interview that he had a 10 percent ownership stake while Cantu got 40 percent and FourWinds retained 50 percent.

7/24/2017
Case 5:17-cv-00808-XR   Document 12-11   Filed 09/11/17   Page 6 of 21
A bankrupt frac-sand company, millions in losses, a Texas state senator and the FBI - San Antonio Express-News

Bates said Uresti also was the company's escrow agent. Uresti, however, said he was an escrow agent for just one of FourWinds' other ventures, not for the company or Cantu's venture.

Uresti said he provided legal services for FourWinds and served as its outside general counsel for four or five months in late 2014. He said he resigned prior to the the 2015 legislative session.

Bates has raised questions about whether Uresti's multiple roles created conflicts of interest. Bates listed Uresti as a "responsible third party" in response to a lawsuit Cantu filed last year in Cameron County accusing Bates and his company of fraud.

Uresti declined to discuss the issue in an interview, saying he did not want to jeopardize the FBI investigation. Cantu's lawsuit has been on hold since FourWinds filed for bankruptcy.

In April, the bankruptcy trustee for FourWinds sued Uresti to collect on the $40,000 loan, which the politician allegedly failed to pay back to the company. The trustee recently settled the dispute, with Uresti paying $30,000, an Aug. 6 court filing shows.

The June 2014 loan was "kind of like an advance on future commissions (and) future legal work," Uresti said in an interview.

As of Friday, Uresti hadn't amended his personal financial statement with the Texas Ethics Commission. If anyone files a complaint, the agency could impose a fine of $5,000 per violation or triple the amount at issue, whichever is greater, for filing an incomplete financial report, commission lawyer Ian Steusloff said.

**It is a 'big deal'**

"Financial statements are very important part of the checks and balances in our system, and are important to prevent conflicts of interest," said Fred Lewis, an Austin elections law attorney. "So lawmakers should be very careful to properly and completely fill out their financial statement. So, yes, it is a big deal."

Failing to report an asset or debt on the form also may be a criminal offense, Lewis added.

Uresti said in a May court filing that that the company hadn't yet paid him for helping find investors. He, like others, was duped by Bates, the filing added.

With FourWinds strapped for cash, Bates testified LaHood recommended bringing on Cain to help find funding for its operations. LaHood denied Bates' take in an email. Cain was brought on board in September 2014, a couple of months after a Bexar County jury cleared him of criminal charges in the Rackspace land deal.

LaHood, who headed up Cain's legal defense, was elected district attorney in November 2014. LaHood currently is co-owner and co-chairman of Cain's financial services company, Trinity Global Funding & Consulting LLC, according to a corporate document submitted as evidence in Bates' bankruptcy. LaHood confirmed in an email that he is still "in business" with Cain.

"One of my roles is to evaluate potential business opportunities with the desire to be involved in business for profit," LaHood said. He added that he will "continue to be involved in and look for business opportunities to further bless my family, outside of this office." LaHood, who handles both civil and criminal matters as DA, is slated to get a $46,000 boost in the next fiscal year that will bring his annual salary from the state and county to $242,000.

**Passing the blame**

Bates has blamed everyone but himself for FourWinds' failure, including investors, Cain, Uresti and Halliburton — one of the company's biggest customers.

Seven of 11 investors got their money back, Bates said in an interview last week.

"Those (other) four investors said, 'We want our money back, we want our money back.' I said those (expletive deleted) got hundreds of thousands of dollars in return. They all got money, including Uresti." Bates also attributed the company's troubles to a precipitous drop in the price of sand when oil prices collapsed.

Nothing in Bates' background would suggest he had the chops to be a sand baron.

Bates, 44, served nearly 14 years and in 40 countries as a Marine, according to his court testimony in December. He testified that he manned a sniper post and was a forward observer, giving coordinates to aircraft while serving in Umm Qasr, a southern city in Iraq.

He also was a recruiter when the Marines had an office in the Hipolito F. Garcia Federal Building and U.S. Courthouse in downtown San Antonio, the same building where Bates would return for bankruptcy court hearings. It was during one of the Marines' Toys for Tots drive that

Bates said he first met Uresti, himself an ex-Marine. Uresti recalled the meeting but doesn't remember any details.

Bates' educational background is unclear.

He posted on his LinkedIn page that he received a bachelor's degree in business administration from the University of North Carolina at Chapel Hill through a Marine Corps program. But the university has no record of him ever attending, media relations manager MC VanGraafeiland said.

When asked about the discrepancy, Bates stood by his educational record. But he later removed the reference from his LinkedIn page. A university spokesman said it hasn't supported the program for the past three years but couldn't immediately determine if that was the case in 1996, the year Bates said he graduated.

**Breaking into oil**

After an honorable discharge, Bates testified, he went into the automotive-sales business, working as a sales manager and general manager. He then started his own business, B&B Marketing LLC, handling direct mail and other services for car dealerships. The business unraveled, Bates said in court, when one of the printing businesses he used went under, causing a few clients to sue for the return of their money.

Those legal claims would be the basis for those creditors later forcing Bates into an involuntary bankruptcy after FourWinds went under.

"Stan Bates is a quintessential con man," San Antonio lawyer Ron Smeberg wrote in a January court filing. Smeberg represents a partnership that invested with FourWinds and is headed by Richard Thum, who runs dry cleaning company SA Five Star Cleaners. "Mr. Bates' businesses activities can be summed up as he is willing to lie, cheat and steal to get as much money as he can and then he runs away," Smeberg added in the filing.

At the suggestion of a friend he had served with in the Marines, Bates sought to break into Texas' oil and gas industry despite having no energy industry experience.

"I started knocking on rig sites' doors … trying to get into the oil business," Bates testified. "I physically started off with me, my truck and my dog."

Bates enlisted an acquaintance from his car-business days, Smith, to help run FourWinds in May 2014, about a month before oil peaked at more than $107 a barrel.

Soon, they were attracting investors anxious to get in on the riches gushing out of the Eagle Ford and other shale plays.

Among those investors was Cantu. She was instructed by her attorneys not to comment for this article, but according to a transcript of testimony she gave in November, Uresti suggested she go see Bates.

## 10 percent 'off the top'

Uresti was a family attorney who helped her settle the wrongful-death case of two of her children, she said.

Uresti's signature does not appear on the agreed final judgment signed by the lawyers even though he said he participated in mediating the settlement. San Antonio attorney Mikal Watts, whose firm also represented Cantu, said he couldn't recall whether Uresti referred the case. But Watts added, "Carlos has been good enough to me to send me a lot of business over the years."

Cantu, Uresti, Bates and Smith all are listed in state corporate records as FWL-DC managers.

Asked during a Nov. 18 bankruptcy court hearing by Martin Seidler, Bates' bankruptcy lawyer, if Uresti disclosed to her that he also was the corporate lawyer for FourWinds, Cantu simply said "no."

Uresti said in an interview that he wasn't FourWinds' lawyer at the time she invested. But the unsigned joint venture agreement said a copy of any notices to the joint venture should go to "Carlos Uresti, Attorney."

When asked why his name was listed as her attorney, Uresti said: "If it's unsigned, it's not a contract."

He added, "You're asking me to comment on a document that's not even proven to be true and correct."

Seidler, in questioning Cantu during the hearing, asked: "And you knew at the time you made the investment that Carlos Uresti, your lawyer, was going to take 10 percent off the top, right?"

Cantu replied, "I didn't know that."

Uresti, in an interview, said his commission on Cantu's investment was 3 percent, or $27,000 and that he took a 10 percent ownership stake in her venture. She added that Uresti no longer was her attorney when she agreed to the joint venture agreement in May 2014.

### 'Stupid' returns

The joint venture agreement authorized FourWinds to take up to $20,000 a month out of Cantu's investment before profits were paid to cover its costs. Any profits, or losses, were supposed to be shared between the company and the investor, the agreements stated.

Bates told Cantu she could expect a $30,800 return every 45 days on her investment, according to copies of text messages between the two that were submitted in court.

"For total of $246,400.00 A (expletive deleted) YEAR," Bates wrote in one undated message. "Babygirl that a 28% guaranteed return."

"Stupid ass return," said another.

Bates made similar grandiose promises to other prospective investors.

Sand is "more valuable than gold. It's more valuable than oil itself," Bates touted during one profanity-laced meeting. "Sand's never went down (in value). It only goes up."

In the September 2014 presentation, which was recorded by a participant, Bates projected sales of $1.2 billion within 18 months.

### 'Zero-risk investment'

It was a simple business plan. Each of the investment partnerships set up — there were at least five — would not buy sand unless an end-user already had agreed to purchase the sand. FourWinds would mark up the the price on the sand by anywhere from $18 to $25 a ton — which would partly represent profit for the joint venture partners. Bates testified of reselling "50,

7/24/2017          A bankrupt frac-sand company, millions in losses, a Texas state senator and the FBI - San Antonio Express-News

60, 70,000 tons of sand" over an unspecified time frame. Profits were supposed to go into an escrow account.

"It's almost a zero-risk investment," he pitched to potential investors during the recorded presentation. "The only risk that people have with an investment with me is if I tell everybody to (expletive deleted) off … and skate off to Lima, Peru, never see me again." But he assured them that wouldn't happen because he had two children to keep him around. Bates took the Fifth when asked if it was his voice on the recording.

Guillermo Hoyos, a fine-arts broker and executive director of the now-defunct Museo Alameda, admitted in court he made the audio recording of Bates so he could play it back later at his own pace to better understand the fast-talking Bates. Attempts to reach Hoyos for comment were unsuccessful.

Hoyos, who testified he met Bates through Uresti and San Antonio clothing designer Margarito Alonzo, had developed relationships with individuals eager to invest in the then-booming oil and gas industry. Hoyos introduced Bates to Thum, SA Five Star Cleaners' president, and Hector Navarrete, a San Antonio businessman whose LinkedIn page says he is in the telecommunications field.

Hoyos received commissions for finding investors, but testified he wasn't a licensed securities broker. He said in a Dec. 16 court hearing that Uresti and Alonzo also received payment for bringing in investors. Attempts to reach Alonzo were unsuccessful. Uresti also said he received a commission on Navarrete's investment, though he couldn't recall the amount.

Hoyos didn't do any of his own due diligence on FourWinds or Bates, he acknowledged.

"I trust Mr. Bates was doing a great business and I trust the business was doing fantastic," he said in the Dec. 16 court hearing. Uresti, citing the FBI investigation, declined to say whether he did anything to vet Bates.

**Spindletop redux**

Thum, a private pilot, had flown over the Eagle Ford on several occasions and was floored by the oil industry's "hustle and bustle," he said in an interview.

"When I heard this thing about fracking … I said, man, right in our backyard. This is like Spindletop," said Thum, referring to the Beaumont oil field where crude was struck in 1901, marking the birth of the modern petroleum industry. "Man, I'd like to be part of it some way. So the pump was already primed prior to Stan Bates."

Thum met with Bates around June 2014. Thum initially expressed skepticism regarding the financial strength of FourWinds and concerns about its brief time in operation. Bates sought to put Thum at ease by giving him a May 2014 bank statement showing the company had more than $18.8 million in a bank account, Thum said in an interview.

The document apparently wasn't real. Subpoenaed bank records in Bates' bankruptcy show FourWinds had $96,918.03 in the Chase bank account at the end of May 2014, and never had more than $1.4 million at any one time during the month.

Asked during a bankruptcy court hearing if there ever was more than $18 million in the account, Bates declined to answer, exercising his Fifth Amendment right against self-incrimination.

Other FourWinds' bank documents and financial statements were allegedly forged, as well, court testimony indicates. Eric Nelson, who had been FourWinds' e-commerce and marketing director, testified that Bates asked him to change the balance shown on a Chase bank statement. At first, Nelson resisted. But he eventually did so out of fear, he said.

Bates "said if I didn't do it he would fire me and then shoot me in the back of the head," Nelson said. He conceded the two weren't pals and that Bates would sometimes torment him.

"He would push me, stick his finger in my ear. Throw a football at me when I wasn't looking," Nelson testified in a Jan. 5 court hearing.

Nelson said the bank statements he altered were used as "proof of funds for us to purchase frac sand."

**Not braggadocious**

Prior to agreeing to put up money to buy sand in a partnership, Thum requested a meeting with Uresti. They met for dinner at a restaurant at Interstate 10 and Huebner Road, Thum said in an interview, though he couldn't remember the establishment.

Uresti's involvement in FourWinds gave the company a measure of credibility, Thum said.

"Why would a state senator be involved (with) a crook?" Thum said in an interview. He and Navarette each put up $1.4 million in August 2014 to buy a combined 20,000 tons of sand. The money was supposed to go into an escrow account set up by Uresti, Thum said.

During their meeting, Thum said, Uresti told him "the company's doing good, Eagle Ford Shale is booming. They may not know FourWinds but they know I'm a state senator." Thum also recalled Uresti saying his Senate district included the area and "if there was a problem that (the company) had, he could … make a call and get past the secretary."

Uresti disputed Thum's recollection. "That's not how I am, that's not how I act, and that's not how I represent myself," Uresti said. "I'm not braggadocious. He must have misunderstood or misheard. That's completely untrue."

Uresti has been in the state Senate about 10 years and has spent most of that time on the Senate Natural Resources Committee, which handles oil and gas legislation. He previously served nine years in the state House of Representatives. State representatives make $7,200 a year, plus expenses.

"As the only member of the Senate to represent areas in both the Eagle Ford and the Permian Basin plays, Sen. Uresti is uniquely aware of the needs in our energy sectors," a 2015 news release from his office boasted.

**'Golden goose'**

The senator has been a staunch industry supporter. Last year, he was one of only four Democrats in the Senate to vote in favor of stripping local governments from having the authority to ban fracking. The legislation came after voters in the North Texas city of Denton passed a fracking ban in November 2014.

"You have to take care of the golden goose," Uresti said, explaining why he backed the bill in a July 2015 appearance on the radio show "In the Oil Patch." That same month, Uresti said the law "will help avoid a patchwork of regulations over methods used to recover hydrocarbon resources," he wrote in Shale Oil & Gas Business Magazine.

Having a sitting state senator involved in his fledgling frac-sand business was a coup for Bates, who didn't hesitate to tell prospective investors that Uresti was the "in-house counsel" for FourWinds, Bates testified.

Uresti said prospective investors were told to do their own due diligence on FourWinds and seek legal advice before deciding whether to invest.

**Wild parties**

When Shannon Smith joined FourWinds as Bates' partner in May 2014, Smith said he had been assured everything was in place to start operations. While money was coming in from investors, he quickly discovered they didn't have a sand supplier.

"I panicked a little bit," Smith testified at a bankruptcy court hearing earlier this year. "I knew we had investors lined up and ready to to go and we needed to start getting sand ready to be sold. So we frantically started looking for sand suppliers." Smith didn't return multiple phone calls for comment.

Smith testified that he spent the next three months visiting mines to find a sand supplier. Once that was done, the investor partnerships started selling sand to industry giants like Halliburton, Baker Hughes Inc. and C&J Energy Services.

Smith soon became concerned about how Bates was running FourWinds, which employed about 40 people, he testified. Smith recalled a September 2014 breakfast meeting where he confronted Bates.

"We talked about drugs, we talked about spending on things that we shouldn't be spending money on, we talked about … office affairs," Smith testified.

In a sworn affidavit, Smith said Bates held "wild parties" and drove around in a Ferrari.

Bates told Smith he was going to run the company the way he saw fit, Smith added.

**Victoria's Secret**

FourWinds' bankruptcy schedules detail a peculiar assortment of transactions for a company.

One week in early fall 2014, there were purchases from lingerie shop Victoria's Secret, women's boutique Apricot Lane, clothing shop WantMyLook.com , which touts its "sexy sophistication." There also were expenditures from car and sport-vehicle shops Auto Exotic Rentals, Killer Motorsports and Kent Powersports, which sells motorcycles, boats and all-terrain vehicles. The transactions ranged from about $200 to $4,200.

Bates said in an interview that those purchases were for Uresti, not for him.

"That's completely false," Uresti said.

Bates also was accused of using company funds to pay his and family members' personal expenses, court documents state.

A month before FourWinds filed for bankruptcy, Bates began making installment payments on a 2015 Mercedes G550 SUV — with a sticker price of more than $100,000. Then, just days before the bankruptcy, he spent $21,800 at Lloyd's Diamonds as half-payment on a four-carat diamond engagement ring. His girlfriend posted on Facebook that they got engaged Aug. 22, 2015.

"This is his personal piggy bank," Raymond Battaglia, a bankruptcy lawyer for some investors, said during a November court hearing in FourWinds' bankruptcy. "I'm pretty sure frac sand didn't need Victoria's Secret."

Bates described the purchases as draws on his monthly $45,000 salary, which he later reduced to $15,000 when money got tight. A June court filing showed FourWinds had revenue of $2.6 million in 2014 and $1.2 million in 2015.

Bates' lawyer Martin Seidler defended the executive's compensation and extravagant lifestyle, telling U.S. Bankruptcy Judge Gargotta at a Dec. 16 hearing that the company was generating "considerable cash flow." Seidler declined to comment for this article.

Gargotta, in his January ruling, concluded Bates had funneled money out of FourWinds through another company and back to himself. Gargotta said Bates moved more than $600,000 out of his personal bank account shortly after receiving notice of his involuntary bankruptcy, presumably before the account would have been frozen.

**Cain and LaHood**

About the time Smith was questioning Bates' management style, Cain was brought on to help find funding for FourWinds' operations — just two months from being cleared in his criminal trial in July 2014. Rackspace's co-founder and then-CEO Graham Weston testified during Cain's trial that the company was defrauded out of millions of dollars in a land scheme orchestrated by Cain.

Testifying at a December hearing in his personal bankruptcy case, Bates said he was introduced to Cain — who was in the midst of his own personal bankruptcy — by Uresti but that LaHood recommended that FourWinds bring on Cain. Uresti also represents Cain in a divorce case.

LaHood, who was Cain's defense lawyer in the Rackspace case, said in an email he was introduced to Bates by Uresti at a campaign fundraiser.

Cain's services were retained through the company Cain and LaHood co-chair: Trinity Global Funding & Consulting, Bates said.

"Mr. LaHood has extensive experience in business management leads the way for his running the largest law firm in Bexar County (sic)," according to a Trinity Global document, which is riddled with grammatical errors.

Campaign finance reports show Bates contributed more than $10,000 to LaHood's 2014 campaign for district attorney, though $5,000 of that was returned in June 2015. LaHood said in an email that he returned the money after hearing concerns from citizens about Bates' business practices and that "his contributions could have been a result of ill gain from unsuspecting investors.

"I returned the $5,000 because I believed, at the time, that amount was the total contribution," LaHood said. "My campaign advisers have subsequently discovered there are others and these will be returned as well."

**Bad blood**

Bates and Cain didn't work well together.

In an interview, Cain said the first thing he did to help FourWinds was secure a $180 million line of credit. The financing was obtained from a Minnesota factoring company by presenting financial statements that he said he later discovered "we're being reported improperly."

Cain said he also secured from a Korean pension fund a $50 million commitment for the development of sand silos and a commitment for $25 million in financing from a New York group to fill purchase orders.

FourWinds didn't get its money's worth out of Cain and his company, which received $30,000 a month from FourWinds, Bates testified.

"I know he did a lot of advising," Bates said in court. "I don't know if the advising was in the best interest of FourWinds or anybody else except for him."

Bates added that he obtained a line of credit on behalf of FourWinds, not Cain, and it was for $130 million.

Cain pointed the finger at Bates.

"As the receivables came in, instead of giving that money to investors in accordance with the investor agreements, (Bates) was spending it," Cain said in a Nov. 30 interview.

Cain said he quit working with FourWinds in May 2015, but Bates said he was fired.

There was a lot of bad blood between Bates and Cain, and both accuse the other in unrelated litigation of allegedly trying to steal control of a separate venture called AMD Energy Services LLC, an oil field services company.

**Lawsuits**

Some FourWinds' investors, in the meantime, were starting to get antsy about their money and began asking questions in late 2014.

Thum said the vast majority of the proceeds from sand sales didn't go into the escrow accounts. He only got back $163,000 of the $1.4 million he invested, he said in an interview.

Cantu, the Harlingen woman who invested proceeds from the wrongful-death case, testified that she lost $800,000 of her $900,000 investment. She sued Bates and the company for fraud in Cameron County in May 2015.

The following month, Bates and FourWinds responded to Cantu's lawsuit by claiming her damages, "if any, were caused all or in part by Carlos Uresti." In their answer to the lawsuit, Bates and the company sought to designate Uresti as a "responsible third-party."

"I'm assuming there was some kind of conflict," Bates responded during a creditors meeting when asked what Uresti did wrong to be designated a responsible third party.

When asked in an interview if he had any conflicts of interest, Uresti replied, "Absolutely not."

Thum's partnership also sued Bates and the company for fraud in June 2015 in Bexar County District Court.

FourWinds filed for Chapter 11 bankruptcy reorganization in August 2015, putting the litigation on hold. But with no chance of the company reorganizing, the case was converted to a liquidation a little more than two months later.

In its bankruptcy schedules, FourWinds listed "malpractice claims and contributions claims" totaling $900,000 against Uresti. He called that "absurd."

**Ponzi scheme alleged**

Thum's lawyer, Smeberg called the FourWinds operation a Ponzi scheme, using some of Cantu's money to pay out another investor. FourWinds' bankruptcy trustee, Randolph Osherow, has sued that investor, whose joint venture allegedly received more than $2.9 million from the company in July 2015. The lawsuit alleged the transfer may have contributed to FourWinds' insolvency while also defrauding other creditors.

Besides suing Bates and FourWinds for fraud in July 2015, Thum said he went to the Bexar County district attorney's office and met with LaHood and Willie Ng, the chief investigator.

Thum was unaware at the time of LaHood's connection with Cain or Trinity Global Funding & Consulting. Thum said LaHood and Ng expressed interest in what was going on at FourWinds and "would look into it." Instead of waiting to hear back, Thum said he took his story to the FBI.

Ng, in an emailed statement, said they suggested Thum contact a federal law enforcement agency — "due to the complexity and nature of the alleged financial fraud."

Thum also was told the DA's office only conducts investigations referred by an initiating law enforcement agency, Ng said.

Ng also said he "sought to share" Thum's account with the San Antonio Secret Service field office, but added that Thum already had contacted the FBI before Ng could do so.

Thum said he also lays a lot of the blame for his losses on Uresti.

When asked about Thum's claim, Uresti said: "I think I have an impeccable reputation and I'm going to defend my reputation. That's all I'm going to say on that."

**Coming undone**

As the company was spiraling toward bankruptcy, partner Shannon Smith testified that Bates pulled him into the office's recreational room for a private conversation.

"He says, 'It's inevitable this thing's going to fold,'" Smith said at a January bankruptcy hearing. "He says, 'There's roughly $300,000 or $400,000 that's going to be in the operating account. I'm going to send that money to Blair, my son, and we'll say it's a consulting fee, and I'll send you a $100,000 check.'"



1:37:22                                                                 Share

Stan Bates Audio
#fracking #SanAntonio #ExpressNews #MySA #StanBates #Audio

Asked how he responded to Bates' plan, Smith said: "Not no, but hell no. I'm not that kind of guy. There was no more conversation."

Smeberg forced Bates into an involuntary bankruptcy in October 2015. The petitioning creditors included the car dealerships that claimed they were stiffed by Bates' defunct direct-mail business. At a court hearing in November, Smeberg told the court that "there are millions of dollars out there that have been stolen by this gentleman," a transcript of the proceeding shows.

Bates' life has seemingly come undone since FourWinds' bankruptcy.

At an April 14 creditors meeting, he said he and his fiancee split up. The Mercedes was repossessed.

Bates also said he got a notice to vacate the $4,000 monthly rental home the couple shared in Boerne, which was being paid for by the company.

"I have nowhere to put my personal belongings," he said at the creditors meeting. He added he was unemployed and had been borrowing money from family and friends. He also said he couldn't afford to pay his son's college tuition or child support for his daughter.

His truck also was broken into and several thousand dollars worth of personal items were stolen, including a Sig 9mm pistol and a Rolex watch, he said during the meeting.

On April 24, 10 days after the creditors meeting, Bates was arrested and charged with a misdemeanor DWI, court records show.

**Default judgments**

Last month, Gargotta, the bankruptcy judge, entered an order holding Bates personally liable for FourWinds' debts. Bates didn't bother to contest the action brought by Osherow, resulting in a nearly $14.7 million default judgment — a debt that can't be discharged by Bates' personal bankruptcy.

"Bates … did perpetrate an actual fraud on (the company's) creditors primarily for his own direct personal benefit," Osherow alleged in a May lawsuit in Bates' bankruptcy.

A similar default judgment recently was awarded to Thum, as well. The court said Bates owed Thum more than $1.2 million in damages for his fraud claims and $2.5 million in punitive damages. Bates didn't fight Thum's action, either, saying he didn't have enough money to mount a legal defense.

As for the frac sand that Bates told investors never would lose value, Gargotta signed off on an order in January to sell the remaining 17,000 tons owned by FourWinds that it valued at $233,674 in bankruptcy schedules.

The sale price on the sand? $5,000.

*pdanner@express-news.net*

*Twitter: @AlamoPD*

*Staff Writers David Saleh Rauf and Aaron Nelsen and News Researcher Julie Domel contributed to this report.*



**Patrick Danner**

Reporter | San Antonio
Express-News

HEARST *newspapers*

© 2017 Hearst Communications Inc.