UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **BATES ENERGY OIL & GAS, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **VS.** | ) | **Civil Action No.  SA-17-CA-808-XR** |
| | ) | |
| **COMPLETE OIL FIELD SERVICES,** | ) | |
| **LLC and SAM TAYLOR,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

On this date, the Court considered Complete Oil Field Services' motion for temporary restraining order and for preliminary injunction (docket no. 13).

Plaintiff Bates Energy Oil & Gas, LLC filed this action in state court against Defendants Complete Oil Field Services, LLC ("COFS") and Sam Taylor.  Bates sues COFS for breach of contract and sues Taylor for tortious interference with contract.  Bates alleges that it and COFS entered into a Memorandum of Understanding ("MOU") on or around April 13,2017, under which Bates agreed to provide and transport 50,000 tons of 40/70 mesh Proppant and 30,000 tons of 100 mesh Proppant frac sand to COFS.  Bates alleges that COFS was obligated to accept delivery of the sand under the terms of the MOU, but COFS rejected attempted deliveries of over 40,000 tons of frac sand.

As part of the agreement, $4,000,000 was placed in escrow accounts with Equity Liaison Company, LLC ("ELC") and Amegy Bank.  $1 million was placed into the account managed by ELC and $3 million into the Amegy Bank account.  Under the MOU, this deposit was to fund "the payment for initial orders as agreed"; "[d]isbursements from this account shall be made upon the

authorized conditions"; and "[a]ny monies placed into the escrow account must have Bates Energy's written approval prior to withdrawal, to ensure that no material invoice is tied to such funds." Bates was to receive 50% of the invoice total upon delivery of the bill of lading and receive the outstanding balance within three business days after delivery.

COFS and Bates also entered into an Escrow and Disbursement Agreement dated April 14, 2017, which provided for the deposit of funds into the ELC escrow account. Bates alleges that COFS regularly sought withdrawals from the escrow account without the required authorization from Bates and that COFS has refused to provide requested approval for disbursement of funds for costs incurred by Bates pursuant to the Agreement. Bates alleges that it incurred expenses and lost profits as a result of COFS's breach of the agreement. Bates further alleges that Taylor has approached one or more of Bates's suppliers and offered to enter into independent agreements with the suppliers to cut Bates out. Bates sought a temporary restraining order enjoining COFS from making withdrawals from the escrow accounts and enjoining COFS and Taylor from contacting Bates's suppliers. On July 20, the state district court granted the temporary restraining order *ex parte*.

COFS was served on July 24. COFS filed a motion to dissolve or vacate the *ex parte* TRO and sought an expedited setting for a hearing. COFS asserted that the TRO froze the $4 million in escrow funds owned by its client ProPetro, on whose behalf COFS was purchasing the frac sand,[1] and that Bates had failed to provide the frac sand, forcing COFS to buy substitute product from a

---

[1] COFS and ProPetro entered into an April 13, 2017 Supply Agreement for COFS to supply 80,000 tons of frac sand (40/70 Northern White and 100 Mesh Northern White sand). It provided that the initial quantity would be approximately 10,000 plus tons delivered to the applicable terminated at Seagraves, Pecos, Big Springs, San Angelo, Odessa, Midland, or Monahans, Texas, to be purchased no later than May 10, 2017 "and increase such quantity up to 80,000 tons of Materials within 90 days of April 12, 2017." That Agreement states, "Upon execution of this agreement, Buyer [ProPetro] shall deposit funds in a qualified escrow account as agreed with Seller, the amount of $4,000,000 USD. Such amount shall be drawn upon by Sellers supplier, upon verification by independent escrow agent, to pay for the initial purchases of Materials included in this agreement. After the escrowed funds are exhausted, Buyer shall remit funds to Seller upon terms outlined in paragraph 5."

different vendor, whom it was then unable to pay because of the TRO.  COFS also asserted that the TRO was procedurally and substantively defective. The district court dissolved the TRO and issued an amended TRO on July 26, but the TRO still enjoined COFS from withdrawals and requests of withdrawals from the escrow accounts.  The Court set a temporary injunction hearing for August 3.

On August 2, COFS and Taylor filed their Answer, asserting a general denial and various affirmative defenses.  COFS also filed a Counterclaim against Bates for declaratory judgment, rescission, fraud, breach of contract, equitable accounting, and theft, and sought a writ of attachment to protect the escrow account.  The Counterclaim asserted that Bates was obligated under the MOU to deliver 10,000 tons of frac sand by May 10 and a total of 80,000 tons by July 12, and the sand was required to be either 40/70 or 100 mesh, "had to be in grades 'API compliant,'" and had to be delivered to one of the seven designated West Texas rail terminals.  COFS asserted that, once Bates could confirm through bills of lading, rail car receipts, and other proof that it had delivered the correct type of sand to the correct location, that documentation would be sent to the escrow account managers for audit, and if the audit showed proper delivery, then the escrow account manager was authorized to release payment funds to Bates.  COFS alleged that ELC was an escrow agency chosen by Bates, and that ELC's principal Dewayne Naumann has a close relationship with Bates.  COFS alleges that Bates made false representations about having acquired sand for delivery, but no sand was delivered and Bates was unable to produce bills of lading or other supporting documents showing it ever loaded a railcar with sand.

COFS alleges that it became concerned about Bates's ability to meet its obligations under the MOU and began investigating Bates's purported mines and other sources of frac sand.  COFS traveled to Wisconsin and was given a "winding tour around Wisconsin, stopping at two mines along the way," but COFS alleges neither mine had the capacity to delivery any appreciable amount of frac sand, and neither allowed them to access its premises.  COFS alleges that Bates later asserted that

the price in Wisconsin had become too high and suggested that COFS would have to pay a higher price than under the MOU, which COFS rejected.

COFS alleges that "Bates Energy wholly failed to meet the MOU's May 10, 2017 delivery deadline." COFS alleges that in June Bates emailed and texted COFS that it could deliver noncomplying frac sand, but COFS had no obligation to accept this sand, and it did not. COFS alleges that Bates admitted in early June 2017 that it had never scheduled any sand for delivery to COFS, revealing a two-month pattern of lying, fraud, and blatant misrepresentations, and "demonstrat[ing] multiple attempts by Bates Energy and Bates to steal money from the escrowed funds, by demanding payment when it knew no sand would be delivered." COFS alleges that Bates did make a real attempt to deliver compliant frac sand around June 9, but the amount of sand differed from the purchase order, Bates failed to deliver any bills of lading to prove it was the owner, the railcar documentation indicated the consignee was "High Crush" rather than Bates, and Taylor could never confirm the sand was there.

COFS alleges that it began a search for alternative suppliers so it could meet its obligation to ProPetro, and identified CSI Sands, one of Bates's potential suppliers in Wisconsin, and CSI began providing the sand to COFS. Bates executed a disbursement letter on June 15 permitting payment up to $1 million to CSI from the escrow account. COFS alleges that Bates admitted in open court that the invoiced funds are properly payable from escrowed monies, but Bates has been insisting that payment be made from the Amegy account and not the ELC account managed by ELC and Naumann.

COFS alleges that in July 2017, Bates "succeed[ed] in absconding with approximately $40,000 of escrowed funds without delivering any sand to COFS" after it sent what appeared to be documentation showing it had placed six railcars for delivery to Seagraves, Texas, with delivery due July 23. COFS alleges that it authorized payment to Bates under the ELC escrow account, but the

sand was never delivered.  COFS alleges that Bates likely forged one or more of the documents and ELC's "audit" failed to discover the forged or deficient documentation.

COFS further alleges that it has learned that Bates is under federal indictment related to his prior business activity as CEO of Four Winds, and that the third-party escrow company for Four Winds was ELC.  COFS alleges that Bates was arrested on May 17, 2017 and released on bail.  COFS further alleges that the bankruptcy judge in Bates's 2015 bankruptcy proceeding made "numerous findings that do not bode well for the preservation of the funds in the ELC account" and that Naumann and his wife were recently sued for failing to pay a home mortgage debt since January 2013, and a default judgment was entered, to be satisfied through foreclosure.  COFS alleges that Naumann has no longer been responsive to inquiries by COFS about the escrow account and has not provided a requested simple account balance, and that Bates has moved out of its office building.

The state district judge heard Bates's application for a temporary injunction on August 3, and issued a written order denying the injunction on August 8.  Defendants COFS and Taylor then removed this case on August 23, alleging diversity jurisdiction.  On September 8, Defendant COFS filed an Amended Counterclaim, asserting claims against ELC and its principal/agent Dewayne D. Naumann for breach of the Escrow Agreement, breach of fiduciary duty, "restitution and money had and received," and equitable accounting.  The Amended Counterclaim also seeks a writ of attachment on the escrowed funds.  The Amended Counterclaim alleges that, upon COFS's termination of the MOU (on August 15), "ELC and Naumann were obligated to disburse escrowed funds of up to $1 million to COFS," but they have not, in contravention of the express terms of the parties' escrow agreement."  It further alleges that ELC and Naumann refuse to provide information about the account balance.

COFS requests an *ex parte* temporary restraining order restraining ELC and Naumann and anyone else acting in active concert or participation with them, including Bates Energy and Stan

Bates, from directly or indirectly withdrawing, transferring, removing, dissipating, assigning, encumbering, or disposing of funds caused to be deposited by COFS in any ELC escrow account and an immediate equitable accounting by ELC and Naumann of all funds entrusted to its or his care, including a statement of activity on the account since its inception in April 2017, the current balance in the account, all bank account statements pertinent to such funds, all records showing receipts and disbursements from such accounts, and the identification of any bank or escrow accounts containing proceeds frm the original deposit.  COFS then seeks a preliminary injunction following notice and a hearing with similar restraints.

## Applicable Standards

*Ex parte* restraining orders should be limited to preserving the status quo only as long as necessary to hold a preliminary injunction hearing.  *Granny Goose Foods, Inc., v. Brotherhood of Teamsters*, 415 U.S. 423, 439 (1974).  A temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required.  FED. R. CIV. P. 65(b).

COFS also requests a preliminary injunction.  A preliminary injunction cannot be issued without notice to the adverse party. FED. R. CIV. P. 65(a)(1); *Parker v. Ryan*, 960 F.2d 543, 544 (5th Cir. 1992).  The Fifth Circuit has held that notice under Rule 65(a)(1) must comply with the five-day requirement of Rule 6(d).  *Harris Cty. v. CarMax Auto Superstores, Inc.*, 177 F.3d 306, 326 (5th Cir. 1999).  Rule 6(d) is no longer in effect, and the current rule, Rule 6(c)(1), provides: A written motion and notice of the hearing must be served at least 14 days before the time specified for the hearing

unless a court order--which a party may, for good cause, apply for *ex parte*--sets a different time.

The factors that govern an application for a temporary restraining order are the same as those that govern a request for preliminary injunction. *Hill v. Green County School Dist.*, 848 F. Supp. 697, 703 (S.D. Miss. 1994). Under well-settled Fifth Circuit precedent, a preliminary injunction requires the movant to show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that may result from the injunction to the non-movant; and (4) that the injunction will not undermine the public interest. *Valley v. Rapides Parish School Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997). To determine the likelihood of success on the merits, the Court looks to the standards provided by the substantive law. *See Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 622 (5th Cir.1985). The substantive prerequisites for obtaining an equitable remedy as well as the general availability of injunctive relief are not altered by Rule 65 and depend on traditional principles of equity jurisdiction. *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999).

## Analysis

COFS argues that it has demonstrated a substantial likelihood of success on the merits of its claims. COFS brings claims against ELC and Naumann for declaratory judgment, breach of contract, breach of fiduciary duty, equitable accounting, restitution and money had and received, and seeks a writ of attachment under Chapter 61 of the Texas Civil Practice and Remedies Code. The preliminary injunction standard requires COFS to present a prima facie case, not entitlement to summary judgment, and is governed by the substantive law of Texas. *Janvey v. Alguire*, 647 F.3d 585, 595-96 (5th Cir. 2011).

COFS contends that ELC and Naumann breached the Escrow and Disbursement Agreement by failing to return the escrowed funds to COFS upon termination of the MOU. The Escrow and

Disbursement Agreement dated April 14, 2017 was entered between COFS as Buyer and Bates Energy as Seller, and they agreed to "cause certain funds to be deposited in escrow with Equity Liaison Company, LLC . . . on terms and conditions more particularly described" in the Agreement. April 14, 2017 Escrow Agreement (docket no. 1-1).   It provides that COFS "has caused or will cause to be deposited with ELC those certain amounts, from time to time, pursuant to that certain Purchase and Sale Agreement ('PSA') by and between the Buyer [COFS] and Seller [Bates], dated April 14, 2017 (such sum, or the balance thereof remaining from time to time being referred to herein as the '<u>Fund</u>')." *Id.* ¶ 1.1.  It further provides that the Fund "shall be held and disbursed in accordance with the terms of this Escrow Agreement and PSA as follows: Upon receipt by ELC of the Disbursement Authorization (Exhibit A) executed by Buyer, ELC is hereby authorized and directed to deliver the Escrow Fund only (i) to the undersigned against their joint receipt, or (ii) to any of the undersigned upon written direction of each other of the undersigned, or (iii) in accordance with the joint written instruction of all of the undersigned, or (iv) if there is only one undersigned, to the undersigned." *Id.* ¶ 1.3.  The Escrow Agreement would terminate upon one of two conditions: (1) disbursement of the balance of the Fund in accordance with the provisions of the agreement and (2) "The expiration or termination of the PSA, in which case the remaining balance, accrued interest or excess finds of the Fund shall be disbursed to the Buyer." *Id.* ¶ 1.4 Dewayne Naumann signed the Escrow Agreement on behalf of ELC, agreeing that "Equity Liaison Company, LLC, Escrow Agent, hereby accepts its appointment as Escrow Agent as described in the foregoing Agreement, subject to the terms and conditions set forth therein."

COFS alleges that ELC and Naumann are parties to the Escrow Agreement, that upon termination of the MOU, ELC and Naumann were obligated to disburse to COFS the funds held in the escrow account, and that the failure to disburse the funds is a breach of the Escrow Agreement. COFS relies upon ¶ 1.4, which provides that, upon termination of the "PSA," the escrow balance

"shall be disbursed to the Buyer," COFS. The Escrow Agreement defines the "PSA" as "that certain Purchase and Sale Agreement . . . by and between the Buyer [COFS] and Seller [Bates], dated April 14, 2017." COFS acknowledges that there is no Purchase and Sale Agreement dated April 14, 2017 between COFS and Bates, and contends that this language actually refers to the MOU between Bates and COFS, which the parties relied upon as the operative contract.[2] COFS argues that it has officially terminated the MOU, and thus ELC was obligated under the Escrow Agreement to disburse the escrowed funds to COFS.

COFS provides a copy of the MOU signed by Bates on April 18, 2017 and unsigned by COFS. With its state court petition, Bates included a copy of the MOU signed by Bates on April 12 and by Taylor for COFS on April 13, 2017 (docket no. 1-1). These two MOUs are substantially similar, but are not the same in all respects.[3] Neither one is dated April 14. And both appear to be temporary agreements—both state that "the purpose of this MOU is to set forth certain binding understandings with respect to the matters covered herein and serve as an agreement until any final details may be defined in a final agreement." And both state above the signature line in bold letters, "By signing this MOU you agree to be bound by all of the terms and conditions described herein subject to the mutually agreed and executed Purchase Agreement ('Agreement') to be executed

---

[2] The only other contract document submitted is a Purchase Order issued by COFS to Bates on April 24, 2017 for 7,000 tons of 40/70 Northern White and 3,100 tons of 100 Northern Mesh sand, which states that "Funds are held in escrow with Equity Liaison Company LLC and Amegy Bank pursuant to the MOU and Escrow Agreement." Docket no. 12-1.

[3] For example, the April 12/April 13 provides that Bates shall procure approximately 50,000 tons of 40/70 and 30,000 tons of 100 mesh Proppant and the initial quantity would be "10,000 plus Tons of Proppant" delivered to the rail terminated located at one of seven West Texas locations, as directed by final buyer, no later than May 10, 2017, and increase such quantity up to "80,000 tons of Proppant" within 90 days of the execution of the MOU. The April 18 MOU (unsigned by COFS) provides for an initial quantity of approximately 10,000 plus tons of "each grade" delivered to one of the seven West Texas locations (the "as directed by final buyer" language is removed) and "increase such quantity up to 80,000 tons of each grade within 90 days of the date of execution of this MOU." In addition, the April 18 MOU contains additional terms.

between the parties." Thus, the MOU clearly contemplated that the parties would execute a Purchase Agreement representing their final agreement, though it appears that they did not do so.

Even if the Escrow Agreement can be read such that termination of the MOU requires ELC to disburse the funds under ¶ 1.4, the Court does not find that COFS is likely to prevail on this claim. The Escrow Agreement provides:

> In the event of any disagreement between any of the parties to this Agreement, or between any of them and any other person, resulting in adverse claims or demands being made in connection with the matters covered by this Agreement, or in the event that ELC, in good faith, be in doubt as to what action it should take hereunder, ELC may, at its option, refuse to comply with any claims or demands on it, or refuse to take any other action hereunder, so long as such disagreement continues or such doubt exists, and in any such event, ELC shall not be or become liable in any way or to any person for its failure or refusal to act, and ELC shall be entitled to continue to refrain from acting until (I) the rights of all interested parties shall have been fully and finally adjudicated by a court of competent jurisdiction, or (ii) all differences shall have been adjudged and all doubt resolved by written agreement among all of the interested persons, and ELC shall have been notified in writing thereof in writing signed by all such persons.

Escrow Agreement ¶ 2.2(D).

Bates Energy filed this lawsuit claiming that it was owed monies from the escrow account for frac sand deliveries on July 20, 2017. COFS has counterclaimed, arguing that Bates did not deliver sand in compliance with the contract, and that the money in the escrow account rightfully belongs to COFS and/or ProPetro. COFS sent notice terminating the MOU in August 2017. Even if termination of the MOU was sufficient to trigger the disbursement clause under ¶ 1.4, it appears that ELC had a right to "refuse to comply with any claims or demands on it" until the disagreement between Bates and COFS is resolved. Thus, the Court is unable to conclude that COFS has a substantial likelihood of success on the merits of the breach of contract claim against ELC.

COFS's Amended Counterclaim alleges that ELC and Naumann breached their fiduciary duties by failing to (1) release the funds to COFS in accordance with the terms of the Escrow

Agreement; (2) disclose activity in and related to the escrow account; and (3) pay the funds only to COFS, who is entitled to the funds.  Am. Counterclaim ¶ 116.  To establish a claim for breach of fiduciary duty, COFS must show: (1) a fiduciary relationship between itself and ELC and/or Naumann; (2) the fiduciary breached its fiduciary duties to the plaintiff; and (3) the breach caused injury to the plaintiff or benefit to the defendant.  *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) (quoting *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.–Dallas 2006, pet denied).

Under Texas law, courts have held that escrow agents owe a fiduciary duty to both parties to the contract that arises as a matter of law.  *Capcor at KirbyMain, LLC v. Moody Nat'l Kirby Houston S, LLC*, 509 S.W.3d 379, 385 (Tex. App.–Houston [1st Dist.] 2014, no pet.); *Home Loan Corp. v. Texas Am. Title Co.*, 191 S.W.3d 728, 733 (Tex. App.–Houston [14th Dist.] 2006, pet. denied).  The fiduciary duty consists of the duty of loyalty, the duty to make full disclosure, and the duty to exercise a high degree of care to conserve the money and pay it only to those persons entitled to receive it.[4]  While these are the general duties of an escrow agent arising as a matter of law, these duties are limited to the escrow agent's role as escrow agent and defined by the escrow agreement itself.  *Garcia v. Bank of Am. Corp.*, 375 S.W.3d 322, 333 (Tex. App.–Houston [14th Dist.] 2012, no pet.); *see also Trahan v. Lone Star Title Co. of El Paso, Inc.*, 247 S.W.3d 269, 287 (Tex. App. –El Paso 2007, pet. denied).  The Escrow Agreement states that it "expressly and exclusively sets forth the duties of ELC with respect to any and all matters pertinent hereto, and no implied duties or obligations shall be read into this Escrow Agreement against ELC."

The Application for TRO asserts that COFS will likely prevail on its claims against ELC and

---

[4] *See also City of Fort Worth v. Pippin*, 439 S.W.2d 660, 665 (Tex. 1969) (even without formal escrow agreement and relationship, where entity took money to accomplish a specific purpose and was paid a fee for its services and for the careful handling of the funds, entity owed a fiduciary duty of loyalty, duty to make full disclosure, and duty to exercise a high degree of care to conserve the money and pay only to those persons entitled to receive it).

Naumann because they breached the Escrow Agreement by failing to return the escrowed funds to COFS upon termination of the MOU and that they breached their fiduciary duties by failing to disclose critical information to COFS, including but not limited to the balance of the account, and a record or statement of activity within the account.  With regard to the claim that ELC breached its fiduciary duty by failing to disburse the funds upon termination of the MOU, the Court discussed above that the Escrow Agreement appears to give ELC the right to refuse to disburse the funds in light of the dispute between Bates and COFS.

With regard to the claim that ELC breached its fiduciary duty by failing to make full disclosure, including but not limited to the balance of the account and a record or statement of activity within the account, the escrow agreement is silent concerning ELC's duty to provide statements or accountings specifically.  However, it expressly requires that "ELC shall immediately notify and convey to Buyer and Seller every request or other notice received from the other party or any other source regarding the subject escrow funds."  Escrow Agreement ¶ 2.1(B).  To the extent any amount other than the $40,000 COFS is aware of was requested to be disbursed, ELC was under a duty to disclose such a request to COFS.  Further, the court of appeals in *Home Loan Corp. v. Texas American Title* recognized a broad duty of disclosure, rejecting the Restatement view that the escrow holder owes no duty of disclosure unless specified by the agreement.  *Home Loan Corp.*, 191 S.W.3d at 731-32.  It is likely that Texas law would require an escrow agent to respond to a request for an accounting, or at the very least to timely disclose all disbursements from the escrow account, especially if such information is requested by one of the parties.[5]  COFS has sufficiently established

---

[5] Texas law requires that a trustee must deliver a statement of accounts upon written demand, and if the trustee fails or refuses to deliver the statement "on or before the 90th day after the date the trustee receives the demand or after a longer period ordered by a court, any beneficiary of the trust may file suit to compel the trustee to deliver the statement to all beneficiaries of the trust."  Generally, a trustee is not required to account to the beneficiaries more frequently than once every 12 months.  TEX. PROP. CODE § 113.151.  Under Texas Property Code § 111.0035, the terms of a trust may not limit the trustee's duty, with regard to an irrevocable trust, to respond to a demand for an accounting made under section 113.151 if the

that ELC has likely breached this duty.

Although the TRO application focuses on ELC's failure to disburse the funds and its failure to make an accounting, the crux of COFS's complaint against ELC and Naumann is its belief that "the funds in the escrow account have not been preserved for the benefit of COFS, but have been transferred or otherwise conveyed out of the account." Am. Counterclaim ¶ 117. This implicates the fiduciary duty to conserve the money and pay it only to those persons entitled to receive it. COFS argues that ELC's lack of responsiveness and failure to provide an accounting, the insistence that CSI be paid only from the Amegy Bank Account, the financial status of Naumann, and the pending criminal proceeding all "strongly suggest that ELC and Naumann are hiding the funds or otherwise mishandling the funds." Application for TRO at 5.

Texas law permits injunctive relief to prevent a threatened breach of trust, and funds held in escrow by an escrow agent are essentially held in trust for the parties. Texas Property Code § 114.008 provides that, to remedy a breach of trust that has occurred *or might occur*, the court may: (1) compel the trustee to perform the trustee's duty or duties; (2) *enjoin the trustee from committing a breach of trust*; (3) compel the trustee to redress a breach of trust, including compelling the trustee to pay money or to restore property; (4) *order a trustee to account*; (5) appoint a receiver to take possession of the trust property and administer the trust; (6) suspend the trustee; (7) remove the trustee as provided under Section 113.082; (8) reduce or deny compensation to the trustee; (9) subject to Subsection (b), void an act of the trustee, impose a lien or a constructive trust on trust property, or trace trust property of which the trustee wrongfully disposed and recover the property or the proceeds from the property; or (10) order any other appropriate relief. Tex. Prop. Code § 114.008

---

demand is from a beneficiary who, at the time of the demand, is entitled or permitted to receive distributions from the trust or would receive a distribution from the trust if the trust terminated at the time of the demand and to act in good faith and in accordance with the purposes of the trust.

Further, both Texas and federal law recognize that injunctive relief is available to preserve assets that are the subject matter of the pending litigation and to secure an equitable remedy. *Nowak v. Los Patios Investors, Ltd.*, 898 S.W.2d, 9, 9-10 (Tex. App.–San Antonio 1995, no writ) (discussing cases where an injunction issued to preserve assets that would be subject to a pleaded equitable remedy such as rescission, constructive trust, or restitution); *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554 (5th Cir. 1987). COFS is not attempting to freeze assets to secure a potential damages remedy, but to preserve property that might be the subject of a final decree and to secure equitable remedies against a fiduciary alleged to have breached its duties. *Dixon*, 835 F.2d at 561. In such circumstances, an asset freeze by injunction is an appropriate method to assure the meaningful, final relief sought. *Id.*; *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220 (1945) (injunctive relief is always appropriate to grant intermediate relief of the same character as that which may be granted finally); *In re Fredeman Litigation*, 843 F.2d 821, 825 (5th Cir. 1988).

The second element for preliminary injunctive relief requires COFS to demonstrate that it would be irreparably harmed if the injunctive relief is denied. COFS contends that it will suffer irreparable harm and injury without the injunction because the actions of ELC and Naumann "strongly suggest that ELC and Naumann are hiding the funds or otherwise mishandling the funds." COFS contends that "only logical purpose" for ELC and Naumann to be hiding or mishandling the funds is to enable ELC or those acting in concert with it, including Bates, to abscond with the funds, demonstrating a threat of imminent harm. COFS contends that status quo will be preserved by ensuring that the funds are kept whole and not hidden or transferred. COFS asserts that ELC and Naumann would be unable to replenish the funds if they were improperly disbursed, and loss of the funds would damages COFS's relationship with ProPetro. COFS also argues that dissipation of the funds would impair this Court's ability to grant an effective remedy, particularly because much of the relief sought by COFS is equitable in nature and involves the assets that would be frozen. COFS

contends that the injury from ELC and Naumann's breaches could not be fully rectified by a final judgment following trial because the funds will likely be removed and ELC and Naumann would not be able to reimburse COFS for the damages.

In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages. *Janvey*, 647 F.3d at 600. However, "the mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.'" *Id.* The Fifth Circuit has held that "where a district court has determined that a meaningful decision on the merits would be impossible without an injunction, the district court may maintain the status quo and issue a preliminary injunction to protect a remedy, including a damages remedy, when the freezing of the assets is limited to the property in dispute or its direct, traceable proceeds." *Id.* The Court finds that COFS has successfully shown a likelihood that it will be irreparably harmed without the TRO.

COFS asserts that the harm from a restraining order if denied outweighs any harm that will result if the TRO is granted, and the grant would not disserve the public interest. COFS argues there is no harm to ELC or Naumann if the TRO is granted because the MOU has been terminated, there will be no more sales of frac sand, and thus no more requests for disbursement, rendering the escrowed funds static. The Court finds that the threatened injury to COFS outweighs any damage that the injunction may cause to ELC or Naumann, and that the injunction will not disserve the public interest. The Court further finds that COFS has made efforts to notify ELC and Naumann of its application for TRO but that irreparable harm may occur before they have an opportunity to answer and respond. The Court thus finds that issuance of a TRO *ex parte* is warranted and the Court will set the application for preliminary injunction as soon as possible.

Accordingly, the Court issues the following temporary restraining order:

**TEMPORARY RESTRAINING ORDER**

IT IS ORDERED that Equity Liaison Company ("ELC") and Dewayne D. Naumann, and anyone else who is acting in active concert or participation with it or him or on their behalf, including Bates Energy and Stan P. Bates, be restrained from, directly or indirectly, withdrawing, transferring, removing, dissipating, assigning, encumbering, or disposing of the funds in the escrow account, or monies transferred from the Amegy Bank escrow account.

IT IS FURTHER ORDERED that ELC and Naumann immediately provide a detailed accounting of all funds that have come into the possession of ELC through that escrow agreement dated April 14, 2017, including a statement of activity in the account since its inception in April 2017, the current balance in the account, all bank account statements pertinent to such funds, all records showing receipts and disbursements from such account(s), and the identification of any bank accounts containing proceeds and disbursements from the original deposit.

IT IS FURTHER ORDERED that ELC and Naumann appear for a hearing on COFS's motion for preliminary injunction on **Monday, September 25, 2017, at 9:30 a.m.**, in Courtroom 3 of the U.S. District Court in San Antonio, Texas.

IT IS FURTHER ORDERED that this Order shall not be effective unless and until COFS executes and files with the Clerk a bond or cash in lieu of bond, in conformity with Local Rule CV 65.1, in the amount of five hundred dollars ($500).  As soon as COFS has done so, <u>COFS shall serve a copy of this Order on ELC and Naumann.</u>

SIGNED this 13th day of September, 2017.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE