```
1                UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF TEXAS
2                   SAN ANTONIO DIVISION

3   BATES ENERGY OIL & GAS, LLC,      )
    Plaintiff and Counter-defendant, )
4                                      ) No. SA:17-CV-808(XR)
         vs.                           )
5                                      ) San Antonio, Texas
    COMPLETE OIL FIELD SERVICES,       ) September 25, 2017
6   LLC                                )
    SAM TAYLOR,                        )
7   Defendants and Counter-claimants,)
                                       )
8        vs.                           )
                                       )
9   EQUITY LIAISON COMPANY,            )
    DEWAYNE D. NAUMANN,                )
10  Counter-defendants.                )
    -------------------------------

11        HEARING ON MOTION FOR PRELIMINARY INJUNCTION
12           BEFORE THE HONORABLE XAVIER RODRIGUEZ
                UNITED STATES DISTRICT JUDGE
13
    A P P E A R A N C E S:
14
    FOR THE PLAINTIFF AND COUNTER-DEFENDANT, BATES ENERGY OIL &
15  GAS, LLC:

16  Rosenblatt Law Firm, P.C.
    Shellie Renee Reyes, Esquire
17  Tiffanie Stegall Clausewitz, Esquire
    16719 Huebner Road, Building 1
18  San Antonio, Texas 78248

19  FOR THE DEFENDANT/COUNTER-CLAIMANT, COMPLETE OIL FIELD
    SERVICES AND SAM TAYLOR:
20
    Jefferson Cano
21  Lamont Alan Jefferson, Esquire
    Lisa Schumacher Barkley, Esquire
22  112 East Pecan Street, Suite 1650
    San Antonio, Texas 78205
23

24

25
```

1    FOR THE COUNTER-DEFENDANT, EQUITY LIAISON COMPANY AND DEWAYNE
     D. NAUMANN:
2
     Pulman, Cappuccio, Pullen, Benson & Jones, LLP
3    Leslie Hyman, Esquire
     2161 N.W. Military Highway, Suite 400
4    San Antonio, Texas 78213

5    COURT REPORTER:

6    Karl H. Myers, CSR, RMR, CRR
     Official Court Reporter
7    655 E. Cesar Chavez Blvd., Rm. 315
     San Antonio, Texas 78206
8    Telephone:  (210) 244-5037
     Email:   karlcsr@yahoo.com
9
     Proceedings reported by stenotype, transcript produced by
10   computer-aided transcription.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (September 25, 2017.)

 2              THE COURT:  Thank you.  Please be seated.

 3    17-Civil-808, Bates Energy vs. COFS.  Appearances, please.

 4              MR. JEFFERSON:  Your Honor, Lamont Jefferson

 5    representing the counter-plaintiff, COFS.

 6              THE COURT:  Thank you.

 7              MS. HYMAN:  Good morning, Your Honor.  Leslie Hyman

 8    representing Equity Liaison Company and Dewayne Naumann.

 9              MS. CLAUSEWITZ:  Your Honor, Tiffany Clausewitz and

10    Shellie Reyes representing Bates Energy.

11              THE COURT:  Thank you.

12              So we are here on a motion for preliminary

13    injunction.  I guess I am just going to start off with the

14    questions.  I mean, it appears we are disputing the 1 million

15    minus 40,000 that was deposited into Equity Liaison.

16              I mean, if that is the sole amount that we are

17    disputing, why doesn't Equity Liaison -- I mean, they are not

18    the owner of the money.  Why don't they just deposit that in

19    the registry of the Court and then we settle all of the other

20    issues at a later point?  I mean, isn't that the resolution

21    for all of this?

22              MS. HYMAN:  Your Honor, there is not that much money

23    left.  We can explain what is left, but I did offer to either

24    enter into -- well, I offered on Friday to enter into an

25    agreed preliminary injunction freezing the remaining funds and
```

1     turning over the documents you had ordered turned over.  We

2     are equally open to putting the remaining money in the

3     registry of the Court.

4                THE COURT:  How much money is left?

5                MS. HYMAN:  There is, completely unencumbered,

6     $308,662.35, if you don't account for some money that is --

7     well, there is a pending receivable of $204,226.97, and then

8     there is about $40,000 that is encumbered.  So depending on

9     how you calculate it, it is either -- I mean, there is

10    $308,622.35 in cash.

11               THE COURT:  What is a pending receivable?  I thought

12    the way this deal worked is that a million was deposited into

13    ELC and 3 million was deposited into --

14               MS. HYMAN:  Amegy Bank.

15               THE COURT:  -- Amegy.

16               MS. HYMAN:  Yes.

17               THE COURT:  And so I thought there was just this

18    deposit and then there would be withdrawals as the sand was

19    delivered.  So how are there any pending receivables?

20               MS. HYMAN:  My understanding is that Bates bought

21    some sand to -- for COFS that COFS hasn't paid for, and they

22    are trying to sell it to mitigate everybody's damages, and so

23    that $204,000 is what they hoped to get for the sand that they

24    had already bought that COFS won't take.

25               THE COURT:  And then the remaining 500,000, what

```
 1   happened to that?

 2          MS. HYMAN:  I can put my client on and we can go

 3   through the documents, but basically, 140 of it, 140,000 went

 4   to demurrage and rail storage costs, on demand of counsel for

 5   Bates Energy, for sand that was being stored because COFS

 6   wouldn't take it.

 7          Let's see.  There was the sand -- that was

 8   purchased.  There was demands for money out of the escrow by

 9   Bates Energy for liquidated damages.  Let's see.  Some

10   insurance for the railcars.  That's mostly it.  A little bit

11   of administrative fees.

12          THE COURT:  And since I have you here, Ms. Hyman,

13   tell me, ELC, I mean, could it just unilaterally make these

14   withdrawals?  Or I mean, I thought --

15          MS. HYMAN:  No, Your Honor.

16          THE COURT:  -- it required COFS to agree, so did

17   COFS agree to all of these withdrawals?

18          MS. HYMAN:  They weren't unilateral to ELC.  Nothing

19   was unilateral to ELC.  Money came out of that account on the

20   unilateral instruction of COFS and then was replaced by money

21   from Amegy Bank.  I am not sure why that happened, but it did.

22          THE COURT:  Whoa, whoa, whoa.  So there is not

23   3 million in Amegy anymore?

24          MS. HYMAN:  There is not, Your Honor.

25          THE COURT:  How much is in Amegy?
```

1          MS. HYMAN:  About 2 -- yes.  About 2 million.  About

2     a million -- because COFS was using this escrowed funds, which

3     was supposed to be used to buy sand from Bates; COFS were

4     using those funds to buy sand around Bates directly from

5     suppliers.

6          THE COURT:  Okay.  Well, with sort of that

7     understanding or lack of understanding, at least on my part, I

8     mean, I guess it is your motion, Mr. Jefferson.  I mean, I

9     don't know where you all want to begin.

10          MR. JEFFERSON:  Yes, Your Honor.  If I could -- I

11     think the Court's opening is interesting, and this is the

12     first time we have heard this.

13          As the Court knows, this is our application for

14     preliminary injunction consistent with the temporary

15     restraining order requiring that Mr. Naumann account for the

16     funds that have been deposited into his possession.

17          We for months were attempting to get that

18     information, unsuccessfully, ultimately filing this amended

19     counterclaim in this Court that resulted in this Court

20     entering an order that says ELC and Naumann immediately

21     provide a detailed accounting of all funds that have come into

22     the possession of ELC through the escrow agreement dated

23     April 14, 2017, including bank statements, et cetera.  We have

24     received nothing.

25          THE COURT:  So my questions was the first time you

1    have heard this?

2          MR. JEFFERSON:  Those are the first numbers -- and

3    these are my clients.  The first time Janis Kline, the first

4    time Perry Taylor has heard this, that their customer, Pro

5    Petro, their only client is -- they will now have to deliver

6    the news to them that the money that they have been

7    representing is in this account is not there, because Mr.

8    Naumann somehow has spent those funds without their knowledge

9    and in spite of repeated requests for information.

10          There has been no documentation whatsoever to

11   support any withdrawal of funds from that escrow account, and

12   there has been no accounting from Mr. Naumann for the moneys

13   that were in his possession, in spite of this Court's order

14   and in spite of many requests from our clients in the past few

15   months.

16          We are at a loss.  And the information that we are

17   getting from Ms. Hyman right now, we have gotten a lot of

18   information from Mr. Bates, from Mr. Naumann that has turned

19   out to not be true, and so we are very suspicious about what

20   has happened with these funds, and until we have a complete

21   accounting, which this Court has already ordered, we are not

22   going to know, and we are not going to know whether there are

23   funds out there that are traceable, that we can get to, and it

24   sounds like because these funds have been expended that we

25   need to move quickly to try to figure out where they are and

```
 1    figure out whether any of this is salvageable.

 2              THE COURT:  What is your understanding of Amegy?

 3    What is going on there?  I thought we were only dealing with

 4    ELC.  I had no idea until I just heard something that we were

 5    dealing with Amegy.

 6              Are we dealing with Amegy here, or what is going on?

 7              MR. JEFFERSON:  The Court's order, the temporary

 8    restraining order recounted the facts, I think, very well.

 9    There is an Amegy account.  There were two accounts.  There

10    was an Amegy account.  There was an ELC account.

11              When sand was not delivered, the parties agreed that

12    COFS, my client -- I will refer to them as COFS -- could

13    procure that sand from someone who could deliver the sand, not

14    Mr. Bates, but somebody else.

15              That sand was procured from a mine called CSI.  And

16    as sand was delivered from CSI, it was accounted for in this

17    same escrow arrangement.  Mr. Bates agreed to that.  He agreed

18    that a million dollars could be spent from the Amegy account,

19    that he had no access to, to procure sand.

20              And so we do have statements from Amegy, we have

21    monthly statements that show exactly how much money went in,

22    how much money went out, and every time a delivery went to

23    CSI, a deposit was made back into the ELC account, so that had

24    an evergreen $1 million number established.

25              THE COURT:  Okay.  With regard to the accounting,
```

1    what, if any, documents does your client have about the

2    withdrawals of the $1 million in the ELC account?

3              MR. JEFFERSON:  Zero.

4              THE COURT:  Even before all of the fights began, you

5    never received statements?

6              MR. JEFFERSON:  There were -- that is correct.

7    Ms. Kline requested on numerous occasions from Mr. Naumann

8    statements, saying:  We need statements.  We need to assure

9    our client how much -- confirm the balance in these accounts.

10             There have been no statements.  There was an initial

11   statement provided by Mr. Naumann when the deposit was made.

12   It shows a $1 million deposit.  And then we know after that

13   that $40,000 was withdrawn on the signature of Mr. Bates and

14   with Mr. Naumann's concurrence for a supposed delivery of sand

15   that still has not happened.  That's the extent of the

16   documentation that we have.

17             THE COURT:  So, Ms. Hyman, what documents, if any,

18   do you have today?

19             MS. HYMAN:  Your Honor, my client has put together

20   an accounting spreadsheet and then I have the documents to

21   support it.

22             THE COURT:  And have you given those to Mr.

23   Jefferson?

24             MS. HYMAN:  No.  I offered, like I said, to work

25   this out without needing to bother the Court and he declined,

1    so I have them here today.

2            THE COURT:  I mean, I ordered documents to be

3    produced.  Why did he have to reach some kind of agreement

4    with you?

5            MS. HYMAN:  Well, I didn't have them until

6    yesterday -- I didn't have them all put together until

7    yesterday.  This is something that my client has had to go

8    back and reconstruct.

9            THE COURT:  I am a little concerned about that.  I

10   mean, what kind of company is Equity Liaison that they have to

11   recreate statements after the fact?  Aren't statements

12   generated when transactions occur?

13           MS. HYMAN:  Not the statements -- well, I am not

14   sure -- there are bank statements -- this money -- there are

15   bank statements.  He didn't have to create those.  But the

16   accounting is a spreadsheet, and he had to go and pull the

17   documents to support the numbers in the spreadsheet.

18           THE COURT:  I am not sure I understand that either,

19   but -- well, for purposes of this hearing, I mean, I guess we

20   can muddle through, Mr. Jefferson, or, you know, have her

21   deliver to you what documents she has in her hands right now,

22   we take a recess, you all review it, and if you are ready to

23   call a witness, we can do it that way, or we can just proceed

24   now.  I don't care.

25           MR. JEFFERSON:  I am fine with proceeding now, just

1    calling a witness, Your Honor.  And whenever she is ready to

2    deliver the documents to me, I will take a look at them.

3                   THE COURT:  Well, she is ready now, because I order

4    it now.

5                   So hand over the documents.

6                   (Documents handed to Mr. Jefferson.)

7                   THE COURT:  Your first witness, Mr. Jefferson.

8                   MR. JEFFERSON:   I will call Janis Kline, Your

9    Honor.

10                  (Oath administered to the witness.)

11                  COURTROOM DEPUTY:  Thank you.

12                           *-*-*-*-*-*-*-*

13                        DIRECT EXAMINATION

14   BY MR. JEFFERSON:

15   Q.  Would you state your name, please, for the record.

16   A.  Janis Kline.

17   Q.  And, Ms. Kline, how are you related to COFS, Complete Oil

18   Field Services?

19   A.  One of the owners and the CFO.

20   Q.  And can you give the Court just a very quick background of

21   your professional life as an adult?

22   A.  Sure.  I am a CPA.  I graduated from the University of

23   Utah.  I went to school -- I mean, I went to work for a firm

24   that was predecessor of KPMG as an auditor, was there for 12

25   years, left as a senior audit manager.

```
1    Q.  And about what year are we now?

2    A.  Mid eighties.

3    Q.  Okay.

4    A.  And then went to work as CFO of a restaurant company.

5    Q.  What was the name of the company?

6    A.  Teratron.

7    Q.  And what kind of restaurants?

8    A.  We had Hardy's Restaurants.  There were 80 of them

9    throughout seven states.

10   Q.  Okay.  You were the CFO?

11   A.  Yes.

12   Q.  Okay.

13   A.  Then we had a real estate division, and I worked with the

14   real estate and then left.  Only did that part-time, left.

15   Went to work with another CPA firm, a local firm called

16   Pinnock, Robbins, Posey & Richins, where I was a partner, and

17   ended up being --

18            THE COURT:  I don't mean to be disrespectful, but I

19   don't need this.

20            MR. JEFFERSON:  Okay.

21            THE WITNESS:  Okay.

22            MR. JEFFERSON:  Very good.

23   BY MR. JEFFERSON:

24   Q.  Now, Ms. Kline, can you explain just the relationship

25   between -- the Court is familiar with the background facts.
```

1          Can you explain the relationship between the Amegy

2    escrow account and the ELC escrow account as it pertains to

3    this case?

4    A.   Yes.   The Amegy account was to hold the majority of the

5    funds.   The ELC account was the disbursing escrow account.

6    Q.   And why was there -- why were there two accounts, to begin

7    with?

8    A.   There were two accounts because we were concerned about

9    the close relationship of Mr. Naumann with Bates Energy.

10   Q.   And why did you suspect there was a relationship there?

11   A.   Because we saw that he had done -- he was doing a lot

12   of -- they were just too cozy, and the relation -- Bates

13   absolutely insisted that we use that firm, that we use ELC,

14   and he wanted all 4 million in there.

15          And we said, no, we wouldn't do it.   We needed to

16   have a bank that was a fiduciary, governed by regulators and

17   we would put the bulk of the money in that and the 3 million

18   in that fund.

19          It was our -- because of the anticipated amount of

20   sand that was supposed to be purchased, we had a million

21   dollars in ELC.   We anticipated that we would blow through

22   that million dollars very quickly, because Mr. Bates had

23   represented that he had hundreds of thousands of tons of sand

24   that he could get his hands on quickly.

25   Q.   And so the ELC account, you said that Mr. Bates insisted

1    on that company being the escrow agent?

2    A.  Yes.  He said he knows how to handle these transactions.

3    A bank won't know how to do it.  And he made a great big deal

4    about it.

5    Q.  And initially, was there discussion that there would just

6    be one escrow account and that that would be with ELC?

7    A.  Yes.

8    Q.  And what happened with that discussion?

9    A.  We said we wouldn't do it.

10   Q.  Did you attempt to do due diligence on ELC to determine

11   what its credentials were?

12   A.  We did.

13   Q.  And what did you find?

14   A.  Not much.

15   Q.  Is it subject -- is that company subject to licensing

16   requirements in the state of Texas, to your knowledge?

17   A.  Well, I actually talked to Dewayne about that beforehand

18   and he represented himself as a fiduciary.  He represented

19   himself as -- that he did audits, fraud audits, and in

20   addition to that that he was -- he didn't say he was licensed.

21   He said he didn't have to be licensed, but the way he talked,

22   it was as if he were -- since he was a fiduciary -- and, quite

23   frankly, we needed to get the sand quickly, and this was the

24   only way we were going to be able to do it and we anticipated

25   that the million dollars would not stay there long.

1    Q.  Why did you need to get the sand quickly?

2    A.  Because Mr. Bates was constantly calling us and saying:  I

3    have trains of sand.  They are ready to go.  You need to fund

4    the escrow.  I have expenses to pay.  You need to fund the

5    escrow.  And it was a barrage of communication like that, and

6    our customer needed the sand and they needed it right away.

7    Q.  Who was the customer?

8    A.  The customer was Pro Petro.

9    Q.  What kind of company is Pro Petro?

10   A.  It is a pressure pumping company.

11   Q.  And why does it need sand?

12   A.  Because that is its business, pump sand down into the

13   fracs.

14   Q.  And are we talking about the fracking oil and gas

15   industry --

16   A.  Yes.

17   Q.  -- that we have been reading so much about in the news?

18   A.  Yes.

19   Q.  All right.  So the -- let me -- this is the ELC escrow

20   agreement.

21         MR. JEFFERSON:  Your Honor, and I know that the

22   Court is familiar with these documents, so I don't know the

23   extent to which you want to go through each one of them, but I

24   am going to -- I intended to mark at least the escrow

25   agreement, the ELC escrow agreement, and the memorandum of

 1    understanding that governs the relationship of the parties.

 2              THE COURT:  Yes.  Go ahead and use them as exhibits

 3    here, just so we have a record, and then you can hit just the

 4    salient points, how disbursements were supposed to take place,

 5    those kinds of things.

 6              MR. JEFFERSON:  Okay.  Very good.

 7              If I may approach, Your Honor --

 8              THE COURT:  Yes.

 9              MR. JEFFERSON:  -- I will ask that these be marked

10    as Plaintiff's 1 and 2 -- or Defendant's or Counter-defendant.

11              THE COURT:  Why don't you just say COFS.

12              MR. JEFFERSON:  COFS.

13              MS. HYMAN:  Do you have copies for me?

14              MR. JEFFERSON:  I do have copies for you, actually.

15              MS. HYMAN:  Thank you.

16              MR. JEFFERSON:  If I may approach the witness.

17    BY MR. JEFFERSON:

18    Q.  Can you identify, Ms. Kline, the documents that I have

19    handed you that are marked Defendant's 1 and 2?

20    A.  Yes.  The memorandum of understanding and the ELC escrow

21    agreement.

22              THE COURT:  And just to make sure we know which memo

23    of understanding we are talking about, what is -- there are

24    two, so which date is this?

25              THE WITNESS:  The April 13th.

```
 1              MR. JEFFERSON:  Your Honor, we offer 1 and 2.

 2              THE COURT:  Any objection to 1 and 2?

 3              MS. HYMAN:  No objection, Your Honor, but if I could

 4   just clarify which one is 1 and which one is 2.

 5              THE COURT:  1, I believe, is the memo of

 6   understanding.

 7              Correct?

 8              THE WITNESS:  Correct.

 9   BY MR. JEFFERSON:

10   Q.  Now, Ms. Kline, first of all, with respect to the

11   memorandum of understanding, if you turn to the last page that

12   is on Exhibit 1, there are signatures, correct?

13   A.  Yes.

14   Q.  And there is a date as well?

15   A.  Yes.

16   Q.  Did all parties sign this agreement?

17   A.  Yes.

18   Q.  And what is the date, the signature of the COFS

19   representative?

20   A.  April 13, 2017.

21   Q.  And the date of the signature of the Bates representative?

22   A.  April 12, 2017.

23   Q.  And very briefly, there has been some confusion because

24   there is another MOU that has a date of April 18, 2017.  You

25   have seen that?
```

1    A.  I have.

2    Q.  Is that signed by COFS?

3    A.  No, it is not.

4    Q.  Was there ever an April 8 -- or an MOU dated April 18 that

5    was signed by COFS?

6    A.  No.

7    Q.  Was there ever an MOU signed after the escrow agreement

8    was set up?

9    A.  No.

10   Q.  Okay.  So if we look at the escrow agreement, which is

11   Exhibit 2, what is the date of the signatures on the escrow

12   agreement?

13   A.  April 14.

14   Q.  Okay.  And so if there is an April 18th memorandum of

15   understanding, that would not have been signed by you -- there

16   was no other memorandum of understanding signed after the

17   escrow agreement was set up, was there?

18   A.  No, there was not.

19   Q.  Okay.  Now, let's -- so there are kind of two points in

20   time I want to talk about:  First, shortly after the escrow

21   agreement was signed, what you expected to happen then, and

22   then we are going to talk about, in a minute, what happened

23   with the CSI transactions.  Okay?

24   A.  Okay.

25   Q.  So first of all, when this escrow agreement was signed and

1    the memorandum of understanding was entered into, what did you

2    expect to happen with respect to the flow of funds?

3    A.   What was set up was when Mr. Bates would send us a request

4    for funds to pay for sand, that request would be accompanied

5    by a bill of lading as evidence, and that is the normal

6    protocol for any transaction that includes transportation and

7    product.

8    Q.   Why is a bill of lading important in that transaction?

9    A.   A bill of lading tells you what is the product, where did

10   it come from, how many pounds or tons, and where is it going

11   to and who the owner is.

12   Q.   All right.  So let's back up for just a minute.  So the

13   sand is acquired in a mine in some location; is that right?

14   A.   Yes.

15   Q.   And in this case, where was the sand supposed to be

16   acquired from?

17   A.   It was all supposed to northern white, so it would have

18   been acquired in Wisconsin, primarily.

19   Q.   Okay.  And how would the sand make its way from Wisconsin

20   to wherever Pro Petro needed it?

21   A.   It would go by rail.

22   Q.   And who would be -- who was responsible for ensuring that

23   the sand got put on the railcars and was shipped as

24   represented?

25   A.   Bates Energy was responsible to have the cars loaded and

1    have them arrive in one of the listed rail terminals in the

2    Midland-Odessa area, and then they were to be -- and they were

3    supposed to handle it clear to the transload, until it was

4    transloaded off from the railcars into the trucks.

5    Q.   Okay.  So the term "transload" simply means either the

6    loading or unloading of a car?

7    A.   Yes.

8    Q.   Is it just loading or is it -- is it just unloading or

9    does it include loading --

10   A.   It can include loading as well.

11   Q.   Okay.  So at the mine, there may be some transloading

12   fees, then the rails make its way to Texas, it gets

13   off-loaded, and it is in Pro Petro's, your customer's

14   possession at that point?

15   A.   It is in our customer's possession at the point it is

16   off-loaded into the truck of whatever trucking company they

17   have designated to pick it up.

18   Q.   Okay.  So when in this transaction is money supposed to be

19   disbursed from the escrow account?

20   A.   Fifty percent was to be disbursed upon the train leaving

21   and the evidence, and the other 50 percent was to be

22   disbursed, and it was in a series of transactions based upon

23   when the product was transloaded off the railcar into the

24   truck, and it would be billed on the BOL amount for what went

25   into the truck, if that makes sense.

```
 1    Q.  Okay.  And are those payment terms, are they reflected in

 2    the memorandum of understanding?

 3    A.  Yes.

 4    Q.  So when the loading occurs -- well, at what point in this

 5    process is a bill of lading generated?

 6    A.  There is a bill of lading generated for the train as it is

 7    getting ready to leave the station.  It cannot leave --

 8    Q.  Which station?

 9    A.  In Wisconsin or, in this case, Minnesota.

10    Q.  Okay.

11    A.  It cannot leave the train station without a bill of lading

12    representing cargo.

13    Q.  And when a bill of lading is issued, who gets it?

14    A.  The party that starts the process gets it, and then

15    normally when we buy product, then we get a copy of it

16    immediately.

17    Q.  Okay.  In this case, how was it supposed to work?  Who

18    should have had a bill of lading assigned to them when the

19    sand was being picked up at a mine in Wisconsin or Minnesota,

20    as you say?

21    A.  Bates Energy.

22    Q.  Okay.  Now, so the way it was supposed to work was Bates

23    would procure the sand somehow in Wisconsin or Minnesota?

24    A.  Correct.

25    Q.  It would then, by procuring the sand, they would be issued
```

1   a bill of lading?

2   A.  Correct.

3   Q.  And provide that to you?

4   A.  Yes.

5   Q.  And then at that point, you would pay half of the amount

6   due?

7   A.  Correct.  They would also give us an invoice and we would

8   pay half.

9   Q.  Okay.  They would give you the invoice with the bill of

10  lading and you would pay half.  And then what would happen?

11  A.  Then the train would go to the Midland-Odessa area, and

12  then they were supposed to coordinate with us and -- well,

13  they coordinated with us and Pro Petro's group and we would

14  get -- Pro Petro would send trucks and pick it up.

15  Q.  Okay.  And when was the next payment?

16  A.  At the point that the trucks were picking up the product.

17  Q.  And what documentation would you get at that point to show

18  that it was picked up?

19  A.  Bill of ladings for the trucks.

20  Q.  So different bills of lading --

21  A.  Correct.

22  Q.  -- that show now the sand has transferred possession?

23  A.  Correct.

24  Q.  Okay.  When was the first time, Ms. Kline, that COFS

25  received any bills of lading from Bates Energy?

1    A.  July 12.

2    Q.  July 12 of 2017?

3    A.  Yes.

4    Q.  And how much sand was supposed to be delivered between

5    April 14 of 2017, the date -- April 13, 2017, the date of the

6    memorandum of understanding, and July 12, 2017?

7    A.  80,000 tons.

8    Q.  80,000 tons of sand was supposed to be delivered by what

9    date?

10   A.  It was by 90 days of execution of this MOU, so it would

11   have been -- I am thinking it was July.  I would have to

12   calculate it.

13   Q.  April, May, June, July, ninety days?

14   A.  Yes.

15   Q.  So April 13 or thereabout, by then, 80,000 tons of sand

16   was to have been delivered?

17   A.  July 13.

18   Q.  Did I say -- April, May, June, July.  So by July 13 --

19   A.  Correct.

20   Q.  -- 80,000 tons was to have been delivered?  How much was

21   delivered?

22   A.  None.

23   Q.  All right.  And around July 12, you got some bills of

24   lading from Mr. Bates?

25   A.  Yes.

1    Q.  And do you remember what the bills of lading contained?

2    A.  It was seven cars and there was some 40-70 and some 100

3    mesh.  I think there was only one railcar of 100 mesh.

4    Q.  Okay.  And did you authorize payment on those bills of

5    lading?

6    A.  Yes.

7    Q.  How much was due at that time?

8    A.  $39,190-something, as I remember.

9    Q.  Okay.  All right.  Did you ever authorize any additional

10   payments out of the ELC escrow account?

11   A.  Yes.  We authorized some to CSI, no other payments to

12   Bates.

13   Q.  Okay.

14            THE COURT:  How much to CSI?

15            THE WITNESS:  That was the million dollars that we

16   spoke of earlier that was approved.

17   BY MR. JEFFERSON:

18   Q.  Okay.  So let's talk about that million dollars for a

19   second.  So when -- can you just explain to the Court whether

20   the schedule under the MOU was met?  So there were supposed to

21   be deliveries of sand within certain periods of time.  Was

22   that schedule met?

23   A.  No.

24   Q.  And did you have discussions with anybody about what to do

25   with that, with respect to that situation?

1    A.   In what regard?

2    Q.   How would sand get to your customer?  In other words, what

3    were you going to do about the fact --

4    A.   Oh.  We were --

5    Q.   -- that Mr. Bates was not delivering sand?

6    A.   Yes.  There had been -- I personally did not have those

7    discussions.  Sam Taylor did.

8    Q.   Okay.  And was an accommodation reached as a result of

9    those discussions?

10   A.   Yes.

11   Q.   What was the accommodation?

12   A.   That we received a letter from Mr. Bates authorizing us,

13   and an e-mail authorizing us to -- that we could expend up to

14   a million dollars with CSI La Prairie to acquire 40-70 sand.

15   Q.   Okay.  And so you have got an Amegy escrow account.  You

16   have an ELC escrow account.  What would happen with those

17   accounts and how would that sand get purchased?

18   A.   Originally, it was supposed to go direct out of Amegy.

19   Q.   And when you say "it," the money was supposed to go

20   directly from Amegy to the mine?

21   A.   Yes.

22   Q.   Okay.

23   A.   And so we prepared documents to that effect to have it go

24   direct to the mine.  Now, Dewayne had to -- Dewayne Naumann

25   had to sign off on any transfers out of Amegy.

1    Q.   Okay.  Explain why that is the case.  Why did Mr. Naumann

2    have to sign off on transfers out of Amegy?

3    A.   Because the Amegy escrow agreement had two parties.  It

4    had Dewayne Naumann and ELC and Complete Oil Field Services,

5    and the signatories were Dewayne and myself, myself for COFS.

6    Q.   All right.  So let's just keep the parties straight.

7    Mr. Naumann and ELC had an escrow account where they were the

8    escrow agent, correct?

9    A.   Correct.

10   Q.   And as the escrow agent, they were bound to instructions

11   from you and Mr. Bates?

12   A.   Correct.

13   Q.   Then there is an Amegy escrow account.  Who is the escrow

14   agent on the Amegy escrow account?

15   A.   It is Amegy Bank.

16   Q.   And who were the instructors?  Who were the parties to

17   give Amegy instruction, agree to instruction about the

18   disbursement Of funds?

19   A.   Dewayne Naumann as representative of ELC and myself as

20   representative of COFS.

21   Q.   So Mr. Naumann, on one hand, is an escrow agent; on the

22   other hand, he is a pay agent for Bates Energy?

23   A.   Correct.

24        MS. HYMAN:  Objection, Your Honor.  Could we keep

25   track of when we are talking about ELC, the company, and when

1      we are talking about Mr. Naumann as an individual?

2                MR. JEFFERSON:  And I am using the term

3      synonymously.  He is the only member of the company.

4                THE COURT:  Well, I mean, how were the documents

5      drafted; do you know?  I mean, was he acting in some kind of

6      individual capacity when he was acting as an agent for Bates?

7                THE WITNESS:  It is my understanding that he was

8      acting as an agent of ELC, but that would be -- you guys would

9      have to tell me.

10               MR. JEFFERSON:  Your Honor, the escrow agreement,

11     Exhibit No. 2, reflects that Mr. Naumann is the principal and

12     he is the one to provide instruction to the escrow agent, and

13     I will just --

14               THE COURT:  Well, I will just keep that distinction

15     in mind as I am looking through this.  Go ahead.

16               MR. JEFFERSON:  Thank you, Your Honor.

17     BY MR. JEFFERSON:

18     Q.  Okay.  So with respect to the Amegy account and the CSI

19     purchases, again, ELC and Complete Oil Field Services were to

20     provide instruction to Amegy?

21     A.  Correct.

22     Q.  Okay.  And did that happen?

23     A.  Yes.

24     Q.  And --

25               THE COURT:  Well, I mean, I don't mean to cut this

```
 1    short, but to make sure I understand COFS's position, I mean,

 2    are you all alleging that there is some kind of improper

 3    shortage in the current Amegy account, or is the Amegy account

 4    all proper?

 5              THE WITNESS:  The Amegy account is proper, and we

 6    have full accounting on our end and on Amegy's end.

 7              THE COURT:  Okay.  So, then, let me make sure I

 8    understand what is going on, then, with the ELC account.

 9              You authorized payment of about $40,000, give or

10    take, for seven cars back on July 12.  Did that instance

11    follow your protocol of 50 percent at the train leaving

12    Minnesota and 50 percent at the truck loading in

13    Midland-Odessa?

14              THE WITNESS:  Yes.

15              THE COURT:  And so -- and was it the sand you

16    expected?

17              THE WITNESS:  It was -- we agreed to take that

18    sand --

19              THE COURT:  Okay.  So --

20              THE WITNESS:  -- if that is how you are asking.

21              THE COURT:  Yes.  That's fine.  I thought your memo

22    of understanding specified a typical -- a specific type of

23    sand, so --

24              THE WITNESS:  It did.  That train had 40-70 on it

25    and 100 mesh, all northern white, so it was --
```

1          THE COURT:  So it met your specifications?

2          THE WITNESS:  Yes.

3          THE COURT:  Okay.  After July 12, did Bates ever

4    supply you any more sand?

5          THE WITNESS:  No.  And he never supplied that

6    either.

7          THE COURT:  He didn't supply the 40,000?

8          THE WITNESS:  No.

9          THE COURT:  Who supplied that?

10          THE WITNESS:  Well, he was supposed to supply it,

11    and then they filed the TRO right after -- it was supposed to

12    arrive in Odessa on the 23rd of July.  There was a TRO filed

13    on the 20th.  We tried to find out where the sand was, and no

14    one would tell us.  He never billed us for the other half of

15    the hand.  There was zero communication on their end.

16          We -- Mr. Jefferson sent a letter to his attorney,

17    Ms. Clausewitz, asking where this sand was and we would pick

18    it up.  In the hearing that we had on the 3rd or 4th of

19    August, we indicated that we would gladly pick up that sand

20    and buy it, but we heard zero.  We don't really know where it

21    is at.

22          THE COURT:  So these allegations that we heard

23    earlier in the state court and then the representations made

24    this morning about $204,226.97 receivable and all of this

25    other stuff, I mean, where is that coming from?

1              THE WITNESS:  I have no idea.  We have not received

2    one grain of sand from Bates.

3              THE COURT:  Have you ever rejected any sand that

4    Bates has actually put on a car?

5              THE WITNESS:  Not to my knowledge.

6              THE COURT:  Go ahead.

7    BY MR. JEFFERSON:

8    Q.  Can you explain why that is not to your knowledge?

9    A.  Because Sam Taylor, my partner, was the one that dealt

10   with the sand acquisition.

11   Q.  All right.  But what --

12             THE COURT:  So is Mr. Taylor here?

13             MR. JEFFERSON:  Mr. Sam Taylor is not here.

14   Mr. Perry Taylor, his brother, is here.

15             THE COURT:  Well, I mean, I am trying to figure out

16   whether an accounting is correct here.  I mean, how am I going

17   to get there?

18             MR. JEFFERSON:  Your Honor, I think an accounting is

19   perfectly correct here, as Mr. Naumann certainly, as an escrow

20   agent, has the fiduciary obligations of an escrow agent.

21             THE COURT:  Well, I am trying to figure out whether

22   or not any of these other disbursements are proper or

23   improper.

24             MR. JEFFERSON:  Well, that's --

25             THE COURT:  So what did Sam Taylor say?  And isn't

1    that going to implicate whether it is proper or improper?

2              THE WITNESS:  We never -- we never agreed -- we

3    never got BOLs for sand, other than one attempt on June 9th,

4    that I am aware of, and that was a disaster because it was in

5    the wrong names and we could not prove ownership.

6              And just so you are aware, in the Midland area,

7    there have been a number of frauds around ownership issues on

8    BOLs, so we were being very cautious.

9              THE COURT:  So this June 9 BOL, that predated the

10   July 12 successful seven-car delivery?

11             THE WITNESS:  Right.

12             THE COURT:  Okay.

13             THE WITNESS:  Yes.  But that was already sitting in

14   Midland.  They didn't load those cars for us.  It was already

15   in Midland and there was a question as to ownership.

16             THE COURT:  So this June 9 attempt, I mean, you

17   received a BOL from who?

18             THE WITNESS:  I don't think we ever received any

19   BOLs, actually.

20             THE COURT:  So how did you know there was sand

21   waiting for you at the Midland train station?

22             THE WITNESS:  It was a conversation between Sam and

23   them.  I wasn't a part of that, sir.

24             THE COURT:  Did Sam, to your knowledge accept

25   this --

1          THE WITNESS:  No.

2          THE COURT:  -- train delivery on June 9?

3          THE WITNESS:  No.

4          THE COURT:  Do you know what, if anything, happened

5    to the sand?  Was it returned?  Did somebody else buy it or --

6          THE WITNESS:  I don't know.  In the hearing, it was

7    represented by Mr. Bravo that --

8          THE COURT:  That is -- refresh me, who is he?

9          THE WITNESS:  Mr. Bravo is one of the Bates Energy

10   parties.

11         THE COURT:  Okay.

12         THE WITNESS:  He represented -- and I think

13   Mr. Howard, Austin Howard also, the way they talked about it,

14   they said, it is like one of them said, used the term:  It is

15   like bread on a shelf.  If it is in Midland, Texas, you can

16   sell that sand and it will be gone, especially when you are

17   talking 40-70.

18         THE COURT:  Go ahead.

19   BY MR. JEFFERSON:

20   Q.  Okay.  Ms. Kline, did you receive any statements from

21   Mr. Naumann with respect to what was going on with the funds

22   that were in his possession?

23   A.  No.

24   Q.  Did you ask for statements from Mr. Naumann about that?

25   A.  Multiple times.

```
 1    Q.  Did you receive any statements from Amegy Bank with

 2    respect to what was going on with the Amegy escrow account?

 3    A.  Yes.  Every month.

 4              MR. JEFFERSON:  Your Honor, if I may approach.

 5              THE COURT:  Yes.

 6    BY MR. JEFFERSON:

 7    Q.  Let me hand you, Ms. Kline, what has been marked as

 8    Defendant's Exhibit 3.

 9              Can you identify what Defendant's Exhibit 3 is

10    without talking about the contents yet?

11    A.  It is bank statements from Amegy Bank on the escrow

12    account.

13    Q.  On the escrow account we have been talking about in this

14    case?

15    A.  Yes.

16              MR. JEFFERSON:  Your Honor, I would offer

17    Defendant's 3.

18              THE COURT:  Any objection?

19              MS. HYMAN:  No objection, Your Honor.

20              THE COURT:  3 is also admitted.

21    BY MR. JEFFERSON:

22    Q.  Now, Ms. Kline, let's go through here and have you explain

23    what is going on with the transfer of funds in the Amegy Bank

24    escrow account.  The first statement is on the -- I guess it

25    would be the third page of the exhibit, actually, beginning on
```

1    the second page of the exhibit.

2              And are there dates on that statement?

3    A.  Yes.

4    Q.  And what are the dates?

5    A.  April 19th and April 21st.

6    Q.  And you are talking about transactions from the statement?

7    A.  Yes.

8    Q.  What time period does the statement cover?

9    A.  April 1st through April 30th.

10   Q.  Okay.  And what does it show happened in that time period

11   on this statement in the Amegy escrow account?

12   A.  On April 19, there was a deposit for $3 million, which was

13   a wire in from Pro Petro.  April 21st, there is a deposit of

14   $4,000.  That was a payment by us to pay the escrow fees.

15   Q.  Okay.  So Complete Oil Field Services paid the escrow fees

16   separately.  Pro Petro supplied the $3 million to fund it?

17   A.  Correct.

18   Q.  Were there any transactions in the month of May?

19   A.  Also on April 21st, but it shows to pay out of the escrow

20   fees of 4,000 to Amegy Bank.

21   Q.  Okay.  So Complete Oil Field paid the funds into the

22   escrow account.  Amegy Bank then took the funds out.  That was

23   all accounted for?

24   A.  Correct.

25   Q.  Okay.  Were there any transactions in the month of May?

1    A.   The only transaction was accrued income.

2    Q.   Okay.  And is that reflected on the statement?

3    A.   Yes.

4    Q.   Were there any transactions in the month of June?

5    A.   Yes.  There was a payment for $96,804.43, and it was paid

6    to Equity Liaison Company.

7    Q.   It was paid to ELC?

8    A.   Yes.

9    Q.   Mr. Naumann's company?

10   A.   Yes.

11   Q.   And explain why it is that money would be paid from the

12   Amegy escrow account to the ELC escrow account.

13   A.   Because when we entered the arrangement with CSI, as I

14   mentioned earlier, our first draw to pay CSI, we tried to pay

15   it direct out of Amegy Bank.  Mr. Naumann had to sign and

16   execute that, as well as us.  He didn't sign it.  Instead, he

17   called and he was very angry and was upset at me for having it

18   go direct.

19         And I said to him:  On the letter, it says it is

20   supposed to go direct, so that's the way I have got it going.

21   And he was very adamant that that was not how it was going to

22   go, that everything needed to go through him.

23   Q.   Okay.

24   A.   So we were -- talked on the phone for quite a while and

25   went the rounds, and I needed CSI to get paid, because that

1    train was leaving the station.

2    Q.  So sand was on its way from the mine to Pro Petro and they

3    needed to get paid?

4    A.  Yes.

5    Q.  Okay.

6    A.  So I said:  Fine.  Then what we will do, the requirement

7    is that ELC's escrow account stays at the million dollars, so

8    what we will do is we will transfer funds from Amegy Bank to

9    ELC, then ELC can make payment to CSI.

10   Q.  Okay.  And did that happen?

11   A.  That did happen, and that's the way it happened for every

12   transaction.  Mr. Naumann had copies of all of the

13   documentation, the BOL and the invoice from CSI.  He would

14   audit them and approve them and then he would do the wire to

15   CSI, and we entered documentation so that that wire would be

16   reimbursed from Amegy.

17           THE COURT:  Let me stop you here.  This June

18   statement you are looking at, the withdrawal of $96,804.43 to

19   ELC, what date in June did that take place?

20           THE WITNESS:  That was June 30th.

21           THE COURT:  Can you go to the documents that

22   Ms. Hyman gave you, that spreadsheet that her client prepared?

23   Does it indicate a deposit on June 30 in that amount?

24           MR. JEFFERSON:  Yes.  There is a 96 -- this first

25   sheet is a spreadsheet that shows a $96,804 reimbursement from

```
 1    Amegy.

 2                  THE COURT:  Okay.

 3                  MR. JEFFERSON:  So there is a list of reimbursements

 4    from Amegy listed -- and this is the first time I have seen

 5    this -- listed on this page.

 6                  THE COURT:  Okay.  Go ahead.

 7    BY MR. JEFFERSON:

 8    Q.  If you continue through the Amegy Bank statements,

 9    statements of account, in July, were there additional

10    transactions?

11    A.  Yes.

12    Q.  And can you -- there are not very many of them.  Can you

13    run through what the transactions were?

14    A.  Yes.  They are all the same as the CSI -- to CSI with the

15    same scenario.  One, July 6, $87,037.80.

16                  July 11, $25,171.15.

17                  July 13, $89,616.64.

18                  July 13, another one, $110,480.13.

19                  July 18, $265,302.18.

20                  Then in addition to that, there is a deposit for

21    investment income of $1,209.99.

22    Q.  Okay.  And so if you go through the rest of the Amegy

23    statement, does it show -- I guess there is only one other

24    statement.  That is the August statement, correct?

25    A.  Correct.
```

1   Q.  And were there additional transactions in August?

2   A.  Yes.  The TRO was lifted at the first part of August.  I

3   think it was like the 7th.

4   Q.  Okay.

5   A.  And so after that, we requested two disbursements to pay

6   CSI.  One was August 9th for $122,712.88.  Another one was

7   August 9th for $187,629.33.  And that took it to just under a

8   million dollars, and we did no more because our limit was a

9   million dollars.

10  Q.  So all of the transactions regarding the Amegy Bank, or

11  the Amegy escrow account, are they all reflected on the

12  statements that is Defendant's Exhibit 3?

13  A.  Yes.

14  Q.  And you received no statements with respect to the ELC

15  account, correct?

16  A.  Correct.

17          MR. JEFFERSON:  If I may approach, Your Honor.

18          THE COURT:  Yes.

19  BY MR. JEFFERSON:

20  Q.  Ms. Kline, I am going to hand you what has been marked as

21  Defendant's Exhibit 4.  Can you just identify what Defendant's

22  Exhibit 4 is?

23  A.  It is an e-mail dated July 28 -- well, it's a couple --

24  28th, 25th, between Dewayne Naumann and myself.

25  Q.  Okay.  And what is the subject of the e-mail on the 25th?

1    A.  On the 25th --

2    Q.  What are you asking for?

3    A.  I am asking him if you could please send me a statement so

4    I can confirm balances tomorrow.

5    Q.  So --

6    A.  And mentioned that the TRO was lifted.

7    Q.  You were asking for copies of statements?

8    A.  Yes.

9    Q.  And what did Mr. Naumann respond?

10   A.  He has been traveling.  He would be back in the office on

11   Monday.  Considering the legal circumstances we are all

12   under -- all under -- I assume that is supposed to be -- at

13   the current time, I will have to consult and seek the advice

14   of legal counsel as well.  This is not something I took into

15   consideration when this relationship began.

16   Q.  Okay.  So now, July 28, by that time, there is a TRO that

17   Mr. Bates has obtained, correct?

18   A.  Yes.

19   Q.  And you are asking Mr. Naumann for a statement regarding

20   the ELC escrow account, the account that he managed?

21   A.  Yes.  And then he went on in this e-mail and said:

22   Generally speaking, company policy has always been to do a

23   reconciliation for year-end only.

24   Q.  Go a little slower.

25   A.  Oh.  A reconciliation for year-end only.  In the case of a

1    special reconciliation, our policy is to give ourselves a

2    minimum of 30 days to respond to the request.  I cannot drop

3    everything at one time and simply focus on a singular account

4    and let all others languish.  With that said, I will begin the

5    process of compiling the data to prepare the reconciliation

6    requested, seeking guidance from counsel.

7    Q.  And that was dated July 28th of 2017?

8    A.  Yes.

9    Q.  And have you received any substantive statement before

10   today regarding the accounting, a statement or a detailed

11   accounting --

12   A.  I received nothing.

13   Q.  Okay.  And did you follow up that request with other

14   requests?

15   A.  Yes.  Multiple e-mails and texts.

16   Q.  Did you talk --

17   A.  I called.

18   Q.  -- to Mr. Naumann by phone?

19   A.  I tried to, and I left messages.  And then later, as I was

20   calling, it would just ring and ring and ring and ring.

21   Q.  Okay.  How would Mr. Naumann -- how could Mr. Naumann be

22   expected to respond and provide a statement of account for his

23   escrow account when there is this Amegy account that is also

24   out there doing other -- performing other functions?

25   A.  Well, it is like any other account that you have.  I have

1    never had an escrow account that they don't give you automatic

2    statements, monthly statements, and it shows everything that

3    is listed, and if there is any support that you don't have,

4    they provide the support.

5    Q.  So what would you have expected -- if Mr. Naumann were to

6    have provided you -- if Mr. Naumann would have responded to

7    this request on July 28 and provided you with a detailed

8    accounting of all of the input and output of the ELC escrow

9    account, what would you have expected to see?

10   A.  I would have expected to see a balance of 960,000 and

11   change, and I would have expected to only see the transactions

12   that were CSI transactions, and the one Bates transaction.

13              MR. JEFFERSON:  If I may approach, Your Honor.

14              THE COURT:  Yes.

15   BY MR. JEFFERSON:

16   Q.  I am going to hand you, Ms. Kline, a series of e-mail

17   exchanges between the dates of July 25 and August 14.

18              Can you take a moment and look and identify that

19   exchange?

20   A.  It is multiple requests asking for the statement, and then

21   there is the request for a disbursement, but the biggest piece

22   is:  Where is our statement?  Where is our statement?  Where

23   is our statement?

24   Q.  And have you heard from Mr. Naumann since August 14, since

25   the e-mail that is on the front page of the exhibit?

1    A.  No.

2    Q.  And at that point, what did he say he was going to do with

3    respect to an accounting?

4    A.  That he would get the accounting done.  When I asked him,

5    "When?" his answer was:  Just as quick as humanly possible.

6    Q.  Did Mr. Naumann ever say to you that the reason why he

7    couldn't do an accounting is because he was confused based on

8    the Amegy escrow account that was also performing functions

9    with respect to delivering sand?

10   A.  No.

11   Q.  Did he ever say there was any confusion about where the

12   money was supposed to come and go?

13   A.  No.

14   Q.  Did he provide an explanation?  I see one, sort of, on the

15   first page of the exhibit.

16   A.  Well, his explanation he had here is:  We manage money

17   accounts for multiple customers, so our day is filled with

18   tracking down lazy clients who fail to send in supporting

19   documentation -- documents, locating incoming wires and the

20   like.  That is what eats up time we can use to be productive

21   otherwise.

22           MR. JEFFERSON:  Your Honor, I would offer

23   Defendant's Exhibits 4 and 5, which are these e-mail

24   exchanges.

25           THE COURT:  Any objection?

```
 1                 MS. HYMAN:  No, Your Honor.

 2                 THE COURT:  Those are admitted.

 3      BY MR. JEFFERSON:

 4      Q.  What is the current status of the memorandum of

 5      understanding, which is Exhibit No. 1?

 6                 MR. JEFFERSON:  Your Honor, I made a bit of a mess.

 7                 THE COURT:  I think she still has them all.

 8                 MR. JEFFERSON:  I spilled some water.

 9      BY MR. JEFFERSON:

10      Q.  What is your understanding of the current status of the

11      memorandum of understanding that was entered into between

12      Mr. Bates and COFS?

13      A.  We terminated it.

14      Q.  And did I terminate it at your request?

15      A.  Yes.

16                 THE COURT:  When did that occur?

17                 THE WITNESS:  I can't remember the date.

18                 THE COURT:  This month?  Last month?

19                 THE WITNESS:  This month.

20      BY MR. JEFFERSON:

21      Q.  Was the letter of termination actually sent on August

22      the 15th?

23      A.  I honestly can't remember the date.

24      Q.  Okay.

25                 MR. JEFFERSON:  If I may approach, Your Honor.
```

```
 1              THE COURT:  Yes.
 2    BY MR. JEFFERSON:
 3    Q.  Let me hand you, Ms. Kline, what has been marked as
 4    Defendant's 6 and 7.  Can you identify those, please, for the
 5    Court?
 6    A.  Yes.  Transmittal email and letter from Lamont Jefferson
 7    to Tiffany Clausewitz and Shellie Reyes.
 8    Q.  And is that 6 or is that 7?
 9    A.  6.
10    Q.  And what is the date on the letter?
11    A.  August 15.
12    Q.  All right.
13              MR. JEFFERSON:  Your Honor, we offer Defendant's
14    Exhibit 6.
15              THE COURT:  Any objection?
16              MS. HYMAN:  No, Your Honor.
17              THE COURT:  6 is admitted.
18    BY MR. JEFFERSON:
19    Q.  And what is Defendant's 7?
20    A.  It is an e-mail to Mr. Naumann from Lamont Jefferson.  The
21    e-mail went to Mr. Naumann, Tiffany Clausewitz, Shellie Reyes
22    on August 15.
23    Q.  And in that e-mail -- I will just read it quickly for the
24    record -- it says:  Mr. Naumann, please see the correspondence
25    attached and e-mail below.  Complete Oil Field Services
```

1   expects that all funds held in the ELC escrow account will be

2   delivered to the company in the next 24 hours, as provided for

3   in section 1.4 B of the agreement.  Please let me know if you

4   need additional information to ensure that payment is

5   accomplished.

6             Did I read that correctly?

7   A.  That is correct.

8   Q.  And that was dated August 15 of 2017, correct?

9   A.  Correct.

10            MR. JEFFERSON:  I will offer Defendant's 7, if I

11  haven't already.

12            THE COURT:  Any objection?

13            MS. HYMAN:  No, Your Honor.

14            THE COURT:  7 is admitted.

15            MR. JEFFERSON:  I will pass the witness, Your Honor.

16            THE COURT:  Any questions?

17            MS. HYMAN:  Yes, Your Honor.

18                    *-*-*-*-*-*-*-*

19                  CROSS EXAMINATION

20  BY MS. HYMAN:

21  Q.  Ms. Kline, why was COFS formed?

22  A.  To sell sand.

23  Q.  To who?

24  A.  To Pro Petro or other customers down the road.

25  Q.  So at the time, Pro Petro was the only customer?

1   A.   Yes.

2   Q.   And when was it formed?

3   A.   In April.

4   Q.   Of?

5   A.   2017.

6   Q.   Did COFS, at that time, have connections to frac sand

7   producers?

8   A.   Sam had some connections because he had been working on it

9   since -- in January-ish.

10  Q.   And so -- and when he formed in April to source frac sand

11  for Pro Petro, who did you expect to buy the sand from?

12  A.   From Bates Energy.

13  Q.   So at the time that you formed COFS, you intended to buy

14  the sand from Bates Energy?

15  A.   They were already in conversation, and it was just shortly

16  after that that -- that's why it got filed at that point, as

17  we were getting ready to go.

18  Q.   Okay.  And did COFS do any due diligence on Bates Energy

19  before going into business with that company?

20  A.   We did do some due diligence.

21  Q.   And what about due diligence on Mr. Bates?

22  A.   We saw the newspaper articles.  We had multiple

23  conversations, and our intent to protect ourself was to set up

24  these escrow accounts.

25  Q.   So the newspaper articles you are referring to are that

1    Mr. Bates' prior company Four Winds had filed for bankruptcy?

2    A.  Yes.

3    Q.  And that Mr. Bates had been indicted for fraud in

4    connection with his prior company?

5    A.  Yes.

6    Q.  And you started a new company, COFS, in order to do

7    business with Mr. Bates, knowing those facts?

8    A.  We started the new company -- when we did that, we didn't

9    know those facts.  They came out a little bit later, but it

10   was not a lot later.  It was at about the same time.

11   Q.  When you say, "The facts came out a little bit later,"

12   what do you mean?

13   A.  We didn't know the facts until we started doing some -- we

14   Googled him, basically.

15   Q.  So, again, I am trying to set the timeline.  You started

16   COFS intending to do business with Mr. Bates and --

17   A.  Well, let me correct that.

18   Q.  Okay.

19   A.  We started COFS thinking that we might be doing business

20   with Mr. Bates, but with someone else as well, and we were

21   working out how to get things going.

22   Q.  And what was the other company you thought you might be

23   doing business with?

24   A.  We didn't have anybody else targeted, as in a specific

25   company.

1   Q.  Okay.  And so you started COFS intending to do business

2   with Sam Bates or maybe another company, but you didn't have

3   anybody in particular in mind?

4   A.  Right.

5   Q.  And then you formed COFS, and then did you do the due

6   diligence before or after you signed the memorandum of

7   understanding and the escrow agreement?

8   A.  We did it before we signed both of those documents.  We

9   thought that ELC would protect our funds.

10  Q.  Okay.  So COFS was formed in April?

11  A.  Uh-huh.

12  Q.  And the memorandum of understanding and the escrow

13  agreement were signed in April?

14  A.  Right.  It was like a week or two later.

15  Q.  Okay.  And in that two weeks, you learned that Mr. Bates

16  was under indictment and that his immediate prior frac sand

17  company had filed for bankruptcy?

18  A.  Yes.

19  Q.  Okay.  When you started purchasing from CSI, how did you

20  learn about CSI?

21  A.  Sam had talked to them in January, and Eric Strange was in

22  his cellphone, and when he was with one of -- I think it was

23  Mark Silva, they were driving around Wisconsin, they saw the

24  mine, and Sam said, basically, "Oh, I know who this is," and

25  then he called up Eric Strange.

1    Q.  Who is Mark Silva?

2    A.  He is a Bates representative.

3    Q.  So Sam Taylor and a Bates representative were driving

4    around Wisconsin looking at sand companies?

5    A.  Bates had represented -- well, I think David Bravo was

6    supposed to meet him, to begin with.  And it is all in the

7    transcripts, so -- of the hearing.  And -- but David Bravo

8    didn't.  They had Mark Silva meet him.  And mark Silva was

9    supposed to be showing him the mines that Mr. Bates was going

10   to be pulling the sand out of.

11   Q.  Okay.  So to answer the question I actually asked, Mr.

12   Silva and Mr. Taylor were driving around Wisconsin looking at

13   mines?  Yes or no?

14   A.  Yes.  They were just driving by them, basically, and Mark

15   Silva would say --

16   Q.  If you could just answer the questions I ask --

17   A.  Yes.

18   Q.  -- that would be helpful.  Okay.  And so was CSI one of

19   the mines that Mr. Silva pointed out to Mr. Taylor as a mine

20   that Bates Energy would be getting sand from?

21   A.  No.

22   Q.  No.

23   A.  He pointed out that mine, but he did not point out that it

24   was a mine that he would be getting product from.

25   Q.  So he pointed out, here is a sand mine --

1   A.   They stopped to go to the bathroom.  Sam says:  What is

2   that?  Who owns that mine?

3             And Mr. Silva says:  Well, that is La Prairie.

4             And Sam said:  Oh, I know Eric Strange.  And they

5   talked about Eric Strange was associated with La Prairie CSI.

6   Q.   And this is your understanding of that conversation based

7   on talking to who?

8   A.   It is actually in the transcripts of the hearing.

9   Q.   This is your understanding --

10  A.   Yes.

11  Q.   -- from who?

12  A.   From Sam.

13  Q.   Okay.  When you had ELC pay for the sand to CSI, were the

14  documents releasing the money from the ELC escrow signed by

15  you and Mr. Bates?

16  A.   No.  They were signed by Dewayne and myself.

17  Q.   And what was your understanding about who could agree to

18  release money from the ELC escrow?

19  A.   It was my understanding that Dewayne was his

20  representative and he could release it under the caveat of the

21  $1 million letter from Mr. Bates.

22  Q.   Dewayne was the representative of ELC?

23  A.   Yes.

24  Q.   Okay.  So it is your understanding that if it was okay

25  with ELC and it was okay with COFS, money could be released

1    from the ELC escrow account?

2    A.   To CSI.  Is that specifically what you are asking about,

3    those transactions, or --

4    Q.   Just generally.  I mean, for the CSI transactions, did

5    anybody from Bates Energy sign to release money from ELC, the

6    individual transactions?

7    A.   No.

8                MS. HYMAN:  Pass the witness.

9                THE COURT:  Anything else?

10               MR. JEFFERSON:  No, Your Honor.

11               THE COURT:  You may step down.  Thank you.

12               That transaction report that Ms. Hyman delivered

13   this morning, is there anything indicating any transaction

14   after August 15?

15               MR. JEFFERSON:  Yes.  There is a $552,000 --

16               MS. HYMAN:  No.  That is the balance.

17               MR. JEFFERSON:  It appears that there is a

18   transaction for $140,000 to Bates Energy on August 23rd, 2017,

19   if I am reading this correctly.

20               THE COURT:  Okay.  That answers my question.

21               Any other witnesses, Mr. Jefferson?

22               MR. JEFFERSON:  Mr. Naumann, if I am pronouncing

23   that name correctly.

24               THE COURT:  If you will come up here.

25               (Oath administered to the witness.)

```
 1              COURTROOM DEPUTY:  Thank you.

 2              THE WITNESS:  Thank you.

 3                      *-*-*-*-*-*-*-*

 4                   DIRECT EXAMINATION

 5   BY MR. JEFFERSON:

 6   Q.  State your name, please.

 7   A.  Dewayne Naumann.

 8   Q.  Mr. Naumann, you know Janis Kline here, correct?

 9   A.  I am familiar with her by e-mail and phone.

10   Q.  You have not met her in person?

11   A.  Not in person.

12   Q.  You don't dispute that she asked you numerous times for

13   copies of statements reflecting activity in the ELC escrow

14   account, do you?

15   A.  No.

16   Q.  And you did not provide that information, did you?

17   A.  There is no provision in the escrow agreement to do that.

18   Q.  And, therefore, you did not?

19   A.  Exactly.

20   Q.  So from April 14 until now, you have not provided a single

21   statement about any disbursements from that ELC escrow

22   account, correct?

23   A.  I complied with the terms of the escrow agreement,

24   correct.

25   Q.  In other words, you have not provided any information
```

1     about disbursements?

2     A.  It was stated earlier that I represented that a year-end

3     accounting would be performed and delivered, but other than

4     that, no.

5     Q.  What year-end were you going to provide a statement?

6     A.  Tax year.

7     Q.  And how do we know that?

8     A.  Well, I put it in writing.  I said I would do it.

9     Q.  You said that you were going to provide a statement at

10    year-end?

11    A.  It is in the e-mail that you presented earlier that I said

12    I would do a year-end accounting.  And, generally, for tax

13    purposes in the business world, that's what you do.

14    Q.  Mr. Naumann, as an escrow agent, you understand that you

15    are a neutral, correct?

16    A.  Correct.

17    Q.  You receive instructions from two parties and you do what

18    those parties say, correct?

19    A.  With discretion provided in the escrow agreement.

20    Q.  And the parties are supposed to provide you with written

21    instruction, correct?

22    A.  Yes.

23    Q.  And so Ms. Kline or someone from COFS was supposed to have

24    authorized all of the disbursements that occurred from the

25    escrow account on which you were the escrow agent, correct?

1    A.  I am not sure I understand the question.

2    Q.  Someone from COFS had to sign off on every payment out of

3    the ELC escrow account that you managed, correct?

4         MS. HYMAN:  Objection, Your Honor.  Calls for a

5    legal conclusion.

6         THE COURT:  That is overruled.  You can answer.

7         THE WITNESS:  Okay.  If you would please repeat the

8    question one more time so I understand it.

9    BY MR. JEFFERSON:

10   Q.  Okay.  You expected someone from COFS to give you

11   instruction every time money was paid out of the -- your ELC

12   escrow account, correct?

13   A.  I believe it is the reverse.  I believe the way the

14   understanding is is the person who wants to receive funds

15   initiates the process, with the subsequent conclusions by

16   COFS.  So in answer to your question, Bates Energy would have

17   had to initiate the request for payment under the

18   circumstances that you outlined.

19        THE COURT:  What do you mean, "subsequent

20   conclusions"?  So Bates would initiate the request, and then

21   what did you expect of COFS?

22        THE WITNESS:  Either approval or denial or no

23   action.

24   BY MR. JEFFERSON:

25   Q.  When this escrow account was set up, did you set it up in

1    a segregated account?

2    A.  I set it up in an account that was previously reserved for

3    Bates Energy Oil & Gas.

4    Q.  Was the escrow account that you set up, was that just for

5    the procurement of sand related to the Bates Energy COFS MOU?

6    A.  No.

7    Q.  So what other accounts had a claim against that particular

8    bank account?

9    A.  That bank account, the only other client-related

10   expenditures that were subject to that bank account were a

11   previous contract that had been fulfilled and there were

12   errant last-minute items that needed to be paid in order to

13   close out the contract.

14   Q.  So what was the balance of the account before the million

15   dollars got funded into it?

16   A.  I believe it was, to the best of my recollection, 105,000,

17   maybe, more or less, but that money was to be immediately

18   turned over whenever I was -- I received it, according to the

19   terms of that escrow agreement.

20   Q.  Who was that escrow agreement with?

21   A.  It was a company by the name of Nitro something or other

22   out of Oklahoma, I believe.

23   Q.  Who was the principal of that company?

24   A.  I don't recall.

25   Q.  Were you an escrow agent for those funds?

```
 1    A.  I was on a spot purchase payment plan only.  It was --

 2    money came in, paid for the sand.

 3    Q.  So you did not set up a separate account when the ELC

 4    money was wired to ELC from Pro Petro?

 5    A.  No.

 6            THE COURT:  Why not?

 7            THE WITNESS:  Sir, it is a matter of just

 8    transacting accounting and bookkeeping through a single

 9    account for one client.  That way, I keep the disbursements

10    for one client clear and don't have to worry about commingling

11    it with other accounts.

12            THE COURT:  But you did commingle it.  You

13    commingled it with 105,000 that belonged to some other

14    transaction.

15            THE WITNESS:  With all due respect, sir, I would

16    disagree.  I kept accurate records for both transactions, and

17    when the account was technically terminated under the use with

18    the previous client, then the account became available for the

19    use with COFS.

20    BY MR. JEFFERSON:

21    Q.  You set up bank accounts, I presume, throughout your

22    career as an escrow agent, right?

23    A.  Yes.

24    Q.  For how long have you been serving as an escrow agent?

25    A.  Under my current configuration, about the last four years.
```

```
1    Q.  And you know it is not a big deal to set up a bank

2    account, right?

3    A.  Well, it is to me, but, yes, it is not hard to go walk

4    into a bank and say, "I need a bank account."

5    Q.  So it would not have been a problem to set up a new

6    account number that would just handle this particular

7    expenditure of money, correct?

8    A.  The expense related to that sort of thing is something

9    that I choose -- for lack of better term, I chose not to go to

10   the additional expense of having to create a new account and

11   start all over again when I had an account that was

12   functioning and was available to use and had had little to no

13   activity for the last nine months.

14         THE COURT:  Well, let me ask you this.  After the

15   $1 million was deposited into that account --

16         THE WITNESS:  Yes, sir.

17         THE COURT:  -- did you ever make any disbursements

18   from that account that were not related to the COFS

19   transactions?

20         THE WITNESS:  From a bookkeeping standpoint, there

21   were a few small transactions that were just meant to clear

22   the books on the previous contract.

23         THE COURT:  And you made no other disbursements?

24         THE WITNESS:  No, sir.  No other disbursements.

25
```

1    BY MR. JEFFERSON:

2    Q.  Now, Mr. Naumann, let me make sure I understand what you

3    said a moment ago.  As an escrow agent in this transaction,

4    you required instruction from two parties, correct?  Mr. Bates

5    was one of them, correct?

6    A.  Uh-huh.  Correct.

7    Q.  And COFS for the other one?

8    A.  Correct.

9    Q.  And if you didn't get instruction from both parties, then

10   you couldn't authorize a payment from that account, correct?

11   A.  With the exception of the latitude that was in the

12   agreement that they both signed.

13   Q.  What are you referring to?  What part of the agreement are

14   you referring to?

15   A.  Section 2.

16   Q.  You are referring to Section 2 of the escrow account?

17   A.  The escrow agreement, yes.

18   Q.  The escrow agreement that is dated April -- signed on

19   April 14 by all parties?

20   A.  I am assuming that you are looking at the one between

21   myself and COFS and Bates Energy Oil & Gas.

22            THE COURT:  Is that the same thing as Exhibit 2 that

23   we talked about earlier?

24            MR. JEFFERSON:  It is Exhibit 2.

25

1    BY MR. JEFFERSON:

2    Q.  What do you recall in Section 2 that would authorize a

3    disbursement without a COFS direction?

4    A.  Without it in front of me, I would hesitate to try to

5    opine.

6    Q.  What do you remember?

7    A.  What do I remember?

8          THE COURT:  Why not just hand it to him so we can

9    clear this up.

10         THE WITNESS:  Section 2.2, paragraph B.  ELC shall

11   be protected in acting upon any written notice, request,

12   waiver, consent, certificate, receipt, authorization, power of

13   attorney or other paper or document which ELC in good faith

14   believes to be genuine and what it purports to be, including,

15   but not limited to, items directing investment or

16   non-investment of funds, items requesting and authorizing

17   release, disbursement or retainage of the subject matter of

18   this agreement and items amending the terms of this agreement

19   or PSA.

20         THE COURT:  Well, but look at 1.3.

21         THE WITNESS:  1.3.  I am aware of what 1.3 says,

22   sir.

23         THE COURT:  So 1.3 required you to disburse executed

24   by buyer.  Buyer is COFS.  The section you read is protecting

25   you from any fraudulent or fake disbursements that you weren't

 1    aware of.  Isn't that the correct reading of this agreement?

 2              THE WITNESS:  I take it all under the context of

 3    authority to act, as the title of -- the caption for that

 4    particular section of the agreement.

 5              THE COURT:  Go ahead.

 6    BY MR. JEFFERSON:

 7    Q.  So, Mr. Naumann, you are saying that under this agreement,

 8    under 2.2-B, if you got a request just from Mr. Bates, not

 9    from COFS, then you were entitled to disburse funds based on

10    that direction?

11    A.  That's what the agreement says.

12    Q.  And did you do that in this case?  Did you get direction

13    from Mr. Bates?

14    A.  Yes, I did, or his attorney, yes.

15    Q.  Or his attorney?

16    A.  Yes.

17    Q.  Which attorney?

18    A.  Tiffany.

19    Q.  And did you follow those directions based upon this

20    particular part of the agreement?

21    A.  Correct.

22    Q.  So how, in your mind, did you reconcile 2.2 with 1.3,

23    which requires the receipt of a signed document by the parties

24    to the agreement?  How did you -- these paragraphs conflict,

25    don't they?

1   A.  Not to me.  The agreement only technically applies to my

2   authority to act, and I took my authority to act from 2.2.

3   Q.  When you acted, as you say, did you notify COFS that that

4   is what you were doing?

5   A.  I didn't -- it doesn't say in here that I have to.

6   Q.  So, therefore, you didn't?

7   A.  I did not.

8           THE COURT:  I mean, are you claiming that any of the

9   notices that you got from Bates was fake?

10          THE WITNESS:  I did not.  And if you review the

11  information that I am provided, you will see that I rejected

12  on numerous occasions the requests for funds to be paid out.

13          THE COURT:  But with regard to the payments you did

14  pay out, are you saying that any of those were fraudulent?

15          THE WITNESS:  In what respect, sir?

16          THE COURT:  Well, I am looking -- at your

17  construction, giving you the benefit of the doubt of 2.2 and

18  2.3, the way it looks to me, I mean, at first glance, is that

19  if you receive fraudulent instructions, you had

20  indemnification from that.

21          So what I am asking you is, when you made payments,

22  are you claiming that anything you relied upon was fraudulent?

23          THE WITNESS:  Not to my knowledge.

24  BY MR. JEFFERSON:

25  Q.  I have a stack of documents here that your lawyer handed

```
 1    me just before we began the hearing.  I have not had a chance
 2    to review them.
 3              Does this stack of documents show checks written to
 4    rail companies?
 5    A.  Checks?
 6    Q.  Funds --
 7    A.  No.
 8    Q.  -- sent to --
 9    A.  To rail companies?
10    Q.  Yes.
11    A.  No.
12    Q.  Does it reflect funds sent to mines?
13    A.  Not that I am aware of.
14    Q.  Is there a document here that -- I presume you are
15    familiar with this stack of documents?
16    A.  Yes.
17    Q.  Is there a document here that shows that Mr. Bates paid
18    for sand?
19    A.  Paid for sand?
20    Q.  Yes, sir.
21    A.  No.  Not that I am aware of.
22    Q.  Is there a document here that shows that Mr. Bates or you
23    paid for either sand or for the transporting of sand?
24    A.  Are you talking in whole?
25    Q.  Yes.  In whole.
```

A.  Yes.  There are documents in that amalgam of paper that
you hold in your hand that shows that sand was paid for.

Q.  And sand from CSI was paid for, wasn't it?

A.  Wisconsin Sands is the name of the bank account that the
money went to, which I am assuming is one of the multiple
iterations of La Prairie Sand, CSI, whatever -- whatever their
name was, I had to deal with the banking side of it.

Q.  And that, as far as you knew, all dealt with one mine,
right?

A.  As far as I know.

Q.  All right.  Are you aware of any sand being procured from
any other mine besides the La Prairie CSI mine?

A.  By whom?

Q.  By Mr. Bates, by you, by COFS.

A.  Yes.  Yes.  Documentation delivered in that stack of
paperwork is a mine transloading delivery system.  I am not
sure what their actual function is, but it is called Tier 1,
with the number 1.

Q.  Who procured that?

A.  Mr. Bates.

Q.  So Mr. Bates procured some kind of a provision of sand
from Tier 1?

A.  Correct.

Q.  How much sand?

A.  I don't know the exact amounts.  It was 1,400 tons of

1    40-70, and 400 or 500 tons of 100 mesh.  I am not exactly

2    100-percent sure on the numbers.  All I am concerned was the

3    bottom-line price and how much money was going in and going

4    out.

5    Q.  And you ensured that that fund got transferred?

6    A.  Correct.

7    Q.  On Mr. Bates' instruction?

8    A.  Correct.

9    Q.  And that money came out of the million dollars that COFS

10   had deposited?

11   A.  Correct.

12   Q.  And you -- COFS, is this the first time that COFS has

13   heard about this expenditure of funds?

14   A.  I can't testify to what they know and don't know.

15   Q.  You didn't give them this information?

16   A.  It is not up to me to notify them.

17   Q.  And, therefore, you did not?

18   A.  Correct.

19   Q.  And so unless they found out from some other source, they

20   wouldn't know?

21   A.  I assume so.

22   Q.  Are there any other mines or other sand providers from

23   whom sand was procured in this stack of documents?

24   A.  Not that I am aware of.

25   Q.  So just the one, the Tier 1?

1    A.  I am not privy to Mr. Bates' business operations, so I

2    have no idea.  When I receive an invoice or a demand from him,

3    the demand goes from the account into his separate bank

4    account.  What he does with that money after that is none of

5    my business.

6    Q.  Does this stack of documents include all of the demands

7    that Mr. Bates made for payment?

8    A.  Yes.

9    Q.  Did you consider it necessary, Mr. Naumann, to receive a

10   bill of lading or similar document to support a payment?

11   A.  It wasn't part of the instructions that I received from

12   Mr. Bates, one way or the other.  Verification was between the

13   parties, not at my expense.

14   Q.  Now, Mr. Naumann, you understand the importance of a bill

15   of lading?

16   A.  I understand what it is.

17   Q.  You insisted on bills of lading in order to support

18   payments out of the Amegy account, didn't you?

19   A.  That was at the direction of the party on the other side.

20   Q.  And before you would authorize payment, you would insist

21   on seeing a bill of lading, wouldn't you?

22   A.  According to the terms of the escrow agreement, if they

23   agreed on payment of the funds, I didn't look behind that.

24   Q.  "If they agreed," you are talking about Bates and COFS?

25   A.  Anybody, in any agreement.  It doesn't matter.

Q.  Okay.  I mean, the bottom line here is, you felt like if

you got an instruction from Mr. Bates, and if there was

nothing on the face of it that looked fraudulent, you were

okay with paying money out?

A.  Yes.

        MR. JEFFERSON:  Your Honor, if I could approach.

BY MR. JEFFERSON:

Q.  I am going to hand you, Mr. Naumann, what I have marked as

Defendant's Exhibit 8.  What is Defendant's Exhibit 8?

A.  Disbursement authorization number 5.

Q.  And it pertains to what?

A.  It pertains to the payment of $89,616.64 exactly

representing 60 percent of invoice number S01007, payable to

Wisconsin Bank & Trust for the benefit of CSI Sands

(Wisconsin) Ltd.

Q.  And in that event, you were acting as an instructor,

right?  I mean, you were not the escrow agent with respect to

this disbursement?

A.  If you can define "instructor."

Q.  One authorized to provide instructions to an escrow agent.

A.  Okay.  I am not sure I am following you, but I believe I

understand where you are going.  This was the arrangement

between -- the verbal understanding between COFS and my

company to facility transactions outside of the purview of the

original memorandum of understanding, which I did not sign and

1    I am not a party to, and the original escrow agreement between

2    COFS, Bates Energy and my company.

3    Q.  Right.  But this would be appropriate documentation to

4    instruct an escrow agent about what to do with funds, correct?

5    A.  This is an example.

6    Q.  And it is signed by both parties to the escrow agreement,

7    correct?

8    A.  It is.  Or let me correct that and say, I know it is

9    signed by me.  That is my signature on that document.

10                MR. JEFFERSON:  Your Honor, I will offer Exhibit 8.

11                THE COURT:  Any objection?

12                MS. HYMAN:  No, Your Honor.

13                THE COURT:  8 is admitted.

14                MR. JEFFERSON:   I will pass the witness.

15                THE COURT:  Any questions?

16                MS. HYMAN:  Yes, Your Honor.

17                        *-*-*-*-*-*-*-*

18                        CROSS EXAMINATION

19   BY MS. HYMAN:

20   Q.  Mr. Naumann, if you could look at Exhibit 2, the escrow

21   agreement again.

22   A.  Yes, ma'am.

23   Q.  Could you read the beginning of paragraph 1.3, that little

24   introduction there.

25   A.  Escrow procedure and payment instruction.

1   Q.  And then read the next sentence, please.

2   A.  The fund, together with all interest earned thereon, if

3   any, which interest shall become and remain a part of the

4   fund, shall be held and disbursed in accordance with the terms

5   of this escrow agreement and PSA.

6   Q.  And then if you could look to see in paragraph 1.1 what

7   the definition of the fund is.

8   A.  1.1.  Establishment of fund.  The undersigned buyer has

9   caused or will cause to be deposited with ELC those certain

10  amounts, from time to time, pursuant to that certain purchase

11  and sale agreement ("PSA") by and between the buyer and

12  seller, dated April 14, 2017 (such sum, or the balance thereof

13  remaining from time to time being referred to herein as the

14  "fund."

15  Q.  So the way I read that, the fund is the deposit or the

16  balance remaining after there have been disbursements.  Is

17  that how you read it?

18  A.  Yes.  That is correct.

19  Q.  And so, then, paragraph 1.3 would be talking about what

20  happens to the fund, all of the remaining money, as opposed to

21  individual disbursements?

22  A.  Correct.

23  Q.  Whereas 2.2 talks about your authority to act with respect

24  to disbursements?

25  A.  Correct.

1    Q.  You were asked whether --

2              THE COURT:  Well, let me ask you here.  I mean, your

3    construction of this, I mean, there is money left over, then

4    what?  It never reverts back to the depositor?  They just get

5    to keep it?  I mean, I don't understand where you are going

6    with this.

7              MS. HYMAN:  Your Honor, that's how -- I didn't write

8    the document.

9              THE COURT:  But is that where you are going with

10   this?  That's what the logical extension of your argument is.

11             MS. HYMAN:  No.  That the fund, the remaining money

12   could be disbursed in accordance with the terms of this escrow

13   agreement and PSA as follows by a document executed by the

14   buyer.  You can deliver that fund to the undersigned against

15   their joint receipt or to any of the undersigned upon written

16   direction of each other or in accordance with the joint

17   written instruction, or if there is only one undersigned, to

18   the undersigned.  That would be the balance -- ways that the

19   balance of the fund could be paid out.

20             THE COURT:  Okay.  I see where you are headed.

21   Okay.  Go ahead.

22   BY MS. HYMAN:

23   Q.  You were asked earlier if when you received requests from

24   Mr. Bates to disburse funds you notified COFS and you said

25   that you did not?

1     A.  I did not.

2     Q.  When you received requests from COFS to disburse funds,

3     did you notify Mr. Bates?

4     A.  I did not.

5     Q.  And why did you not notify one party when the other party

6     was requesting disbursements out of the account?

7     A.  Because I was instructed not to.

8     Q.  By who?

9     A.  Janis Kline.

10    Q.  And what did Ms. Kline tell you?

11    A.  Do not share any information with Stan Bates.

12              MS. HYMAN:  Your Honor, if I could approach.

13              THE COURT:  Come on up.

14    BY MS. HYMAN:

15    Q.  I have handed you what has been marked as ELC Exhibit 1.

16    Could you please tell the Court what that document is?

17    A.  That is a reconciliation of the account activities related

18    to the accounts specifically held for Bates Energy Oil & Gas

19    and the Complete Oil Field Services business transaction under

20    the escrow agreement.

21    Q.  Who prepared this document?

22    A.  My office did, myself and my assistant.

23    Q.  And is it a compilation of information contained in other

24    documents that you have at your office?

25    A.  That is correct.

1    Q.  And does this reflect every transaction in or out of

2    the -- related to that $1 million?

3    A.  Correct.

4              MS. HYMAN:  I offer Exhibit 1, Your Honor.

5              MR. JEFFERSON:  No objection.

6              THE COURT:  That is admitted.

7    BY MS. HYMAN:

8    Q.  I could ask you a couple of things about this, but let me

9    skip ahead to the end.  The Judge asked earlier whether this

10   document reflected any transactions after August 15; do you

11   recall that?

12   A.  After August 15?

13   Q.  Yes, sir.

14   A.  There is one transaction to Bates Energy for demurrage and

15   rail storage costs for sand initiated by Bates Energy Oil &

16   Gas for the benefit of COFS.

17   Q.  I believe you mentioned that that was as a result of a

18   demand letter from an attorney; is that correct?

19   A.  Yes.

20             MS. HYMAN:  May I approach, Your Honor?

21             THE COURT:  Yes.

22   BY MS. HYMAN:

23   Q.  Mr. Naumann, I have handed you what has been marked as ELC

24   Exhibit 2.  Could you identify that document, please?

25   A.  It is a letter from the Rosenblatt Law Firm signed by

1    Tiffany S. Clausewitz.

2    Q.  And what is the date?

3    A.  August 23rd, 2017.

4    Q.  Is this a letter that you received?

5    A.  Yes.

6            MS. HYMAN:  I offer ELC Exhibit 2, Your Honor.

7            MR. JEFFERSON:  No objection.

8            THE COURT:  That is admitted.

9    BY MS. HYMAN:

10   Q.  Could you please explain what this letter was requesting?

11   A.  This letter is demanding that I make payments to Bates

12   Energy Oil & Gas to cover expenses incurred directly for the

13   activities between them and COFS in the amount of $140,541.85.

14   Q.  If you could, the one, two -- third paragraph down, could

15   you read the last sentence?

16   A.  You are hereby demanded to make this disbursement

17   according to Sections 1.D, 3.C and 3.D of the MOU, together

18   with Sections 2.2B of the escrow and disbursement agreement

19   related thereto.

20   Q.  And Section 2.2B is the one that we were discussing that

21   you believe gives you authority to act, correct?

22   A.  Yes.

23   Q.  The second page of that exhibit, could you please explain

24   what you understood this second page to be?

25   A.  This is a detailed invoice from Bates Energy Oil & Gas

1     outlining the charges it incurred for rail storage of cars

2     delivered to a certain transload facility somewhere in the

3     state of Texas.  I am assuming it is Odessa, because that's

4     what it says, and these are the rail demurrage charges that

5     were incurred by Bates Energy Oil & Gas as it relates to their

6     procurement of sand for the benefit of COFS.

7     Q.  Could you just tell us what a demurrage charge is?

8     A.  A demurrage charge, as I understand it, is the charge the

9     railroad charges individuals or companies to place railcars on

10    lines for rail storage.  In simple terms, the railroads, they

11    charge you from the minute it leaves until the minute you

12    unload the car and return the car back to empty status.  And

13    the demurrage charge, the way I understand it, is the charge

14    per day that the owner of the contents of the car is billed

15    for the purpose of having it set on whatever rail line it is

16    occupying.

17    Q.  Other than that 100 -- well, let me ask you this.  Did ELC

18    pay that $140,541.85 in response to the demand letter?

19    A.  Yes.

20    Q.  And did you pay it out of the escrowed funds, as was

21    demanded?

22    A.  Yes.

23              MS. HYMAN:  May I approach, Your Honor?

24              THE COURT:  Yes.

25

```
 1   BY MS. HYMAN:

 2   Q.  Mr. Naumann, I have handed you what has been marked

 3   Exhibit ELC No. 3.  Could you please identify this group of

 4   documents?

 5   A.  The first one is a letter from Commercial Insurance

 6   Associates, LLC addressed to Mr. Bates, president of Bates

 7   Energy Oil & Gas.  Pursuant to your request, below is the

 8   wiring instructions for Commercial Insurance Associates.

 9   Signed by Mr. Kevin D. Brons, principal of Commercial

10   Insurance Associates.

11             They are identifying their bank, where they are to

12   receive payment for insurance related to railcars.

13   Q.  And then behind that, I see it looks like four pages of

14   e-mails; is that correct?

15   A.  Correct.  Those e-mails pertain to a dialogue between

16   myself, Mr. Bates and Mr. Brons, the insurance agent, related

17   to the cancellation of the policy and the reimbursement of

18   those funds that were expended to procure the insurance

19   premium, to cover the insurance on the cars that were being

20   procured for COFS.

21             MS. HYMAN:  I offer Exhibit 3, Your Honor.

22             MR. JEFFERSON:  No objection.

23             THE COURT:  That is admitted.

24   BY MS. HYMAN:

25   Q.  Could you please -- does the information reflected on
```

1   Exhibit 3 show up on this spreadsheet that is Exhibit 1?

2   A.  Yes, it does.

3   Q.  What line is that?

4   A.  Item number 3, I believe.  Let me double-check.  That is

5   correct.

6   Q.  So did you pay $10,761.52 for insurance for the COFS-

7   Bates Energy transaction?

8   A.  I did.

9   Q.  And out of the escrowed funds?

10  A.  I did.

11  Q.  At Mr. Bates' request?

12  A.  I did.

13  Q.  And that money was wired directly to CIA Associates --

14  A.  Correct.

15  Q.  -- with the information on the front of this document?

16  A.  Correct.

17  Q.  You mentioned that the insurance was canceled and there

18  was a refund of the premium?

19  A.  Yes, there was.

20  Q.  And where did the refund go?

21  A.  The refund --

22  Q.  To the best of your knowledge.

23  A.  Since the refund was paid on behalf of Bates Energy Oil &

24  Gas, the refund was credited back to Bates Energy Oil & Gas.

25              THE COURT:  Wait a minute.  You took the money out

```
 1    of the escrow account, but then you gave it to Bates?

 2              THE WITNESS:  I did not give it to anyone, sir.  I

 3    paid --

 4              THE COURT:  Wait.

 5              THE WITNESS:  -- the insurance premium and the

 6    insurance company --

 7              THE COURT:  Go back to my question.

 8              THE WITNESS:  All right.

 9              THE COURT:  My question is, the insurance premium

10    was taken out of the escrow account; is that correct?

11              THE WITNESS:  That is correct.

12              THE COURT:  And then when the insurance later got

13    canceled or whatever and a refund was made, did that money go

14    back into the escrow account?

15              THE WITNESS:  It did not.  At my insistence, it did

16    not go back into the escrow account.  The reimbursement for

17    the unused premium or cancellation went directly to Bates

18    Energy Oil & Gas.

19    BY MS. HYMAN:

20    Q.  That was at your request?

21    A.  No.  It was at my insistence that the funds come back to

22    me, but they did not.

23    Q.  So you were requesting that the cancellation, the premium

24    come back to you?

25    A.  Correct.
```

```
 1    Q.  And it did not come back to you?

 2    A.  Correct.

 3    Q.  Or ELC?

 4    A.  Correct.

 5    Q.  And it went to Mr. Bates instead?

 6    A.  It went back to Mr. Bates' bank account for Bates Energy

 7    Oil & Gas.

 8    Q.  Whose decision was that?

 9    A.  I have no idea.

10         THE COURT:  Did you try to get the money back from

11    Bates?

12         THE WITNESS:  Yes, sir, I did, on numerous

13    occasions.  There were many e-mail and phone calls back and

14    forth checking on the status of the refund, and then I was

15    informed later on that the refund was sent directly to the

16    Bates Energy Oil & Gas bank account.

17         THE COURT:  My question was, did you try to get the

18    money back from Bates?

19         THE WITNESS:  Yes, I did, several times.

20    BY MS. HYMAN:

21    Q.  Going back to Exhibit 1, so line 1 is the deposit, the

22    million dollars, correct?

23    A.  Correct.

24    Q.  And then line 2, if you could explain what line

25    2 reflects.
```

A.   Line 2 basically is an internal process for handling money that I am not getting paid for.  The funds were transferred into an account that my company owns that is a high-yield interest-bearing account, and that money sat there available to be retransferred in at the time it was needed to be disbursed for that particular transaction.

Q.   But the balance, based on that transaction, it is still a million dollars?

A.   It is still a million dollars, correct.

Q.   And then we talked about line 3, which is the $10,761.52 for the purchase of the insurance?

A.   Correct.

Q.   Lines 4 and 5, if you go all the way over to the right, show invoices canceled, and the balance does not seem to change.  Could you explain what lines 4 and 5 reflect?

A.   Those disbursement authorizations that are the subject of those particular items were canceled because the transaction for the sand never went through.  We were attempting to put together the purchase of sand -- or I say "we."  I was on the receiving end of documents that represented that Mr. Bates had entered into an agreement to purchase sand for COFS through the individuals that are listed there, Howard Resources, to fulfill his contractual or agreement obligations to COFS, but it was later canceled because -- for one reason or another that I am not privy to.

1              THE COURT:  But did you get any bills of lading?

2              THE WITNESS:  I did not, because it was canceled.

3              THE COURT:  Did you make any disbursements on any of

4    those canceled accounts?

5              THE WITNESS:  No, sir, I did not.

6    BY MS. HYMAN:

7    Q.  So even though no disbursements were made, those

8    transactions are reflected on your accounting?

9    A.  Correct.

10             THE COURT:  But that's what I am confused by.  Why

11   would there even be reflections on the account if you never

12   got a bill of lading and -- so there was nothing ever to

13   disburse?  Why would you even be making those entries?

14             THE WITNESS:  Sir, we document everything, so that

15   way there is a clear understanding of what did and did not

16   happen to the account.  It is for our own internal controls as

17   well.

18             THE COURT:  By the way, who drafted the escrow

19   agreement?

20             THE WITNESS:  It was drafted by me four years ago

21   and modified by me a couple of times inbetween, and it has

22   been reviewed by lawyers, past and present.

23             THE COURT:  So this April 14, 2017 agreement was you

24   or your company, correct?

25             THE WITNESS:  Correct.

1    BY MS. HYMAN:

2    Q.  Were there -- did either COFS or Bates Energy request any

3    changes to the form of the escrow agreement that you provided

4    to them?

5    A.  Yes.  There were a few minor changes that I believe they

6    wanted.  I agreed to them, because it didn't, in my opinion,

7    change the nature of the agreement.  It was just a means of

8    procuring payment documentation or other items.

9          And to be honest with you, it may be on the

10   agreement between ELC and Amegy Bank was the changes; after I

11   supplied this document in Word form to Janis for her review

12   and expecting that to remain confidential, I expected that

13   document to come back with her changes, and there were a few

14   minor changes that didn't affect the direction or content, per

15   se, of the document, in my opinion.

16   Q.  To the best of your knowledge, is the second escrow

17   agreement, the one between ELC and Amegy and COFS, a document

18   that was drafted using your form of escrow agreement as a

19   starting point?

20   A.  I do.

21          MS. HYMAN:  May I approach, Your Honor?

22          THE COURT:  Yes.

23   BY MS. HYMAN:

24   Q.  I have handed you what has been marked as Exhibit ELC No.

25   4.  Could you please identify that document?

1    A.  It is a letter from Stan Bates, CEO, Bates Energy Oil &

2    Gas, to me at Equity Liaison Company, LLC, dated June 15,

3    2017.

4    Q.  And do the other documents comprising Exhibit 4 go

5    together with that letter?

6    A.  To the best of my knowledge, yes.

7              MS. HYMAN:  Offer Exhibit ELC No. 4.

8              MR. JEFFERSON:  No objection.

9              THE COURT:  That is admitted.

10   BY MS. HYMAN:

11   Q.  What is Mr. Naumann telling you in this June 15, 2017

12   letter?

13   A.  You mean Mr. Bates?

14   Q.  I'm sorry.  Mr. Bates.

15   A.  He has instructed me to distribute funds for the purpose

16   of covering -- if you will give me a minute to reread it.

17   Authorizing -- I am authorizing the distribution of funds per

18   the escrow agreement with Bates Energy.  The following parties

19   will be required to submit W-9s to ELC and sign an individual

20   agreement with your company.  Please not all payees -- and I

21   believe that was meant to be "note."  Please note all payees

22   are responsible for their own taxes and reporting to the IRS

23   via a 1099 for ELC at the end of the year.

24   Q.  And what does Mr. Bates indicate that the purpose of this

25   distribution is?  The last sentence of that paragraph.

1    A.   The last sentence of that paragraph:  Due to liquidated

2    damages and administration fees of $150,000.

3    Q.   Do you know what Mr. Bates was referring to when he said

4    "liquidated damages and administration fees"?

5    A.   Liquidated damages and administrative fees, as I

6    understand it, were the lost income, lost revenue from the

7    continuous rejection of frac sand provided by Mr. Bates to

8    COFS for their -- for their purchase.

9    Q.   I notice one of the lines -- so that the total is $65,050,

10   correct?

11   A.   Correct.

12   Q.   And did you disburse those funds?

13   A.   Yes.

14   Q.   In accordance with these instructions?

15   A.   Yes.

16   Q.   One of the lines is for $10,000 to Equity Liaison Company,

17   correct?

18   A.   Correct.

19   Q.   And did you receive -- did your company receive that

20   money?

21   A.   Yes.

22   Q.   And what did that fund represent, in your mind?

23   A.   Liquidated damages of lost profit as it relates to the

24   escrow agreement terms for payment to my company for services

25   provided.

1    Q.  And is this Exhibit 4 reflected on the spreadsheet as line

2    6?

3    A.  Yes.

4             THE COURT:  I am curious.  I mean, so does Mr. Bates

5    provide you any kind of documentation to support his claim

6    that sand is being rejected improperly?

7             THE WITNESS:  E-mails, phone conversations, text

8    messages and the like.

9             THE COURT:  And so as an escrow agent, as a neutral,

10   you just take one side and you unilaterally believe --

11            THE WITNESS:  No.

12            THE COURT:  -- his story and you disburse?

13            THE WITNESS:  No, sir.

14            THE COURT:  Then what did you do?

15            THE WITNESS:  If the other side would have come to

16   me and said -- if they would have been in the same shoes, I

17   would have looked at it in a similar fashion.

18            THE COURT:  Well, did you give them notice that

19   Bates was seeking these disbursements?

20            THE WITNESS:  Again, that was not part of my

21   responsibility.  My responsibility was to process the funds

22   and receive the documents.

23            THE COURT:  Wow.

24   BY MS. HYMAN:

25   Q.  Turning back to ELC Exhibit 1, I believe lines 7 and 8 --

```
 1    well, let me ask you what line 7 and 8 reflect.

 2    A.   Line 7 represents $96,804.43 paid as 60 percent of invoice

 3    number SO1001, 1,709 tons at $94.38 per ton.  And without the

 4    actual document in front of me, the only time we did a 60-40

 5    disbursement was for CSI Wisconsin Sands or La Prairie,

 6    whichever is the appropriate name for that particular

 7    disbursement.

 8    Q.   And then what does line 8 reflect?

 9    A.   The identical sum being reimbursed back to ELC for the

10    invoice paid.

11              MS. HYMAN:  May I approach, Your Honor?

12              THE COURT:  Yes.

13    BY MS. HYMAN:

14    Q.   I have handed you what has been marked as Exhibit ELC No.

15    5.  Are these documents the basis for the entries on lines

16    7 and 8?

17    A.   Yes, they are.

18              MS. HYMAN:  I would offer Exhibit 5.

19              MR. JEFFERSON:  No objection.

20              THE COURT:  Admitted.

21    BY MS. HYMAN:

22    Q.   Turn to the second page of Exhibit 5.  This is a --

23    appears to be a disbursement request, requesting that ELC

24    disburse $96,804.43 out of the escrow account to CSI Sands; is

25    that correct?
```

1    A.  Correct.  Out of the account specifically set up for Bates

2    Energy Oil & Gas.

3    Q.  And when you got this instruction from -- so you received

4    this instruction from COFS?

5    A.  Correct.

6    Q.  And you made the disbursement of $96,804.43 out of the

7    escrow account?

8    A.  Yes.

9    Q.  At COFS's request?

10   A.  At their insistence, yes.

11   Q.  Did you let Mr. Bates know that you were sending this

12   money out?

13   A.  Again, I was told not to let him know that I was making

14   these disbursements.

15           MS. HYMAN:  May I approach, Your Honor?

16           THE COURT:  Yes.

17   BY MS. HYMAN:

18   Q.  I have handed you what has been marked as ELC Exhibit 6,

19   which appears to me to be a June 30th, 2017 request from Mr.

20   Bates to disburse funds for liquidated damages, similar to the

21   one we saw before; is that correct?

22   A.  Correct.

23           MS. HYMAN:  I offer ELC Exhibit 6.

24           MR. JEFFERSON:  No objection.

25           THE COURT:  That is admitted.

BY MS. HYMAN:

Q.  And did you disburse funds from the escrow account, as requested in this document?

A.  Yes, I did.  It is reflected as line item number 9 on the spreadsheet.

Q.  And, again, some portion -- this is $28,500; is that correct?

A.  Correct.

Q.  And Equity Liaison Company did receive some moneys, $7,500 out of this disbursement?

A.  Correct.

Q.  Other than the $10,000 reflected on Exhibit 4 and this $7,500, as of this date, June 30th, had ELC received any other sums for the work it was doing managing the escrow account?

A.  Related to this specific escrow agreement, no.

Q.  What about related to the Amegy Bank escrow agreement?

A.  No.  There were no provisions for me to be paid by COFS or Amegy Bank or anybody else, for that matter.

Q.  Okay.  So for the work you were doing in connection with the escrow -- the Pro Petro escrow, all $4 million of it, wherever it was going, as of June 30th, the only moneys you had received were the $10,000 reflected in Exhibit 4 and the $7,500 reflected in Exhibit 6?

A.  That is correct.

Q.  Turning back to Exhibit 1, it appears to me that lines 10

1   and 13 are another example of money coming -- going out from

2   this account and then coming back in from Amegy Bank.  It is a

3   wash.

4          Is that your understanding of how to read the

5   document, 10 and 13?

6   A.  Yes.

7          MS. HYMAN:  May I approach?

8          THE COURT:  Yes.

9   BY MS. HYMAN:

10  Q.  And, again, even though the money is a wash, because you

11  are sending money out and then you are getting money back in,

12  it reflects on your spreadsheet; is that correct?

13  A.  That is correct.

14  Q.  And that is because your intention is to reflect every

15  transaction, whether it ends up being a wash or it is canceled

16  or whatever?

17  A.  Yes.

18  Q.  I have handed you what has been marked as Exhibit 7, ELC

19  Exhibit 7.  Could you identify this document for me, please?

20  A.  It is a disbursement authorization called number 1,

21  payable to Tier 1 Sands in the amount of $155,232 exactly for

22  invoice number 2744.

23  Q.  And is invoice number 2744 attached?

24  A.  Yes, it is.

25  Q.  And what does that document reflect?

1  A.  It reflects the invoice with railcar numbers for

2  1,120 tons at the rate of $99 per ton for 40-70 northern

3  white.

4          THE COURT:  And what date is that?

5          THE WITNESS:  The date on the invoice is July 5th of

6  2017.

7          THE COURT:  Thank you.

8          THE WITNESS:  And the second item reflected is

9  448 tons of 100 mesh at the rate of $99 per ton.

10         MS. HYMAN:  I offer ELC Exhibit 7.

11         MR. JEFFERSON:  No objection.

12         THE COURT:  That is admitted.

13  BY MS. HYMAN:

14  Q.  Did you disburse $155,232 in accordance with this

15  disbursement authorization?

16  A.  I did.

17  Q.  Is that reflected on line 11 of your spreadsheet?

18  A.  Yes, it is.

19  Q.  On the second page of Exhibit 7 there is also a -- I see

20  the $155,232 in the middle of the page, and then I see a flat

21  fee, Bates Energy Oil & Gas, LLC, $1,000 admin fees.

22         Did you disburse that $1,000 reflected on that

23  document as well?

24  A.  I don't recall.  It is possible that I did, but I don't

25  recall.  Because it is not reflected on the spreadsheet, I

1    question whether I did or didn't.

2    Q.  Actually, if you look at line 12, I thought I did see it

3    reflected on the --

4    A.  It is very possible.  Yes, it is.  Yes, it is.  You are

5    correct.

6    Q.  Okay.  When I spoke at the beginning of the hearing, I

7    mentioned that there is some money reflected on your

8    spreadsheet in line 30, pending receivable 204,000-some-odd

9    dollars?

10   A.  Yes.

11   Q.  Is that related in any way to this document?

12   A.  Yes, it is.  That was the item number 11, together with

13   item number 23, comprising the total sum of sand purchased for

14   the benefit of COFS -- COFS between -- for -- that Bates

15   procured and delivered on behalf of this agreement and this

16   MOU, which was rejected by COFS.

17              THE COURT:  Is there any bills of lading for those?

18              THE WITNESS:  Not in my possession at this time.

19   There may be.  I don't know -- I don't believe I have them.

20              THE COURT:  But if you don't have them, then under

21   this agreement, how do you have this as a receivable?

22              THE WITNESS:  The receivable is reconciled from the

23   invoice provided by Bates Energy to Transload Sand Sales in

24   Oklahoma, who has agreed to purchase this sand and resell it.

25              THE COURT:  I guess what I don't understand is, why

```
 1    are you even putting yourself in this position?  I mean, if

 2    you are just the neutral, if there are disputes about all of

 3    this, why aren't you just letting the procurer of sand fight

 4    this out with Bates individually?  Why are you throwing

 5    yourself in the middle of this?

 6              THE WITNESS:  I am not sure how to answer that

 7    question, sir.  I apologize.

 8              THE COURT:  Well, I mean, your role is real clear.

 9    You get a bill of lading.  The way I interpret the escrow

10    agreement, you have to be instructed by COFS to issue payment

11    and you have a duty to notify COFS once payments are

12    disbursed, so why are you even keeping pending receivables?

13              THE WITNESS:  In order to offset expenses paid.

14    This money is supposed to come back to ELC to offset the sand

15    that was purchased by Bates Energy Oil & Gas to provide to

16    COFS, who rejected it.

17              THE COURT:  But how do you know that?  Do you have a

18    bill of lading and how do you know it has been rejected?

19              THE WITNESS:  The conversations that I have between

20    Mr. Bates and Mr. Bravo, who runs the sand supply on the other

21    side.

22              THE COURT:  So, again, even though you are the

23    neutral, you are just relying upon verbal statements made by

24    Bates for all of this?

25              THE WITNESS:  Verbal and text messages.
```

```
 1   BY MS. HYMAN:

 2   Q.  Did you also rely on verbal statements and text messages

 3   from Janis Kline in your dealings with COFS?

 4   A.  Yes.

 5            THE COURT:  But that is like a red herring to me.

 6   Are they contesting those amounts?

 7            MS. HYMAN:  I don't know, Your Honor.

 8            THE COURT:  Well, I mean, let's get to it.  Are you

 9   guys contesting those amounts?

10            MR. JEFFERSON:  The amounts paid to CSI were -- they

11   are all properly accounted for.  They are in the Amegy records

12   and we are not contesting those payments.  We knew they were

13   going through the EL -- I am sorry.  COFS knew they were going

14   through the ELC account and that's not a contested matter.

15            (Mr. Jefferson conferring.)

16            THE COURT:  You still stand by that statement?

17            MR. JEFFERSON:  Yes.

18            THE COURT:  Okay.

19            MR. JEFFERSON:  That statement is correct.

20            THE COURT:  Go ahead.  I guess why I ask, it is

21   11:45.  I mean, how much more are we going to have of all of

22   this?  Do you have any more witnesses?

23            MR. JEFFERSON:  No more witnesses, Your Honor.

24            THE COURT:  Are you going to have any additional

25   witnesses, Ms. Hyman?
```

```
1              MS. HYMAN:  No, Your Honor.  I am agreeing to the

2     injunctive relief.  I don't --

3              THE COURT:  And so -- well, then, let's get to the

4     chase, then, I mean, because the way I look at this, there is

5     a substantial likelihood of prevailing on the merits.  I do

6     believe there is a substantial likelihood that Equity Liaison

7     Company violated the terms of Exhibit 2.

8              And so with that, I am looking at the other factors.

9     Substantial threat of irreparable harm if the injunction is

10    not granted.  I believe there have been, at best,

11    characterized charitably, irregularities in these

12    disbursements.

13             Three.  The threatened injury outweighs any harm

14    that may result from the injunction to the nonmovant.  Now,

15    there, I am concerned about the 204 226.  I mean, it seems

16    clear that the 308,662 needs to go into the registry of the

17    Court, but how do you address the 204?

18             How is this -- and that's why I was asking the

19    questions earlier of Mr. Naumann.  I mean, it seems that if

20    this 204,226 bill does come in, and it is a real bill, it is a

21    bill that that sand company has with Bates.

22             How is your client implicated by having that 204,226

23    going to the registry of the Court?  How is this client

24    harmed?

25             MS. HYMAN:  He is not, Your Honor.  It is not his
```

1    money.

2            THE COURT:  That's what I thought.  And there is no

3    undermining of the public interest by that.  So shouldn't all

4    513,000 or so that is remaining in this account be placed in

5    the registry of the Court?

6            MS. HYMAN:  Well, that 204 needs to come in from the

7    purchaser.  It is not money that he has.

8            THE COURT:  Well, how much money is in the account

9    right -- total.  I don't want accounts receivable.  I want to

10   know, how much total is in that account right now?

11           MS. HYMAN:  $308,622.35.

12           THE COURT:  So, then, the earlier representation,

13   there is a net of only like $100,000, supposedly, out of this

14   million?

15           MS. HYMAN:  I am not understanding.

16           THE COURT:  Well, this 204, I mean, if a true bill

17   of lading came in and it is correct, and if this equity

18   agreement had not been terminated and the bill came through,

19   would that 204 get deducted from the 308?

20           MS. HYMAN:  No.  Added to.

21           THE COURT:  Added to.  Okay.  Added to.  It is a

22   pending receivable to this account.  Okay.  I follow now.

23           And so -- well, where is that money right now, then?

24           MS. HYMAN:  That is the sand -- the sand was

25   purchased, and so the money came out of the account, but

1      then -- maybe we should let Mr. Naumann --

2              THE COURT:  Yes.  I am trying to figure out how much

3      money needs to be deposited into the registry of the Court.

4      That is what I am trying to figure out.

5              THE WITNESS:  If I could, sir.

6              THE COURT:  Go ahead.

7              THE WITNESS:  If you add the 155 and the 44

8      together, which comprises the two purchases of sand that were

9      meant for COFS from Tier 1, you combine those, which were

10     purchased at a rate of $94, I believe it was, $99, the sand is

11     being sold through Transload Sand Sales in Oklahoma at a

12     higher rate, I believe at 104.

13             The other party to the agreement has agreed to put

14     all 204 of it back with me and turn it back over into the

15     escrow account.

16             THE COURT:  When is that deal supposed to close?

17             THE WITNESS:  It is one of the -- as anybody in the

18     sand business knows, it is 30, 60, 90-day net, and we are

19     about 30 days into this deal.

20             THE COURT:  So let me ask it this way.  Has the sand

21     actually been delivered by Tier 1 to whoever the new buyer is?

22             THE WITNESS:  Yes.  As far as I know.  As far as I

23     know, the sand was purchased, delivered, and it has been sold

24     to the user in the field, who is apparently on a 30 or 45 or

25     60-day net turnaround payment period with Transload Sand

1    Sales.  So the money is coming back.

2           THE COURT:  Okay.  So, I mean, why shouldn't the

3    order for today be that the $308,662.35 be immediately placed

4    in the registry of the Court and that directions be given to

5    Tier 1 that upon receipt of its moneys, the $204,226.97 should

6    be made payable to the registry of the Court?  Why isn't that

7    a solution here today?

8           THE WITNESS:  Well, it is not Tier 1.

9           THE COURT:  Or whoever it is.

10          THE WITNESS:  It is --

11          MS. HYMAN:  Transload.

12          THE WITNESS:  -- Transload Sand Sales.

13          THE COURT:  Transload.  So, I mean, why isn't that

14   the solution today?

15          MS. HYMAN:  That's fine with us.

16          THE COURT:  So if that was the order, your client

17   wouldn't be harmed in that fashion?

18          MS. HYMAN:  No.  I mean -- no.

19          THE COURT:  So, Mr. Jefferson, I mean, why -- I know

20   you want a million bucks, but there is not a million bucks

21   here.  So, I mean, for purposes of today, I mean, the fight

22   continues, I guess, with whatever claims you have against

23   Equity Liaison and Bates, but why isn't that an appropriate

24   solution to today?

25          MR. JEFFERSON:  Yes, Your Honor.  That sounds like

```
1    that's as best as we can do today, is gather all of the funds

2    that we possibly can, get them out of his hands, so he doesn't

3    get --

4              THE COURT:  Let's not make it all that personal.

5              MR. JEFFERSON:  Right.

6              THE COURT:  Just stick to a solution.  Okay?

7              MR. JEFFERSON:  Protect the funds, whatever funds

8    are available.

9              THE COURT:  So is there anything wrong or, from your

10   client's perspective, needs to be adjusted from what I just

11   said?

12             MR. JEFFERSON:  I think that covers all of the

13   assets that we know about.  So if we learn about additional

14   assets -- and that's, I think, a crucial part of today's

15   proceeding is to understand -- and I think we got some

16   information, but to understand --

17             THE COURT:  And by the way, I want to make what you

18   received today an exhibit, because as we continue on, I want

19   to understand what happened, so I want copies of all of that

20   made as an exhibit and a part of the record.

21             MR. JEFFERSON:  And it is all Bates stamped, Your

22   Honor, so we can follow -- Ms. Hyman has done a good job

23   there.  But we need an accounting.  We need to understand

24   exactly where the money went.

25             THE COURT:  Well, when you say you need an
```

 1    accounting, I mean, it has been tendered to me that that is

 2    the accounting.  And I know you haven't had enough time to

 3    look at it, but I mean, at first blush, do you think it is a

 4    deficient accounting or what?

 5              MR. JEFFERSON:  I don't know.  I guess if the

 6    representation is, this is an accounting, then we would like

 7    at least to -- obviously, we would like to have the

 8    opportunity to examine it.

 9              And part of the suspicion here, Your Honor, is --

10    this is not a secret.  I mean, Mr. Naumann was served with a

11    TRO when it was signed, the day that it was signed, and that

12    was on September 15.

13              Ms. Hyman has had some documents in her possession

14    at least since Friday.  And she told me, let's pass the

15    hearing.  I will give you the documents I have.  We have not

16    had a chance to look at any of this stuff until right now.  It

17    is being shown to us now as we are going through the hearing.

18              So we do want to have an opportunity to inspect and

19    test whether these documents are real or not.  I mean, a lot

20    of the documents -- and we have heard from Mr. Naumann, a lot

21    of the documents on which he based his payment decisions have

22    nothing but ELC and Bates documents on them.  There is no

23    third party.

24              The ones that do have a third party on them are from

25    David Bravo, who is an employee.  So this is a highly

1    suspicious accounting, if it is an accounting whatsoever.  And

2    so we would just like the opportunity -- number one, the order

3    remain in place that an accounting be done, if it hasn't; and

4    secondly, the opportunity to test whether or not this is

5    really an accounting or whether this is made up.

6            THE COURT:  Well, let me go to the first point, the

7    accounting.

8            So, Ms. Hyman, is this accounting or was this a

9    preliminary attempt, or is there further work to come, or is

10   this it?

11           MS. HYMAN:  This is it.  Obviously, if there is

12   additional information they need, I am happy to work with them

13   to try to locate any additional information.

14           THE COURT:  So this is the accounting.  So to the

15   extent that later, as you review the documents, you find there

16   are deficiencies or questions, I expect you to confer with

17   Ms. Hyman.  I respect both of you all.  You all know how to do

18   this.

19           But if there is an inadequate accounting or it is

20   unexplained for, then we can have another hearing about why

21   the terms of the restraining order have been violated, or the

22   injunction.

23           And so with regard to the injunction here, I will

24   leave it to the two of you to draft the document, but whatever

25   money is left in this account, not less than $308,662.35, but

1     if there is more money in this account, all of that money in

2     that account is to be placed in the registry of the Clerk's

3     Office.

4              With regard to the $204,226.97, you all work out

5     language that whoever the buyer of this sand is, once they

6     have made the payment, the payment goes into the registry of

7     the Court, and I will leave you all to write the order.

8              Is there anything else we need to address today?

9              MR. JEFFERSON:  I don't believe so, Your Honor.  I

10    think that covers it, but, obviously, there are a lot of

11    questions.  And what we would at least like to know is, who is

12    the buyer of this sand and --

13             THE COURT:  Well, he stated it earlier.

14             MS. HYMAN:  I would have gotten there, but --

15             THE COURT:  Well, he told me earlier.

16             MS. HYMAN:  Yes.  And I have a document.

17             THE COURT:  What is the name again, sir?

18             THE WITNESS:  Transload Sand Sales in Oklahoma.

19             MS. HYMAN:  It is Bates numbered ELC 000097, the

20    invoice.

21             THE COURT:  So I fully understand that this is just

22    a preliminary injunction and the fight continues, so I know

23    that there is going to be more to this.  But for purposes of

24    today, is there anything -- is there any further relief your

25    client seeks that we have not addressed?  Not to say you are

```
 1    going to get it.  I just want to know if there is anything

 2    else out there.

 3              MR. JEFFERSON:  Your Honor, we have addressed

 4    everything that is in our application at this point.

 5              THE COURT:  Anything else from your perspective,

 6    Ms. Hyman?

 7              MS. HYMAN:  No, Your Honor.  I was willing to do

 8    this as of Friday.

 9              THE COURT:  Well, but you had an obligation to turn

10    over what documents you had to turn over with regard to the

11    TRO, but like I said, I respect both of you all and there must

12    have been some reason for this.

13              Ms. Clausewitz, did you want to chime in at all

14    today?

15              MS. CLAUSEWITZ:  No, Your Honor.  We have nothing.

16              THE COURT:  Give me the order in the next three days

17    while it is fresh in my mind.

18              We are adjourned.

19              *-*-*-*-*-*-*-*-*

20

21

22

23

24

25
```

```
 1                        *-*-*-*-*-*-*-*

 2    UNITED STATES DISTRICT COURT )

 3    WESTERN DISTRICT OF TEXAS    )

 4            I certify that the foregoing is a correct transcript

 5    from the record of proceedings in the above-entitled matter.

 6    I further certify that the transcript fees and format comply

 7    with those prescribed by the Court and the Judicial Conference

 8    of the United States.

 9    Date signed:  October 2, 2017.

10

11                          /s/ Karl H. Myers

12                          _____
                            KARL H. MYERS, CSR, RMR, CRR
                            Official Court Reporter
13                          655 East Durango Blvd., Suite 315
                            San Antonio, Texas 78206
14                          (210) 244-5037

15

16

17

18

19

20

21

22

23

24

25
```