**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **BATES ENERGY OIL & GAS, LLC,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION:  SA:17-CV-00808-XR** |
| | § | |
| **COMPLETE OIL FIELD SERVICES** | § | |
| **LLC AND SAM TAYLOR.** | § | |

---

**DEFENDANT/COUNTER-PLAINTIFF COMPLETE OIL FIELD SERVICE, LLC'S**
**MOTION TO RELEASE FUNDS HELD IN COURT REGISTRY**

---

NOW COMES Complete Oil Field Services, LLC ("COFS" or "Defendant/Counter-Plaintiff"), and files this Motion to Release Funds Held in Court Registry and shows the Court as follows:

**I.**
**SUMMARY OF ARGUMENT**

1.     This case involves a $4 million escrow arrangement that was supposed to fund COFS's procurement of tens of thousands of tons of frac sand.  Because of misrepresentations and deceptions, no frac sand was delivered and a substantial portion of the escrowed funds disappeared.

2.     When presented with these facts, this Court granted COFS's request for a preliminary injunction and ordered that all remaining funds in the control of the escrow agent, Defendant Equity Liaison Company ("ELC"), be deposited in the registry of the Court until further order of the Court.  [Dkt. 30].  The Court also ordered that ELC account for all funds that came into its possession.  [Dkt. 16 and 30].  In addition, the Court ruled that if COFS's examination of ELC's accounting revealed "insufficiencies, inaccuracies, incompleteness or some other concern," then COFS could seek further relief from the Court.

3.      COFS' examination of the ELC accounting did indeed reveal irregularities and COFS therefore filed Defendant/Counter-Plaintiff Complete Oil Field Services LLC's Motion to Enforce TRO and Preliminary Injunction.  [Dkt. 39].  Thereafter, ELC provided COFS with additional bank statements in support of its accounting.  The accounting as a whole continues to include substantial irregularities and unauthorized redactions.  By this motion, COFS asks the Court to release and disburse all remaining funds from the registry of the Court to COFS, as owner in trust of the funds, so that COFS may satisfy obligations it owes to its customer, ProPetro Services, Inc. ("ProPetro").

## II.
### BACKGROUND

4.      On April 19, 2017 ProPetro, a pressure pumping services company based in West Texas that provides fracking services to well operators, placed $4 million in funds into two escrow accounts.  The funds were to be the first deposit of monies dedicated exclusively for COFS's use in procuring frac sand for ProPetro.  An April 13, 2017 Supply Agreement between ProPetro and COFS governed the deposit and intended disbursement of the funds.  [Dkt. 12-4].  The Supply Agreement provided that ProPetro would pay $104 per ton to buy the sand.  Thus, the $4 million fund should have purchased over 38,000 tons of sand in a period of weeks – 10,000 tons to be delivered within a month and another 70,000 tons within the first 90 days.

5.      Prior to the execution of the Supply Agreement, Stan Bates represented to COFS that he had access to an allocation of 370,000 tons of sand a month, ready to be delivered, and that he was already delivering some 88,000 tons every 45 days to other customers.  Based on these representations, COFS entered into a Memorandum of Understanding("MOU") with Bates Energy Oil & Gas, LLC ("Bates Energy") whereby Bates Energy would locate and procure the specified sand.  Bates Energy would be paid $99 per ton, resulting in a $5 per ton profit to COFS.  [Dkt. 12-

6].  The MOU provides that Bates Energy would be paid 50% of the procurement cost at the time the sand was loaded for delivery from the mine (or point of origin), and 50% of the procurement cost at the time the sand was off-loaded for final delivery to the well site.  In order to prove that the sand was actually procured, Bates Energy was obligated to provide Bills of Lading.

6.      As referenced above, the $4 million in escrow funds was split into two accounts: $3 million was deposited in an Amegy Bank escrow account, with Amegy serving as the escrow agent (the "Amegy Escrow Account"), and $1 million deposited in an ELC bank account at JP Morgan Chase, with ELC serving as the escrow agent, (the "ELC Escrow Account").  Stan Bates insisted that ELC serve as escrow agent for at least some of the funds because Amegy was not embedded in the oil and gas industry and because ELC was, in his words, "a proven performance company."  The signatories on the Amegy Escrow Account were Janis Kline for COFS and DeWayne D. Naumann ("Naumann") for ELC.  The signatories on the ELC Escrow Account were Janis Kline for COFS and Stan Bates for Bates Energy.  Thus, Naumann simultaneously served as both a neutral escrow agent, and as a pay agent for Bates Energy.  This arrangement, though unusual, was acceptable to COFS because both escrow agreements required COFS's signature and authorization to effectuate any disbursements of funds.

7.      In fact, Naumann made substantial disbursements of funds out of the ELC Escrow Account solely on the instruction of Stan Bates – with no authorization from, or even notice to, COFS.  ELC's secret disbursements were made in the midst of repeated, unanswered requests by COFS to ELC for information on the balance in the ELC Escrow Account.

8.      Moreover, none of ELC's disbursements of funds from the ELC Escrow Account were made for frac sand purchases procured by Bates Energy.  Rather, the unlawfully disbursed funds were used for unauthorized and undocumented purposes, including (1) arbitrarily declared

"liquidated damages," (2) "flat fees," (3) "administrative fees," or a "draw," (4) legal fees, (5) insurance costs, and (6) failed attempts to "mitigate" costs for sand that was never delivered.

9.      The payments disbursed by Naumann on Stan Bates' signature alone totaled over $600,000 of the original $1,000,000 deposited in the ELC Escrow Account.  The amounts disbursed included at least $37,500 paid by ELC to Naumann himself.  To this day, Bates Energy has failed to deliver a single grain of frac sand either to COFS, or COFS's customer ProPetro.

10.      Two months after the escrow accounts were created, it was clear that Bates Energy could not deliver sand in the promised volumes required by ProPetro.  At that point COFS identified a mine in Wisconsin, CSI Sands (Wisconsin) Ltd. ("CSI"), that could supply a large quantity of the needed sand.

11.      In order to pay for the CSI sand with the funds held in escrow, COFS needed Bates Energy's cooperation.  COFS approached Stan Bates and requested that he authorize a transfer of $1 million from the Amegy Escrow Account directly to CSI.  On June 15, 2017, Stan Bates sent Naumann a letter authorizing Naumann to release funds to CSI "per the escrow agreement with BATES Energy."  This authorization would have permitted Naumann, as Bates' escrow pay agent, to sign off on disbursements from the Amegy Escrow Account for payments directly to CSI.

12.      For reasons that are now clear, Naumann refused to comply with that instruction.  Instead, he took the situation as an opportunity to control additional funds through the ELC Escrow Account.  Naumann contends he believed he was permitted to disburse funds from that account based on unilateral instructions from Stan Bates, and to do so without ever notifying COFS.

13.      Even as Naumann and Stan Bates were secretly funneling COFS's escrow funds to themselves and others, Bates Energy obtained an *ex parte* temporary restraining order on July 20, 2017 in state court that prevented COFS from seeking withdrawals from either escrow account,

including withdrawals necessary to pay for sand that had already been procured from CSI.[1]  Bates Energy boldly, and wrongfully, claimed that injunctive relief was warranted because COFS was seeking to access escrow funds without the required authorization of Bates.  Those claims were ultimately disproven and the state court denied Bates Energy's request for injunctive relief.

14.    During the course of the state court litigation, COFS continued to ask that Naumann confirm the balance in the ELC Escrow Account.  [Dkt. 33-1, at 26].  Despite numerous requests, Naumann refused to provide any substantive response.  Only after the case was removed to this United States District Court, and ELC/Naumann were sued, did Naumann finally reveal in open court that he had repeatedly withdrawn funds from the ELC Escrow Account on the unilateral instruction of Stan Bates.  Naumann admitted that only $308,662.65 remained in the account of the original balance of $1 million.

15.    In the meantime, because of the complete lack of performance by Bates Energy, COFS terminated the MOU by letter dated August 15, 2017.  [Dkt. 4-19].

16.    The ELC Escrow and Disbursement Agreement provides as follows: "This Escrow Agreement shall terminate upon the *first to occur* of any of the following events…The expiration *or termination of the PSA [MOU]*, in which case *the remaining balance, accrued interest or excess finds [funds] of the Fund shall be disbursed to the Buyer* [COFS]."  [Dkt. 4-7, at 1 (emphasis added)].

17.    Consequently, COFS's termination notice included the demand that all remaining funds in the ELC Escrow Account be remitted to COFS.  Not only did ELC/Naumann refuse the demand to return the funds, he also took that opportunity to secretly disburse an additional $140,541.85 on

---

[1] COFS removed the state court litigation to this federal court on or about September 7, 2017 [Dkt. 9].

August 23, 2017 from the ELC Escrow Account, once again at the sole request of Stan Bates, and with no notice to COFS.  [Dkt. 34, at 1].  Those funds were wired to Stan Bates.

*18.*     In an effort to stop ELC/Naumann and Stan Bates/Bates Energy from further dissipating the escrowed funds, COFS requested preliminary injunctive relief from this Court, including an order that ELC/Naumann deposit the remaining funds into the Court's registry.  [Dkt. 13, p. 5].  On September 29, 2017, this Court entered such Order.  [Dkt. 30, p. 4].  The Court ruled that the funds were to remain in the registry "until further order of the Court." *Id.*

19.     In stark contrast to the ELC Escrow Account, the Amegy Escrow Account was managed by Amegy in a professional and responsible manner.  Amegy provided monthly statements on the account showing all credits and debits, including a running balance.  Amegy responded promptly to requests for information.  And Amegy returned the balance of the funds it was holding when the escrow agreement terminated on its own terms.[2]

---

[2] The Amegy escrow agreement provided, "This Escrow Agreement shall terminate upon the first to occur of any of the following events: … B.  The expiration of 6 months from the date of this Escrow Agreement, in which case the remaining balance of the Fund shall be disbursed to COMPLETE OIL FIELD SERVICES, LLC."

## II.
## ARGUMENT AND AUTHORITIES

20.     "Pursuant to Rule 67 of the Federal Rules of Civil Procedure, a party may deposit a sum of money with the court. Once funds are deposited, the court should determine ownership and make disbursements." *Jones v. Prescott*, 702 Fed. Appx. 205, 208 (5th Cir. 2017), citing *In re Craig's Stores of Texas, Inc.*, 402 F.3d 522, 524 (5th Cir. 2005). "Whether Rule 67 relief should be available in any particular case is a matter committed to the sound discretion of the district court." *Jones v. Prescott, id*., citing *Cajun Elec. Power Co-op., Inc. v. Riley Stoker Corp.*, 901 F.2d 441, 445 (5th Cir. 1990).[3]

21.     This Court's decision to order that the remaining subject escrow funds be deposited into the registry of the Court was amply supported by the facts and the law.  It is undisputed that ELC/Naumann served as an escrow agent for the transactions and occurrences involved in this suit.  As an escrow agent, ELC owed fiduciary duties to COFS, including the duty of loyalty, the duty to make full disclosure, and the duty to exercise a high degree of care to conserve the money placed in escrow and pay it only to those persons entitled to receive it.  *Holder-McDonald v. Chi. Title Ins. Co.*, 188 S.W.3d 244, 248 (Tex. App.—Dallas 2006, pet. denied).  ELC breached those duties by, among other things, unlawfully disbursing funds to various recipients, without the authorization of COFS and without delivery of frac sand, and by failing to fully and promptly disclose to COFS that such disbursements were being made.

22.     The Court now has the discretion to order disbursement of the escrowed funds, pursuant to FED. R. CIV. P. 67, and COFS respectfully requests that the Court find that COFS is the sole and

---

[3] "There is very little case authority applying Rule 67." *Putz v. Golden*, No. C10-0741JLR, 2012 U.S. Dist. LEXIS 154240, 2012 WL 5293354, at *12 (W.D. Wash. Oct. 26, 2012), citing 12 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane & Richard L. Marcus, Federal Practice and Procedure § 2991 at 58 (2d ed. 1997).

rightful owner of the funds, as trustee for its customer ProPetro.  There is no longer an escrow agreement governing the disposition of the funds that were originally deposited into the ELC Escrow Account.  Consequently, those funds should be released as provided for in the agreement – i.e., to the "Buyer" who is defined in the agreement as "Complete Oil Field Services, LLC." [Dkt. 4-7, at 1].

23.     ELC has asserted a claim for indemnity based upon the language of Paragraph 2.3 of the ELC escrow agreement.  That claim does not entail any ownership interest in the registry funds, and should not prevent the release of funds from the Court's registry to COFS for two reasons.

24.     First, the indemnity claim is not a claim against the escrow fund itself, rather it is a claim against COFS and Bates Energy.  Moreover, even if ELC were to prevail on its indemnity claim, nothing entitles it to any indemnification relief from the specific funds held in the Court's registry.  Thus, the release of the funds from the registry will not prejudice the prosecution of ELC's indemnity claim.

25.     Second, the indemnity clause in question includes an exception for conduct undertaken by ELC that is deemed to constitute "gross negligence" or "willful misconduct."   Naumann's testimony during this Court's hearing on COFS's motion for a preliminary injunction amply established that his and ELC's conduct amounted to gross negligence and/or willful misconduct.  For instance, Naumann admitted he failed to create a segregated bank account to manage the escrow funds (Transcript at p. 56); he admitted he failed to obtain COFS's consent before releasing funds (Transcript at p. 60-61); and he admitted he failed to respond to COFS's repeated requests for information about the activity in the account (Transcript at p. 52). [4]  Thus, even if the escrowed

---

[4] Pages of the transcript from the September 25, 2017 hearing on COFS's motion for preliminary injunction are attached as Exhibit 1.

funds were available to satisfy an indemnity obligation, ELC is owed no indemnity as a matter of law.

26.     The only party in this case that has a viable ownership claim to the funds in the Court registry is COFS, the entity who rightfully owns the funds on behalf of its customer ProPetro, and based on the express terms of the ELC Escrow Agreement.  As explained above, ELC has no viable competing claim. Bates Energy likewise has no competing claim.  Even if it did, it is a corporate entity without legal representation, and consequently has no legitimate way to prosecute such a claim.

## PRAYER

WHEREFORE, COFS respectfully requests that this motion be granted and that the funds currently deposited with the registry of the Court be released and disbursed to it as soon as possible, with accrued interest and less any required fees and costs of Court, and for general relief.

Respectfully submitted,

_____/s/ Lamont A. Jefferson_____
Lamont A. Jefferson
State Bar No. 10607800
Lisa S. Barkley
State Bar No. 17851450
JEFFERSON CANO
112 East Pecan Street, Suite 1650
San Antonio, Texas  78205
Telephone:  (210) 988-1811
Facsimile:  (210) 988-1811
LJefferson@jeffersoncano.com
LBarkley@jeffersoncano.com

**ATTORNEYS FOR
DEFENDANTS/CROSS-PLAINTIFF**

## <u>CERTIFICATE OF CONFERENCE</u>

This certifies that counsel for COFS attempted to confer with counsel for ELC and Dwight D. Naumann with respect to the merits of the foregoing motion, and exchanged emails, but no agreement was reached by the time COFS filed the motion.

_/s/ Lisa S. Barkley_
Lisa S. Barkley

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 11th day of January, 2018, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system and served the following counsel of record in accordance with the Federal Rules of Civil Procedure:

Leslie Sara Hyman
Matthew McGowan
PULMAN, CAPPUCCIO, PULLEN, BENSON & JONES, LLP
2161 NW Military Highway, Suite 400
San Antonio, Texas  78213

_/s/ Lisa S. Barkley_
Lisa S. Barkley

Exhibit "1"

```
 1                  UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION

 3   BATES ENERGY OIL & GAS, LLC,     )
     Plaintiff and Counter-defendant, )
 4                                     ) No. SA:17-CV-808(XR)
            vs.                        )
 5                                     ) San Antonio, Texas
     COMPLETE OIL FIELD SERVICES,      ) September 25, 2017
 6   LLC                               )
     SAM TAYLOR,                       )
 7   Defendants and Counter-claimants,)
                                       )
 8          vs.                        )
                                       )
 9   EQUITY LIAISON COMPANY,           )
     DEWAYNE D. NAUMANN,               )
10   Counter-defendants.              )
     -------------------------------)

11

             HEARING ON MOTION FOR PRELIMINARY INJUNCTION
12              BEFORE THE HONORABLE XAVIER RODRIGUEZ
                  UNITED STATES DISTRICT JUDGE
13
     A P P E A R A N C E S:
14

     FOR THE PLAINTIFF AND COUNTER-DEFENDANT, BATES ENERGY OIL &
15   GAS, LLC:

16   Rosenblatt Law Firm, P.C.
     Shellie Renee Reyes, Esquire
17   Tiffanie Stegall Clausewitz, Esquire
     16719 Huebner Road, Building 1
18   San Antonio, Texas 78248

19   FOR THE DEFENDANT/COUNTER-CLAIMANT, COMPLETE OIL FIELD
     SERVICES AND SAM TAYLOR:
20
     Jefferson Cano
21   Lamont Alan Jefferson, Esquire
     Lisa Schumacher Barkley, Esquire
22   112 East Pecan Street, Suite 1650
     San Antonio, Texas 78205
23

24

25
```

```
 1              COURTROOM DEPUTY:  Thank you.
 2              THE WITNESS:  Thank you.
 3                      *-*-*-*-*-*-*-*
 4                    DIRECT EXAMINATION
 5    BY MR. JEFFERSON:
 6    Q.  State your name, please.
 7    A.  Dewayne Naumann.
 8    Q.  Mr. Naumann, you know Janis Kline here, correct?
 9    A.  I am familiar with her by e-mail and phone.
10    Q.  You have not met her in person?
11    A.  Not in person.
12    Q.  You don't dispute that she asked you numerous times for
13    copies of statements reflecting activity in the ELC escrow
14    account, do you?
15    A.  No.
16    Q.  And you did not provide that information, did you?
17    A.  There is no provision in the escrow agreement to do that.
18    Q.  And, therefore, you did not?
19    A.  Exactly.
20    Q.  So from April 14 until now, you have not provided a single
21    statement about any disbursements from that ELC escrow
22    account, correct?
23    A.  I complied with the terms of the escrow agreement,
24    correct.
25    Q.  In other words, you have not provided any information
```

1     A.  I was on a spot purchase payment plan only.  It was --

2     money came in, paid for the sand.

3     Q.  So you did not set up a separate account when the ELC

4     money was wired to ELC from Pro Petro?

5     A.  No.

6              THE COURT:  Why not?

7              THE WITNESS:  Sir, it is a matter of just

8     transacting accounting and bookkeeping through a single

9     account for one client.  That way, I keep the disbursements

10    for one client clear and don't have to worry about commingling

11    it with other accounts.

12             THE COURT:  But you did commingle it.  You

13    commingled it with 105,000 that belonged to some other

14    transaction.

15             THE WITNESS:  With all due respect, sir, I would

16    disagree.  I kept accurate records for both transactions, and

17    when the account was technically terminated under the use with

18    the previous client, then the account became available for the

19    use with COFS.

20    BY MR. JEFFERSON:

21    Q.  You set up bank accounts, I presume, throughout your

22    career as an escrow agent, right?

23    A.  Yes.

24    Q.  For how long have you been serving as an escrow agent?

25    A.  Under my current configuration, about the last four years.

```
 1    aware of.  Isn't that the correct reading of this agreement?
 2              THE WITNESS:  I take it all under the context of
 3    authority to act, as the title of -- the caption for that
 4    particular section of the agreement.
 5              THE COURT:  Go ahead.
 6    BY MR. JEFFERSON:
 7    Q.  So, Mr. Naumann, you are saying that under this agreement,
 8    under 2.2-B, if you got a request just from Mr. Bates, not
 9    from COFS, then you were entitled to disburse funds based on
10    that direction?
11    A.  That's what the agreement says.
12    Q.  And did you do that in this case?  Did you get direction
13    from Mr. Bates?
14    A.  Yes, I did, or his attorney, yes.
15    Q.  Or his attorney?
16    A.  Yes.
17    Q.  Which attorney?
18    A.  Tiffany.
19    Q.  And did you follow those directions based upon this
20    particular part of the agreement?
21    A.  Correct.
22    Q.  So how, in your mind, did you reconcile 2.2 with 1.3,
23    which requires the receipt of a signed document by the parties
24    to the agreement?  How did you -- these paragraphs conflict,
25    don't they?
```

1    A.  Not to me.  The agreement only technically applies to my

2    authority to act, and I took my authority to act from 2.2.

3    Q.  When you acted, as you say, did you notify COFS that that

4    is what you were doing?

5    A.  I didn't -- it doesn't say in here that I have to.

6    Q.  So, therefore, you didn't?

7    A.  I did not.

8         THE COURT:  I mean, are you claiming that any of the

9    notices that you got from Bates was fake?

10        THE WITNESS:  I did not.  And if you review the

11   information that I am provided, you will see that I rejected

12   on numerous occasions the requests for funds to be paid out.

13        THE COURT:  But with regard to the payments you did

14   pay out, are you saying that any of those were fraudulent?

15        THE WITNESS:  In what respect, sir?

16        THE COURT:  Well, I am looking -- at your

17   construction, giving you the benefit of the doubt of 2.2 and

18   2.3, the way it looks to me, I mean, at first glance, is that

19   if you receive fraudulent instructions, you had

20   indemnification from that.

21        So what I am asking you is, when you made payments,

22   are you claiming that anything you relied upon was fraudulent?

23        THE WITNESS:  Not to my knowledge.

24   BY MR. JEFFERSON:

25   Q.  I have a stack of documents here that your lawyer handed