**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **BATES ENERGY OIL & GAS, LLC** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION:  SA:17-CV-00808-XR** |
| | § | |
| **COMPLETE  OIL  FIELD  SERVICES** | § | |
| **LLC AND SAM TAYLOR** | § | |

---

### DEFENDANT/COUNTER-PLAINTIFF COMPLETE OIL FIELD SERVICE, LLC'S THIRD AMENDED COUNTERCLAIM

---

Complete Oil Field Services, LLC ("COFS" or "Defendant/Counter-Plaintiff") files this Third Amended Counterclaim against Counter-Defendants Bates Energy Oil & Gas, LLC ("Bates Energy"); Stanley P. Bates ("Bates"); Equity Liaison Company, LLC ("ELC" or "ELC/Naumann"); Dewayne D. Naumann ("Naumann"); Unlimited Frac Sand, LLC d/b/a Frac Sand Unlimited ("FSU"); David Bravo ("Bravo"); Lorena Silvistri Bravo, individually and d/b/a Bravo Consulting Services ("Silvistri"); Mark B. Sylla; Howard Resources, LLC ("Howard Resources"); Tier 1 Sands, LLC ("Tier 1 Sands"); and the Rosenblatt Law Firm, PC ("Rosenblatt" or "Rosenblatt Firm"), and respectfully shows the Court as follows:[1]

### I.
#### NATURE OF ACTION

1.     Defendant/Counter-Plaintiff Complete Oil Field Services, LLC ("COFS") seeks damages against Counter-Defendants for their unlawful acts, and their wrongful receipt and retention of substantial funds entrusted to COFS.  The funds were dedicated solely for procuring oil field frac

---

[1] Counter-Plaintiff incorporates by reference its earlier requests for temporary and permanent equitable relief, and incorporates by reference the Court's entry of a temporary restraining order on September 13, 2017, and entry of a preliminary injunction on September 29, 2017.  Counter-Plaintiff further incorporates by reference its First Amended Counterclaim to the extent appropriate.

# EXHIBIT 1

sand on behalf of COFS.  The Counter-Defendants instead, using fraudulent documents, irregular bank transactions, and outright falsehoods, created a scheme that resulted in their taking funds from COFS virtually "on-demand," and in absolute violation of the terms of escrow agreements put in place specifically to govern all expenditures, and prevent the fraud that Counter-Defendants perpetrated.  No frac sand was ever delivered by Counter-Defendants.  As explained below, Counter-Defendants' cash grabs constituted theft, conspiracy and aiding and abetting theft, the knowing receipt of ill-gotten gains, and the wrongful retention of stolen funds.  COFS has been substantially damaged and seeks recovery of all funds wrongfully taken, distributed, or retained by Counter-Defendants.

## II.
### JURISDICTION AND VENUE

2.      This Court has diversity jurisdiction under 28 U.S.C. §§ 1332(a) and 1441(a).  Diversity of citizenship exists between the parties to this action pursuant to and in accordance with the requirements of 28 U.S.C. § 1332, which confers original subject matter jurisdiction upon this Court.   Counter-Plaintiff COFS and Defendant Sam Taylor are diverse from all Counter-Defendants for purposes of diversity jurisdiction.  Counter-Plaintiff and Defendant are citizens of Utah; all Counter-Defendants are citizens of Texas or Wisconsin.

3.      The amount in controversy in this matter exceeds $75,000.00, as required for diversity jurisdiction under 28 U.S.C. § 1332.  In its state court petition, Bates Energy alleges monetary relief over $1,000,000 and non-monetary relief.  In this amended counterclaim, the funds at stake exceed $650,000, and non-monetary relief is also sought.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to COFS's claims occurred in this district.

### III.
### PARTIES

**Defendant/Counter-Plaintiff**

5.      Defendant/Counter-Plaintiff Complete Oil Field Services, LLC is a foreign limited liability company duly organized and existing under the laws of the State of Utah, and registered to do business in Texas.  Its three members, Perry Taylor, Janis Kline, and Sam Taylor, are all individuals, and all of them reside in, and are citizens of the State of Utah.  The company's principal place of business is Sandy, Utah.  It has already appeared in this lawsuit.

6.      Defendant Sam Taylor is an individual residing in the State of Utah.  For purposes of diversity jurisdiction, Taylor is a citizen of Utah.  He has already appeared in this suit.

**Counter-Defendants**

7.      Bates Energy Oil & Gas, LLC ("Bates Energy") is a limited liability company organized and existing under the laws of the State of Texas.  Its sole member, Blair Bates, an individual, resides in, and is a citizen of the State of Texas.  The company's principal place of business is San Antonio, Bexar County, Texas.  It has already appeared in this case.

8.      Stanley P. Bates ("Bates") is a natural person whose current address in San Antonio, Texas is unknown.  Upon information and belief, Bates will be assigned to a federal prison facility on or about August 27, 2018.  He may be served with process at that location if he cannot be located before that time.

9.      Equity Liaison Company, LLC ("ELC") is a limited liability company duly organized and existing under the laws of the State of Texas.  The sole member of ELC, Dewayne D. Naumann, is a citizen of the State of Texas. The company's principal place of business is Austin, Travis County, Texas.  ELC's agent for service is Dewayne D. Naumann, whose business address is 3303

Northland Drive, Austin, Texas 78731, and whose residential address is 5018 Highland Court, Austin, Texas 78731. ELC has already appeared in this case.

10.     Dewayne D. Naumann is a natural person residing at 5018 Highland Court, Austin, Texas 78731.  He has already appeared in this case.

11.     David Bravo is a natural person who resides at and may be served with process at 7814 Braesview Lane, Houston, Texas 77071, or at his place of business, Unlimited Frac Sand, LLC d/b/a Frac Sand Unlimited, 4210 County Road 1286, Suite 401, Odessa Texas 79765. He may be served with process at one of those locations.

12.     Unlimited Frac Sand d/b/a Frac Sand Unlimited is a Texas limited liability company that may be served with process through its registered agent, David Bravo at the registered office, 4210 County Road 1286, Suite 401, Odessa, Texas 79765, or at Bravo's place of residence, 7814 Braesview Lane, Houston, Texas 77071.

13.     Lorena Silvistri Bravo, individually and d/b/a Bravo Consulting Services is believed to be the spouse of David Bravo, and may be served with process at 7814 Braesview Lane, Houston, Texas 77071.

14.     Mark B. Sylla is a natural person and resident of Wisconsin.  He may be served with process at his place of business, 3466 Cambridge Place, River Falls, Wisconsin 54022.

15.     Howard Resources, LLC is a Texas limited liability company that may be served with process through its registered agent, Paul Scott Howard, 1308 CR 905A, Joshua, Texas 76058. Austin Howard is Chief Operations Officer at Howard Resources.

16.     Tier 1 Sands, LLC is a Texas limited liability company that may be served with process through its registered agent, Amalia M. Holbert, at the company's registered office, 920 S. Main St., Boerne, Texas 78006.

17.     Rosenblatt is a Texas Professional Corporation and may be served with process by and through its registered agent at its registered office, James Rosenblatt, 16719 Huebner Rd., Bldg. 1, San Antonio, Texas, 78248.

### IV.
### FACTS

####     A.     **Background**

18.     COFS was created in 2017 for the specific purpose of providing frac sand to ProPetro Servicing, Inc. ("ProPetro").  ProPetro is a pressure pumping company based in Midland, Texas that services oil and gas exploration companies throughout North America.  Among the services provided by ProPetro is hydraulic fracturing of well bores.

19.     The oil and gas fracking industry has been robust in recent years.  Pressure pumping companies like ProPetro require a reliable supply of specialized frac sand to service their customers. In an active market, the demand for frac sand is enormous and competitive.  This competition has led to the creation of numerous companies that claim to be frac sand suppliers. Unfortunately, fly-by-night ventures are part of that new market.

20.     The principals at COFS have a long-standing business relationship with ProPetro, characterized by mutual honesty, dependability and integrity.  Accordingly, COFS was created specifically to acquire frac sand for its sole customer, ProPetro.  As a testament to the degree of trust between the two companies, ProPetro made an advance payment of $4 million to allow COFS to acquire frac sand.  An April 13, 2017 Supply Agreement between ProPetro and COFS governed the deposit and intended disbursement of the funds.  A copy of the Supply Agreement is attached as Exhibit 1. The Supply Agreement provided that ProPetro would pay $104 per ton to buy the sand.

21.     Obtaining the right amount of frac sand, in the right grades, and at the right time is a logistical challenge.  Frac sand is often obtained from mines located thousands of miles away from a well site.  Generally, sand is shipped by rail, often in trains that are over 100 cars in length.  Thus, securing frac sand entails at least the following steps: (1) locating a source with the appropriate grade of sand (i.e., a mine); (2) determining a delivery schedule based on the needs at a well site; (3) buying or leasing a sufficient quantity of railcars to service the need; (4) loading the appropriate grades of sand onto the railcars; (5) transporting the train railcars to a location near a well site; (6) transloading the sand from the railcars onto delivery trucks for final transport to the well site; and (7) scheduling delivery of the sand to the well site at a time when fracturing of the well is imminent.

22.     As a new entrant to the frac sand industry, COFS conducted research and relied upon information provided by others in order to fulfill its obligations to ProPetro.  One critical resource was Austin Howard, who at all times was acting in the course of his employment with Howard Resources.  In March 2017, after learning of COFS's need to acquire substantial amounts of frac sand, Austin Howard introduced COFS to Stanley P. Bates ("Bates"), principal and CEO of Bates Energy.[2]

23.     Bates Energy was created on February 14, 2017 ostensibly to procure frac sand for its customers.  A copy of the Certificate of Formation is attached as Exhibit 2.

24.     Bates Energy was managed by Stanley Bates.[3]  Despite Bates' reputation as an unscrupulous businessman, Austin Howard firmly vouched for Bates as a trustworthy associate.

---

[2] While Stan Bates is CEO of Bates Energy, he is not an owner of the company.  His college age son, Blair Bates, is the sole member of the entity. Bates has testified he is a "W-2 employee" who has received no salary during his employment with Bates Energy.

[3] Bates was indicted on May 16, 2017 on eight felony charges, including securities fraud and money laundering, relating to his separate sand fracking company, Four Winds Logistics.  Bates plead guilty to all charges on January 8, 2018, and awaits sentencing by United States District Judge David Ezra, scheduled for August 27, 2018. Bates faces decades of time in prison and fines up to $5 million on each of the two counts of securities charges.

He assured COFS that Bates was well-regarded in the frac sand industry, he believed Bates' side of the story with respect to public information detailing allegations of past illegal acts, and he referred to Bates as the "go to guy" in the industry when large volumes of sand were needed.

25.    Once Bates Energy became aware that COFS was a potential client, it promptly notified other Counter-Defendants, copying them on emails and giving rise to the conspiracy and other unlawful acts that led to the Counter-Defendants' theft of over $650,000 of COFS's funds.

26.    Bates/Bates Energy represented to COFS that the company had the capacity to supply the type and tonnage of frac sand required by COFS for ProPetro.  More specifically, Bates/Bates Energy represented the company had rights with mines in Wisconsin to buy 370,000 tons of sand a month (its "allocation"), and that the company was actually delivering 88,000 tons to customers every 45 days.

27.    Relying upon these and other representations, COFS entered a Memorandum of Understanding (Operating Agreement) ("MOU") with Bates Energy on or about April 18, 2017. A copy of the MOU is attached as Exhibit 3.

28.    The MOU obligated Bates Energy to deliver the following quantity of frac sand to COFS, at specified due dates:

**Total of approximately 80,000 tons of sand**

**Due Dates**:

- By **May 10, 2017**:
  - 10,000 tons
- By **July 12, 2017**:
  - Total of 80,000 tons

---

*See also* "More frac sand woes for Uresti co-defendant Bates," San Antonio Express-News, July 21, 2017, http://www.mysanantonio.com/business/local/article/More-frac-sand-woes-for-Uresti-co-defendant-Bates-11306273.php.

29.     The sand was required to be either 40/70 or 100 mesh.  COFS would pay Bates Energy $99 per ton, and COFS would then sell that sand to ProPetro at the rate of $104.50 per ton, resulting in a $5.50 per ton profit to COFS.  Bates Energy would be paid 50% of the price at the time the sand was loaded for delivery from the mine (or other point of origin), and 50% of the cost when the sand was off-loaded for final delivery to the well site.  Bates Energy was required to deliver the frac sand to one of seven rail terminals in Texas: Seagraves, Pecos, Big Springs, San Angelo, Odessa, Midland, or Monahans.

### B.     The Escrow Accounts and Agreements

30.     Public allegations of improper conduct by Bates created COFS's need for caution if the parties were to proceed.  COFS moved forward, based on Howard's endorsement, but insisted on a legal structure to protect the funds entrusted by ProPetro.  That structure included the creation of two independent escrow accounts to be accountable for ProPetro's monies.

31.     An escrow agreement is a financial device designed to ensure that funds in escrow are not disbursed except upon specified agreed-upon conditions.  The escrow agent is supposed to be a neutral third party who owes fiduciary duties to both buyer and seller, including the duties of loyalty, to make full disclosure, to exercise a high degree of care to conserve any funds received, and to pay such funds only in strict accordance with the escrow agreement.

32.     Both COFS and Bates Energy understood that the $4 million was funded by COFS's customer, ProPetro, as a prepayment towards its expected receipt of the 80,000 tons of frac sand.  Consequently, once COFS could confirm through bills of lading ("BOLs"), rail car receipts, invoices, purchase orders, and other documentation that Bates Energy had delivered the correct type of sand to the correct location, that documentation would be sent to the escrow account

manager for audit.  If the audit showed proper delivery, then the escrow account manager was authorized to release payment funds to Bates Energy for the sand delivered to COFS.

33.   Bates Energy originally insisted that the $4 million be held in escrow by what COFS later learned was a close associate, ELC, and overseen by its principal, Dewayne Naumann, ostensibly because Amegy Bank was not embedded in the oil and gas industry and, in Bates/Bates Energy's opinion, ELC was "a proven performance company."  Because ELC was not a financial institution, and was unknown to COFS, COFS insisted upon the creation of a second escrow account with Amegy Bank.

34.   COFS later learned that ELC not only served as a neutral escrow agent on transactions involving Bates Energy, it also served as an "escrow agent" for Bates Energy's business operating accounts.  In this regard, Bates Energy directed that funds in ELC escrow accounts be expended on regular business transactions for Bates Energy, much like a checking account at a bank. Moreover, COFS has learned that ELC/Naumann held multiple bank accounts in Chase Bank for itself and for Counter-Defendant Frac Sand Unlimited.  As shown below, ELC/Naumann repeatedly transferred and commingled substantial amounts of funds in and out of these various accounts, and made illegal disbursements from the multiple accounts to itself and the other Counter-Defendants.  ELC is also a creditor of Bates Energy, loaning it over $13,000.

35.   ProPetro's $4 million payment was split into two escrow accounts: $1 million was deposited in ELC bank account no. 2917 at Chase Bank on or about April 17, 2017, with ELC/Naumann serving as the escrow agent (the "ELC Escrow Account"). And $3 million was deposited in an Amegy Bank escrow account on or about April 19, 2017, with Amegy serving as the escrow agent (the "Amegy Escrow Account").

36.     Under the terms of the ELC escrow agreement, attached as Exhibit 4, ELC/Naumann were contractually obligated to deposit and maintain COFS's funds in a separate escrow account under COFS's name.   However, unbeknownst to COFS, Chase Bank account no. 2917, where ELC/Naumann deposited the $1 million in the ELC Escrow Account, was a pre-existing *Bates Energy* escrow account that ELC/Naumann was already handling for Bates Energy.  The $1 million was therefore immediately commingled with funds already in that account.

37.     The signatories on the Amegy Escrow Account were Janis Kline for COFS, and Naumann for ELC.  The signatories on the ELC Escrow Account were Janis Kline for COFS and Stan Bates for Bates Energy.  *Any* disbursements of funds from *either* account required the joint instruction of *both* parties.

38.     The **Amegy** escrow agreement provided:

> **1.3     Escrow Procedure and Payment Instruction**.  The Fund…shall be held and disbursed in accordance with this Escrow Agreement as follows:

> Upon receipt by the Escrow Agent of Exhibit A [joint payment instructions], **executed by the Partie**s…the Escrow Agent is authorized and directed to deliver the Escrow Fund only (i) to the undersigned against their **joint written instruction** as contained therein or (ii) to any of the undersigned upon written **direction of each other** of the undersigned. (Emphasis added.)

39.     The **ELC** escrow agreement provided:

> **1.2.     Treatment of Fund.**  The monies constituting the Fund shall be deposited in a **segregated account** pursuant…Such account shall be styled **Equity Liaison Company, LLC – Escrow Account**…

> **1.3     Escrow Procedure and Payment Instruction**.  The Fund…shall be held and disbursed in accordance with the terms of this Escrow Agreement and PSA [sic] as follows:

> Upon receipt by ELC of the **Disbursement Authorization (Exhibit A)** executed **by Buyer** [defined as COFS], ELC is hereby authorized and directed to deliver the Escrow Fund only (i) **to the undersigned** against their **joint receipt**, or (ii) to any of the undersigned upon written **direction of each other** of the undersigned, or (iii) in accordance with the **joint written instruction** of all of the undersigned, or (iv) if there is only one undersigned, to the undersigned.

**2.1(B).** …**ELC shall immediately notify and convey** to Buyer [COFS] and Seller [Bates Energy] **every request or other notice received from the other party** or any other source regarding the subject escrow funds…

**2.2    Authority to Act**.   ELC is hereby **authorized and directed** by the undersigned to deliver the subject matter of this Escrow Agreement **only in accordance with the provisions of Article I of this Agreement.** (Emphasis added.)

40.    Exhibit A to the ELC escrow agreement obligated both Bates and COFS to sign off before

a disbursement was made:[4]

**EXHIBIT A**

DISBURSEMENT AUTHORIZATION No. _____

Pursuant to that certain Escrow Agreement dated and effective _____ among _____ (Buyer) ____, _____ (Seller) _____ and Equity Liaison Company, LLC, the parties hereto hereby request disbursement of funds in the amount and manner described below from account number _____ styled **Equity Liaison Company, LLC – (***insert account nickname***)**, Escrow Account.

Please disburse to:        _____
Amount to disburse:       _____
Form of disbursement:    *(insert full bank name and delivery method)*
                                       Account Name: _____
                                       Account Number: _____
                                       Routing/ABA Number: _____

IN WITNESS WHEREOF:  the parties hereto have executed this Disbursement Request in multiple counterparts, each of which is and shall be considered an original for all intents and purposes, effective as of the date first written above.  The parties further acknowledge that all provisions and requirements of the Purchase and Sale Agreement dated _____ _____ by and between the parties related to this disbursement are fully compliant.

**Buyer**                                                **Seller**

By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____

Date: _____          Date: _____

---

[4] ELC000306.

41.     Under the express terms of the ELC Escrow Agreement, if the MOU was terminated, ELC was obligated to return the balance of the funds in the escrow account to COFS:

> **1.4     Termination**.  This Escrow Agreement shall terminate upon the first to occur of any of the following events:
>
> > A.     The disbursement of the balance of the Funds in accordance with the provisions of Section 1.3 hereof.
> >
> > B.     **The expiration or termination of the [MOU], in which case the remaining balance**, accrued interest or excess funds of the Fund **shall be disbursed to the Buyer [COFS]**…(emphasis added)

*See* Exhibit 4, ¶ 1.4(B).[5]

42.     This arrangement, though unusual, was acceptable to COFS because both escrow agreements required COFS's notice, signature and authorization to effectuate any disbursements of funds.  Moreover, Naumann assured COFS that he and ELC recognized their legal obligations as a fiduciary. All parties, including Bates/Bates Energy, ELC/Naumann, Howard Resources, Bravo and Rosenblatt, knew that disbursement of escrowed funds was improper until COFS signed off on an invoice or disbursement authorization.[6]

### C.     Bates/Bates Energy Failed to Deliver Any Sand

43.     Bates Energy wholly failed to perform under the MOU at any time, despite its multiple claims that sand was on its way.

---

[5] The ELC Escrow Agreement refers to a "Purchase and Sale Agreement," or "PSA."  COFS and Bates Energy did not enter into a formal PSA or any other operating agreement beyond the MOU.  Counsel for Bates Energy's contention that the Escrow Agreement is unenforceable because no PSA exists is without merit, given all of the parties' reliance on the MOU as the operative contract.

[6] *See, e.g.*, ELC000412, 000423, 000433, 000437-000438, 000446, 000468, 000474, 000476, 000505, 000513, 000515, 000557.

44.     For example, by April 17, 2017, even before the formal MOU had been executed, Bates was encouraging COFS to complete the $4 million escrow deposit, representing that Bates Energy had already acquired a substantial amount of sand for delivery to COFS:

> Please let us know the Status of the [escrow] wire this morning…my operations Chief lands in WI [Wisconsin] at 10:30 a.m.!  I will be paying for a lot of Sand today and Locking on the Trains…I'll feel a whole lot better knowing your money is sitting in escrow to replace mine in a few weeks! Lol.

45.     When COFS confirmed that funding of the escrow accounts was imminent, Bates again represented his company's purported acquisition of sand and its preparations for delivery:

> Just wanted to ensure everything is a Go!  Once again I'm ordering Trains and Paying for a tremendous amount of sand today and I wanted to ensure of Wire transfer to Escrow and P/O [Purchase Order] being issued…just wanted that warm and fuzzy that your money was sitting safe in Escrow!  Thank you

46.     No sand was delivered, despite Bates' repeated representations that Bates Energy had bought substantial amounts of sand and arranged for its delivery.

47.     Several days later, Bates repeated his act.  On April 27, Bates promised that railcars were currently in Iowa and would be leaving for Texas on April 29.  Further:

> Please see the attachment, which is the trace Numbers and RailCar list that will be launching this weekend and early next week!  Also the assignment letter and verification of inspection sir.  I just wanted to take a minute and keep you in the loop.
>
> Dewayne, please File sir.
>
> Respectfully submitted
>
> Stan Bates
> USMC
> Chief Executive Officer
> Bates Energy Oil & Gas, LLC

48.     Bates/Bates Energy "anticipated" the sand would be delivered to COFS on or about May 5, and again requested a purchase order.  Again, no sand was delivered.  Bates Energy provided no BOLs or other supporting documents showing it ever loaded any railcar with sand.

49.     Bates Energy's false representations, coupled with its failures to perform, triggered concern by COFS about the company's ability to meet its obligations under the MOU.  COFS began investigating Bates Energy's purported mines and other sources of frac sand product.  On or about May 9, 2017, COFS's president Sam Taylor, over resistance from Bates, traveled to Wisconsin to visit mines from which Bates/Bates Energy represented it obtained its frac sand allocation.  Bates was a no-show, but he sent company representative Mark Sylla ("Sylla").  Sylla is also in the frac sand business, and operates Unlimited Frac Sand, LLC, d/b/a Frac Sand Unlimited with Bates' girlfriend Audra Vega and David Bravo.

50.      Sylla took Sam Taylor on a winding tour around Wisconsin, stopping at two mines along the way.  Neither mine had the capacity to deliver any appreciable amount of frac sand and neither permitted Sylla/Bates Energy access to its premises.  Bates Energy later asserted that the price in Wisconsin had become "too high," and suggested COFS would have to pay a higher amount than under the MOU.  COFS rejected this proposition as contrary to the parties' agreement.

51.     Ultimately, Bates Energy wholly failed to meet the MOU's initial May 10, 2017 delivery deadline; it failed to deliver any frac sand, much less the 10,000 tons promised.

52.     In June 2017, Bates Energy changed its strategy, but still failed to deliver any frac sand.  To string along COFS, Bates/Bates Energy told COFS it could deliver noncomplying frac sand, for example sand that was 30/50 rather than 40/70 or 100-mesh.  It also offered to sell COFS "brown" sand, rather than Northern White sand which the pertinent purchase order required.

COFS had no obligation to accept noncompliant sand, and it did not.  Bates Energy never delivered any of the noncompliant sand.

53.     Bates Energy next began "offering" sand from Arkansas.  Once again, Bates resisted Sam Taylor's attempts to travel to Arkansas to inspect the mines that purportedly were Bates Energy's sources of product.

54.     Bates Energy never successfully delivered any compliant sand to COFS. Bates gave no plausible explanation for his company's failure to perform or why he was demanding payment for sand he knew he was not going to deliver. Upon information and belief, Bates Energy did not have a mine or other sand supplier who could provide the tonnage and type of sand COFS required under the MOU.

55.     In early June 2017, Bates admitted that Bates Energy had never scheduled any sand for delivery to COFS since the MOU was signed in April.  Bates claimed that COFS, as a new client, had never been put into "rotation" with Bates Energy's other established clients.  In other words, Bates Energy placed COFS "at the back of the line" and consequently it never got any sand because Bates Energy's established clients received sand first out of Bates Energy's purported monthly allocation.  There was allegedly no sand left to deliver to COFS.

56.     Bates/Bates Energy's concession revealed a 2-month pattern of lying, misrepresentations and fraud. Moreover, it demonstrated multiple attempts by Bates Energy and Bates to steal money from the escrowed funds by demanding payment when it knew no sand would be delivered.

57.     Bates Energy's first "attempt" to deliver compliant frac sand occurred on or around June 9, 2017, when certain sand was purportedly at a transloading facility in Odessa.  But even this attempt was defective.  First, the amount of sand differed from the purchase order.  Second, Bates Energy failed to deliver any BOLs, the critical document that would prove it was the owner of the

product.  Third, the railcar documentation indicated that the consignee of the product was "High Crush" rather than Bates Energy.  Bates insisted Sam Taylor fix that problem by falsely representing to railroad officials that Sam was with Frac Sand Unlimited, the company managed by David Bravo, Mark Sylla, and Bates' girlfriend Audra Vega.  Fourth, after hours of searching the Odessa transloading facility, Sam could never locate the sand.

58.     After these failures, Bates Energy agreed that COFS could use some of the escrowed funds to acquire sand from an alternate supplier, CSI Sands (Wisconsin) Ltd. ("CSI"), so it could meet its own commitment to ProPetro.

59.     Consequently, on June 15, 2017, Bates Energy executed a Disbursement Letter that expressly permitted payment to CSI from the ELC Escrow Account of up to $1 million.  A copy of Bates Energy's Disbursement Letter is attached as Exhibit 5.  CSI immediately began delivering compliant frac sand to COFS, which COFS then delivered to ProPetro.  ELC/Naumann reviewed and audited invoices, BOLs, and other transportation documents submitted by CSI and COFS and found all to be in order.  CSI was then paid from the ELC Escrow Account.  The funds used for that payment were then replenished from the Amegy Escrow Account.

60.     Despite the Disbursement Letter, and Bates Energy's complete failure to perform, Bates Energy sued COFS and its president, Sam Taylor, in Texas state court on July 20, 2017, complaining that COFS was refusing delivery of sand.  Bates Energy obtained an *ex parte* TRO that shut down COFS's ability to communicate with CSI or any other sand supplier.  It falsely contended COFS attempted to access the escrowed funds, a claim that was discredited at the August 3-4, 2017 hearing on Bates Energy's unsuccessful application for temporary injunction.

### D.   The Grab: ELC/Naumann Illegally disburse COFS Funds to Counter-Defendants

61.    At the same time that COFS was unsuccessfully urging Bates/Bates Energy to deliver compliant frac sand, Counter-Defendants were secretly and systematically raiding COFS's escrow funds.  Their conspiracy and conduct continued through at least August 23, 2017.  At all times Counter-Defendants knew funds should not have been disbursed absent notice to and consent by COFS.[7]

62.    Counter-Defendants actively transferred, disbursed, received, and retained hundreds of thousands of dollars from ELC escrow accounts all without COFS's knowledge.  None of the disbursements were connected to the delivery of a single grain of sand.  They were made for falsified reasons such as "liquidated damages," "admin fees," legal fees, or just simple cash grabs.  The more substantial thefts were based on sham sand transactions with affiliated entities that lacked BOLs or any other indicia of validity, and included fabricated documents and false statements.

63.    Based on Bates/Bates Energy's failure to deliver sand, COFS expected the balance of funds in the ELC Escrow Account to be $960,808.87.  After this Court ordered ELC/Naumann to account of all funds in its possession, ELC revealed that the account balance was actually $308,662.65.  Counter-Defendants, therefore, absconded with at least $652,000 of COFS's funds.

### E.   Bates/Bates Energy and ELC/Naumann's methods to steal and conceal COFS's cash

---

[7]       Q: "Did you issue – issue distribution of funds letters to COFS?"  A: "I did, several times, but they never signed any of them."  ELC000816.

Q: "That prevented my client from doing anything to get you or anybody else paid, correct?"

A: "Because your client didn't pay us on time when we begged and begged and begged and issued disbursement of funds letters…to get paid."  ELC000144.

64.     Counter-Defendants used various techniques to conceal the unlawful disbursements of COFS's funds.   First, ELC/Naumann deposited the $1 million into a "Bates" Chase Account, No. 2917 that immediately commingled the funds.  Second, ELC/Naumann frequently transferred large sums of money between, at a minimum, the following four Chase Bank accounts:[8]

      a.   No. 2917, which was supposed to be the segregated <u>COFS escrow account</u>;

      b.   No. 7800, <u>ELC/Naumann's "high interest"</u> money market account;

      c.   No. 3761, <u>Frac Sand Unlimited's checking</u> account

      d.   No. 9117, <u>ELC/Naumann's personal checking account</u>

65.     Third, ELC/Naumann used at least three sets of "books" in disbursing COFS's funds:

      a.   A legitimate set of fully executed disbursement authorizations ("DA"), establishing COFS's approval of payment to the alternate sand supplier CSI, after Bates/Bates Energy failed to perform, itemized in <u>Exhibit 6</u>:

      b.   A fraudulent set of DAs or similar documents that purported to "permit" ELC/Naumann's disbursements of money without COFS's consent or knowledge, and without delivery of any sand, itemized in <u>Exhibit 7</u>; and

      c.   Bank statements showing random and unsupported disbursements of monies without COFS's consent or knowledge, itemized <u>in Exhibit 8</u>.[9]

66.     ELC/Naumann's court-ordered "accounting" is also inaccurate and intended to conceal monies taken from COFS.  The math in the accounting is incorrect, and it fails to identify most of the improper transfers and disbursements of funds.

---

[8] Amegy bank retained its COFS's escrowed funds in a single account, never transferring the money to another Amegy account.

[9] The fraudulent set of DAs and bank statements were not revealed to COFS until September 2017.

67.    Because of ELC/Naumann's redactions in bank statements, production of incomplete records, and the misleading "accounting," it is impossible to identify at this time the specific recipients of all cash disbursements from the COFS escrow account.  For example, on May 12, 2017, ELC/Naumann withdrew a total of $50,000 from the COFS Chase Bank account No. 2917, by three withdrawals of $16,666 each.  In one transaction, ELC/Naumann transferred $16,666 from the COFS account directly to its own personal account at Chase, No. 9117.  Upon information and belief, the other two withdrawals were electronic transfers to Bates/Bates Energy and Bravo/FSU.

68.    In other transactions, documents show with reasonable certainty who obtained and retained COFS's funds.  Again, by example, on May 12, 2017, Bates/Bates Energy approved a wire transfer from the ELC Escrow Account for $10,761.52 to purchase railcar insurance without COFS's knowledge.   The MOU did not permit Counter-Defendants to use escrowed funds to buy commercial insurance.  The insurance was cancelled shortly thereafter and Bates/Bates Energy pocketed the refund rather than return it to the escrow account.

69.    On June 7, 2017, Bates/Bates Energy caused the sum of $71,250 to be disbursed to Arepet Industries for sand never delivered.  COFS had never heard of Arepet until ELC/Naumann recently produced documents.

70.    On June 15, 2017, after Bates Energy had failed multiple times to deliver sand, it tasked ELC/Naumann with disbursing $65,050 from COFS's funds to the Counter-Defendants for "liquidated damages."  Neither the MOU nor the ELC escrow agreement permit the payment of "damages." ELC/Naumann duly disbursed $70,050 (with an additional $5,000 for himself) on June 15, 2017, as follows:

| Date | Payee | Amount of COFS Funds |
|------|-------|----------------------|
| 6/15/2017 | Bates Energy | $20,000 |
| 6/15/2017 | Bravo | $20,000 |
| 6/15/2017 | Mark Sylla | $10,000 |
| 6/15/2017 | Howard Resources | $5,050 |
| 6/15/2017 | ELC | $15,000 |
| **TOTAL** | | **$70,050** |

71.    Bates/Bates Energy issued another distribution of $28,500 from COFS's funds on June 30, 2017 for "Liquidated Damages and Administration Fee," paid to Counter-Defendants as follows:

| Date | Payee | Amount of COFS Funds |
|------|-------|----------------------|
| 6/30/2017 | Bates Energy | $8,500 |
| 6/30/2017 | Bravo | 7,500 |
| 6/30/2017 | Mark Sylla | $5,00 |
| 6/30/2017 | ELC | $7,500 |
| **TOTAL** | | **$28,500** |

72.    Attorney's fees of $26,415.25 were paid that same day presumably to Bates/Bates Energy's lawyers, Rosenblatt.   Neither the MOU nor the escrow agreement permitted payment of legal fees.

73.    On July 12, 2017, Bates/Bates Energy issued a distribution of funds letter to ELC/Naumann requesting payment of $39,191.13 for the fulfillment of 50% of a purchase order relating to the purported delivery of 7 railcars of sand.  This distribution request *was* approved by COFS, because Bates produced BOLs that appeared to reveal actual sand shipments.  However, no sand was ever delivered, indicating that the BOLs were invalid.  Nevertheless, ELC/Naumann wired $39,191.13 to Bates/Bates Energy from the ELC Escrow Account.

74.    Also on July 12, 2017, Bates/Bates Energy and ELC/Naumann facilitated another payment to Bates/Bates Energy for $6,500 in unauthorized "admin fees."

75.     On July 19, 2017, the day before Bates Energy sued COFS, Bates/Bates Energy issued a request for the disbursement of funds for "liquidated damages and admin fees" of $69,000, plus $31,000 in legal fees.  These funds were distributed as follows:

| Date | Payee | Amount of COFS Funds |
|------|-------|----------------------|
| 7/19/2017 | Bates Energy | $20,000 |
| 7/19/2017 | Bravo | $20,000 |
| 7/19/2017 | Mark Sylla | $7,500 |
| 7/19/2017 | Howard Resources | $6,500 |
| 7/19/2017 | ELC | $15,000 |
| **Total** | | **$69,000** |

Upon information and belief, the $31,000 paid as attorney's fees went to the Rosenblatt Firm.

76.     ELC/Naumann disbursed $5,000 on July 26, and another $15,000 on July 31, 2017. ELC/Naumann redacted the name of the payee from its bank statements, but on information and belief these payments too went to the Rosenblatt Firm.

77.     On July 30, 2017, Bates/Bates Energy attempted to drain the entirety of COFS's escrow account by demanding that ELC/Naumann distribute all sums in the account to Bates Energy "due to Liquidated Damages, Cost of Goods, and Demurrage of Rail Cars."[10]

78.     Counter-Defendants used Boerne, Texas company Tier 1 Sands, LLC for two substantial fraudulent sand transactions.  COFS had no notice about Tier 1 Sands until ELC/Naumann produced documents in this litigation.

79.     First, on July 6, 2017, Bates/Bates Energy demanded that $155,232 of COFS's money be paid to Tier 1 Sands, LLC.  The payment was purportedly to purchase frac sand; however, neither any frac sand nor BOLs were ever delivered.

---

[10] ELC000651 - 000666.

80.     Second, on July 18, 2017, Bates/Bates Energy demanded that $44,352 be paid to Tier 1 Sands. Again, no sand was delivered, or BOLs provided.

81.     On August 3, 2017, Bates/Bates Energy repeated the previous demand that Tier 1 Sands be paid $155,232 via an email to ELC/Naumann's assistant:

> Thank you for sending this $44K transfer, however I need the $155K DOF [Distribution of Funds] and Wire Transfer to Teir 1. [sic][11]

82.     On August 14, 2017, Bates/Bates Energy altered its demand, asserting that payments "billed" by Tier 1 Sands should be distributed to *Bates Energy*.[12]  Upon information and belief, Bates/Bates Energy and/or Bravo/Frac Sand Unlimited are either affiliated with Tier 1 Sands, and/or have an illegal side agreement to share funds stolen from COFS.  Bates Energy copied ELC/Naumann and David Bravo on pertinent communications relating to this sham transaction, including the following:[13]

> Mr. Naumann, please give me a call 1st thing in the morning to Execute this Distribution of Funds per the Signed and Executed MOU with [COFS]…[COFS] has a Tremendous amount of Demurrage charges!!![14]

83.     On August 15, 2017, Bates/Bates Energy requested that ELC/Naumann pay $106,970.56 for demurrage obligations purportedly *incurred by Tier 1 Sands*, but *divided among the Counter-Defendants* as follows:

| | |
|---|---|
| Tier 1 Sands | $14,895 |
| Rosenblatt Firm | $15,000 |
| ELC | $22,358.53 |
| Bravo Construction | $22,583.53 |
| Bates Energy | $22,583.53 |
| "High yield checking" reserve for legal | $10,000 |
| Total | $106,970.56[15] |

---

[11] ELC000637.
[12] ELC000676-000679.
[13] *See* ELC000682-000688, including falsified "storage" charges.
[14] ELC000680 - 000681.
[15] ELC000684-000698.

84.    On August 15, 2017, COFS formally terminated the MOU with Bates/Bates Energy.[16] Rosenblatt emailed the termination notice to Bates/Bates Energy and Bravo.  Three minutes later, Bates/Bates Energy sent Rosenblatt's email to ELC/Naumann and Bravo with the note:

It's NOW or NEVER![17]

85.    Bates/Bates Energy and ELC/Naumann immediately exchanged an email regarding "Demurrage Invoice and Distribution of Funds."[18]  The next day, Bates/Bates Energy sent to ELC/Naumann a fake "demurrage" invoice from Tier 1 Sands, LLC to Frac Sand Unlimited, for $4,550.[19] A week later, on August 23, 2017, Bates/Bates Energy sent ELC/Naumann another invoice demanding payment to itself for $140,541.85, for "demurrage," based on yet more fake documents prepared by Bates/Bates Energy.[20]

86.    This time ELC/Naumann disbursed $140,541.85 to Bates/Bates Energy without any supporting third-party documentation because Bates/Bates Energy had never delivered any sand.[21]

87.    ELC/Naumann was concerned the lack of support in this transaction would expose itself to liability.  Accordingly, Rosenblatt wrote ELC/Naumann "demanding" that it pay Bates/Bates Energy $140,541.85 of COFS's funds. A copy of this letter is attached as Exhibit 10.  Rosenblatt was legal counsel for both ELC/Naumann and Bates/Bates Energy when it wrote the demand letter,

---

[16] ELC000701.

[17] ELC000698-700.  A copy of this correspondence is attached as Exhibit 9.
[18] ELC000702.
[19] ELC000704; *see also*, ELC000683-000698.
[20] ELC000195, ELC000215.
[21] See ELC000867-000868; ELC000877-0001879.
     Upon information and belief, Bates/Bates Energy, Rosenblatt and ELC/Naumann all knew that Bates Energy was never billed by any entity for demurrage, and therefore were all complicit in Rosenblatt's "demand" that ELC/Naumann pay Bates/Bates Energy.

and knew that Bates/Bates Energy and ELC/Naumann were disbursing COFS's funds without COFS's knowledge or consent.

88.    COFS's funds were substantially diminished at this point.  Nevertheless, on August 21, ELC/Naumann encouraged Bates/Bates Energy to buy or lease railcars.  Bates responded, copying Bravo:

> Ok?  We have no money to buy Sand, much less Railcars, Legal fees, Rent, and Food?[22]

ELC/Naumann responded,

> "So we are giving up? WTF![23]

Bates/Bates Energy wrote, "NO, just bigger problems and right in our face problems Man! Stressed the F out."[24]  A copy of this correspondence is attached as Exhibit 11.

### F.  Dewayne Naumann and ELC

89.    ELC/Naumann were at all times fiduciaries of COFS with obligations of loyalty, full disclosure, a high degree of care to conserve any funds received, and to pay such funds only to those entitled to receive them.  ELC/Naumann authorized numerous payments from the ELC Escrow Account that were disloyal, undisclosed, and paid in contravention of the escrow agreements because they were neither disclosed to, nor authorized by COFS.  Such unauthorized payments include those outlined herein.  ELC/Naumann routinely disbursed cash to the other Counter-Defendants, and to itself, even after expressly representing to COFS that it "did not handle

---

[22] ELC000718.
[23] ELC00719.
[24] ELC000720.

or process cash of any kind."[25] In making distributions without COFS's authorization, ELC/Naumann's actions were committed intentionally.[26]

90.     ELC/Naumann further breached duties owed to COFS by failing to disclose that it was the escrow agent for Bates Energy, and that it would transfer money in and out of the Bates Energy account, commingling those funds with the COFS escrow funds.   Neither Bates Energy nor ELC/Naumann informed COFS of any of their conflicts of interest before the parties entered into the subject agreements.

91.     ELC/Naumann also breached duties to COFS by repeatedly refusing to provide information regarding the balance in the ELC escrow account. COFS began asking for an accounting in July 2017.  Three hours after COFS emailed ELC/Naumann on July 22, 2017 requesting it confirm the balance of the escrow account was $960,308.37, ELC/Naumann forwarded the email to Frac Sand Unlimited with the comment,

The full court press begins![27]

ELC/Naumann either ignored COFS's requests, or complained that Naumann had no time or obligation to perform an accounting until yearend.

92.     ELC/Naumann was closely involved in Bates' attempts to justify their unlawful acts in secretly taking COFS's funds.  On the day before the August 3-4, 2017 state court hearing on Bates Energy's application for temporary injunction, Naumann consulted with Bates regarding whether

---

[25] ELC000364.

[26] ELC/Naumann admitted in open court in September 2017 that he had repeatedly withdrawn funds from the ELC COFS's Escrow Account on the unilateral instruction of Bates/Bates Energy.

[27] *See* ELC000570.  Bates Energy had filed suit against COFS two days earlier, on July 20, 2017.

a "sworn statement" from Austin Howard regarding supposed sand "suppliers" was sufficient to support Bates' "defense."[28]

93.    ELC/Naumann and Bates also discussed COFS's counterclaim immediately after it was filed on August 2.  Bates referred to Sam Taylor as a "piece of shit" and "lair scumbag" [sic], and Naumann replied, "Ok, then I'm unleashing my lawyer."[29]

94.    ELC/Naumann fraudulently induced COFS to enter into the ELC escrow agreement.  On or about April 14, 2017, through the exchange of emails between Janis Kline and Dewayne Naumann, the parties specifically negotiated contract language that obligated ELC/Naumann to immediately notify COFS of every request made by any party regarding the funds in the ELC Escrow Account, and to convey every request or other notice regarding the subject funds.  That language, upon COFS's request, was incorporated into the escrow agreement.  This was in addition to language in the agreement already requiring COFS's approval before any funds could be disbursed. Consequently, ELC/Naumann expressly represented to COFS that no funds would leave the ELC Escrow Account absent notice to COFS, conveyance to COFS of any notice or request for funds, and COFS's signature approving the disbursement.  COFS relied on these material representations to its detriment.  ELC and Naumann now take the position that no such notice or approval was required before they could disburse escrow funds.  Both ELC and Naumann individually are liable for these and other transgressions because Naumann is using the corporate form of ELC to perpetrate a fraud on COFS, and adherence to the corporate fiction would promote injustice and lead to an inequitable result.

---

[28] ELG000605.
[29] ELC000636.

**Austin Howard/Howard Resources**

95.     Austin Howard, in the course and scope of his employment with Howard Resources, introduced COFS to Bates and vouched for the legitimacy of Bates and Bates Energy, based on allegations that Howard Resources and Bates Energy often did business with each other.  COFS relied upon the representations of Howard Resources in entering into its relationship with Bates. Those representations were reckless, false, and/or negligent.

96.     Howard Resources, purportedly a sand logistics trucking sale company, was to be paid a commission of $1 per ton from Bates Energy for every ton of sand delivered to COFS through Bates/Bates Energy.  Because the MOU anticipated 80,000 tons being delivered to COFS in the first 3 months of the contract, Howard Resources expected to earn $80,000 in under 90 days.  Thus, Howard Resources was motivated to participate in the unlawful acts in order to ensure that a deal was struck between Bates/Bates Energy and COFS.

97.     Howard Resources was involved in the creation of the MOU that existed between COFS and Bates Energy, whereby substantial sums of money would be placed into an escrow account. Howard Resources established with Bates/Bates Energy and ELC/Naumann that any payments it received "when sand was delivered" would be paid directly from the ELC Escrow Account.

98.     Thus, Howard Resources knew, or at a minimum should have known, that it was not entitled to any payment from the escrow account unless and until both parties signed off.  Yet, Howard Resources knowingly accepted payments from ELC/Naumann even though no sand had been delivered, and no authorization for payment had been received from COFS.

99.     Howard Resources furthered the scam by falsely testifying in open court that sand was being delivered in accordance with the MOU.  At the August 3-4, 2017 temporary injunction

hearing Austin Howard testified that he personally confirmed that COFS had "18 cars readily available right now in Odessa – I have confirmed with Union Pacific myself."

100.    Howard Resources was paid and retained at least $11,550.00 from the COFS escrow account in spite of the fact that no sand was ever delivered.

**David Bravo, Unlimited Frac Sand, and Bravo Construction[30]**

101.    David Bravo has been described alternatively as an owner, the chief operating officer, and the logistics coordinator of Bates Energy.[31]  Bravo worked closely with Bates/Bates Energy on all the transactions and occurrences that led to this dispute.  He was aware of the MOU and the escrow agreements, and he knowingly received and retained payments from the escrow account without COFS's knowledge, consent or authorization.

102.    Bates and Bravo knew that Bates faced imminent indictment for his role in the Four Winds frac sand scandal.  Consequently, on May 12, 2017, Bravo, Mark Sylla, and Bates' girlfriend Audra Vegas created a new company, Unlimited Frac Sand d/b/a Frac Sand Unlimited, or "FSU," in order to maintain the parties' fraudulent and illegal acts against COFS, and drain COFS's escrowed funds.  Bates was indicted four days later, on May 16, 2017.

103.    Frac Sand Unlimited was essentially one and the same as Bates Energy, and was operated by Bates and Bravo.  By July 2017, Bates was directing ELC/Naumann to use the name Unlimited Frac Sand d/b/a Frac Sand Unlimited on new escrow agreements, and it was listed as the "assignee" on Bates/Bates Energy correspondence and false invoices referring to sand that was never procured or delivered.[32]

---

[30] On August 4, 2017, Bravo and Mark Sylla were preparing to enter into another transaction, involving funding with a $5 million commitment, under the corporate name of Odessa Commodity Services, LLC.  ELC000645-000647
[31] ELC000735-00737
[32] *See, e.g.*, ELC000573 – 000587.

104.     Upon information and belief, ELC/Naumann established Chase Bank account no. 3761 as the "escrow account" for FSU. Thereafter, ELC/Naumann directed numerous unauthorized payments to FSU from COFS's escrowed funds. Moreover, FSU is listed as the consignee on 18 BOLs that were supplied to COFS as proof that Bates Energy had procured frac sand. As discussed above, COFS authorized a payment of $31,191.13 to Bates Energy in reliance upon those representations. No frac sand was delivered, demonstrating that the BOLs were false, fraudulent, and/or forged.

105.     Bravo/FSU also participated with Bates/Bates Energy in a substantial sham sand transaction involving Transload and Logistics, LLC ("Transload"), an Oklahoma entity. Transload was the purported buyer of the sand, and the seller was FSU. On August 11, 2017, Bates (using the name "Phil") emailed Transload that it needed to pay its invoice "ASAP" by wiring funds of $204,266.97 into the FSU escrow account no. 3761 held by ELC/Naumann.[33]  Bates copied Naumann, Bravo and Audra Vega on the email. In fact, Transload paid nothing. Bates/Bates Energy, Bravo, and ELC/Naumann instead transferred $204,266.97 of COFS's funds to FSU. There was no sand sale; the emails and "invoice" were a pretext to once again raid COFS funds. The parties refer to this fraudulent transaction as a "pending receivable" in ELC/Naumann's "accounting."[34]

106.     Bravo and/or FSU have assisted and advised Bates/Bates Energy in its lawsuit against COFS. On August 2, 2017, Bravo emailed Bates a fake list of approximately 10 times COFS allegedly rejected sand deliveries. Bates forwarded Bravo's email to Rosenblatt.[35]

---

[33] ELC000667-000672. The "Phil" is believed to be Frac Sand Unlimited's vice-president, Phil Stanley.

[34] ELC000001, 000097.

[35] ELC000604.

107.    Bravo was also involved in the August 3-4, 2017 temporary injunction hearing, testifying on behalf of Bates.   Moreover, on August 3, Bravo/FSU reassured Rosenblatt that Counter-Defendants' theft from COFS was justified:

> [the] escrow agreement is wide open for us.  Tells Dewayne to notify
> us or cofs of movement but does not "require" him to do so.[36]

108.    Bravo participated with ELC/Naumann and Bates/Bates Energy in a scam in Kansas to lease railcars, using COFS's $4 million in escrowed funds.  On April 19, 2017, the same day COFS funded the ELC and Amegy escrow accounts, Naumann sent a "proof of funds" letter on ELC letterhead to Kansas company Caldwell-Baker Co. on behalf of Bates/Bates Energy and Bravo. The letter represented that Bates/Bates Energy and Bravo held a cash balance of over $4 million – obviously the same $4 million COFS had just placed in escrow.  A copy of this letter is attached as Exhibit 13.  Based on ELC/Naumann's "proof of funds" letter, Bates/Bates Energy and Bravo entered into an agreement with Caldwell-Baker Co. to lease 170 railcars for transporting frac sand. Bates/Bates Energy and Bravo reneged on the lease shortly thereafter.  Caldwell-Baker Co. sued Bates/Bates Energy and Bravo in Kansas state court for breach of contract and fraudulent misrepresentation. The court granted Caldwell-Baker Co.'s motion for summary judgment against Bates Energy, who did not respond to the motion, for nearly $650,000.  The case is proceeding against Bravo.

109.    Bravo directed that payments to him for so-called "liquidated damages" or administrative paid out by ELC/Nauman be made to Lorena Silvistri Bravo, individually and d/b/a Bravo Consulting Services.  Lorena Silvistri Bravo is believed to be Bravo's wife.  Upon information and

---

[36] ELC000615.  See Exhibit 12.

belief, Bravo and/or his surrogates and affiliated entities were paid, and have retained, at least $47,500.00 from the COFS escrow account for these false claims.

**Mark Sylla**

110.   Mark B. Sylla is an owner of FSU.  Before FSU was formed, Sylla was an independent contractor working for Bates/Bates Energy.  Sylla conspired with Bates/Bates Energy, Bravo and others in falsely representing to COFS that Bates/Bates Energy had access to numerous legitimate sand mines in Wisconsin and elsewhere, and that sand was on the way.  Sylla accompanied COFS's president Sam Taylor on the Wisconsin trip, falsely pointing out to Sam along the way the mines in which Bates/Bates Energy allegedly had contracts and interests or allocations.

111.   ELC/Naumann paid Sylla, and Sylla accepted and retained, illegal payments of at least $22,500 from the COFS escrow account, without notice to or consent from COFS.

**The Rosenblatt Law Firm**

112.   Rosenblatt served as counsel for Bates/Bates Energy from at least May 2017 to October 27, 2017.  It served as counsel for ELC/Naumann from at least July 2017 to August 25, 2017.[37]

113.   Rosenblatt knew at all relevant times that Counter-Defendants were wrongfully removing money from the COFS escrow account without COFS's knowledge or consent.  On August 1, 2017, two days before a temporary injunction hearing against COFS, Rosenblatt advised Bates and Bravo in a detailed memo:

> I am very, very concerned they [COFS and its counsel] will have found out information on the ELC account, or will question you about it – *and if it comes out that you have unilaterally directed draws out of the account and that Dewayne authorized them*, all

---

[37] When the government subpoenaed ELC and Naumann in the Four Winds Logistics case for bank records related to Bates and escrow accounts, ELC/Naumann retained Rosenblatt to represent them in quashing the subpoena.  This was at the same time Rosenblatt was representing Bates in this matter.  Rosenblatt subsequently withdrew both from its representation of Bates/Bates Energy in this matter, and from its representation of ELC/Naumann in Four Winds, where it was replaced by John Convey.

before and after we asked the Court to protect the money – *we are likely done.* (emphasis added)

…I can almost guarantee COFS will file a counterclaim or new suit against you – I'm kind of surprised they haven't already. (the "Rosenblatt Memo")

114.    Bates forwarded the Rosenblatt Memo to ELC/Naumann, who responded:

Wow, that's not good.[38]

115.    Bates also forwarded the Rosenblatt Memo to David Bravo. Bravo referred to COFS as "morons," accusing it of lying and manufacturing evidence, and attempted to justify their joint unlawful conduct. *See* Exhibit 12.

116.    Rosenblatt thus knew by August 2, 2017 that Counter-Defendants were removing COFS's money from the escrow account without notice to COFS. The firm knew the raiding of funds continued while the suit was pending, and kept tabs on it. On August 11, 2017, Rosenblatt asked Stan Bates, "[C]an you please send me all the paperwork showing the disbursements that have been sent out this week?"[39]

117.    That same day, knowing that Counter-Defendants were still stealing COFS's funds, Rosenblatt wrote COFS stating that the escrow account was essentially frozen, and advising that Bates Energy "will not execute nor authorize any further disbursements from either escrow account, pending resolution of the instant matter." The firm's representation was false and misleading.

118.    As referenced above, on August 15, 2017, counsel for COFS terminated the MOU and escrow agreement and sent notice of such termination to Bates/Bates Energy, ELC/Naumann and Rosenblatt. The correspondence demanded the immediate return of all funds held in escrow.

---

[38] A copy of the Rosenblatt Memo and ELC/Naumann's response are attached as Exhibit 14.
[39] ELC000673.

119.    Ignoring the termination and demand, Rosenblatt was actively complicit with the unauthorized payment of $140,541.58 of COFS's funds on August 23, 2017, referred to above.

120.    Rosenblatt was also involved with the fraudulent transaction involving payments to Bate/Bates Energy and/or Bravo/FSU of $39,131.13 of COFS's funds referenced above. Bates/Bates Energy sent false documentation to COFS purportedly showing that it had placed as many as 18 railcars of sand for delivery to Seagraves, Texas, one of the proper rail destinations under the MOU.  The first shipment was due July 23.  In accordance with the terms of the MOU, COFS authorized a payment to Bates Energy from the ELC escrow account of 50% of the total, or $39,131.13.  The second payment would be due when the sand was offloaded from the railcars.

121.    July 23 came and went with no sand delivery.  Consequently, one of the matters in dispute at the temporary injunction hearing on August 3-4, 2017 was whether frac sand was in fact ever delivered to COFS.  Bates Energy and Rosenblatt argued that railcars were "sitting on the ground" in West Texas, waiting for COFS to pick them up.

122.    At the hearing, the Chief Financial Officer of COFS testified that if those railcars were truly in West Texas, "We would take those cars, every one of them, in a second." That afternoon, counsel for COFS emailed Rosenblatt about taking receipt of the railcars "sitting on the ground." Counsel for COFS requested a substantive response by August 9 about the specifics of the delivery, otherwise COFS would assume that no sand had in fact been delivered.  There was no response.

123.    Accounting information produced by ELC/Naumann reflects requests by Bates/Bates Energy that COFS's escrow funds be used to pay legal fees of $26,415.25 on June 30, 2017, and $31,000 on July 19, 2017.  Payments were made to the Rosenblatt Firm from the ELC Escrow Account with the firm's full knowledge that the payments were made in spite of a total lack of

notice to, or consent from COFS.   Rosenblatt has wrongfully retained any and all of these amounts.[40]

## V.
## RESPONDEAT SUPERIOR AND RATIFICATION

124.   All of the individual Counter-Defendants named herein are liable in their individual capacities for the causes action stated that are grounded in tort law, whether based on statute or common law.   In all cases, the individual named was acting on his own behalf, as well as in the course and scope of his employment or agency for the entity to which he or she was contracted. In this regard, Stan Bates was at all times acting both individually and in the course and scope of his employment with Bates Energy.   Dwayne Naumann, as the only principal in ELC, was at all times acting both individually and in the course and scope of his employment for ELC.   David Bravo was at all time acting individually and in the course and scope of his employment for either Bates Energy or his employment by or ownership of FSU.   Mark Sylla was at all times acting individually and in the course and scope of his agency with Bates Energy; or in the course and scope of his employment by or ownership of FSU.   Austin Howard was at all times acting individually and in the course and scope of his agency with Howard Resources, LLC.

## VI.
## CAUSES OF ACTION

**COUNT 1:   FRAUD (against Bates, Bates Energy; ELC and Naumann, individually; FSU and Bravo, individually, and Howard Resources)**

125.   Each allegation contained in the above paragraphs is re-alleged as if fully stated herein.

---

[40] On July 26, 2017, Bates/Bates Energy demanded that ELC/Naumann execute a "Distribution of Funds ASAP" for "reserve legal funds," for $5,000.   Several minutes later, ELC/Naumann confirmed to Bates that the document had been "[s]ent directly to Rosenblatt Law."   A second payment was made to Rosenblatt with similar assistance of ELC/Naumann on or about July 28, 2017, for $15,000, for legal fees.   *See* ELC000597-000603.

126.    Counter-Defendants Bates and Bates Energy, individually and through its CEO Bates, made misrepresentations or omissions of material facts to induce Counter-Plaintiff COFS to enter into the MOU and ancillary agreements.   These representations were false and/or were made recklessly, as positive assertions, and without knowledge of their truth.   Bates Energy and Bates made these false representations and omissions with the intent that COFS rely upon them.   The fraudulent representations committed by Bates Energy and Bates include but are not limited to the following:

      a.   That Bates Energy had access to an allocation of 370,000 tons of frac sand a month, ready to be delivered, and that it was already delivering some 88,000 tons every 45 days to other customers, as of April 2017;

      b.   That Bates Energy was in the process of paying for frac sand on April 17, 2017;

      c.   That 150 railcars committed to Bates Energy had passed inspection as of April 27, 2017 and were scheduled to launch;

      d.   That railcars of sand were "sitting on the ground" and waiting for delivery to COFS as of July 23, 2017;

      e.   That it would not take COFS's funds without notice to COFS and its authorization.

127.    Counter-Defendants Dewayne Naumann and ELC, by and through Naumann, made misrepresentations or omissions of material facts to induce Counter-Plaintiff COFS to enter into the ELC escrow agreement and other agreements, including but not limited to the fraudulent sale of sand for which these Counter-Defendants obtained the "consent" of COFS.     These representations were false and/or were made recklessly, as positive assertions, and without knowledge of their truth.   They made these false representations and omissions with the intent that

COFS rely upon them.  The fraudulent representations committed by Naumann and ELC include but are not limited to the following:

     a.   That they would not remove COFS's funds from the escrow account without notice to and the consent of COFS.

     b.   That sand was delivered with proper support documentation.

     c.   That they would properly require, account for and audit supporting documentation for any sand deliveries.

128.   Counter-Defendant Howard Resources, LLC, by and through its Chief Operations Officer Austin Howard, made misrepresentations or omissions of material facts to induce Counter-Plaintiff COFS to enter into the MOU, and ancillary escrow agreements, related to Bates, Bates Energy, ELC, Naumann, Bravo and Sylla.  These representations were false and/or were made recklessly, as positive assertions, and without knowledge of their truth.  It made these false representations and omissions with the intent that COFS rely upon them. The fraudulent representations committed by Howard Resources include but are not limited to the following:

     a.   That Bates and Bates Energy were competent, honest and the "go to" people for acquiring frac sand in the industry;

     b.   That frac sand had been delivered.

129.   Defendant/Counter-Plaintiff had no knowledge of the falsity of Plaintiff/Counter-Defendants' representations and omissions of material fact.  Defendant/Counter-Plaintiff reasonably and justifiably relied upon the representations and omissions in deciding to enter into the relationships and agreements referred to herein, to its detriment.

130.   Plaintiff/Counter-Defendants' misrepresentations and omissions directly and proximately caused Defendant/Counter-Plaintiff to suffer injuries and substantial damages in an amount in

excess of the minimum jurisdictional limits of this Court.  Additionally, these acts were committed

willfully, wantonly, and were otherwise fraudulent, malicious, and/or were grossly negligent, and,

accordingly, Defendant/Counter-Plaintiff is entitled to recover compensatory and punitive

damages in an amount to be determined by a trier of fact.

### COUNT 2:   CONSPIRACY TO COMMIT FRAUD (against all Counter-Defendants)

131.    Each allegation contained in the above paragraphs is re-alleged as if fully stated herein.

132.    Counter-Defendants all had an object to be accomplished, namely the fraudulent actions

towards COFS leading to the taking and retention of COFS's funds. Counter-Defendants had a

meeting of the minds on the object or course of action, and such conduct was the proximate cause

of damages to COFS.

133.    As a result of Plaintiff/Counter-Defendants' actions, Defendant/Counter-Plaintiff has been

damaged in an amount in excess of the minimum jurisdictional limits of this Court

### COUNT 3:    BREACH OF CONTRACT (against Bates Energy and ELC)

134.    Each allegation contained in the above paragraphs is re-alleged as if fully stated herein.

135.    If the Court finds that the MOU is a valid agreement, then COFS fully performed its

obligations under the MOU or, in the alternative, Counter-Defendant were at all times ready,

willing and able to perform.

136.    Counter-Defendant Bates Energy failed to perform pursuant to the terms of the MOU,

including but not limited to wholly failing to procure frac sand in accordance with specifications

and deadlines.

137.    All conditions precedent have been performed.

138.    As a result of Counter-Defendant's breach of the MOU, COFS has been damaged in an

amount that exceeds the minimum jurisdictional limits of this Court.

139.    Further, COFS and Counter-Defendant ELC are parties to the ELC Escrow Agreement. COFS fully performed its obligations under the ELC Escrow Agreement, or were prevented from performing based on the actions of ELC.

140.    ELC failed to perform as required by the specific terms of the ELC Escrow Agreement. More specifically, ELC breached paragraphs 1.2 and 1.3 by failing to maintain the escrow funds in a segregated account, and by making payments and disbursements from the escrow funds without the signatures of all parties to the agreement.

141.    Upon termination of the MOU, ELC was obligated to disburse to COFS the funds held in the escrow account.  ELC's failure to disburse the funds also constitutes a breach of the Escrow Agreement.

142.    At all times, COFS was ready, willing and able to perform its obligations pursuant to the terms of the MOU and the Escrow Agreement.

143.    All conditions precedent have been performed.

144.    ELC/'s breach has caused damages and injury to COFS for which COFS seeks to recover herein.

**COUNT 4:    THEFT AND CONSPIRACY TO COMMIT THEFT (against all Counter-Defendants)**

145.    Each allegation contained in the above paragraphs is re-alleged as if fully stated herein.

146.    Counter-Defendants wrongfully assumed dominion and control over property belonging to COFS.  Plaintiff/Counter-Defendant's actions constitute theft as that term is defined in the Texas Theft Liability Act, Chapter 134, Texas Civil Practice & Remedies Code.  All Counter-Defendants, without Defendant/Counter-Plaintiff's consent, knowingly took, accepted and retained funds held and belonging to Defendant/Counter-Plaintiff, causing Defendant/Counter-Plaintiff to sustain damages as a result of the theft.  Such property was stolen in that it was acquired by Counter-

Defendants as a result of theft, by withholding such property from Defendant/Counter-Plaintiff permanently or for so extended a period of time that a major portion of the value of the property is lost.

147.   Counter-Defendants all had an object to be accomplished, namely the theft and retention of COFS's funds, had a meeting of the minds on the object or course of action, and such conduct was the proximate cause of damages to COFS.

148.   As a result of Plaintiff/Counter-Defendant's actions, Defendant/Counter-Plaintiff has been damaged in an amount in excess of the minimum jurisdictional limits of this Court.

> **COUNT 5:   BREACH OF FIDUCIARY DUTY AND CONSPIRACY TO COMMIT BREACH OF FIDUCIARY DUTY (against Bates Energy, Bates, ELC, Naumann, Bravo, FSU, and Rosenblatt)**

149.   Each allegation contained in the above paragraphs is re-alleged as if fully stated herein.

150.   To the extent the MOU is a valid agreement, it underlies the Escrow Agreement in which COFS and Bates Energy agreed to definite escrow terms.

151.   An escrow was established when COFS deposited funds with ELC and Naumann, as third parties, and agreed to the terms in which ELC and Naumann would deliver the funds deposited.

152.   A fiduciary relationship exists between COFS and ELC/Naumann, as escrow agents under the Escrow Agreement.

153.   Consequently, ELC/Naumann owed duties of loyalty, to make full disclosure, and to exercise a high degree of care to conserve the funds and pay them only to those entitled to receive them.

154.   By failing to (1) release the funds to COFS in accordance with the terms of the Escrow Agreement; (2) disclose activity in and related to the escrow account; (3) pay the funds only to COFS, who is entitled to the funds; and other actions as set forth herein, ELC and Naumann have breached their fiduciary duty.

155.   ELC/Naumann's conduct has resulted in both injury to COFS for which COFS seeks to recovery, and a benefit to ELC/Naumann.  Upon information and belief, the funds in the escrow account have not been preserved for the benefit of COFS, but have been transferred or otherwise conveyed out of the account.  Upon information and belief, such transfer or conveyance has served as a benefit to ELC/Naumann, whether the funds have been loaned to others, or used for ELC and Naumann's personal expenses, or used for some other purpose not provided for in the Escrow Agreement.  Such funds should be disgorged and returned to COFS.  In addition, COFS has been precluded from reporting the status of the escrow account it has held in trust for ProPetro, and has been unable to return the fuds to ProPetro upon termination of the MOU.

156.   Counter-Defendants all had an object to be accomplished, namely the breach of fiduciary duty, and resulting retention of COFS's funds. Counter-Defendants had a meeting of the minds on the object or course of action, and such conduct was the proximate cause of damages to COFS.

**COUNT 6:   NEGLIGENT MISREPRESENTATION (against Bates, Bates Energy; ELC and Naumann, individually; and Howard Resources)**

157.   Each allegation contained in the above paragraphs is re-alleged as if fully stated herein.

158.   Each of Counter-Defendants Bates, Bates Energy, ELC, Naumann, and Howard Resources made representations to Counter-Plaintiff COFS in the course of their business and/or in a transaction in which they had a pecuniary interest.  The Counter-Defendants provided false information for the guidance of Counter-Plaintiff in those businesses, and none of them exercised reasonable care or competence in obtaining or communicating the information.  Counter-Plaintiff justifiably relied on the representations, and suffered pecuniary loss as a result of its reliance thereon.

**COUNT 7:   EQUITABLE ACCOUNTING (against Bates Energy, ELC, and Naumann)**

159.   Each allegation contained in the above paragraphs is re-alleged as if fully stated herein.

160.   Counter-Plaintiff is entitled to an order requiring an accurate accounting of the ELC escrow account, and any and all other accounts in which any COFS funds were deposited, transferred, disbursed or withdrawn from, removed or altered in any manner, and to disgorge any profits or amounts removed therefrom, such that the balance is restored to its original balance of $1,000,000/ Counter-Plaintiff further requests that the Court appoint a qualified expert to conduct and certify, or audit, the accuracy of the accounting.

## COUNT 8:   RESTITUTION OR MONEY HAD AND RECEIVED (against all Counter-Defendants)

161.   Each allegation contained in the above paragraphs is re-alleged as if fully stated herein.

162.   All Counter-Defendants received escrow money that in equity and good conscience rightfully belongs to COFS as trustee for ProPetro.  No other party holds a just claim to those funds in that all Counter-Defendants knew that the sole purpose of the escrow account was the procurement of frac sand and all Counter-Defendants know that zero frac sand has been delivered.

163.   Consequently, COFS seeks restitution and return of such funds, in the approximate sum of $652,000 - $1,000,000.

## COUNT 9:   ATTORNEYS FEES (against all Counter-Defendants)

164.   Each allegation contained in the above paragraphs is re-alleged as if fully stated herein.

165.   As a result of the contract breaches committed by Counter-Defendants Bates Energy and ELC, Counter-Plaintiff requests reimbursement of attorneys' fees and costs incurred in the prosecution of this case pursuant to § 38.001 of the Texas Rules of Civil Procedure, and all other grounds for recovery of fees.

166.   COFS further seeks the recovery of its reasonable and necessary attorney's fees and costs against all Counter-Defendants by virtue of the Texas Theft Liability Act.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Defendant/Counter-Plaintiff Complete Oil Field Service, LLC respectfully requests that Defendant/Counter-Plaintiff be awarded the following:

a.   Judgment against Plaintiff/Counter-Defendant Bates Energy, and against Counter-Defendants ELC and Naumann in excess of the minimum jurisdictional limits of this Court for actual, special and consequential damages;

b.   Punitive damages;

c.   Statutory damages;

d.   Pre-judgment interest at the highest rate allowed by law;

e.   Post-judgment interest at the highest rate allowed by law;

f.   Reasonable and necessary attorneys' fees through the trial of this cause as well as conditional awards of fees on appeal;

g.   Costs of court and costs of suit;

h.   Such other and further relief, both special and general, at law or in equity, to which Defendant/Counter-Plaintiff may be justly entitled.

Respectfully submitted,

_*/s/ Lamont A. Jefferson*_

Lamont A. Jefferson
State Bar No. 10607800
Lisa S. Barkley
State Bar No. 17851450
JEFFERSON CANO

112 East Pecan Street, Suite 1650
San Antonio, Texas  78205
Telephone:  (210) 988-1811
Facsimile:  (210) 988-1811
LJefferson@jeffersoncano.com
LBarkley@jeffersoncano.com

**ATTORNEYS FOR
DEFENDANTS/CROSS-PLAINTIFF**

## CERTIFICATE OF SERVICE

I certify that on this 25th day of April, 2018, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system and served all counsel of record in accordance with the Federal Rules of Civil Procedure:

_____ /s/ *Lisa S. Barkley*_____
Lisa S. Barkley

SUPPLY AGREEMENT

This Supply Agreement (the "Agreement"), dated as of April __13__, 2017 (the "Effective Date"), is by and between ProPetro Services, Inc. ("Buyer") and Complete Oil Field Services, LLC ("Seller").

The parties hereby mutually agree as follows:

1.    Term

The term of this Agreement shall commence on the Effective Date and shall continue in effect until the supply of 80,000 tons of sand has been delivered, unless sooner terminated as provided herein (the "Term").

2.    Definitions

For purposes of this Agreement:

(a) "Materials" (individually and collectively, as applicable by use herein) shall mean each of the following grades of frac sand: 40/70 Northern White and 100 Mesh Northern White sand as acquired by Seller.

3.    Sale and Purchase

(a) Beginning on the commencement of this contract, Seller will sell to Buyer, and Buyer will purchase from Seller each of the Materials, in the volumes, at the prices and on the delivery terms set forth in Paragraph 4 of this agreement, all in accordance with the terms and conditions set forth in this Agreement. Each of the Materials will be purchased and sold in bulk with no packaging. Other than 100 mesh, each of the above grades of Materials will conform to Seller's applicable standard specifications, which conform to the applicable requirements of International Standard ISO 13503-2, Measurement of Properties of Proppants Used in Hydraulic Fracturing Operations, or such other specifications as may be established by written agreement of the parties (the "Specifications"). The 100 mesh will conform to Seller's applicable standard specifications, or such other specifications as may be established by written agreement of the parties (also, the "Specifications").

(b) Buyer will purchase from Seller, and Seller will sell to Buyer, an aggregate amount of each of the Materials up to 50,000 tons of 40/70 and 30,000 tons of 100 mesh, subject to adjustment as provided in this Agreement.

(c) During the Term, Buyer may purchase from Seller, and Seller may sell to Buyer, additional short tons or pounds, as the case may be, of each of the Materials in excess of the volume of such Materials as described in 3.(b), subject to availability of such Materials as determined solely by Seller at the time of Buyer's request for the same, pursuant to the terms and conditions of this Agreement.

**EXHIBIT 1**

(d) Orders for Materials under this Agreement will be made by written or oral releases issued by Buyer to Seller (the "Releases"). Buyer will submit Releases to Seller at least ten (25) business days prior to the desired date of delivery at the applicable F.O.B. point, which F.O.B. point shall be designated as provided in Section 4, below. Each of the Releases will identify the type, grade and quantity (in short tons or pounds, as applicable) of the Materials then being ordered, and the desired date of delivery at the applicable F.O.B. point. Buyer will order each of the Materials hereunder from Seller in generally even proportions. Subject to the availability of sufficient transportation units (railcars or trucks, as appropriate), shipments of Materials purchased and sold hereunder will be scheduled in reasonably equal proportions.

(e) All Materials purchased by Buyer under this Agreement will be used solely for Buyer's use and consumption in connection with its business operations and Buyer will not re-sell any Materials to any third party.

4. Delivery Terms and Pricing

    (a)    The initial quantity shall be approximately 10,000 plus tons of Materials delivered to the to the applicable terminal located at Seagraves, Pecos, Big Springs, San Angelo, Odessa, Midland, or Monahans, Texas (WTX) or as otherwise designated in writing by agreement of the parties (each, a "Designated Terminal"). Such amount to be purchased no later than May, 10th, 2017 and increase such quantity up to 80,000 tons of Materials within 90 days of April 12, 2017.

    (b)    The price for the Materials shall be $104.50 USD per ton including costs of rail delivery on existing tracks to Designated Terminal and transloading of Material into the trucks of Buyers designated trucking company. Such price shall be locked for 90 days from the effective date of this agreement with an adjustment for a change in FRC as provided in paragraph 4.(e).

    (c)    A demurrage allowance of 1.5 days of storage for every 1,000 tons from the date of arrival in the of rail cars to WTX. All material held over the initial 1.5 days shall incur a daily storage fee equal to $3.00 per ton per Day.

    (d)    Risk of loss will pass to Buyer when Materials are delivered to the applicable carrier at the Designated Terminal for transportation to the applicable Buyer Location. F.O.B. Designated Terminal.

    (e)    For purposes of this Agreement, "FRC" shall mean the freight related costs assessed by carriers and terminals, respectively, in connection with the transportation and handling of Materials. FRC are subject to changes in base rates as well as the applicability of related charges. When charges are assessed, or when base rates or charges are increased, by the carrier or terminal, Seller will change the then F.O.B. Designated Terminal price by the same amount. Any such change will become effective on the date implemented by the carrier or terminal. Seller will not incur any liability in the event of any delay or failure of carriers or terminals to perform services in connection with the movement of Materials from any Seller Plant to any Designated Terminal.

5.    Payment Terms

(a) Upon execution of this agreement, Buyer shall deposit funds in a qualified escrow account as agreed with Seller, the amount of $4,000,000 USD. Such amount shall be drawn upon by Sellers supplier, upon verification by independent escrow agent, to pay for the initial purchases of Materials included in this agreement. After the escrowed funds are exhausted, Buyer shall remit funds to Seller upon terms outlined in paragraph 5.(b).

(b) Payment for Materials and surcharges, if any, will be made by Buyer to Seller, in good funds, by wire transfer net twenty-seven (27) days after the date of confirmed rail shipment of the subject Materials from the origin point (in Wisconsin) or the date of invoice from Seller's supplier. Production based energy surcharges may be imposed from time to time by Seller as agreed with Buyer. Such surcharges, if any, will be added to invoices as separate line items and paid by Buyer to Seller.

6.    Warranties

(a) Seller warrants to Buyer that Seller has title to the Materials when delivered to the carrier at the applicable Designated Terminal for shipment to Buyer. Seller further warrants to Buyer that, when delivered to such carrier, the Materials shall conform to the applicable Specifications and shall be free and clear of all liens and encumbrances. Provided Buyer gives Notice, as set forth in the Notice section below, of any Materials sold under this Agreement fail to conform to the applicable Specifications and such defect is demonstrated to Seller's reasonable satisfaction to have existed prior to the Materials being delivered to the carrier for departure from the Designated Terminal, Seller, reserving the right to inspect the subject Materials in Buyer's possession, will, at Seller's option, either replace at Seller's expense, F.O.B. Buyer Location, or give Buyer proper credit for, such nonconforming Materials. The foregoing shall not apply to Materials that shall have been subjected to alteration, contamination, improper maintenance or storage, misapplication, misuse, negligence or accident after being delivered to the carrier for departure from the Designated Terminal or to Materials to which Buyer's tests use an unrepresentative sample.

(b) EXCEPT AS EXPRESSLY PROVIDED HEREIN, SELLER MAKES NO OTHER WARRANTY OF ANY KIND WITH RESPECT TO THE MATERIALS SOLD UNDER THIS AGREEMENT, WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE WARRANTY OF MERCHANTABILITY AND THE WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE WHICH ARE HEREBY SPECIFICALLY DISCLAIMED.

(c) The remedies set forth herein shall be the sole and exclusive remedy available to Buyer in the event of any breach of warranty in lieu of all other remedies. In no event shall Seller be liable for any direct, incidental, special, consequential or other damages (including, without limitation, lost profits) even if Seller has been previously advised of the possibilities of such damages. In no event will Seller's liability exceed the contract (purchase) price for the Materials, for which liability is claimed, plus, in the event replacement Materials are provided by Seller, freight costs to ship the same to the Buyer Location.

7.    Force Majeure

    Each party shall be relieved of its obligation to perform any part of this Agreement, other than the obligation to pay money, to the extent its performance is prevented by events beyond its reasonable control, which events may include, without limitation, fire, lightning, flood, wind storm, earthquake and other Acts of God, epidemic, quarantine, accident, explosion, hostilities, war, revolution, act of terrorism, acts of the public enemy, maritime border or boundary dispute, riot and other civil disturbances, sabotage, strike, labor disputes, work stoppages, court injunctions, transportation embargos, general unavailability of electric power or other utilities, laws, acts, regulations, orders or other requirements of federal, state, county, municipal or local governments or branches, subdivisions or agencies thereof, including but not limited to any temporary or permanent government restriction or moratorium on hydraulic fracturing ("Force Majeure"). The party claiming the Force Majeure shall promptly notify the other party of the occurrence of any Force Majeure (which shall include a description of the subject Force Majeure) that affects or may affect its performance of this Agreement and, subsequently, will promptly notify the other party upon the termination of such Force Majeure. The party claiming the Force Majeure shall use commercially reasonable efforts thereafter to overcome the effects of the Force Majeure as promptly as possible and resume performance hereunder; provided, however, neither party shall be required to resolve a strike, lockout or other labor problem in a manner which it alone, in the exercise of its sole discretion, does not deem proper and advisable.

8.    Safety Warning, Handling and Indemnity

    WARNING: FRACTURING SAND COATED PROPPANTS - MAY CAUSE DELAYED LUNG INJURY AND CANCER HAZARD. BOTH MATERIALS CONTAIN FREE CRYSTALLINE SILICA. DO NOT BREATHE DUST. PROLONGED INHALATION CAN CAUSE DELAYED LUNG INJURY, INCLUDING SILICOSIS, A PROGRESSIVE DISABLING AND SOMETIMES FATAL LUNG DISEASE. IARC HAS DETERMINED THAT CRYSTALLINE SILICA INHALED FROM OCCUPATIONAL SOURCES CAN CAUSE CANCER IN HUMANS. AVOID CREATING DUST WHEN HANDLING, USING OR STORING. FOLLOW OSHA OR OTHER RELEVANT SAFETY AND HEALTH STANDARDS AND USE GOOD HOUSEKEEPING AND ADEQUATE VENTILATION TO KEEP EXPOSURE BELOW RECOMMENDED EXPOSURE LIMITS. AVOID PROLONGED OR REPEATED SKIN CONTACT UNLOADING OPERATIONS - DO NOT EXCEED FIVE (5) PSI WHEN UNLOADING THIS MATERIAL TO MINIMIZE THE CREATION OF AIRBORNE DUST AND POSSIBLE DUST EXPLOSION HAZARD.

    SELLER WILL NOT BE LIABLE TO BUYER FOR ANY HARMFUL HEALTH EFFECTS WHICH MAY BE CAUSED BY EXPOSURE TO SILICA CONTAINING MATERIALS SUPPLIED BY SELLER HEREUNDER. Buyer warrants that it will adequately warn all of its employees and customers who may come in contact with silica containing materials supplied by Seller of the above described health hazards. Further, Buyer warrants it will fully comply with all applicable health and safety regulations and orders relating to the workplace handling of materials supplied by Seller.

Buyer specifically acknowledges and agrees that it has the expertise and knowledge in the intended use of materials supplied by Seller and any use or other product or material made therefrom, and that it assumes all risk and liability for results obtained by the use of such materials, whether used singly or in combination with other substances or in any process. Upon acceptance of materials supplied by Seller or in the absence of any written notice, as set forth in the Notice section below, of the nonconformity of such materials BUYER AGREES TO FULLY RELEASE, INDEMNIFY, DEFEND AND HOLD SELLER AND ITS SUPPLIERS HARMLESS from and against any and all liability, claims, penalties and suits it may possess or that may be asserted against Seller and/or any of its suppliers by any third party (including but not limited to its employees, any contractors, subcontractors, government agencies or entities, or property owners, or insurers of any of such parties or of the Buyer) in any manner arising in whole or in part, out of: (i) any breach by Buyer of the duties or warranties set forth in this Section 8 and/or (ii) the use, whether used singly or in combination with other substances or in any process, exposure to and/or residual effects of any of the materials supplied by Seller under this Agreement. The provisions of this Section 9 shall survive the expiration, or earlier termination as provided herein, of this Agreement.

9.    Assignment

This Agreement may not be assigned, in whole or in part, by Buyer without the prior written consent of Seller. Any attempted assignment shall be void and ineffective for all purposes unless in conformity with this Section 9. This Agreement will be binding upon and inure to the benefit of the parties hereto and their successors- in-interest and any permitted assigns.

10.    Entire Agreement

This Agreement sets forth the entire agreement and understanding of the parties with respect to the subject matter of this Agreement and supersedes and replaces all prior agreements and understandings, oral or written, with respect to the same. Failure or delay by a party to exercise any right or remedy under this Agreement shall not be deemed a waiver thereof or diminish such party's right thereafter to fully exercise such right or remedy or any other right or remedy of a like or different kind. Waiver of any breach or default of any provision of this Agreement must be in writing and signed by the waiving party to be effective. A waiver on one occasion shall not operate or be construed as a waiver of any subsequent breach or default of a same or similar kind.

11.    Amendment

No modification or amendment of this Agreement shall be effective unless reduced to writing and signed by both Seller and Buyer. For the avoidance of doubt, this Agreement shall not be modified or amended by any terms or conditions contained in any of the Releases submitted by Buyer to Seller.

12.    Applicable Law

This Agreement will be governed by and construed in accordance with the laws of the State of Texas, notwithstanding the principles, if any, that would otherwise govern the choice of applicable law.

13.  Notice

All notices required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered by hand, by fax (with written confirmation of transmission), by e-mail delivery confirmed by rpost.com, or by a nationally recognized private courier service (proof of delivery requested) as provided in this Section. Notices delivered by hand, by fax, by e-mail or by a nationally recognized private courier service shall be deemed received on the day of receipt. Any notice delivered by hand or fax shall be followed by a confirmation letter sent by a nationally recognized private courier, no later than one (1) business day after it is delivered by hand or sent by fax. Notices will be addressed as shown below. Either party may change its address by giving the other party written notice as provided in this Section 14.

If to Buyer:
ProPetro Services, Inc.
Attn: Mark Howell
1706 S. Midkiff, Bldg. B
Midland TX 79701
Fax: *(432) 688-3976*
E-mail: mark.howell@propetroservices.com

If to Seller:
Complete Oil Field Services, LLC
Attn: _____
8731 South Sandy Parkway, Suite 103
Sandy, UT 84070
Fax:
E-mail _____

14. Confidentiality

Buyer will hold the contents of this Agreement in confidence.

15. Miscellaneous

(a) Seller may terminate this Agreement upon written notice to Buyer: (i) if Buyer fails to remit payment to Seller within the time specified in this Agreement, or any extension thereof authorized in writing by Seller.   Either party ("Non-breaching Party") may terminate this Agreement upon written notice to the other party ("Breaching Party"); (ii) if the Breaching Party is in breach of a material obligation under this Agreement and fails to cure such breach within thirty (30) days after the Breaching Party's receipt of written notice thereof from the Non-Breaching Party, or (iii) if the Breaching Party becomes insolvent, or voluntarily files a petition, or has an involuntary petition filed against it, under the Federal Bankruptcy Code or any other Federal or State bankruptcy or insolvency law, or a trustee, receiver or liquidator is appointed for its business or all or a substantial part of its assets, if any assignment is made of its business equipment for the benefit of creditors, other than in the normal course of business.

(b) Buyer shall inspect the Materials purchased from Seller. All claims of any nature relating to the Materials, including but not limited to claims of defect in Materials, non-conforming discrepancy in quantity or delivery date, shall be made in writing to Seller's Customer Service Department within fifteen (15) days of receipt of the subject Materials by Buyer. Notwithstanding anything to the contrary in this Agreement, failure to make any such written claim within the above-prescribed period shall constitute waiver of any such claims and shall be deemed acceptance of such Materials, including but not limited to any quantities and delivery dates relating to such Materials.

(c) In the event that any of the provisions of this Agreement is held invalid, illegal or unenforceable, that will in no way affect, impair or invalidate any other provision, and all other provisions of this Agreement will remain in full force and effect.

(d) This Agreement may be executed in separate counterparts, each of which when so executed and delivered shall be an original, but all of which together shall constitute one and the same instrument. Each counterpart may consist of a number of copies hereof, each signed by less than all but together signed by all of the parties hereto. Exchange of executed copies of this Agreement, including any executed counterparts, via fax or via e-mail in pdf (or similar) format shall constitute execution and delivery of this Agreement and any such counterparts.

(e) This Agreement is being entered into among competent and experienced businesspersons, represented by legal counsel, and has been negotiated and reviewed by the parties and their respective legal counsel. Therefore, the language in this Agreement will not be construed against any particular party as the drafter of such language.

(f) The headings contained at the beginning of each Section of this Agreement are inserted solely for the convenience of the parties and shall not affect the meaning or interpretation of this Agreement.

The above is hereby agreed to and accepted as of the Effective Date.

PROPETRO SERVICES, INC.                    COMPLETE OIL FIELD SERVICES, LLC

By_____            By_____

_____              _____
Dale Redmon
Written Name                               Written Name

Title _____CEO_____            Title _____

(b) Buyer shall inspect the Materials purchased from Seller. All claims of any nature relating to the Materials, including but not limited to claims of defect in Materials, non-conforming discrepancy in quantity or delivery date, shall be made in writing to Seller's Customer Service Department within fifteen (15) days of receipt of the subject Materials by Buyer. Notwithstanding anything to the contrary in this Agreement, failure to make any such written claim within the above-prescribed period shall constitute waiver of any such claims and shall be deemed acceptance of such Materials, including but not limited to any quantities and delivery dates relating to such Materials.

(c) In the event that any of the provisions of this Agreement is held invalid, illegal or unenforceable, that will in no way affect, impair or invalidate any other provision, and all other provisions of this Agreement will remain in full force and effect.

(d) This Agreement may be executed in separate counterparts, each of which when so executed and delivered shall be an original, but all of which together shall constitute one and the same instrument. Each counterpart may consist of a number of copies hereof, each signed by less than all but together signed by all of the parties hereto. Exchange of executed copies of this Agreement, including any executed counterparts, via fax or via e-mail in pdf (or similar) format shall constitute execution and delivery of this Agreement and any such counterparts.

(e) This Agreement is being entered into among competent and experienced businesspersons, represented by legal counsel, and has been negotiated and reviewed by the parties and their respective legal counsel. Therefore, the language in this Agreement will not be construed against any particular party as the drafter of such language.

(f) The headings contained at the beginning of each Section of this Agreement are inserted solely for the convenience of the parties and shall not affect the meaning or interpretation of this Agreement.

The above is hereby agreed to and accepted as of the Effective Date.

PROPETRO SERVICES, INC.

By _____

_____Dale Redmon_____
Written Name

Title _____CEO_____

COMPLETE OIL FIELD SERVICES, LLC

By _____

_____Sam Taylor_____
Written Name

Title _____Manager_____

**Form 205**
**(Revised 05/11)**

Submit in duplicate to:
Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
512 463-5555
FAX: 512 463-5709
**Filing Fee: $300**



**Certificate of Formation**
**Limited Liability Company**

This space reserved for office use.
**FILED**
**In the Office of the**
**Secretary of State of Texas**

**FEB 1 4 2017**

**Corporations Section**

## Article 1 – Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

BATES Energy Oil & Gas, LLC

The name must contain the words "limited liability company," "limited company," or an abbreviation of one of these phrases.

## Article 2 – Registered Agent and Registered Office
(See instructions. Select and complete either A or B and complete C.)

☐ A. The initial registered agent is an organization (cannot be entity named above) by the name of:

**OR**
☒ B. The initial registered agent is an individual resident of the state whose name is set forth below:

| Blair | A. | Bates | |
|-------|----|-------|--|
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

C. The business address of the registered agent and the registered office address is:

| 3201 Cherry Ridge, Building B, Suite 210-B | San Antonio | TX | 78230 |
|--------------------------------------------|-------------|----|-------|
| *Street Address* | *City* | *State* | *Zip Code* |

## Article 3—Governing Authority
(Select and complete either A or B and provide the name and address of each governing person.)

☐ A. The limited liability company will have managers. The name and address of each initial manager are set forth below.

☒ B. The limited liability company will not have managers. The company will be governed by its members, and the name and address of each initial member are set forth below.

**GOVERNING PERSON 1**

**NAME** (Enter the name of either an individual or an organization, but not both.)
**IF INDIVIDUAL**

| Blair | A. | Bates | |
|-------|----|-------|--|
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

**OR**
**IF ORGANIZATION**

*Organization Name*
**ADDRESS**

| 836 Walnut Street, Apartment F | Boulder | CO | USA | 80302. |
|--------------------------------|---------|----|----|--------|
| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |

Form 205

4

# EXHIBIT 2

| GOVERNING PERSON 2 | | | | | | |
|---|---|---|---|---|---|---|
| **NAME** (Enter the name of either an individual or an organization, but not both.) | | | | | | |
| **IF INDIVIDUAL** | | | | | | |
| *First Name* | | *M.I.* | *Last Name* | | | *Suffix* |
| **OR** | | | | | | |
| **IF ORGANIZATION** | | | | | | |
| *Organization Name* | | | | | | |
| **ADDRESS** | | | | | | |
| *Street or Mailing Address* | | *City* | | *State* | *Country* | *Zip Code* |

| GOVERNING PERSON 3 | | | | | | |
|---|---|---|---|---|---|---|
| **NAME** (Enter the name of either an individual or an organization, but not both.) | | | | | | |
| **IF INDIVIDUAL** | | | | | | |
| *First Name* | | *M.I.* | *Last Name* | | | *Suffix* |
| **OR** | | | | | | |
| **IF ORGANIZATION** | | | | | | |
| *Organization Name* | | | | | | |
| **ADDRESS** | | | | | | |
| *Street or Mailing Address* | | *City* | | *State* | *Country* | *Zip Code* |

## Article 4 – Purpose

The purpose for which the company is formed is for the transaction of any and all lawful purposes for which a limited liability company may be organized under the Texas Business Organizations Code.

### Supplemental Provisions/Information

Text Area: [The attached addendum, if any, is incorporated herein by reference.]

**EXHIBIT 2**

## Organizer

The name and address of the organizer:

**BLAIR A. BATES**
_____
_Name_

3201 Cherry Ridge  Bldg. "B" Suite:210B          San Antonio, TX. 78230
_____
_Street or Mailing Address_                    _City_                    _State_    _Zip Code_

## Effectiveness of Filing (Select either A, B, or C.)

A. ☒ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing.  The delayed effective date is: _____

C. ☐ This document takes effect upon the occurrence of the future event or fact, other than the passage of time.  The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

_____

## Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment.  The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized to execute the filing instrument.

Date:    02-14-2017
_____

                              BLAIR A. BATES
                              _____
                              Signature of organizer

                              BLAIR A. BATES
                              _____
                              Printed or typed name of organizer

Form 205                                    6

*Final - MOU*



## Memorandum of Understanding

## (Operating Agreement)

THIS MEMORANDUM OF UNDERSTANDING ("MOU"), is formed and shall become effective on the date executed hereinafter, to detail the relationships between **BATES Energy Oil & Gas, LLC**, a Texas limited liability company (hereinafter referred to as **"BATES Energy"**) whose principal office is located at 3201 Cherry Ridge, Bldg. B Suite: 210B, San Antonio, TX. 78230 and **Complete Oil Field Services, LLC**. a Utah limited liability company, a wholly owned subsidiary of Sam Taylor, a UTAH corporation (hereinafter referred to as **"COFS"**) whose principal office is 8731 S. Sandy Pkwy Ste: 103, Sandy UTAH 84070.

### Recitals

**WHEREAS**, BATES ENERGY operates a business for the purpose of procurement, marketing, distribution, and logistics of Silica Proppant for the Hydraulic Fracturing process;

**WHEREAS**, COFS operates a business for the receiving of Silica Proppant for the Hydraulic Fracturing process; and,

**WHEREAS**, BATES Energy and COFS desire to engage in a relationship to provide and accept Silica Proppants respective of their individual interests; and,

**WHEREAS**, the purpose of this MOU is to set forth certain binding understandings with respect to the matters covered herein and serve as an agreement until any final details may be defined in a final agreement.

**NOW, THEREFORE**, in reliance upon the foregoing facts, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and for the mutual promises contained herein, the parties agree as follows:

1. **BATES Energy obligations:** $99.00 per FOB WTX w/ Trans-Loading included:
   a. Shall procure FRAC sand in grades to include API compliant approximately **50,000 tons of 40/70 and 30,000 tons of 100 mesh Proppant.**
   b. Initial quantity of approximately 10,000 plus Tons of each grade delivered to the rail terminal located at <u>Seagraves, Pecos, Big Springs, San Angelo, Odessa, Midland, or Monahans, Texas</u> (**"WTX"**) no later than May 10th, 2017, and increase such quantity up to 80,000 tons of each grade within 90 days of the date of execution of this MOU.
   c. Shall contract for rail logistics for delivery to WTX via existing train trackage to rail the Proppant.
   d. Demurrage allowance of 1.5 days of storage for every 1,000 tons from the date of arrival in the

# EXHIBIT 3

rail cars to WTX. All material held over the initial 1.5 days shall incur a daily storage fee equal to $3.00 per ton per DAY.

e. Shall provide COFS with customary reporting of Gradation and Turbidity, demonstrating compliance to API standards know as a Stim-Lab and/or Prop-Test.

f. Shall provide trans loading and storage of up to **15 days per 10,000 Tons** in WTX.

g. Shall Have a 90 Locked pricing on all pricing with a 1st Right of refusal for 180 days.

h. **AFTER The Initial deposit of $4M in Escrow has been Exhausted on Orders, BATES Energy will PROVIDE** TERMS: Net 30 Days from the time of Bill Of Ladings "BOL's" are issued to COFS at the Departure Point "Mine"...

2. **COFS obligations:**

   a. Accept delivery of the materials of each grade and quantity as set forth herein.

   b. Shall provide the in a timely manner for material from "WTX" facilities as defined.

   c. Provide for timely payment of the material in the form and under the terms hereinafter defined.

   d. COFS shall be solely responsible for all demurrage to Union Pacific Rail Company (**"UP"**) for non-complying with agreed above Storage policy within 30 days.

3. Payments and Terms:

   a. COFS shall make an initial deposit $4,000,000.00 USD into an escrow account with **Equity Liaison Company, LLC. Austin, TX**. With such an amount of funding the payment for initial orders as agreed. Disbursements from this account shall be made athurized upon the conditions as described in items (b.) below. Any monies placed into the escrow account must have BATES Energy's written approval prior to withdrawal, to ensure that no material invoice is tied to such funds.

   b. BATES Energy shall receive by wire transfer from the escrow company 50% of the invoice total upon delivery of the Bill of Lading ("BOL"). If this wire transfer comes from an account other than the escrow account, then a credit voucher will be issued from BATES Energy authorizing either a) for the amount of the credit to be withdrawn from the escrow account, or b) for the amount of the credit to be applied to secure more material to be loaded out.

   c. BATES Energy shall receive via wire transfer the outstanding balance within three (3) business days or less after the material is loaded into the COFS or designated trucking company, and the BOL of the load-out are issued with the final invoice. The parties understand and agree the prepayments described herein shall be deducted from the total amount due and COFS shall only be required to remit payment for the balance for all Proppant delivered pursuant to BOL from loaded rail cars. These final balances will reflect the total owed from the balance of the BOL, showing a credit of the amount already held in escrow.

   d. **TERMS and LATE FEE's: "COFS" will comply with the Strict Payment terms issued in (1.h.) and will be responsible for a $2.00 per ton, per day LATE FEE on Any & All unpaid Invoices within the agreed NET 30 day pay terms!**

   e. Neither party is liable for failure to perform, except with respect to payment obligations, solely caused by:
   - unavoidable casualty,
   - delays in delivery of materials,

- embargoes,
- government orders,
- acts of civil or military authorities,
- acts by common carriers, emergency conditions (including weather conditions) incompatible with safety or good quality workmanship, or any similar unforeseen event that renders performance commercially implausible.

If an event of force majeure occurs, the party injured by the other's inability to perform may elect one of the following remedies: (a) to terminate this agreement in whole or in part; or (b) to suspend the Agreement, in whole or part, for the duration of the force majeure circumstances. The party experiencing the force majeure circumstances shall cooperate with and assist the injured party in all reasonable ways to minimize the impact of force majeure on the injured party, which may include locating and arranging substitute services if necessary

This agreement and any dispute arising hereunder shall be subject to the laws of the State of Texas and exclusive jurisdiction shall be in San Antonio, Bexar County, Texas.

*By signing this MOU you agree to be bound by all of the terms and conditions described herein subject to the mutually agreed and executed Purchase Agreement ("Agreement") to be executed between the parties.*

For **BATES Energy Oil & Gas, LLC**

By: _____

Printed Name:  STAN P. BATES

Chief Executive Office

Date:  _April 18, 2017_____

For: **COFS-Complete Oil Field Services**

**SAM TAYLOR:**

By: _____

Printed Name: _____

Authorized Officers Signature:

Date: _____

# Complete Oil Field Service, LLC.

# PURCHASE ORDER

P.O.# 1001
DATE: APRIL 24, 2017

| VENDOR | Complete OFS<br>8731 S. Sandy Pkwy<br>Ste: 103<br>Sandy, Utah 84070<br>POC: Sam Taylor<br>701.570.5891 | SUPPLIER: | BATES Energy Oil & Gas<br>3201 Cherry Ridge<br>Bldg.B Ste:210B<br>San Antonio, TX.78230<br>Customer ID: BATES |
|---|---|---|---|

| SHIPPING METHOD | SHIPPING TERMS | DELIVERY DATE |
|---|---|---|
| Pneumatic Railcars | Escrow - Prepaid | 05-12-2017 |

| QTY | ITEM # | DESCRIPTION | JOB | UNIT PRICE | LINE TOTAL |
|---|---|---|---|---|---|
| 7,000 Tons | 1 | 40/70 Northern White | 1 | $99.00 | $693,000.00 |
| 3,100 Tons | 1 | 100 Northern Mesh | 1 | $99.00 | $306,900.00 |
| | | Funds are held in escrow with Equity Liaison Company, LLC and Amegy Bank pursuant to the MOU and Escrow Agreement. Such funds shall be transferred to Bates Energy as follows | | | |
| | | 50% of cost paid upon verification of product in railcars and such cars having left the origin for destination in Texas as agreed and as verified by UP bill of lading and upon receipt of invoice from Bates Energy. | | | |
| | | Remaining cost to be invoiced by separate BOL offloading the railcars into the last mile delivery truck. The BOL's shall be invoiced every 3 days, COFS shall have 2 days to approve then payment shall be funded to Supplier. | | | |
| | | There is a Professional Standing Non-Circumvent in place with BATES Energy's supplier Funding sources. | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| | |
|---|---|
| SUBTOTAL | $999,900.00 |
| SALES TAX | Exempt Resale |
| TOTAL | $999,900.00 |

1. Please send your invoice to ACCEPT this Irrevocable P/O.

2. This order in accordance with the prices, terms, delivery method, and specifications listed above.

3. Please notify us immediately if you are unable to ship as specified.

4. Send all correspondence to:
   **Sam Taylor and Janis Kline, Managers**

   8731 S. Sandy Pkwy. Ste 103, Sandy, Utah 84070

_____            _____

_Authorized by_                                          _Date_

ELS Escrow

## ESCROW AND DISBURESEMENT AGREEMENT

**WHEREAS,** Complete Oil Field Services, LLC a Utah LLC corporation, ("Buyer"), whose address is 8731 Sandy Parkway Ste 103, Sandy Utah, and BATES Energy Oil & Gas, LLC. , a TEXAS corporation, ("Seller"), whose address is 3201 Cherry Ridge Bldg. B Ste: 210B , San Antonio, TX. 78230 , have caused or will cause certain funds to be deposited in escrow with Equity Liaison Company, LLC, a Texas limited liability company ("Escrow Agent or ELC" either individually or collectively), whose address is 3303 Northland Drive, Suite 307, Austin, Texas 78731, on terms and conditions more particularly described herein in this Escrow and Disbursement Agreement ("Agreement"). The financial institution designated for this Agreement shall be JP MORGAN CHASE BANK, N.A. a national banking association ("Bank")

**NOW, THEREFORE,** in consideration of the premises, the undersigned hereby agree as follows:

### ARTICLE I
### TERMS AND CONDITIONS

**1.1     Establishment of Fund.** The undersigned Buyer has caused or will cause to be deposited with ELC those certain amounts, from time to time, pursuant to that certain Purchase and Sale Agreement ("PSA") by and between the Buyer and Seller, dated ___April 14, 2017___ (such sum, or the balance thereof remaining from time to time being referred to herein as the "Fund").

**1.2     Treatment of Fund.** The monies constituting the Fund shall be deposited in a segregated account pursuant to the terms of this Escrow Agreement. Such account shall be styled **Equity Liaison Company, LLC – Escrow Account**. At the written direction of the Buyer, ELC shall place all or part of the finds held in escrow in an "interest-bearing" account similarly styled with Bank.

**1.3     Escrow Procedure and Payment Instruction.** The Fund, together with all interest earned thereon, if any, which interest shall become and remains a part of the Fund, shall be held and disbursed in accordance with the terms of this Escrow Agreement and PSA as follows:

Upon receipt by ELC of the Disbursement Authorization (Exhibit A) executed by Buyer, ELC is hereby authorized and directed to deliver the Escrow Fund only (i) to the undersigned against their joint receipt, or (ii) to any of the undersigned upon written direction of each other of the undersigned, or (iii) in accordance with the joint written instruction of all of the undersigned, or (iv) if there is only one undersigned, to the undersigned.

**1.4     Termination.** This Escrow Agreement shall terminate upon the first to occur of any of the following events:

      **A.**    The disbursement of the balance of the Fund in accordance with the provisions of Section 1.3 hereof.

      **B.**    The expiration or termination of the PSA, in which case the remaining balance, accrued interest or excess finds of the Fund shall be disbursed to the Buyer. In the event of Termination prior to disbursements being made under this or any PSA terms and conditions, the entire amount place in the Fund shall be returned to the Buyer without deduction of any fee.

- 1 -

# EXHIBIT 4

E.     In the event that any controversy should arise among the parties with respect to this Agreement, or should ELC resign and the parties fail to select another escrow agent to act in its stead, the ELC shall have the right to institute a bill of interpleader in any court of competent jurisdiction to determine the rights of the parties.

2.3    Compensation/Indemnification.

A.     ELC shall be compensated by the product seller at a rate agreed to by and between ELC and such supplier which will cover all bank fees, wire transfer fees, accounting, audit, reporting to the Buyer and Seller, and all other fees, including but not limited to courier, mail and delivery fees, printing, electronic and reproduction fees. Compensation contained in this Section shall not cover any third party CPA review outside of the services provided by this agreement, or any third party legal review performed by any attorney directed to do so by the Buyer or Seller. The parties hereto agree that escrow fees shall be due and payable to ELC upon deposit into the specified account with Bank. Such amount shall be deducted from the Fund upon the receipt of the escrow and on each deposit thereafter, if any, of the date hereof.

B.     The parties to this Agreement (other than ELC) hereby jointly and severally agree to indemnify and hold ELC, its affiliates and their officers, employees, successors, assigns, attorneys and agents (each an "Indemnified Party") harmless from all losses, costs, claims, demands, expenses, damages, penalties and attorney's fees suffered or incurred by any Indemnified Party or ELC as a result of anything which it may do or refrain from doing in connection with this Agreement or any litigation or cause of action arising from or in conjunction with this Agreement or involving the subject matter hereof or Funds or monies deposited hereunder or for any interest upon any such monies, including, without limitation, arising out of the negligence of ELC; provided that the foregoing indemnification shall not extend to the gross negligence or willful misconduct of ELC. This indemnity shall include, but not be limited to, all costs incurred in conjunction with any interpleader which ELC may enter into regarding this Agreement.

2.4    Miscellaneous.

A.     ELC shall make no disbursement, investment or other use of funds until and unless it has collected all funds pursuant to the PSA, as the same may be amended or modified from time to time. ELC shall not be liable for collection items until the proceeds of the same in actual US Dollars have been received or the Federal Reserve has given ELC credit for the Funds.

B.     ELC may resign at any time by giving written notice 30 days prior to its intended date of resignation to the parties hereto, whereupon the parties hereto will immediately appoint a successor escrow agent. Until a successor escrow agent has been named and accepts its appointment or until another disposition of the subject matter of this Agreement has been agreed upon by all parties hereto, ELC shall be discharged of all of its duties hereunder save to keep the subject matter whole.

C.     All representations, covenants, and indemnifications contained in this Article II shall survive the termination of this Agreement.

### ARTICLE III
### GENERAL PROVISIONS

3.2    **Discharge of ELC.** Upon the delivery of all of the subject matter or monies pursuant to the terms of this Agreement and the PSA, the duties of ELC shall terminate and ELC shall be discharged from any further obligation hereunder.

3.3    **Escrow Instructions.** Where directions or instructions from more than one of the undersigned are required, such directions or instructions may be given by separate instruments of similar tenor. Any of the undersigned may act hereunder through an agent or attorney-in-fact, provided satisfactory written evidence of authority is first furnished to any party relying on such authority.



3.4     **Notice.** Any payment, notice, request for consent, report, or any other communication required or permitted in this Agreement shall be in writing and shall be deemed to have been given when delivered to the party hereunder specified, by hand delivery, by email delivery, or other such delivery method acceptable to all parties, or when placed in the United States mail, registered or certified, with return receipt requested, postage prepaid and addressed as follows:

If to ELC:

Equity Liaison Company, LLC
3303 Northland Drive, Suite 307
Austin, TX 78731
Attn: Dewayne Naumann, Principal

If to _Complete Oil Field_ (Buyer) _Services, LLC_

_8731 S Sandy Parkway Ste 103_
_Sandy, UT 84070_

Attn: _Janis Kline_

If to _BATES Energy Oil & Gas, LLC._ : (Seller)

_3201 Cherry Ridge_
_Bldg. B Ste: 210B_
_San Antonio, TX. 78230_
Attn: _STAN P. BATES_                          April 14, 2017

Any party may unilaterally designate a different address by giving notice of each such change in the manner specified above to each other party. Notwithstanding the foregoing, no notice to the ELC shall be deemed given to or received by the ELC unless actually delivered to an officer of the ELC having responsibility under this Agreement.

3.5     **Governing Law.** This Agreement is being made in and is intended to be construed according to the laws of the State of Texas. It shall inure to and be binding upon the parties hereto and their respective successors, heirs and assigns. Jurisdiction and venue for all matters under this Agreement shall be Travis County, Texas.

3.6     **Construction.** Words used in the singular number may include the plural and the plural may include the singular. The section headings appearing in this instrument have been inserted for convenience only and shall be given no substantive meaning or significance whatsoever in construing the terms and conditions of this Agreement.

3.7     **Amendment.** The terms of this Agreement may be altered, amended, modified or revoked only by an instrument in writing signed by the undersigned and ELC.

3.8     **Force Majeure.** ELC shall not be liable to the undersigned for any loss or damage arising out of any acts of God, strikes, equipment or transmission failure, war, terrorism, or any other act or circumstance beyond the reasonable control of ELC.

3.9     **Written Agreement.** This Agreement represents the final agreement between the parties, and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.



- 4 -

EXECUTED as of the dates set forth below, but effective the date executed by ELC.

Buyer:

Complete Oil Field Services, LLC

Date: 4/14/2017

By: Janis R. Kline

Name: Janis R. Kline

Title: CFO/Manager

Seller:

BATES Energy Oil & Gas, LLC.

Date: April 14, 2017

By:

Name: STAN P. BATES

Title: Chief Executive Officer

Equity Liaison Company, LLC, Escrow Agent, hereby accepts its appointment as Escrow Agent as described in the foregoing Agreement, subject to the terms and conditions set forth therein.

Date: 14 APR 2017

Equity Liaison Company, LLC, a Texas limited liability company

By:

Name: Dewayne Naumann
Title: Managing Member



# Equity Liaison Company, LLC
3303 Northland Drive • Suite 307 • Austin, TX • 78731

TO WHOM IT MAY CONCERN:

This letter is to inform you that Equity Liaison Company, LLC serves as the escrow and distribution company for Bates Energy Oil & Gas, LLC, and Mr. Stan Bates.

The specific escrow account has been set up to receive and disburse funds for Bates Energy Oil & Gas, LLC and the wiring instructions are as follows:

## WIRING INSTRUCTIONS FOR:

**Receiving Bank Name:** JP Morgan Chase Bank, NA

**Account Name:** Equity Liaison Company, LLC

**Nickname:** Bates Energy OAG

**Account #:** 596292917

**ABA Routing #:** 111000614

**Swift:** CHASUS33

If you require additional information, please feel free to contact me at the number listed below.

Sincerely,

Dewayne Naumann

Principal



3201 CHERRY RIDGE Bldg. "B" Suite: 210B
San Antonio, TX. 78230
Office: 432.272.8347 Email: Sbates@TSSoil.com

TO: Dewayne Naumann
Equity Liaison Company, LLC.
3303 Northland Dr. Suite: 307
Austin, TX. 78731

FROM: Stan Bates – CEO
BATES Energy Oil and Gas, LLC.

SUBJ: Distribution of Funds                                        June 15, 2017

Mr. Naumann,
I'm authorizing the distribution of Funds per the escrow agreement with BATES Energy. The following Parties will be required to submitted a current W-9 to "ELC" and sign an individual agreement with your company. Please not all Payees are responsible for their own Taxes and reporting to the I.R.S. via a 1099 for "ELC" at the end of the Year. Please distribute and transfer the below funds to Payees when all w-9's and agreements are in your care.

Distribution amounts and PAYEES: $99.00 per ton at 80,000 Tons of 40/70 and 100mesh into Seagraves, TX and or West, TX. Payment received from COMPLETE OFS in the amount of $4,000,000.00 in the Trust with ELC out of the Amegy Bank Escrow Account. Apply to Purchase Order# 1001

Flat Fee                 For: CSI Sand Wisconsin, LTD.              One Time Transfer
                         40/70 and 100mesh NW
                         Requested BOL's per Load

TRANSFER:                                              $1,000,000.00

Please provide a distribution receipt of funds and Applicable Bills Of Lading's applied to Transfers from COMPLETE OFS and BATES EOG, and the each Payee. Balance retained into BATES Energy Oil & Gas, LLC.'s operating account for Travel to Verify Cost of Goods and or Product.

Respectfully Submitted,
STAN P. BATES                                    Sam Taylor "or" Janis Kline
Chief Executive Officer                          Authorized Signature:
BATES Energy Oil & Gas, LLC.                     Complete Oil Field Services, LLC.

# EXHIBIT 5

# **Exhibit 6**

**Set 1 – the "COFS-authorized disbursement authorizations:**

    a.      DA, June 27, 2017, payable to CSI Sands, for $96,804.43.

    b.      DA **No. 2**, July 5, 2017, payable to CSI Sands, for $87,037.08.

    c.      DA **No. 3**, July 7, 2017, payable to CSI Sands, for $25,171.15.

    d.      DA No. 4, July 12, 2017, payable to CSI Sands, for $110,480.85.

    e.      DA No. 5, July 12, 2017, payable to CSI Sands, for $89,616.64.

    f.      DA No. 6, July 17, 2017, payable to CSI Sands, for $265,302.18.

    g.      DA No. 7, August 8, 2017, payable to CSI Sands, for $122,712.88.

    h.      DA No. 8 – August 9, 2017, payable to CSI Sands for $187,629.33.

    i.      DA No. 1, July 17, 2017, **payable to ELC**, for $39,191.13; sand never delivered.

# Exhibit 7

## Set 2 – the disbursement authorizations COFS never saw, in date order:

a.   DA No. 3, June 7, 2017, payable to Process Integration Services, LLC, for $253,000.

b.   DA No. 2, June 8, 2017, payable to Arepet Industries, Inc., for $71,250.[1]

c.   Distribution of Funds letter, June 15, 2017, payable to Sylla, Bravo, Bates Energy, ELC, ands Howard Resources, $65,050, "liquidated damages".[2]

d.   Distribution of Funds letter, June 30, 2017, payable to Sylla, Bravo, Bates Energy, ELC, ands Howard Resources, $28,500, "liquidated damages".[3]

e.   DA No. 1, July 6, 2017, payable to Tier 1 Sands, LLC, for $155,232.[4]

f.   Distribution of Funds letter, July 6, 2017, to Bates Energy for "admin fee," for $1,000.

g.   DA No. 2, July 12, 2017, payable to Bates Energy, for $6,500, for "Admin fees."[5]

h.   DA No. 1, July 18, 2017, payable to Tier 1 Sands, LLC, for $44,352.

i.   Distribution of Funds letter, July 19, 2017, paying $69,000 to Bates Energy, Bravo, Sylla, ELC, and Howard Resources, and a remaining $31,000 to Bates Energy.[6]

j.   Distribution of Funds letter, August 23, 2017, for $140,541.85, for "demurrage."

---

[1] This transaction appears to have been all cash, and was deposited into a Frac Sand Unlimited bank account, No. 471519228; the transaction also involved Howard Resources, and ELC/Naumann facilitated the transfer(s). *See* ELC000001, ELC000020-29.

[2] The letter demanded that $150,000 be disbursed, with the $84,950 be disbursed to Bates Energy's "operating account" for legal fees and other expenses.   ELC000030

[3] The letter demanded that $200,000 be disbursed, with $26,415.25 retained into Bates Energy's operating account for legal fees.  ELC000039. 0

[4] COFS would not sign off on a different invoice, one from Bates Energy, rather than Tier 1, for the same dollar amount, without proof of BOLS.  See ELC000432-000433; Tier 1 is a shill for Bates Energy; see also, ELC000447, showing that the $155,232 is comprised of the sums of $110,80, and $44,352.  On July 6, ELC paid Tier 1 the $155,232, and then paid it again for the $44,352 on July 18.  Bates and Naumann knew COFS was required to sign off and approve this purchase, and only pay half at a time.  See, E.G., ELC000450; ELC000477; 000487-488.

[5] ELC000062.

[6] See ELC000080.  Specific distributions for each Defendant, plus an additional $31,000 retained by Bates Energy for legal fees.  Per the bank records, $100,000 was disbursed this day.

# Exhibit 8

## Set 3 – undocumented withdrawals concealed from COFS:

a.  May 12, 2017, $10,761.2, cost of Bates Energy rail car insurance.

b.  $31,000, July 19, 2017, transferred to Bates Energy.[1]

c.  $39,191.13, September 29, 2017, transferred to Bates Energy.

d.  $6,500, Bates "admin fee."

e.  $10,000, July 13, 2017, payment of earnest money, property contract.

f.  $39,191.13. September 29, 2017, for undelivered sand.

g.  $204,266.57, July 27, 2017, for "pending receivable" for sand never delivered.[2]

h.  At least $20,000 in legal fees.

---

[1] See ELC000080.

[2] ELC000001; ELC000097.

| 7-BOL's | 6-BOL's | *5-BOL's* |
|---------|---------|-----------|

| | | | | | | |
|---|---|---|---|---|---|---|
| $ | 46,750.10 | $ | 35,743.74 | $ | *24,476.75* | PAST DUE |

# EXHIBIT 9

ELC000698

-----Original Message-----
From: "Stan Bates" <Sbates@tssoil.com>
Sent: Tuesday, August 15, 2017 3:11pm
To: "DeWayne Naumann" <dnaumann@equityliaison.com>, "David Bravo"
<bravoconstructionsupply@aol.com>
Subject: Fwd: Docket Control Order

It's NOW or NEVER!

STAN BATES
C.E.O.
BATES Energy Oil & Gas,LLC.

FRAC SAND, BARITE, FRAC Valves, BOP's, RailCars, Trans-Loading, & Storage
http://www.batesenergyllc.com/
Office: 432.272.8347
Email:SBates@TSSoil.com

3201 Cherry Ridge
Building "B" Suite 210B
San Antonio, TX. 78230

***OUR CORE VALUES***
VISION - MADE POSSIBLE THROUGH PERFORMANCE
PERFORMANCE - CHARACTERIZED BY LOYALTY
LOYALTY - EARNED THROUGH INTEGRITY
INTEGRITY - REINFORCED WITH VISION

Begin forwarded message:

> **From:** "Shellie R. Reyes" <shellie@Rosenblattlawfirm.com>
> **Date:** August 15, 2017 at 3:08:21 PM CDT
> **To:** Stan Bates <Sbates@tssoil.com>, bravoconstructionsupply
> <bravoconstructionsupply@aol.com>
> **Cc:** Tiffanie Clausewitz <Tiffanie@Rosenblattlawfirm.com>
> **Subject: FW: Docket Control Order**

> See attached.

> **From:** Lamont Jefferson [mailto:LJefferson@jeffersoncano.com]

ELC000699

**Sent:** Tuesday, August 15, 2017 2:46 PM
**To:** Tiffanie Clausewitz <Tiffanie@Rosenblattlawfirm.com>; Lisa Barkley
<LBarkley@jeffersoncano.com>
**Cc:** Shellie R. Reyes <shellie@Rosenblattlawfirm.com>
**Subject:** RE: Docket Control Order

Tiffanie,

I am attaching a letter officially terminating the Memorandum of Understanding
between your client and ours.

You will see that Dewayne Naumann is listed as being copied, but we have not delivered
the letter directly to him because we are unsure whether you are representing
Mr. Naumann for the matters involved in this suit.  If you are, then please accept this
correspondence as service upon him.

If you are not representing Mr. Naumann (or cannot accept delivery on his behalf), let
me know and we will deliver the termination letter to him through other means.
If we do not hear from you by 4 p.m. today, then we will serve him directly.

Thank you,

Lamont

ELC000700



Rosenblatt
Law Firm

Tiffanie S. Clausewitz
Partner
tiffanie@rosenblattlawfirm.com

August 23, 2017

Dewayne Naumann                                    Via Email:  dnaumann@equityliaison.com
Equity Liaison Company, LLC
3303 Northland Drive, Suite 307
Austin, Texas 78731

     Re:  Cause No. 2017CI13215, *Bates Energy Oil & Gas, LLC v. Complete Oil Field
        Service, LLC and Sam Taylor*, In the District Court, 45th Judicial District Court, Bexar
        County Texas

Dear Mr. Naumann:

      As you are aware, our firm represents Bates Energy Oil & Gas, LLC ("Bates Energy"). It
has come to our attention Equity Liaison Company, LLC ("ELC") has rejected the request to
process a distribution of funds in accordance with the Memorandum of Understanding ("MOU"),
and Escrow Agreement between Complete Oil Field Services, LLC ("COFS") and Bates Energy.

      The distribution of funds is for the amount of $140,541.85.  You were provided the
supporting documentation for this amount.

      Demand is hereby made, on behalf of Bates Energy, for a disbursement from the escrow
account under your control related to the MOU by and between Bates Energy and COFS, in the
amount of $140,541.85 for the purpose of satisfying justifiable expenses related to the purchase
and sale of sand proppant between the parties.  You are hereby demanded to make this
disbursement according to Section 1.D, 3.C, & 3.D of the MOU, together with Section 2.2B of the
Escrow and Disbursement Agreement related thereto.

      I appreciate your cooperation with regard to this matter.  If you have any questions, please
do not hesitate to contact my office.

Most sincerely,

Tiffanie S. Clausewitz

cc:    Client

1715 HUEBNER ROAD, BLDG 1
SAN ANTONIO, TEXAS 78248
T 210-562-2900
F 210-562-2901
ROSENBLATTLAWFIRM.COM

# EXHIBIT 10

ELC000093



# Equity Liaison Company, LLC

3303 Northland Drive • Suite 307 • Austin, TX • 78731

## Memorandum

Date: August 23, 2017

From: Dewayne Naumann

To: Escrow File

Subject: Memorandum to file

In compliance with the demand from Rosenblatt Law Firm, on behalf of Bates Energy Oil and Gas LLC, $140,541.85 " for the purpose of satisfying justifiable expenses related to the purchase and sale of sand proppant between parties. According to Section 1.D, 3.C & 3.D of the MOU, together with Section 2.2B of the Escrow and Disbursement Agreement related thereto."

$140,541.85 wired to Bates Energy and Gas Account with Bank of America from Bates Energy Oil and Gas Escrow Account.

ELC000096

Re: 198 closed hopper cars

From: Stan Bates
Sent: Mon, Aug 21, 2017 at 2:06 pm
To: dnaumann@equityliaison.com
Cc: bravoconstructionsupply@aol.com

Ok?  We have no money to buy Sand, much less Railcars, Legal fees, Rent, and Food?

STAN BATES
C.E.O.
BATES Energy Oil & Gas,LLC.

FRAC SAND, BARITE, FRAC Valves, BOP's, RailCars, Trans-Loading, & Storage
http://www.batesenergyllc.com/
Office: 432.272.8347
Email: SBates@TSSoil.com

3201 Cherry Ridge
Building "B" Suite 210B
San Antonio, TX. 78230

***OUR CORE VALUES***
VISION - MADE POSSIBLE THROUGH PERFORMANCE
PERFORMANCE - CHARACTERIZED BY LOYALTY
LOYALTY - EARNED THROUGH INTEGRITY
INTEGRITY - REINFORCED WITH VISION

On Aug 21, 2017, at 1:30 PM, "dnaumann@equityliaison.com" <dnaumann@equityliaison.com> wrote:

**For Sale or Lease**
3,000 cf. Covered Hopper / Frac Sand cars
| | |
|---|---|
| Quantity, | 198 |
| New in | Feb, 1980 |
| MFR. | Portec |
| Capacity, | 100 ton |
| Hatches, | Round |
| Discharge Outlets, | 2) |
| Location, | Pennsylvania on NS |
| Pictures, | Attached |
| Previous commodity, | Frack Sand |
| Price, | $16,500.00 ea, / but very negotiable pursuant to a quantity purchase !!!!!!!!!!!!!!!!!! |

See complete details below or UMLER report attached.

<spcs 198 closed hopper cars.png>

# EXHIBIT 11

ELC000718

**Re: 198 closed hopper cars**

From: dnaumann@equityliaison.com
Sent: Mon, Aug 21, 2017 at 3:33 pm
To: Stan Bates
Cc: bravoconstructionsupply@aol.com

So we are giving up? WTF!

SGM Dewayne Naumann
512-627-0877 Direct
Sent from my iPhone

On Aug 21, 2017, at 2:06 PM, Stan Bates <Sbates@tssoil.com> wrote:

Ok? We have no money to buy Sand, much less Railcars, Legal fees, Rent, and Food?

STAN BATES
C.E.O.
BATES Energy Oil & Gas,LLC.

FRAC SAND, BARITE, FRAC Valves, BOP's, RailCars, Trans-Loading, & Storage
http://www.batesenergyllc.com/
Office: 432.272.8347
Email: SBates@TSSoil.com

3201 Cherry Ridge
Building "B" Suite 210B
San Antonio, TX. 78230

***OUR CORE VALUES***
VISION - MADE POSSIBLE THROUGH PERFORMANCE
PERFORMANCE - CHARACTERIZED BY LOYALTY
LOYALTY - EARNED THROUGH INTEGRITY
INTEGRITY - REINFORCED WITH VISION

On Aug 21, 2017, at 1:30 PM, "dnaumann@equityliaison.com" <dnaumann@equityliaison.com> wrote:

**For Sale or Lease**
3,000 cf. Covered Hopper / Frac Sand cars
Quantity,                       198
New in                          Feb, 1980
MFR.                            Portec
Capacity,                       100 ton
Hatches,                        Round
Discharge Outlets,              2)
Location,                       Pennsylvania on NS
Pictures,                       Attached
Previous commodity,             Frack Sand
Price,                          $16,500.00 ea, / but very negotiable pursuant to a quantity purchase !!!!!!!!!!!!!!!!!!
See complete details below or UMLER report attached.

<spcs 198 closed hopper cars.png>

ELC000719

Re: 198 closed hopper cars

From: Stan Bates
Sent: Mon, Aug 21, 2017 at 3:57 pm
To: dnaumann@equityliaison.com

NO just bigger problems and right in our face problems Man! Stressed the F out

STAN BATES
C.E.O.
BATES Energy Oil & Gas,LLC.

FRAC SAND, BARITE, FRAC Valves, BOP's, RailCars, Trans-Loading, & Storage
http://www.batesenergyllc.com/
Office: 432.272.8347
Email: SBates@TSSoil.com

3201 Cherry Ridge
Building "B" Suite 210B
San Antonio, TX. 78230

***OUR CORE VALUES***
VISION - MADE POSSIBLE THROUGH PERFORMANCE
PERFORMANCE - CHARACTERIZED BY LOYALTY
LOYALTY - EARNED THROUGH INTEGRITY
INTEGRITY - REINFORCED WITH VISION

On Aug 21, 2017, at 3:33 PM, "dnaumann@equityliaison.com" <dnaumann@equityliaison.com> wrote:

> So we are giving up? WTF!
>
> SGM Dewayne Naumann
> 512-627-0877 Direct
> Sent from my iPhone
>
> On Aug 21, 2017, at 2:06 PM, Stan Bates <Sbates@tssoil.com> wrote:
>
>> Ok?  We have no money to buy Sand, much less Railcars, Legal fees, Rent, and Food?
>>
>> STAN BATES
>> C.E.O.
>> BATES Energy Oil & Gas,LLC.
>>
>> FRAC SAND, BARITE, FRAC Valves, BOP's, RailCars, Trans-Loading, & Storage
>> http://www.batesenergyllc.com/
>> Office: 432.272.8347
>> Email: SBates@TSSoil.com
>>
>> 3201 Cherry Ridge
>> Building "B" Suite 210B
>> San Antonio, TX. 78230
>>
>> ***OUR CORE VALUES***
>> VISION - MADE POSSIBLE THROUGH PERFORMANCE
>> PERFORMANCE - CHARACTERIZED BY LOYALTY
>> LOYALTY - EARNED THROUGH INTEGRITY
>> INTEGRITY - REINFORCED WITH VISION
>>
>> On Aug 21, 2017, at 1:30 PM, "dnaumann@equityliaison.com" <dnaumann@equityliaison.com> wrote:
>>
>>
>>> **For Sale or Lease**
>>> 3,000 cf. Covered Hopper / Frac Sand cars
>>> Quantity,              198
>>> New in                 Feb, 1980
>>> MFR.                   Portec
>>> Capacity,              100 ton
>>> Hatches,               Round
>>> Discharge Outlets,     2)
>>> Location,              Pennsylvania on NS
>>> Pictures,              Attached
>>> Previous commodity,    Frack Sand
>>> Price,                 $16,500.00 ea, / but very negotiable pursuant to a quantity purchase !!!!!!!!!!!!!!!!!!
>>> See complete details below or UMLER report attached.
>>>
>>>
>>> <spcs 198 closed hopper cars.png>

ELC000720

**From:** Stan Bates [mailto:stanbates10@yahoo.com]
**Sent:** Tuesday, August 1, 2017 6:35 PM
**To:** Tiffanie Clausewitz <Tiffanie@Rosenblattlawfirm.com>; Shellie R. Reyes <shellie@Rosenblattlawfirm.com>
**Cc:** David Bravo <bravoconstructionsupply@aol.com>
**Subject:** Affidavit-1 Austin Howard

Please see the Sworn statement from Austin Howard, the Chief Operations Officer at Howard resources!!! This will be Notarized by noon tomorrow,
more reason NOT expose of P/O's at hearing because of the Suppliers detailed information!!!  He is willing to take a Depo if needed...

Sam's Circumventing

# EXHIBIT 12

ELC000614

-----Original Message-----
From: "Stan Bates" <Sbates@tssoil.com>
Sent: Wednesday, August 2, 2017 7:11pm
To: "shellie@Rosenblattlawfirm.com" <shellie@Rosenblattlawfirm.com>, "Tiffanie Clausewitz" <Tiffanie@Rosenblattlawfirm.com>
Subject: Review of COFS - Evidence BS

Begin forwarded message:

**From:** David Bravo <david@fracsandunlimited.com>
**Date:** August 2, 2017 at 7:05:09 PM CDT
**To:** FRAC SAND Sales & Operations <vp@fracsandunlimited.com>
**Subject:** Please, **forward to Tiffanie immediately and review**

This breaks down the docs they submitted page by page.
- Four winds is not pertinent to this case. Nor are cases involving Nauman. We are after THEM for breach not the other way around / 5, 7, 31, 30, 33, 29, 6, 32

- BOLs look fake. There are no "exact weights" on rail cars. We feel they either made them up or are hiding something / 8

- morons tried to pull a fast one on ncnda / 35

- need to compare BOLs to payment sheet / 9, 28

- escrow agreement is wide open for us. Tells Dewayne to notify us or cofs of movement but does not "require" him to do so. / 23, 3, 2

- didnt sign DOF letter, setting precedent for breach and willful noncompliance / 4

- They have been lying ALL ALONG about their duties to Propetro. They told us, repeatedly, that their contract only called for 4070 and that is why they breached contract and refused sand / 34

- texts show our intent / 20, 27, 25, 13, 12(road restrictions), 19, 14 shows breach by rejection of product due to Propetro, 16, 17 leads to rejection of 100mesh from Arkansas, 15 doesn't really concern us, 11 Not really our concern, 18, 24 & 26 (text refusing sand)

- LaPrairie is our mine we brought to the table. He knew of Eric but didn't know anything about SCI/ 22- articles for FSU have no bearing on this case / 10

ELC000615

- MOU had been breached. / 1

- 21 rail cars that were available but road restrictions did not permit use

ELC000616

**Piece of Shit Sam Taylor**

From: Stan Bates
Sent: Wed, Aug 2, 2017 at 7:44 pm
To: DeWayne Naumann

COFS Original Counterclaim and Writ of Attach.pdf **(225 KB)**   ATT00001.htm (4.6 KB)  — **Download all**

**Lair Scumbag**

ELC000617

# Equity Liaison Company, LLC

3303 Northland Drive • Suite 307 • Austin, TX • 78731

19 April 2017

Mr. David Bravo, COO
Bates Energy Oil & Gas, LLC
3201 Cherry Ridge
Building "B", Suite 210B
San Antonio, Texas 78230

Re: Proof of Funds

Dear Mr. Bravo:

Please accept this letter as your Letter of Proof regarding funds on deposit for your contemplated transaction held in the escrow account held for Bates Energy Oil & Gas, LLC. The total available balance for draw down is $4,903,344 in accounts at JP Morgan Chase Bank, N.A. and Amegy Bank. This letter is provided as your "Proof of Funds" to provide evidence of the deposits into the trust accounts available.

If you require additional information, please let me know.

Respectfully,

Dewayne Naumann
Principal

# EXHIBIT 13

-----Original Message-----
From: "Stan Bates" <stanbates10@yahoo.com>
Sent: Wednesday, August 2, 2017 3:03pm
To: "DeWayne Naumann" <dnaumann@equityliaison.com>
Subject: LEGAL: IMPORTANT: Please Read

---

Begin forwarded message:

> **From:** Tiffanie Clausewitz <Tiffanie@Rosenblattlawfirm.com>
> **Date:** August 1, 2017 at 10:37:08 PM CDT
> **To:** Stan Bates <stanbates10@yahoo.com>, "Shellie R. Reyes"
> <shellie@Rosenblattlawfirm.com>
> **Cc:** David Bravo <bravoconstructionsupply@aol.com>
> **Subject: IMPORTANT: Please Read**
>
> Stan and David,
>
> I'm sorry I'm writing so late; I literally just got home from a meeting that started at
> 5:30pm.  I've taken a few minutes looking through the emails that have come through,
> and spoke
> with Shellie earlier about her continued document review.  I want to give you my
> worst-case scenario thoughts, because I need to make sure you understand and
> acknowledge them before going any further.
> **Please read carefully**:
>
> > Mr. Howard's statement might be helpful with regard to the tortious interference claim
> > down the road, but I do not anticipate it will be helpful at a TI hearing.  The Court
> 1. already struck that provision from the PO,
> and without a solid non-circumvent agreement, we have no chance at success on the TI request
> with relation to that clause.  I've looked over the agreement supplied by COFS, which is the same one
> supplied by you Stan,
> > but Sam marked out several provisions before he signed.  TWO THINGS: 1) there is no
> agreement, because in marking out sections after you signed, Sam ensured there is no meeting
> of the minds,
> > and therefore not a valid contract; and 2) the agreement is fatally flawed for us because it
> (I'm assuming erroneously) defines Confidential Information as that belonging to COFS,
> > not Bates- as such all of the protections it includes GO ONLY TO COFS'S INFO, not yours.
> We therefore have no contractual protection, and we've had a pretty clear indication from the
> Court they aren't going to let that
> > provision of the TI application fly.  In my opinion, we are losing on that point.
> 2. I am also very concerned about prevailing on protecting the money.  First – in order to

# EXHIBIT 14

ELC000608

prove we have a chance of winning, we have to provide evidence of the breach.

The evidence we have is not as clean as we would like it to be, but it's workable with credible testimony. David, earlier when you called and asked Aimee about Thursday, from what I knew at that point I thought we could possibly get by without you.

Unfortunately, now that I have a better idea of what's going on, that has changed. We have to have you here to prove up certain pieces of evidence, and frankly, we need you as a balancing witness because we all know what they are going to try to do to Stan.

Second, even if we prove up likelihood of success, now that we have a fuller picture (and documents) on the escrow account, they are going to have a very strong argument that the escrow agreements already protect the money, at least through October, such that an injunction is unnecessary and unduly burdensome. We have to prove that without the injunction you are IRREPERABLY HARMED — meaning if they lift the injunction, there is a very high chance of you not recovering the money. All they have to do – and they tried to do it before but were told it wasn't appropriate for the hearings we had last week, but WERE appropriate for the TI hearing — is enter the escrow contacts into evidence. We have some wiggle room here, but not a lot.

Third, and very important, they have the opportunity to prove you came to the Court for this extraordinary remedy with unclean hands. We will fight tooth and nail to keep out information related to Four Winds, but there is enough of a gray area that they might be able to slip some of the information in. In addition, I am very, very concerned they will have found out information on the ELC account, or will question you about it – and if it comes out that you have unilaterally directed draws out of the account and that Dewayne authorized them, all before and after we asked the Court to protect the money – we are likely done.

Finally, of course, I have my concerns about exposing you on the stand, Stan. Again, we will do everything we can to protect you, but it's risky.

If we lose Thursday, your bond is very likely gone, and you could potentially held responsible for more damages (I need to check a couple of things).
Again, to make sure you know where we are, tomorrow I want to discuss whether we should consider nonsuiting the whole lawsuit, and coming back and filing again right before the escrow agreements expire.
If you file the nonsuit before Thursday, you should be able to get your bond back. The decision is in your hands, I just need you to know this option is on the table.

If you go forward Thursday, it can be with or without David's testimony, but for the reasons noted above I think he needs to be present if possible; that being said, it's a decision you guys have to make.

ELC000609

And whether you go forward with the suit or drop it entirely, I can almost guarantee COFS will file a counterclaim or new suit against you—I'm kind of surprised they haven't already.

I think that about sums up all of my concerns. I wish we could have identified these earlier, but because we continued to get new documents and information, we simply weren't able to.
PLEASE UNDERSTAND if you go forward we will fight tooth and nail for you, but it's our job to be as up-front as possible and lay it all out there for your review,
so that you can decide whether it's worth the cost and potential risks to proceed.

Stan, we'll see you tomorrow morning to discuss. Please remember we have to turn over any exhibits we anticipate using by Noon tomorrow.
And David, I'm very sorry about the illness in your family, and that we have to be a thorn in your side while you are dealing with it.

Most sincerely,

**Tiffanie S. Clausewitz**
210.562.2900
tiffanie@rosenblattlawfirm.com
Web | Bio | vCard

---

**From:** Stan Bates [mailto:stanbates10@yahoo.com]
**Sent:** Tuesday, August 1, 2017 6:35 PM
**To:** Tiffanie Clausewitz <Tiffanie@Rosenblattlawfirm.com>; Shellie R. Reyes <shellie@Rosenblattlawfirm.com>
**Cc:** David Bravo <bravoconstructionsupply@aol.com>
**Subject:** Affidavit-1 Austin Howard

Please see the Sworn statement from Austin Howard, the Chief Operations Officer at Howard resources!!! This will be Notarized by noon tomorrow, more reason NOT expose of P/O's
at hearing because of the Suppliers detailed information!!!  He is willing to take a Depo if needed...

Sam's Circumventing

-----Original Message-----
From: dnaumann@equityliaison.com
Sent: Wednesday, August 2, 2017 3:45pm
To: "Stan Bates" <stanbates10@yahoo.com>
Subject: Re: LEGAL: IMPORTANT: Please Read

Wow, that's not good.

SGM Dewayne Naumann
512-627-0877 Direct
Sent from my iPad

On Aug 2, 2017, at 3:03 PM, Stan Bates <stanbates10@yahoo.com> wrote:



Begin forwarded message:

**From:** Tiffanie Clausewitz <Tiffanie@Rosenblattlawfirm.com>
**Date:** August 1, 2017 at 10:37:08 PM CDT
**To:** Stan Bates <stanbates10@yahoo.com>, "Shellie R. Reyes"
<shellie@Rosenblattlawfirm.com>
**Cc:** David Bravo <bravoconstructionsupply@aol.com>
**Subject: IMPORTANT: Please Read**

Stan and David,

I'm sorry I'm writing so late; I literally just got home from a meeting that
started at 5:30pm. I've taken a few minutes looking through the emails that
have come through,
and spoke with Shellie earlier about her continued document review. I want
to give you my worst-case scenario thoughts, because I need to make sure
you understand and acknowledge them before going any further.
**Please read carefully:**

1. Mr. Howard's statement might be helpful with regard to the tortious
interference claim down the road, but I do not anticipate it will be helpful at
a TI hearing.

The Court already struck that provision from the PO, and without a solid non-
circumvent agreement, we have no chance at success on the TI request with
relation to that clause. I've looked over the agreement supplied by COFS,
which is the same one supplied by you Stan, but Sam marked out several
provisions before he signed. TWO THINGS: 1) there is no agreement, because in