# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| BATES ENERGY OIL & GAS, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No.  SA-17-CV-808-XR |
| | § | |
| COMPLETE OILFIELD SERVICES, ET AL., | § | |
| | § | |
| | § | |
| *Defendants.* | | |

## ORDER

On this date, the Court considered Defendant Mark Sylla's Motion to Dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction (docket no. 86), Defendant Dewayne D. Naumann's Motion to Dismiss (docket no. 82), and Defendant Equity Liaison Company's Motion to Dismiss (docket no. 83), and the responses thereto.

### Factual and Procedural Background

This lawsuit, which now involves multiple parties and claims, stems from a contract for the purchase of frac sand between Bates Energy Oil & Gas ("Bates Energy") and Complete Oilfield Services ("COFS"). The following facts alleged in the Third Amended Counterclaim ("TAC") (docket no. 68), which is COFS's live pleading, are taken as true for purposes of the pending motions.

COFS is a Utah company that was created in 2017 for the specific purpose of supplying frac sand to ProPetro, a pressure pumping and fracking company based in Midland, Texas. COFS and ProPetro have a Supply Agreement for COFS to acquire specific types of frac sand

for ProPetro's use, and ProPetro agreed to deposit $4 million into an escrow account to pay COFS's eventual sand supplier for the purchase and delivery of sand.

COFS began researching to find an appropriate source for frac sand, and relied upon information provided by others such as Defendant Austin Howard of Howard Resources. In March 2017, Defendant Howard introduced COFS to Stanley Bates, the principal and CEO of Bates Energy, which was created in February 2017. Despite Bates's reputation as an unscrupulous businessman, Austin Howard firmly vouched for Bates as a trustworthy associate and assured COFS that Bates was well regarded in the frac sand industry. Bates represented to COFS that Bates Energy had the capacity to supply the required frac sand, specifically through its rights with mines in Wisconsin. Relying on Bates's representations about Bates Energy's delivery capabilities, as well as other representations, COFS entered into a Memorandum of Understanding ("MOU") with Bates Energy on April 18, 2017. Under the MOU, Bates Energy was to deliver specific amounts and types of frac sand to one of seven rail terminals in Texas on specific due dates, the first being May 10, 2017. COFS alleges that, "[o]nce Bates Energy became aware that COFS was a potential client, it promptly notified other Counter-Defendants, copying them on emails and giving rise to the conspiracy and other unlawful acts that led to the Counter-Defendants' theft of over $650,000 of COFS's funds." TAC ¶ 25.

COFS alleges that "[p]ublic allegations of improper conduct by Bates created COFS's need for caution if the parties were to proceed." TAC ¶ 30. COFS alleges that it moved forward based on Howard's endorsement, but "insisted on a legal structure to protect the funds entrusted by ProPetro," including the creation of two independent escrow accounts for ProPetro's monies, one with Counter-Defendant Equity Liaison Company ("ELC") and one with Amegy Bank. *Id.*

Bates Energy originally insisted that all $4 million be held in escrow by ELC, which COFS later learned was a close associate of Bates's overseen by its principal Dewayne D. Naumann, ostensibly because Amegy Bank was not embedded in the oil and gas industry and in Bates's opinion, ELC was a "proven performance company." *Id.* ¶ 33. But because ELC was not a financial institution and was unknown to COFS, COFS insisted upon the creation of a second escrow account with Amegy Bank.[1] ProPetro's money was placed into two escrow accounts, one with Amegy Bank with a deposit of $3 million, with Amegy serving as the escrow agent, and one with ELC with a deposit of $1 million in account no. 2917 at Chase Bank, with ELC acting as the escrow agent.

COFS, Bates Energy, and ELC entered into an April 14, 2017 Escrow and Distribution Agreement ("the Escrow Agreement"). Under the terms of the MOU between Bates Energy and COFS, Bates Energy could be paid from the escrow account the first 50% of each purchase upon delivery of a Bill of Lading ("BOL") for the sand, and could receive the outstanding balance within three business days after the sand was "loaded into the COFS or designated trucking company, and the BOL of the load-out are issued with the final invoice." TAC Ex. 3 ¶ 3. The Escrow Agreement required ELC to deposit and maintain COFS's funds in a separate escrow account under COFS's name, but, unbeknownst to COFS, account no. 2917 was a pre-existing Bates Energy escrow account that ELC/Naumann was already handling for Bates Energy, and thus the $1 million was immediately commingled with funds already in the account. TAC ¶¶

---

[1] COFS alleges it later learned that ELC also served as an "escrow agent" for Bates Energy's business operating accounts and "directed that funds in ELC escrow accounts be expended on regular business transactions for Bates Energy, much like a checking account at a bank." *Id.* ¶ 34. COFS also later learned that ELC/Naumann held multiple bank accounts in Chase Bank for itself and for Counter-Defendant Frac Sand Unlimited, and that ELC/Naumann repeatedly transferred and commingled substantial amounts of funds in and out of these various accounts and made illegal disbursements from the multiple accounts to itself and the other Counter-Defendants.

35-36. COFS alleges that disbursements from the ELC escrow account required the joint instruction of both COFS and Bates Energy, and COFS alleges that the unusual arrangement was acceptable to it "because both escrow agreements required COFS's notice, signature and authorization to effectuate any disbursements of funds." *Id.* ¶ 37, 42. COFS alleges that "Naumann assured COFS that he and ELC recognized their legal obligations as a fiduciary" and all parties "knew that disbursement of escrowed funds was improper until COFS signed off on an invoice or disbursement authorization." *Id.* ¶ 42.

COFS alleges that Stanley Bates immediately began lying about frac sand being on its way, and in fact represented that Bates Energy had already begun acquiring sand and arranging for delivery by April 17, before the formal MOU was executed on April 18. *Id.* ¶ 44. Bates again promised that railcars were in Iowa on April 27 and would be leaving for Texas on April 29 with anticipated delivery on May 5. *Id.* ¶¶ 47-48. No sand was delivered either time, and Bates Energy provided no BOLs or other documents showing it ever loaded any railcar with sand. *Id.* ¶ 48.

After COFS became concerned about the truth of the statements and Bates Energy's ability to deliver, COFS's principal Sam Taylor went to Wisconsin on May 9 to investigate Bates Energy's purported mines and other frac sand sources. *Id.* ¶ 49. COFS alleges that Bates sent Mark Sylla, who was also in the frac sand business, as a "company representative," and Sylla "took Sam Taylor on a winding tour around Wisconsin, stopping at two mines along the way," neither of which "had the capacity to deliver any appreciable amount of frac sand and neither permitted Sylla/Bates Energy to access its premises." *Id.* ¶ 50.

Bates Energy failed to meet the May 10 initial delivery deadline. COFS alleges that Stanley Bates and David Bravo, who had been described alternatively as an owner, COO, and logistics coordinator of Bates Energy and worked closely with Bates/Bates Energy and was aware of the escrow agreements, knew that Stanley Bates faced imminent indictment for his role in the Four Winds Logistics frac sand scandal. *Id.* ¶ 102. Consequently, on May 11 or 12, Bravo, Sylla, and Bates's girlfriend Audra Vega, created a new company, Unlimited Frac Sand d/b/a Frac Sand Unlimited ("FSU"), a Texas LLC, "to maintain the parties' fraudulent and illegal acts against COFS, and drain COFS's escrowed funds." *Id.* Sylla is listed as a manager of FSU on the LLC formation documents. COFS alleges that FSU "was essentially one and the same as Bates Energy, and was operated by Bates and Bravo." *Id.* ¶ 103. COFS alleges that by July 2017, Bates was directing ELC/Naumann to use the name FSU on new escrow agreements and it was listed as the "assignee" on Bates/Bates Energy correspondence and false invoices referring to sand that was never procured or delivered. *Id.* ELC/Naumann directed numerous unauthorized payments to FSU from COFS's escrowed funds. *Id.* ¶ 104. On May 12, $50,000 was withdrawn from the ELC escrow account, and disbursed $16,666 each to ELC/Naumann, Bates/Bates Energy, and FSU/Bravo. *Id.* ¶ 67. That same day, Bates/Bates Energy approved an unauthorized wire transfer of $10,761.52 to purchase railcar insurance. *Id.* ¶ 68. On May 16, 2017, Stanley Bates was indicted based on his involvement in Four Winds Logistics.

COFS alleges that Bates Energy changed its strategy in early June to string COFS along, suggesting that it could deliver noncomplying sand. *Id.* ¶ 52. COFS alleges that Bates admitted that he had never scheduled any sand for delivery until June 9, when he made his first attempt to deliver compliant sand. But this attempt was also deficient. *Id.* ¶ 57. The railcar

documentation indicated that the consignee of the product was "High Crush" rather than Bates Energy, and Bates insisted that Sam Taylor "fix that problem by falsely representing to railroad officials that Sam was with Frac Sand Unlimited, the company managed by David Bravo, Mark Sylla, and Bates' girlfriend Audra Vega." *Id.* After hours of searching the Odessa facility, Taylor never located the sand. *Id.* COFS alleges on information and belief that Bates Energy did not have a mine or other supplier that could provide the tonnage and type of sand COFS required under the MOU. *Id.* ¶ 54.

On June 15, COFS and Bates Energy agreed that COFS could use some of the escrowed money to buy sand from CSI, and funds were distributed from the ELC escrow account and then replenished from the Amegy account. *Id.* ¶ 59. COFS alleges that throughout this time, Defendants were "secretly and systematically raiding COFS's escrow funds" despite knowing that "funds should not have been distributed absent notice to and consent by COFS." *Id.* ¶ 61. COFS alleges that Defendants absconded with at least $652,000 of its funds and "used various techniques to conceal the unlawful disbursements." *Id.* ¶¶ 63-64. ELC/Naumann frequently transferred large sums of money among the Chase bank account that was supposed to be the segregated escrow account, ELC's high-interest money market account, FSU's checking account, and ELC/Naumann's personal checking account. *Id.* ¶ 64. COFS alleges that ELC also used at least three sets of "books" and improperly redacted information, making it impossible to identify all specific recipients of cash disbursements from the account. *Id.* ¶¶ 66-67.

On June 15, $65,000 was improperly disbursed as "liquidated damages," including $15,000 to ELC and $10,000 to Sylla. *Id.* ¶ 70. On June 30, there was an additional $28,500 disbursement as "liquidated damages and administration fee," including $7,500 to ELC and

$5,000 to Sylla. *Id.* ¶ 71. COFS alleges there were also improper disbursements for attorney's fees to Bates Energy's attorneys, the Rosenblatt firm.

COFS alleges that Defendants also used a Boerne, Texas company called Tier 1 Sands, LLC for two substantial, fraudulent sand transactions, demanding that money be paid to Tier 1 Sands to purchase frac sand on July 6 and again on July 18. COFS alleges upon information and belief that Bates/Bates Energy and/or Bravo/FSU are either affiliated with Tier 1 Sands and/or have an illegal side agreement to share funds stolen from COFS. *Id.* ¶ 78-83.

On July 12, COFS did approve a disbursement of approximately $39,000 for frac sand based on supplied BOLs. *Id.* ¶ 73.[2] FSU is listed as the consignee on 18 BOLs that were supplied to COFS as "proof" that Bates Energy had procured frac sand. *Id.* ¶ 104. COFS authorized a payment to Bates Energy in reliance upon those representations, but no sand was delivered, demonstrating that the BOLs were false and/or forged. *Id.*

Also on July 12, Bates/Bates Energy and ELC/Naumann facilitated another payment to Bates/Bates Energy for $6,500 in unauthorized "admin fees." *Id.* ¶ 74. On July 19, Bates/Bates Energy issued a request for the disbursement of funds for "liquidated damages and admin fees" of $69,000, distributed to Bates Energy ($20,000), Bravo ($20,000), Sylla ($7,500), Howard Resources ($6,500), and ELC ($15,000), plus $31,000 in legal fees likely paid to the Rosenblatt Firm. *Id.* ¶ 75.

On July 20, Bates Energy brought this lawsuit, asserting a claim against COFS for breach of contract and against its principal Sam Taylor for tortious interference with contract. COFS alleges that Bates Energy continued obtaining unauthorized disbursements on July 26 and 31.

---

[2] In ¶ 73, the amount is listed as $39,191, but in ¶ 104 the amount is listed as $31,191.

TAC ¶ 76. On July 30, Bates/Bates Energy attempted "to drain the entirety of the escrow account" by demanding that ELC/Naumann distribute all sums in the account to Bates Energy "due to Liquidated Damages, Cost of Goods, and Demurrage of Rail Cars." *Id.* ¶ 77. COFS alleges that Bravo and/or FSU have assisted and advised Bates/Bates Energy in its lawsuit. *Id.* ¶ 106. COFS alleges that, on August 11, Bravo and FSU participated with Bates/Bates Energy in a sham sand transaction involving Transload and Logistics LLC, after which ELC/Naumann transferred $204,266.97 of COFS's funds to FSU. *Id.* ¶ 105.

On August 15, Bates/Bates Energy requested that ELC/Naumann pay $106,970.56 for demurrage obligations purportedly incurred by Tier 1 Sands but divided among the Defendants Tier 1 Sands, Rosenblatt Firm, ELC, Bravo Construction, and Bates Energy. *Id.* ¶ 83. Also on August 15, COFS officially terminated the MOU, and Rosenblatt emailed the termination notice to Bates/Bates Energy and Bravo, but Defendants continued their conspiracy to drain the escrow funds through August 23, 2017. *Id.* ¶ 84. Bates sent the termination email to ELC/Naumann and Bravo with the note, "It's NOW or NEVER!" *Id.* Bates/Bates Energy and ELC/Naumann immediately exchanged an email regarding "Demurrage Invoice and Distribution of Funds." *Id.* ¶ 85 (Ex 9). The next day, Bates/Bates Energy sent to ELC/Naumann a fake "demurrage" invoice from Tier 1 Sands, LLC to FSU for $4,550. *Id.* ¶ 85. On August 23, Bates/Bates Energy sent another invoice to ELC/Naumann demanding payment to itself for $140,541.85 for "demurrage," based on yet more fake documents prepared by Bates/Bates Energy, and ELC/Nauman disbursed the funds without any supporting third-party documentation because Bates/Bates Energy had never delivered any sand. *Id.* ¶¶ 85-86. Because ELC/Naumann was

concerned that the lack of documentation would expose it to liability, Rosenblatt wrote ELC/Naumann "demanding" that it pay the funds. *Id.* ¶ 87. (Ex 10).

COFS filed a counterclaim against Bates Energy for declaratory judgment, rescission, fraud, breach of contract, equitable accounting, and theft, and sought a writ of attachment to protect monies in the ELC escrow account. COFS and Taylor removed the case on the basis of diversity jurisdiction. After removal, COFS filed additional counterclaims against third-party defendants ELC and Naumann for declaratory judgment, breach of the Escrow Agreement, equitable accounting, breach of fiduciary duty, and "restitution or money had and received," and sought a writ of attachment. ELC answered and filed counterclaims against COFS and cross-claims against Bates for indemnity. Docket no. 36. Naumann filed a motion to dismiss the counterclaims against him for failure to state a claim for relief under Rule 12(b)(6). Docket no. 37. After a hearing, the Court granted the motion to dismiss the claims against Naumann individually, with leave to amend. Text Order dated January 24, 2018.

Thereafter, COFS filed a motion for leave to file amended pleadings and to join additional defendants, which this Court granted. COFS then filed its Third Amended Counterclaim ("TAC") (docket no. 68) against Bates Energy, ELC, and Naumann, and additional Defendants Stanley Bates, David Bravo, Lorena Silvistri Bravo, individually and d/b/a Bravo Consulting Services, Howard Resources, LLC, the Rosenblatt Law Firm, Mark B. Sylla, Tier 1 Sands, LLC, and Unlimited Frac Sand. As noted above, that is COFS's live pleading. In response, Naumann, ELC, and Sylla filed motions to dismiss (docket nos. 82, 83, & 86). Tier 1 Sands, Howard Resources, David Bravo, Lorena Silvistri Bravo, and Unlimited

Frac Sand filed answers. Docket nos. 85, 89, & 102. COFS voluntarily settled its claims against the Rosenblatt Law Firm. Docket no. 108.

**Analysis**

I.      **Mark Sylla's Motion to Dismiss**

Defendant Mark Sylla, an individual residing in Wisconsin, moves to dismiss the claims against him for lack of personal jurisdiction under Rule 12(b)(2).

A.   Applicable Law

There is personal jurisdiction if the state's long-arm statute extends to the defendant and exercise of such jurisdiction is consistent with due process. *Sangha v. Navig8 Ship Mgmt Private Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018). "Because the Texas long-arm statute extends to the limits of federal due process, the two-step inquiry collapses into one federal due process analysis." *Id.* Due process requires that the defendant have "minimum contacts" with the forum state (*i.e.*, that the defendant has purposely availed himself of the privilege of conducting activities within the forum state) and that exercising jurisdiction is consistent with "traditional notions of fair play and substantial justice." *Id.*

"Minimum contacts" can give rise to either specific jurisdiction or general jurisdiction. In this case, COFS relies on specific personal jurisdiction. Specific jurisdiction may exist "over a nonresident defendant whose contacts with the forum state are singular or sporadic only if the cause of action asserted arises out of or is related to those contacts." *Id.* In other words, such jurisdiction exists "when a nonresident defendant has purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those

activities." *Id*. "[S]pecific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Id*.

The inquiry whether a forum state may assert specific jurisdiction over a nonresident defendant "focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 283-84 (2014). The relationship must arise out of contacts that the *defendant himself creates* with the forum state, not contacts between the plaintiff or third parties and the forum state and not the contacts the defendant makes by interacting with other persons affiliated with the state. *Id*.at 284. The plaintiff cannot be the only link between the defendant and the forum. *Id*.

Once a plaintiff establishes minimum contacts between the defendant and the forum state, the burden of proof shifts to the defendant to show that the assertion of jurisdiction is unfair and unreasonable. *Navig8 Ship Mgmt*, 882 F.3d at 101. The defendant must make a "compelling case." *Id*. In determining whether the exercise of jurisdiction is fair and reasonable, the court must balance: (1) the burden on the nonresident defendant of having to defend itself in the forum, (2) the interests of the forum state in the case, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in the most efficient resolution of controversies, and (5) the shared interests of the states in furthering fundamental social policies. *Id*.

B.  COFS's Allegations Concerning Sylla

As the party seeking to invoke the power of the court, COFS "bears the burden of establishing jurisdiction, but is required to present only *prima facie* evidence." *Pervasive Software, Inc. v. Lexware Gmbh & Co.*, 688 F.3d 214, 219 (5th Cir. 2012) (quoting *Seiferth v.*

*Helicopteros Atuneros, Inc.*, 472 F.3d 266, 270 (5th Cir. 2006)). "In determining whether a *prima facie* case exists, this Court must accept as true [COFS's] uncontroverted allegations, and resolve in [its] favor all conflicts between the [jurisdictional] facts contained in the parties' affidavits and other documentation." *Pervasive Software*, 688 F.3d at 219-20.

The Third Amended Counterclaim makes the following specific allegations concerning Sylla: (1) Sylla is an owner of FSU and operates FSU with Bates's girlfriend Audra Vega and David Bravo, and before FSU was formed, he was an independent contractor working for Bates/Bates Energy; (2) in May 2017, Sam Taylor traveled to Wisconsin to visit mines from which Bates Energy represented it obtained its frac sand, and Bates Energy sent "company representative" Mark Sylla; (3) Sylla took Taylor on a winding tour around Wisconsin, stopping at two mines along the way, neither of which had the capacity to deliver any appreciable amount of frac sand and neither of which allowed Sylla/Bates Energy access to its premises; (4) Sylla conspired with Bates/Bates Energy, Bravo, and others in falsely representing to COFS that Bates/Bates Energy had access to numerous legitimate sand mines in Wisconsin and elsewhere, and that sand was on the way, in part by pointing out to Taylor in Wisconsin mines in which Bates Energy allegedly had contracts and interests or allocations; (5) on May 12, 2017, Bravo, Sylla, and Vega created a new company, Unlimited Frac Sand d/b/a Frac Sand Unlimited ("FSU") in order to maintain the parties' fraudulent and illegal acts against COFS and drain COFS's escrowed funds, and FSU "was essentially one and same as Bates Energy, and was operated by [Stanley] Bates and Bravo"[3]; (6) by July 2017, Bates was directing ELC/Naumann

---

[3] Sylla contends that the Certificate of Formation for the company shows that Bravo alone organized the company, and Sylla "was merely named a manager." Motion at 4 n.1 & Ex. A. The Texas Certificate of Formation of Unlimited Frac Sand, LLC has a filing date of May 11, 2017 and an effective date of May 12, 2017 and shows the initial registered agent as David Bravo and the managers as David Bravo, Mark Sylla, and Audra Aileen Vega.

to use the FSU name on new escrow agreements and it was listed as the "assignee" on Bates/Bates Energy correspondence and false invoices referring to sand that was never produced or delivered; (7) upon information and belief, ELC/Naumann established Chase Bank account no. 3761 as the "escrow account" for FSU, and thereafter ELC/Naumann directed numerous unauthorized payments to FSU from COFS's escrowed funds, and FSU is listed as the consignee on 18 BOLs that were supplied to COFS as proof that Bates Energy had procured frac sand, and for which COFS authorized payment to Bates Energy on July 12 in reliance upon those false representations; (8) ELC/Naumann paid Sylla, and Sylla accepted and retained, illegal payments of at least $22,500 from the COFS escrow account, without notice to or consent from COFS; (9) Sylla was at all times acting individually and in the course and scope of his agency with Bates Energy or in the course and scope of his employment by or ownership of FSU; and (10) on August 4, 2017, Bravo and Sylla were preparing to enter into another transaction, involving funding with a $5 million commitment, under the name Odessa Commodity Services, LLC.

COFS alleges a claim of conspiracy to commit fraud against all Counter-Defendants, including Sylla, asserting that they all had an object to be accomplished, namely the fraudulent actions towards COFS leading to the taking and retention of COFS's funds. COFS also alleges a claim of theft and conspiracy to commit theft against all Defendants, including Sylla, pursuant to the Texas Theft Liability Act, Texas Civil Practice & Remedies Code Chapter 134. COFS alleges that all Defendants conspired to commit the theft and retention of COFS's funds. Last, COFS asserts a claim for "restitution or money had and received" against all Defendants, including Sylla, alleging that they received escrow money that in equity and good conscience rightfully belongs to COFS.

C. <u>Analysis</u>

Sylla contends that the only act attributable to him occurred entirely within the state of Wisconsin and the complaint "contains virtually no allegations or suggestions that the parties' dispute 'arises out of' or 'relates to' any of Sylla's acts or omissions in or related to Texas," such that specific personal jurisdiction is lacking. COFS responds that Sylla's actions in Wisconsin were directed at and caused injury in Texas, and Sylla should have reasonably anticipated being haled into a Texas court "given his relationship with co-defendants Stanley Bates and David Bravo, his knowledge of and assistance with the subject of the MOU (performable in Texas), his participation in the formation of a Limited Liability Company in the State of Texas for the purpose of fulfilling the MOU, and his acceptance of illegal payments from Texas-based ELC out of funds under the care of COFS." Docket no. 97 at 1-2.

COFS asserts that personal jurisdiction does not require Sylla to have engaged in any specific act within Texas, and that when a nonresident defendant commits an act outside the state that causes tortious injury within the state, that tortious conduct amounts to sufficient minimum contacts to constitutionally permit a federal district court within the state to exercise personal jurisdiction over the tortfeasor, citing *Guidry v. United States Tobacco Co.*, 188 F.3d 619, 628 (5th Cir. 1999). *Guidry* confirms that "specific jurisdiction may arise without the nonresident defendant's ever stepping foot upon the forum state's soil or may arise incident to the commission of a single act directed at the forum," if the defendant purposefully availed himself of the privilege of conducting activities in the state, thereby invoking the benefits and protections of the forum's laws. *Id.* However, in *Guidry*, the defendant maintained regular

telephone contact with the patient's doctor in Texas, shipped experimental drugs directly to the plaintiff in Texas, and the alleged tort took place in whole or in part in Texas.

Moreover, *Guidry* pre-dates *Walden v. Fiore*, 571 U.S. 277 (2014), which emphasizes that the Court should focus on the defendant's contacts with the forum that the defendant himself creates, not the defendant's contacts with persons who reside in the forum. It is not enough that the plaintiff is injured in the forum state because the plaintiff cannot be the only link between the defendant and the forum. *Id.* at 284-86. "A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum." *Id.* at 286. "To be sure, a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties. But a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Id.*

Here, some of the contacts upon which COFS relies, such as the fact that the MOU was performable in Texas and was intended for the ultimate benefit of Texas-based ProPetro, are contacts by COFS or third parties, or are based on Sylla's relationship with them, rather than Sylla's purposeful contacts with the forum. Representations about or affecting a contract allegedly formed in Texas and performable in Texas between other parties have been held insufficient to support specific jurisdiction because those contacts with Texas were merely fortuitous. *Navig8 Ship Mgmt.*, 882 F.3d at 103 ("that the email communications were targeted at a contract formed in Texas, and that the emails concerned work that was to be performed in Texas – are legally insufficient to support a finding of specific jurisdiction"). This case does not present as clear a case for specific jurisdiction as COFS asserts.

However, COFS does point to some purposeful contacts by Sylla directed at Texas, and the Court finds those contacts sufficient to support specific personal jurisdiction. *Walden* reaffirmed long-standing Fifth Circuit principles that committing a tort in whole or in part in Texas will give rise to specific jurisdiction here.[4] COFS alleges that Defendants, including Sylla, were conspiring to purposefully target specific, identifiable funds ($1 million) held in escrow in Texas. As part of that conspiracy, the allegations are that (1) Sylla conspired to misrepresent Bates Energy's ability to procure sand, to induce COFS to maintain its relationship with Bates Energy, and, specifically, to keep its money in the Texas escrow account with co-conspirator ELC, so that the members of the conspiracy could steal the funds and (2) participated in the creation of a Texas LLC, of which he was named manager, and used that LLC to create fraudulent invoices and BOLs that were used to misappropriate the specific funds from the Texas escrow account, both without COFS's consent and with its fraudulently obtained consent. And Sylla further personally received money from the Texas escrow account on at least three occasions in June and July 2017 as a result (TAC ¶¶ 70, 71, 75). Thus, fake documents were directed to Texas to further a fraudulent scheme and to cause the transfer of specified funds in

---

[4] Under Texas law, the elements of common-law fraud are (1) defendant made a material misrepresentation that (2) was false, (3) and was either known to be false when made or was asserted without knowledge of its truth, (4) the defendant intended the representation to be acted upon, (5) it was relied upon, and (6) it caused injury. *Jacked UP, LLC v. Sara Lee Corp.*, 854 F.3d 797, 810 (5th Cir. 2017). The elements of a cause of action for theft are: (1) plaintiff had a possessory right to the property; (2) the defendant unlawfully appropriated the property, including money, by taking it without the plaintiff's effective consent; (3) the defendant appropriated the property with the intent to deprive the plaintiff of the property; and (4) the plaintiff sustained damages as a result of the theft. Tex. Civ. Prac. & Rem. Code § 134.003(a), § 134.005(a); Tex. Pen. Code § 31.03(a)-(b); *Haler v. Boyington Cap. Grp.*, 411 S.W.3d 631, 635 (Tex. App.–Dallas 2013, pet. denied). A defendant can appropriate personal property by bringing about a transfer or purported transfer or title to, or other nonpossessory interest in, personal property or by acquiring or otherwise exercising control over personal property. Tex. Pen. Code § 31.01(4)(A), (B). The elements of a cause of action for money had and received are that the defendant holds money that belongs to the plaintiff in equity and good conscience. *Staats v. Miller*, 243 S.W.2d 686, 687-88 (Tex. 1951). The sole inquiry is whether the defendant received money that rightfully belongs to the plaintiff. *Id.*

a Texas account out of the account to participants in the scheme, including Sylla. These contacts are not fortuitous contacts with Texas based on the unilateral acts of COFS or third parties, and go beyond mere injury in Texas, instead establishing that Sylla's conduct connects him to Texas in a meaningful way.

Based on these purposeful contacts, Sylla should have reasonably anticipated being haled into Texas court for claims such as fraud, theft, conspiracy, and money had and received. Sylla further fails to demonstrate that the exercise of personal jurisdiction over him would be unfair or unreasonable. *See Monkton Ins. Servs. v. Ritter*, 768 F.3d 429, 433 (5th Cir. 2014) (if the plaintiff successfully establishes minimum contacts, the burden shifts to the defendant to show that exercising jurisdiction would be unfair or unreasonable). Sylla's motion to dismiss for lack of personal jurisdiction is denied.

## II. ELC and Naumann's Motions to Dismiss

### A. COFS's Allegations as to ELC and Naumann

COFS alleges that allegations of improper conduct by Bates created COFS's need for caution, and its insistence on a legal structure to protect the ProPetro funds, including the creation of two independent escrow accounts. TAC ¶ 30. Because the $4 million was prepayment towards ProPetro's expected receipt of 80,000 tons of frac sand, COFS contemplated that, once it could confirm through BOLs, rail car receipts, invoices, purchase orders, and other documentation that Bates Energy had delivered the correct sand to the correct location, that documentation would be sent to the escrow agent account manager for audit and, if the audit showed proper delivery, the escrow account manager was authorized to release payment funds to Bates Energy. *Id*. ¶ 32. Bates Energy insisted that the money be held in escrow

by ELC because it was "a proven performance entity," but COFS later learned ELC/Naumann was a close associate of Bates, that ELC served as "escrow agent" for Bates Energy's business operating accounts, and that ELC was a creditor of Bates Energy. *Id.* ¶¶ 33-34. COFS alleges that ELC/Naumann held multiple bank accounts in Chase Bank for itself, Bates/Bates Energy, and FSU and "repeatedly transferred and commingled substantial amounts of funds in and out of these various accounts, and made illegal disbursements from the multiple accounts to itself and the other Counter-Defendants." *Id.* ¶ 34.

The signatories on the Escrow Agreement were Janis Kline for COFS and Stan Bates for Bates Energy. TAC ¶ 37. Naumann signed as "Managing Member" for ELC under the language "Equity Liaison Company, LLC, Escrow Agent, hereby accepts its appointment as Escrow Agent as described in the foregoing Agreement, subject to the terms and conditions set forth therein." Docket no. 82 Ex. A at 5.

COFS alleges that, under the terms of the Escrow Agreement, ELC/Naumann were contractually obligated to deposit and maintain COFS's funds in a separate escrow account under COFS's name,[5] but ELC deposited it into Chase Bank account no. 2917, a pre-existing Bates Energy escrow account, and the $1 million was therefore immediately commingled with existing funds in the account. TAC ¶ 36. COFS notes that, under the Escrow Agreement, ELC was authorized to deliver the escrow funds to specified recipients "[u]pon receipt by ELC of the Disbursement Authorization (Exhibit A) executed by Buyer [defined as COFS]." *Id.* ¶ 39 (quoting Escrow Agrmt. ¶ 1.3). COFS alleges that Exhibit A obligated both Bates and COFS to

---

[5] The Escrow Agreement states that "[t]he monies constituting the Fund shall be deposited in a segregated account pursuant to the terms of this Escrow Agreement. Such account shall be styled **Equity Liaison Company, LLC – Escrow Account**." Docket no. 82 Ex. A ¶ 1.2.

sign off before a disbursement was made, and any disbursement required the joint instruction of both parties. TAC ¶¶ 37, 40. The Escrow Agreement further required that ELC "shall immediately notify and convey to Buyer [COFS] and Seller [Bates Energy] every request or other notice received from the other party or any other source regarding the subject escrow funds." Docket no. 82 Ex. A ¶ 2.1B. COFS further alleges that, if the MOU was terminated, ELC was obligated to return the balance of the funds in the escrow account to COFS. TAC ¶ 41; docket no. 82 Ex. A ¶ 2.2.

COFS alleges that the Counter-Defendants were "secretly and systematically raiding COFS's escrow funds" through at least August 23, 2017, at all times knowing that the funds should not be disbursed absent notice to and consent by COFS. TAC ¶ 61. COFS alleges that ELC disbursed at least $652,000 in escrow funds improperly, and used various techniques to conceal the unlawful disbursements, including: (1) commingling the funds in the Chase account no. 2917 with Bates Energy funds; (2) frequently transferring large sums of money among, at a minimum, four Chase bank accounts, the account no. 2917, ELC/Naumann's high-interest money market account, FSU's checking account, and ELC/Naumann's personal checking account; (3) using at least three sets of "books" in disbursing funds; and (4) inaccurate accounting intended to conceal monies taken from COFS. *Id.* ¶¶ 64-66. COFS alleges that ELC/Naumann approved substantial transfers out of the escrow account to others without knowledge or consent of COFS and in violation of the Escrow Agreement. COFS further alleges that "ELC/Naumann" made disbursements to itself, without knowledge or consent of COFS, including $16,666 on May 12, $15,000 on June 15, $7,500 on June 30, $15,000 on July 19, and $22,358.53 on August 15. *Id.* ¶¶ 67-83. COFS also alleges that ELC/Naumann transferred

money out of the escrow account after receiving notice that COFS had terminated the MOU. *Id.* ¶¶ 84 -87.

COFS alleges that ELC/Naumann were at all times fiduciaries of COFS and authorized numerous payments from the ELC escrow account in contravention of the agreements and committed the actions intentionally. TAC ¶ 89. COFS alleges that "ELC/Naumann further breached duties owed to COFS by failing to disclose that it was the escrow agent for Bates Energy, and that it would transfer money in and out of the Bates Energy account, commingling those funds with COFS escrow funds" and that neither Bates Energy nor ELC/Naumann informed COFS of their conflicts of interest before the parties entered into the subject agreements. *Id.* ¶ 90. COFS alleges that "ELC/Naumann also breached duties to COFS by repeatedly refusing to provide information regarding the balance in the ELC escrow account," *id.* ¶ 91, that ELC/Naumann "was closely involved in Bates' attempts to justify their unlawful acts in secretly taking COFS' funds, *id.* ¶ 92, and that ELC/Naumann "fraudulently induced COFS to enter into the ELC escrow agreement," *id.* ¶ 94.

With regard to the fraudulent inducement claim, COFS alleges that the parties specifically negotiated contract language that obligated ELC/Naumann to immediately notify COFS of every request made by any party regarding the funds in the ELC Escrow Account, and to convey every request or other notice regarding the subject funds. TAC ¶ 94. COFS alleges that this language was incorporated into the Escrow Agreement upon COFS's request and was "in addition to language in the agreement already requiring COFS's approval before any funds could be disbursed." *Id.* COFS alleges that "ELC/Naumann expressly represented to COFS that no funds would leave the ELC Escrow Account absent notice to COFS, conveyance to COFS

of any notice or request for funds, and COFS's signature approving the disbursement" and that "COFS relied on these material representations to its detriment." *Id.* COFS alleges that "[b]oth ELC and Naumann individually are liable for these and other transgressions because Naumann is using the corporate form of ELC to perpetrate a fraud on COFS, and adherence to the corporate fiction would promote injustice and lead to an inequitable result." *Id.*

The TAC contains a general section entitled "Respondeat Superior and Ratification," which alleges that all of the individual defendants "are liable in their individual capacities for the causes of action stated that are grounded in tort law, whether based on statute or common law." TAC ¶ 124. It further alleges, "In all cases, the individual named was acting on his own behalf, as well as in the course and scope of his employment or agency for the entity to which he or she was contracted. . . . Dwayne Naumann, as the only principal in ELC, was at all times acting both individually and in the course and scope of his employment for ELC." *Id.*

**B. Equity Liaison Company's Motion to Dismiss**

COFS asserts a breach-of-contract claim against ELC, as well as numerous tort causes of action. ELC moves to dismiss all the tort claims, asserting that COFS "has turned a breach of contract claim into a vast conspiracy of tortious conduct by numerous defendants" and arguing that the tort claims are barred by the economic loss rule. Docket no. 83 at 1. ELC further contends that the theft and negligent misrepresentation claims should be dismissed for failure to give fair notice, that the fraud claim should be dismissed for failure to plead fraud with particularity, and the equitable accounting claim should be dismissed for failure to plead the required elements. *Id.*

1. <u>Whether the economic loss rule bars COFS's tort claims</u>

COFS sues ELC for breach of contract, fraud, conspiracy to commit fraud, theft and conspiracy to commit theft, breach of fiduciary duty and conspiracy to commit breach of fiduciary duty, negligent misrepresentation, equitable accounting, and restitution or money had and received. ELC contends that the economic loss rule bars all of COFS's tort claims because a plaintiff may recover only under a contract theory when the plaintiff claims that the defendant's actions breached a duty that arose solely because the parties have contracted with one another and the injury is only the economic loss to the subject of the contract itself. ELC contends that the economic loss rule requires dismissal of all COFS's tort claims, including the fraudulent inducement and breach of fiduciary duty claims, because any duty, including any fiduciary duty, arises from the contractual agreement, and COFS has failed to identify any damages caused by ELC's actions other than the loss of escrow funds that are the subject of the parties' contract.

The economic loss rule is a defense that bars negligence and certain other tort claims (such as products liability) for recovery of economic loss when the loss is limited to the subject matter of a contract or to the product itself. However, it is not enough to simply say that all tort claims are barred when the economic loss is the subject of a contract, as "there is not one economic loss rule broadly applicable throughout the field of torts, but rather several more limited rules that govern recovery of economic losses in selected areas of the law." *Sharyland Water Supply v. City of Alton*, 354 S.W.3d 407, 415 (Tex. 2011) (quoting Vincent R. Johnson, *The Boundary-Line Function of the Economic Loss Rule*, 66 WASH. & LEE L. REV. 523, 534 (2009)). The rule is not generally applicable, and its application depends on an analysis of its

rationales in a particular situation. *McCaig v. Wells Fargo Bank, N.A.*, 788 F.3d 463, 474 (5th Cir. 2015).

Contractual relationships may create duties under both contract and tort law. *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986). The acts of a party may breach duties in tort or contract alone or simultaneously in both. *Id.* The Texas Supreme Court has held that when a plaintiff seeks damages for breach of a duty created solely under a contract, as opposed to a duty imposed by law, tort damages are unavailable. *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493 (Tex. 1991) (when duty arose solely from contractual promise to publish advertisement, the action was only one for breach of contract); *see also Jim Walter Homes*, 711 S.W.2d at 618 (when injury is solely that parties to construction contract did not get the house they were promised and paid for, that can only be characterized as a breach of contract). In such cases, losses are more appropriately addressed through common-law breach of contract claims than through tort claims. *See Sharyland Water Supply* 354 S.W.3d at 418. In addition, the rule has been applied to unintentional tort claims made by plaintiffs who are not parties to a contract when the loss is the subject matter of the contract and the rationales of the rule justify its application. *See LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234 (Tex. 2014).

### negligent misrepresentation

The Court first considers whether COFS's negligent misrepresentation claim is barred by the economic loss rule. The Texas Supreme Court has indicated that the economic loss rule primarily applies to "actions for unintentional torts." *LAN/STV*, 435 S.W.3d at 235. The *Restatement*, which the Texas Supreme Court cited with approval, now concludes generally that "there is no liability in tort for economic loss caused by negligence in the performance or

negotiation of a contract between the parties." *Id.* at 243 (quoting *Restatement (Third) of Torts: Liability for Economic Harm*). The Court further held that the economic loss rule should apply equally to an action for negligent performance of services and an action for negligent misrepresentation in the same situation. *LAN/STV*, 435 S.W.3d at 246.

In *D.S.A., Inc. v. Hillsboro Independent School District*, 973 S.W.2d 662, 663 (Tex. 1998), the Court explained that, regardless of any independent duty, negligent misrepresentation claims are viable only if a party sustains an injury independent from those stemming from a contractual breach. *See also Sharyland*, 354 S.W.3d at 417 n.12 (noting that negligent misrepresentation claims are "viable only if a party sustains an injury independent from those stemming from a contractual breach"); *Smith v. JPMorgan Chase Bank, N.A.*, 519 F. App'x 861 (5th Cir. 2013) (a plaintiff may not bring a claim for negligent misrepresentation unless he can show that he suffered an injury that is distinct, separate, and independent from the economic losses recoverable under a breach of contract claim); *New Century Financial, Inc. v. Olympic Credit Fund, Inc.*, 487 F. App'x 912 (5th Cir. 2012) (negligent misrepresentation claim barred when plaintiff did not allege an injury distinct from that suffered under the contract and sought the same measure of damages). In *D.S.A.*, the plaintiff failed to distinguish between its out-of-pocket damages and its benefit-of-the bargain damages for its negligent misrepresentation claim, and thus failed to establish an independent injury.

The Fifth Circuit applied the rule to negligent misrepresentation claims in *Ibe v. Jones*, 836 F.3d 516, 526 (5th Cir. 2016), because, in tallying damages, the plaintiff alleged no damages independent from those resulting from the breach of contract. The Court cited *TIB-The Independent BankersBank v. Canyon Community Bank*, 13 F. Supp. 3d 661, 671 (N.D. Tex.

2014), in which the district court stated that "Texas courts have held that where a plaintiff seeks to recover out-of-pocket expenses incurred in reliance on the defendant's misrepresentation, the plaintiff 'establish[es] an injury that is independent of its breach of contract claim.'" Thus, it held that because the plaintiff sought to recover out-of-pocket expenses incurred in connection with having to repurchase the loan, it sufficiently alleged an injury independent from the economic loss to the subject matter of the agreement (the loan). *Id.* The Court noted that its ruling was based on the pleadings, and indicated nothing about how a summary judgment ruling might go. *Id.* at 671 n.7.

As pled, COFS fails to allege an independent injury. COFS alleges that several Counter-Defendants, including ELC, "made representations to Counter-Plaintiff COFS in the course of [its] business and/or in a transaction in which [it] had a pecuniary interest" and "provided false information for the guidance of Counter-Plaintiff in those businesses." TAC ¶ 158. No specific damages are pled related to the negligent misrepresentation claim, other than a general assertion that COFS "suffered pecuniary loss as a result of its reliance." *Id.* The breach-of-contract action likewise indicates no specific damages. And the prayer simply seeks judgment "for actual, special, and consequential damages." While COFS may recover purely economic damages for a negligent misrepresentation claim, it must show damages independent of its breach-of-contract claim under the independent injury rule.

COFS's Response sheds no further light on possible independent injuries. It focuses on the fact that COFS has alleged that ELC breached independent duties, and the types of equitable relief it seeks, but fails to adequately demonstrate independent injury flowing from a negligent misrepresentation as opposed to a breach of contract. It is not sufficient to argue, as COFS does,

that it seeks the equitable relief of forfeiture of the monies wrongfully taken, especially when that relief appears tied to its breach-of-fiduciary duty claim. In addition, a breach-of-contract claim sometimes permits restitution damages, and this relief is specifically tied neither to the contract claim nor the negligent misrepresentation claim.

COFS notes that the escrow agreement is a services contract, and therefore the subject of the agreement is the services rendered, such that it questions the premise that the subject of the agreement is the escrow funds. Docket no. 91 at 10 n.6. The term "loss of the subject matter of the contract" is used frequently in the cases without clarification. But the relevant question for the independent injury rule is whether COFS is alleging damages/injury flowing from reliance on a negligent misrepresentation independent of its claimed damages/ injury from the breach of the contract. In this regard, all the case law is clear that a party may not seek and recover benefit-of-the-bargain or expectancy damages for negligent misrepresentation, *D.S.A.*, 973 S.W.2d at 663, while such damages are available under a breach-of-contract claim. *Chapman Homes* directs that the harm for a negligent misrepresentation claim must be "not merely the economic loss of a contractual benefit" or "only . . . the economic loss of a contractual expectancy." *Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014). Thus, COFS's request for leave to amend to seek lost profit damages as a "form of damages independent of the Escrow Agreement," docket no. 91 ¶ 24, is confusing, since the lost profits it seeks are clearly benefit-of-the-bargain damages as they represent the commissions COFS would have received had all gone according to plan. But if COFS is seeking leave to amend to seek lost profits for its breach-of-contract claim, such leave is granted.

Application of the economic loss rule becomes much more murky when the plaintiff seeks reliance or out-of-pocket damages for the negligent misrepresentation, when such damages are recoverable types of damages under both negligent misrepresentation and contract claims. Nevertheless, at the pleading stage, a plaintiff must at least attempt to differentiate the damages sought. *AT&T Corp. v. Park I-10 Motors*, No. 13-CV-644-XR, 2015 WL 150254 (W.D. Tex. Jan. 15, 2015) (the plaintiff's failure to identify an independent injury in its pleadings is sufficient to apply the independent injury rule).

Additional difficulty arises from the fact that, as Defendant's motion points out, all defendants and claims for negligent misrepresentation are lumped together in the cause of action.[6] Thus, it is unclear exactly what negligent misrepresentations by ELC COFS is attempting to recover for and what damages may flow therefrom. In its Response, COFS argues that its negligent misrepresentation claim is based not on an affirmative misrepresentation, but on a failure to disclose information where there is a duty to do so, citing a case in which a bank was held to have a duty to use reasonable care to provide information to customers. COFS further points to the duties of disclosure of escrow agents. COFS relies on the fact that ELC refused to provide an accounting when asked by COFS and failed to disclose the unauthorized distributions. While these arguments may support COFS's assertion that ELC owed an independent duty under tort law, an issue the Court does not decide, COFS fails to identify the specific damages flowing from the alleged breach of duty. Accordingly, the motion to dismiss the negligent misrepresentation claim is granted as to ELC, with leave to replead.

---

[6] ELC argues that the negligent misrepresentation claim should be dismissed because it impermissibly lumps the various defendants together, alleging that "[e]ach of the counter-defendants gave unspecified false information. Docket no. 83 at 7 (citing TAC ¶ 158). ELC contends that the Complaint thus fails to give fair notice.

*fraud and fraudulent inducement*

Application of the economic loss rule to a fraudulent inducement claim is more straightforward. In *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998), the Texas Supreme Court declined to extend the economic loss rule to fraudulent inducement claims, holding that "tort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract." S*ee also Peterson Grp., Inc. v. PLTQ Lotus Grp.*, 417 S.W.3d 46, 62 (Tex. App.– Houston [1st Dist.] 2013, pet. denied) ("[W]hile the economic loss rule has been applied to bar negligence and products liability causes of action when the injury alleged was also the subject matter of a contract, it has not been extended to bar recovery for fraud or fraudulent inducement."). The Court noted that an independent legal duty, separate from the existence of the contract itself, precludes the use of fraud to induce a binding agreement, and excepted such claims from an independent injury requirement. *Formosa*, 960 S.W.2d at 47; *see also Sharyland Water Supply Corp.*, 354 S.W.3d at 417.

*Formosa* is still good law, and COFS alleges a fraudulent inducement claim against ELC. TAC ¶ 127 ("Naumann and ELC, by and through Naumann, made misrepresentations or omissions of material facts to induce Counter-Plaintiff COFS to enter into the ELC escrow agreement . . . ."). The fraudulent inducement claim is not barred by the economic loss rule.

COFS also alleges a fraud claim related to ELC's performance of the contract, specifically that ELC obtained COFS's "consent" to a payment from the fund through fraud. Whether such a claim is barred by the economic loss rule is more difficult to determine, as some

courts have applied the rule to fraud claims while others have not. *See Payne v. Wells Fargo Bank Nat'l Assn*, 637 F. App'x 833, 837 (5th Cir. 2016) (applying rule to fraud claim where the misrepresentations were directly related to performance of the contract and arose solely from the contractual relationship); *Sam v. Wells Fargo Bank, N.A.*, No. 4:15-cv-03194, 2016 WL 4470111, at *12 (S.D. Tex. July 15, 2016) (noting that some courts have held that the rule bars fraud claims while "courts have also held that the economic loss rule does not necessarily bar fraud claims"); *Experian Info. Solutions, Inc. v. Lexington Allen, L.P.*, 2011 WL 1627115, at *12 (E.D. Tex. Apr. 7, 2011), *report and recommendation adopted*, 2011 WL 1637935 (E.D. Tex. Apr. 28, 2011) (economic loss rule did not bar fraud claims, including claims for fraud in performance).

COFS is alleging that ELC conspired in a scheme to create fraudulent documentation, upon which COFS relied, to induce COFS to provide authorization to release escrow funds (the July 12 authorized disbursement). It appears to the Court that ELC had an independent duty not to fraudulently obtain consent to disbursements, and the damages flowing from that fraud do not appear recoverable as breach-of-contract damages. Thus the fraud claim related to the July 12 authorized disbursement is not barred by the economic loss rule. To the extent COFS is arguing that every *un*authorized disbursement was an actionable fraud, the Court concludes below that such claims are subsumed within the fraudulent inducement claim. Thus, thus the motion to dismiss based on the economic loss rule fails as to the fraudulent-inducement and fraud claims and related conspiracy claims.

*theft and conspiracy to commit theft*

There is not much case law addressing application of the economic loss rule to theft claims, and the cases discussing the rule for related claims for conversion and misappropriation are conflicting and confusing. Theft and conspiracy to commit theft are intentional torts, and thus would appear to be outside the purview of the economic loss rule. The Court has located very few cases discussing application of the rule to claims under the Texas Theft Liability Act ("TLA").[7]

In *MSMTBR, Inc. v. Mid-Atlantic Finance Co., Inc.*, No. 01-12-00501-CV, 2014 WL 3697736, at *5 (Tex. App.–Houston [1st Dist.] July 24, 2014, no pet.), the court of appeals found that the plaintiff's conversion and TLA claims were not barred by the economic loss rule, because "[a] duty to refrain from unlawfully or wrongfully appropriating the property of another arises under statutory and common law." *Id.* Thus, if proven, the allegations of breach could give rise to liability because the defendant breached the agreement, but also could give rise to liability for conversion and theft if the elements of the torts were proven. *Id.* The court further noted that an award of the collateral and statutory penalties under the TLA were damages arising from statute and common law, independent of any benefit-of-the-bargain damages under the contract, and thus were not the subject of the contract. *Id.*

---

[7] In *Payne v. Wells Fargo Bank National Association*, 637 F. App'x 833 (5th Cir. 2016), the Fifth Circuit applied the rule to the plaintiff's fraud claim, but did not discuss it or apply it with regard to the TLA claim. Similarly, in *Lyons v. America's Wholesale Lender*, No. 3:13-CV2608-B, 2014 WL 5326609 (N.D. Tex. Oct. 16, 2014), the court applied the rule to the plaintiff's fraud and negligent misrepresentation claims, but did not discuss its application with regard to the TLA claim. And in *Transverse LLC v. Iowa Wireless Service LLC*, No. A-10-CV-517-LY, 2012 WL 12882856 (W.D. Tex. Sept. 24, 2012), the Court similarly discussed application of the rule to the negligent misrepresentation claim, but did not consider its application to the TLA claim. This indicates that parties and courts have typically not considered claims under the TLA to be subject to the rule.

Similarly, the Southern District of Texas in *SPP SWD Burns Ranch LLC v. Kent*, No. 5:14-CV-88, 2015 WL 12841097, at *3 (S.D. Tex. Jan. 8, 2015), considered somewhat similar facts and found that the TLA claim was not barred by the economic loss rule. Pursuant to an operating agreement, plaintiffs were to fund a construction project, and transferred several million dollars into an account to be held by the defendant until all funds were transferred, at which point the funds could be used for their intended purpose. Plaintiff alleged that the defendant began using the funds to build the facility without first transferring its own funds, and plaintiff sued for breach of contract, conversion, theft, and fraud. The plaintiff then sought to join individual, non-diverse defendants on the conversion and theft claims, and to add a claim for fraud by non-disclosure, which would require remand. The court found that neither the conversion nor the TLA claim was barred by the economic loss rule even though the defendants breached the terms of the contract by using the funds contrary to the contract's terms. It held that "Texas law imposes no limitation on bringing both conversion and breach of contract claims based on a single set of facts and a single injury, nor is there a requirement that the damages stemming from such claims be separate and distinct." *Id.* (citing *Nat'l Union Fire Ins. Co. v. Care Flight Air Ambulance Serv.*, 18 F.3d 323, 327 (5th Cir. 1994) ("Texas courts have consistently found claims for both conversion and breach of contract based on a single set of facts and single injury" and "have not held that in order to allege both a breach of contract and the tort of conversion, the conversion damages must be separate and distinct from the contract damages.")). It held that, even if the defendant's conduct breached the contract, "whatever the contractual terms, the law of conversion and bailment imposed an independent duty on Defendants with respect to those funds." *SPP*, 2015 WL 12841097, at *3. Further, although it

noted that the plaintiff suffered the same injury of unauthorized use of the funds, the conversion claim was also predicated on the plaintiff's loss of control over the funds, and the plaintiff sought exemplary damages, which are unavailable for breach of contract.

Although not considering the TLA, the Fifth Circuit has also held that if a particular duty is defined in both a contract and a statutory provision, and a party violates the duty enumerated in both sources, the economic loss rule does not apply. *McCaig v. Wells Fargo Bank, N.A.*, 788 F.3d 463, 474 (5th Cir. 2015). Thus, it held that claims under the Texas Debt Collection Act were not barred even where the conduct also amounted to a breach of contract. *Id.* Applying that reasoning, the TLA imposes a duty not to commit theft under the circumstances described within the statute, and that duty can be violated even when the theft also violates a contractual duty. These cases thus support the conclusion that COFS's theft and conspiracy to commit theft claims are not barred by the rule even though ELC's conduct violated the terms of the contract.

But another recent Fifth Circuit opinion creates some uncertainty. In *Lincoln General Ins. Co. v. U.S. Auto Insurance Services, Inc.*, 787 F.3d 716, 725 (5th Cir. 2015), the Fifth Circuit noted that "[s]everal Texas cases have applied the economic loss rule to claims for misappropriating property entrusted under a contract." In *Lincoln General*, the plaintiff argued that the economic loss rule did not apply to a conversion claim against a party entrusted with funds who converted those funds because the defendant had a legal duty, separate and apart from any contractual duties, not to convert the funds. *Id.* The Fifth Circuit reasoned, "the conduct giving rise to liability arose from Lincoln entrusting property to U.S. Auto pursuant to the terms of a contract and the Defendants misappropriating that property." *Id.* "To determine the origin of the duty breached and the nature of the resulting injury, [Texas courts] examine the role of

the contract in governing the use of the property" and "[t]he economic loss rule generally bars a tort claim when no factual basis for the tort claim would exist had the defendant complied with the contract." *Id.* Thus, the Fifth Circuit held, "if the use of the property constituted misappropriation only because it breached the parties' contract, then a breach of contract action is usually the plaintiff's sole remedy." *Id.* It found that to be the situation, because the conversion claims based on inflation of the commission and transferring expiring policies stemmed directly from alleged violations of contractual provisions -- the agreement contained "specific terms governing how to calculate the commissions and when to transfer expiring policies." *Id.* at 726.

Thus, the defendant's "alleged use of the funds and policies would amount to misappropriation because U.S. Auto violated a duty specified in the contract," and had the defendant complied with the contracts, "the factual predicate for a conversion claim would collapse." *Id.* The Court continued, "the injury suffered by Lincoln is the subject matter of the contract because it involved the same transactions contemplated by the contract." *Id.* Further, a related conversion claim concerning misuse of funds in a zero balance account was also found barred even though the contract did not explicitly refer to the account because "this claim still depends on provisions in the parties' contract" because the defendant used the account to pay more than plaintiff's contractually designated share on certain claims.

*Lincoln General* cited *National Union Fire* to support its finding that the economic loss rule applied, without attempting to distinguish it. In *National Union Fire*, the Fifth Circuit held that "the district court correctly found that the fact that Care Flight breached its lease contract did not preclude a finding that Care Flight also committed the tort of conversion." 18 F.3d at 328. The district court in *Lincoln General* had distinguished *National Union Fire* on the basis

that it "involved a lease that expressly placed the risk of loss on the lessee, and further provided that the lessor could assert all common law remedies" and the insurance company sought non-contractual damages that went beyond economic loss, including loss of use of the aircraft and repair costs. *Lincoln General v. U.S. Auto Ins. Servs.*, 892 F. Supp. 2d 787, 798 (N.D. Tex. 2012). The Fifth Circuit did not discuss these matters.

But the Texas cases it cites shed some light. They involved contracts for extraction and distribution of propane, and the plaintiffs' conversion claims were essentially that they did not receive all of the propone to which they were entitled under the contract. Thus, the contract defined how much propane the plaintiff should receive, and a claim that the defendant did not provide the contractually agreed-upon amount was essentially a claim for breach of contract. *See Exxon Mobil Corp. v. Kinder Morgan Operating*, 192 S.W.3d 120, 126-28 (Tex. App.–Houston [14th Dist.] 2006, no pet.) (noting that when the contract spells out the parties' rights about a subject matter, the contract, not common law tort theories, governs any dispute about the subject matter); *Castle Tex. Prod. Ltd. P'Ship v. Long Trusts*, 134 S.W.3d 267, 274 (Tex. App.–Tyler 2003, no pet.) (same).

This case is different from *Lincoln General* and the Texas cases. Those cases are more like *Delanney v. Southwestern Bell Telephone*, where the duty is defined by the contract and the injury claimed is the loss of a contractual expectancy as a result of the breach of the contractually defined duty. If the plaintiffs lost something, it was because the terms of the contract said they did. In this case, COFS seeks lost monies entrusted under a contract, but the contract did not define how much money ELC was to provide COFS, and COFS's theft claim is not that it did not receive the money it contractually bargained-for. Rather, the contract defined an escrow

relationship, and because COFS's theft claim is not that it failed to receive its contractual expectancy, the claim is not barred by the economic loss rule.

*breach of fiduciary duty*

Breach of fiduciary duty would appear to be within the scope of the rule, as the escrow duties are subject to and defined by the contract. However, the Texas Supreme Court recognizes that certain professional duties have developed in the common law independent of contracts, and thus generally fall outside the rule. For example, lawyers owe fiduciary duties to clients independent of their representation or fee agreements. And Texas courts have also held that fiduciary duties may arise by operation of law when the relationship is or resembles an escrow agreement, and have declined to apply the economic loss rule where the fiduciary duty breached existed independent of the contract. *Johnson v. Bank of America*, No. 09-12-00477-CV, 2014 WL 5490935, at *16 (Tex. App.–Beaumont Oct. 30, 2014, no pet.) ("It is true that courts have declined to apply the economic loss rule where the fiduciary duty breached existed independent of [the] contract.") (citing *James J. Flanagan Shipping Corp. v. Del Monte Fresh Produce N.A.*, 403 S.W.3d 360, 366 (Tex. App.–Houston [1st Dist.] 2013, no pet.)(economic loss rule did not preclude claim when fiduciary duty breached – that of agent to principal – arose independent of the contract)).

COFS relies on a case from the Northern District of Texas, *Newington Ltd. v. Forrester*, No. 3:08-CV- 0864-G, 2008 WL 4908200 (N.D. Tex. Nov. 13, 2008). In *Newington*, the plaintiff placed $1 million in trust with Forrester with instructions to hold the money until the plaintiff finalized a deal with a third party, but Forrester transferred $200,000 of the money to another party without authorization. When the plaintiff did not finalize the deal with a third party and

asked for the money back, Forrester could only return $800,000, and the plaintiff sued under various theories of liability, including conversion, unjust enrichment, breach of fiduciary duties, breach of trust, and money had and received. The plaintiff did not sue for breach of contract, and there was no written agreement, but Forrester asserted that the tort claims were barred by the economic loss rule because the underlying agreement was a contract and the only claimed loss was the $200,000 subject to the agreement. The district court disagreed, finding that Forrester owed the plaintiff the independent duties of an escrow agent under Texas common law, and thus the duties owed and liability for breach existed independent of any contract.

This Court previously noted that, under Texas law, courts have held that escrow agents owe a fiduciary duty to both parties to the contract that arises as a matter of law. Docket no. 16 at 11 (citing cases). The fiduciary duty consists of the duty of loyalty, the duty to make full disclosure, and the duty to exercise a high degree of care to conserve the money and pay it only to those persons entitled to receive it. *City of Fort Worth v. Pippin*, 439 S.W.2d 660, 665 (Tex. 1969). COFS asserts that ELC owed it a duty of loyalty separate and apart from the contractual duties and obligations, and that it breached its duty of loyalty and to act as a neutral third party by engaging in self-dealing and placing its own interests above COFS's interests. COFS further alleges that ELC breached its duty to make full disclosure beyond the obligations of the Escrow Agreement and breached its duty to conserve the money and pay it only to those entitled to receive it. COFS further seeks equitable remedies beyond those available for breach of contract. Because a fiduciary duty may arise as a matter of law independent of the contract, dismissal of

the breach of fiduciary duty claim at this motion to dismiss stage would be premature, and the motion to dismiss is denied on this claim.[8]

*restitution or money had and received*

In *ConocoPhillips Company v. Koopmann*, 542 S.W.3d 643, 663-64 (Tex. App.–Corpus Christi 2016), *aff'd* 547 S.W.3d 858 (Tex. 2018), the court of appeals applied a variant of the economic loss rule holding that when a valid contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory such as unjust enrichment and money had and received. *See also Payne v. Wells Fargo Bank Nat'l Assn*, 637 F. App'x 833 (5th Cir. 2016) (existence of express contract between the parties foreclosed claim for money had and received). But, as with the TLA claims, the Court notes that the facts here are different from the typical situation where the claim requires construction and application of the contract to measure a contractual expectancy. Moreover, COFS has pled fraudulent inducement and could seek rescission of the contract. While this rule may ultimately preclude a restitution claim, dismissal is premature at this early stage.

*summary*

The Court dismisses COFS's negligent misrepresentation claims, with leave to replead, but denies the motion to dismiss the other claims at this time.

---

[8] Whether such duties did arise is more appropriately addressed at summary judgment. At that time, the Court will also consider whether the language in ¶ 2.1.A of the Escrow Agreement that the agreement "expressly and exclusively sets forth the duties of ELC with respect to any and all matters pertinent hereto, and no implied duties or obligations shall be read into this Escrow Agreement against ELC" is effective to prevent duties from arising by operation of law.

2. whether COFS has pled fraud with sufficient particularity

ELC contends that COFS has failed to satisfy Rule 9(b) by pleading the time, place, and contents of the alleged false representations as well as the identity of the person making the misrepresentation and what that person obtained thereby. Docket no. 83 at 5-6 (citing *Tuchman v. DSC Comms. Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)). ELC asserts that the only fraud allegations against ELC/Naumann is that they "fraudulently induced COFS to enter into the ELC escrow agreement" through an exchange of emails "on or about April 14, 2017," which resulted in certain language being included in the ELC Escrow Agreement, and that they fraudulently induced COFS into entering "other agreements." TAC ¶¶ 94, 127. The alleged specific misrepresentations are that: (1) they would not remove COFS's funds from the escrow account without notice to and the consent of COFS; (2) that sand was delivered with proper support documentation; and (3) that they would properly require, account for and audit supporting documentation for any sand deliveries. *Id.* ¶ 127.

Naumann contends that COFS fails to identify the "other agreements," that it fails to allege what ELC obtained by any of these alleged misrepresentations, that it fails to allege the time or place of any representation regarding sand delivery or that ELC would "require, account for any audit supporting documentation," and that these failures also require dismissal of any related conspiracy to commit fraud claim.

Under Texas law, there are two types of common-law fraud: (1) simple fraud, also known as fraudulent misrepresentation, and (2) fraudulent inducement, which is when someone allegedly induces another to enter into a contract by using false representations. These are separate causes of action, but they share the same elements, which are: (1) defendant made a

material misrepresentation that (2) was false, (3) and was either known to be false when made or was asserted without knowledge of its truth, (4) the defendant intended the representation to be acted upon, (5) it was relied upon, and (6) it caused injury. *Jacked UP, LLC v. Sara Lee Corp.*, 854 F.3d 797, 810 (5th Cir. 2017). However, to state a claim of fraudulent inducement, the plaintiff must also prove the existence of a contract. *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 277 (5th Cir. 2012).

Rule 9(b) requires that fraud be pled with particularity, meaning that the plaintiff must plausibly plead facts establishing the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby. *IAS Servs. Grp., LLC v. Jim Buckley & Assocs., Inc.*, 900 F.3d 640, 647 (5th Cir. 2018). However, the ultimate meaning is context-specific. *Id.* Rule 9(b) does not supplant Rule 8's notice pleading standard, and only supplements Rule 8(a) in order to provide defendants with fair notice of the plaintiff's claims, protect defendants from harm to their reputation and good will, reduce the number of strike suits, and prevent plaintiffs from filing baseless claims and then attempting to discover unknown wrongs. *Id.* In the fraud context, the requirement of pleading the timing and content of the alleged misrepresentation is tied to the requirement that the plaintiff plausibly establish that he specifically relied on the alleged misrepresentation to his detriment. *Id.* at 648.

COFS adequately pleads its fraudulent inducement claim. For the fraudulent inducement claim, COFS pleads that, during the pre-contracting period, ELC/Naumann falsely stated that they would not remove COFS's funds from the escrow account without notice to and consent of COFS and that they would properly require, account for, and audit supporting documentation

for any sand deliveries, and that COFS relied on these misrepresentations in entering the escrow agreement with ELC, and that it was harmed thereby because ELC disbursed monies from the account without COFS's knowledge or consent. This is sufficient to plausibly state a fraudulent inducement claim.

For the fraud claim, the specifics of the alleged misrepresentations upon which COFS relied are less clear. COFS's Response points to "fraudulent acts of disbursing funds." Docket no. 90 at 8. But an unauthorized distribution from the escrow account is not alone a basis for a cause of action for fraud. COFS alleges that ELC paid out numerous unauthorized disbursements from May through August, but alleges no specific misrepresentations upon which it relied other than the pre-contract representations that form the basis of its fraudulent inducement claim. COFS alleges that these transfers were made "for falsified reasons such as 'liquidated damages,' 'admin fees,' legal fees, or just simple cash grabs." TAC ¶ 62. But COFS alleges that these transfers were made without its knowledge, and thus it establishes no basis for reliance in connection with any of those falsified reasons for the specific alleged sham transfers. Thus, to the extent COFS appears to assert that each sham transaction was a separate fraud based upon ELC/Naumann's pre-contractual promises, these claims would appear to be subsumed by the fraudulent inducement claim: ELC promised to make disbursements only pursuant to the terms of the contract, not intending to carry through on that promise at the time it was made, and then in fact did not abide by the promise in carrying out the agreement. Each unauthorized disbursement then is evidence of the original fraudulent misrepresentation, but is not itself an actionable fraud. COFS did not rely on a misrepresentation with respect to any particular transaction, because it was unaware of those transactions, and relied upon the misrepresentation

only in entering the contract. To the extent COFS may be attempting to assert claims of fraud by nondisclosure based on Naumann's failure to provide information concerning the account, such a claim is not clearly set forth in the Third Amended Counterclaim to provide fair notice. Thus, the TAC fails to plausibly plead fraud claims related to unauthorized disbursements other than the fraudulent inducement claim alleging that COFS was fraudulently induced into entering the Escrow Agreement.

The TAC does state a claim for fraud related to the July 12 authorization to disburse funds, which COFS approved because Bates produced BOLs that appeared legitimate. The TAC ¶ 127 alleges that Naumann "made misrepresentations or omission of material facts to induce Counter-Plaintiff to enter into the ELC escrow agreement and other agreements, including but not limited to the fraudulent sale of sand for which these Counter-Defendants obtained the 'consent' of COFS." The TAC further alleges that "fraudulent representations committed by Naumann and ELC include . . . b. That sand was delivered with proper support documentation." TAC ¶ 127. Thus, COFS alleges a specific misrepresentation, upon which it relied in authorizing the July 12 disbursement of $31,000 or $39,000, and states a fraud claim with regard to the July 12 disbursement.

The motion to dismiss the fraudulent inducement claim and conspiracy to commit fraudulent inducement claim against ELC is denied. The motion to dismiss the fraud claim and conspiracy to commit fraud claim is denied as to the July 12 disbursement, but is granted with regard to the alleged unauthorized disbursements, with leave to replead to identify any misrepresentations or fraudulent omissions made by ELC upon which COFS relied or, for the

conspiracy claim, any misrepresentation made by another party to which ELC was a co-conspirator and upon which COFS relied.

    3.  <u>Whether COFS has stated a claim for theft</u>

The TAC alleges that all defendants wrongfully assumed dominion and control over property belonging to COFS and their actions constitute theft as that term is defined in the Texas Theft Liability Act, Chapter 134. TAC ¶ 146. It further alleges that defendants, without COFS's consent, knowingly took, accepted and retained funds held and belonging to COFS, causing COFS to sustain damages as a result of the theft. *Id.* Further, such property was stolen in that it was acquired by Defendants as a result of theft, by withholding such property from COFS permanently or for so extended a period of time that a major portion of the value of the property is lost. *Id.*

The TLA provides that "[a] person who commits theft is liable for the damages resulting from the theft." TEX. CIV. PRAC. & REM. CODE § 134.003(a). "Theft" is defined as "unlawfully appropriating property or unlawfully obtaining services as described by Section 31.03 [theft of property], 31.04 [theft of services], 31.06 [theft by check or similar sight order], 31.07 [unauthorized use of a vehicle], 31.11 [tampering with identification numbers], 31.12 [theft of or tampering with multichannel video or information services], 31.13 [manufacture, distribution, or advertisement of multichannel video or information services device], or 31.14 [sale or lease of multichannel video or information services device], Penal Code." *Id.* § 134.002(2).

ELC argues that COFS fails to state a claim for theft under the TLA because COFS does not identify which section of the Penal Code forms the basis of its claim and fails to identify

which defendant undertook which action alleged to violate the Penal Code. The TAC alleges that defendants' "actions constitute theft as that term is defined in the Texas Theft Liability Act, Chapter 134, Texas Civil Practice & Remedies Code," TAC ¶ 146, and COFS argues that the relevant section of the Texas Penal Code is apparent from the pleading because "the only reasonable section of the Texas Penal Code demonstrating ELC's acts constituted theft, as COFS has plead, is § 31.03, theft of property." Docket no. 91 at 17-18. The Court agrees, given the language in the pleadings and the fact that the other provisions of the Penal Code are clearly not applicable.

The elements of a cause of action for theft are: (1) plaintiff had a possessory right to the property; (2) the defendant unlawfully appropriated the property, including money, by taking it without the plaintiff's effective consent; (3) the defendant appropriated the property with the intent to deprive the plaintiff of the property; and (4) the plaintiff sustained damages as a result of the theft. TEX. CIV. PRAC. & REM. CODE § 134.003(a), § 134.005(a); TEX. PEN. CODE § 31.03(a)-(b); *Haler v. Boyington Cap. Grp.*, 411 S.W.3d 631, 635 (Tex. App.–Dallas 2013, pet. denied). A defendant can appropriate personal property by bringing about a transfer or purported transfer of title to, or other nonpossessory interest in, personal property or by acquiring or otherwise exercising control over personal property. TEX. PEN. CODE § 31.01(4)(A), (B). Although the cause of action refers to all "Defendants" together, COFS has plausibly pled facts establishing a cause of action for theft against ELC, and the detailed factual portion of the TAC sets forth allegations as to the individual actions of ELC. ELC's motion to dismiss the theft claim is denied.

4. <u>Whether the Complaint fails to state a claim for equitable accounting</u>

ELC argues that the TAC ails to state a claim for an equitable accounting because COFS does not allege that the information it seeks is complex or that it would be unable to obtain the information through discovery. Docket no. 82 at 10. COFS responds that it has alleged the complexity of the accounting information caused by ELC's manipulation of bank accounts and commingling funds, and its use of three sets of "books" in disbursing funds, including two sets of "cooked" books. Docket no. 91 at 19-20. COFS asserts that even the initial court-ordered accounting is inaccurate and intended to conceal monies, and that ELC used fraudulent "disbursement authorizations" and similar documents and redacted bank statements, all of which show that discovery is insufficient to determine what ELC did with COFS's money. *Id.* at 20. Thus, COFS contends it has alleged sufficient facts showing what it needs and to warrant an equitable accounting.

The Court finds that COFS has sufficiently stated a claim for an equitable accounting. *Phillips v. Estate of Poulin*, No. 03-05-00099-CV, 2007 WL 2980179, at *3 (Tex. App.–Austin, Oct. 12, 2007, no pet.) (probate court did not abuse its discretion in ordering an accounting where there was evidence of "possible improprieties" and party was "less than forthcoming in providing information" and the information provided was "confusing, inexplicable, and suggestive of other possible improprieties"). The motion to dismiss this claim is denied.

## C. Dwayne D. Naumann's Motion to Dismiss

Naumann moves to dismiss all of COFS's claims against him in his individual capacity. COFS sues both ELC and Naumann for fraud and conspiracy to commit fraud, theft and conspiracy to commit theft, breach of fiduciary duty, negligent misrepresentation, equitable

accounting, and money had and received. COFS's complaint refers to "ELC/Naumann" as a single party, but alleges claims against ELC and against Naumann in his individual capacity (direct claims) and vicariously on a veil piercing theory. Naumann argues that he cannot be liable as a party to the Escrow Agreement because he is not a signatory in his individual capacity, signed only as the managing member of ELC, and did not personally undertake any obligations. Naumann contends that COFS fails to state a claim against him individually because every action of which COFS complains was taken by Naumann in his capacity as a principal of ELC.

Naumann further argues that COFS fails to allege fraud with sufficient particularity; fails to identify which Defendants took which actions sufficient to give fair notice under its TLA and negligent misrepresentation claims; fails to state a claim for breach of fiduciary duty because it fails to allege that Naumann personally acted as escrow agent; fails to plead a relationship between COFS and Naumann individually to support a negligent misrepresentation or equitable accounting claim; fails to identify any money that Naumann personally received and why that money belonged to COFS for the restitution or money had and received claim; and fails to plead sufficient facts to state a claim for veil piercing.

    1.   individual liability and vicarious liability/veil piercing

Before considering whether the pleadings state any particular causes of action against Naumann, the Court must first consider the extent to which Naumann may be held directly individually liable for the alleged torts or vicariously liable through a veil piercing theory. A defendant's liability in his individual capacity for his own tortious conduct is distinct from liability under a veil piercing theory, which is a form of vicarious liability. COFS asserts that Naumann may be liable in his individual capacity for knowingly participating in fraudulent or

tortious acts, even when acting within the course and scope of his employment. Docket no. 90 at 3. COFS cites several cases in that vein. However, Naumann contends that COFS's pleadings fail to state a claim against Naumann individually.

Naumann also correctly notes that certain language in the TAC indicates that COFS is attempting to reach Naumann by piercing the corporate veil of ELC, specifically alleging that "Naumann is using the corporate form of ELC to perpetrate a fraud on COFS, and adherence to the corporate fiction would promote injustice and lead to an inequitable result." Docket no. 82 at 12 (citing TAC ¶ 94). Naumann contends that it is insufficient to allege that Naumann was the only principal of ELC, and that COFS must allege more -- specifically that the fraud was perpetrated primarily for Naumann's direct personal benefit. Docket no. 82 at 12-13. COFS contends that it has sufficiently pled its claims for direct and vicarious liability, but seeks leave to amend to address any deficiencies identified by the Court in analyzing the motion.

Texas has long had two methods for holding individual corporate agents or officers personally liable when they are acting within the course and scope of their employment or role as corporate agents – piercing the corporate veil or direct individual liability. First, a plaintiff may impose individual liability against corporate agents by imposing vicarious liability on the individual for the corporation's liability through one of the various veil piercing theories for disregarding the corporate form, including sham to perpetrate a fraud or alter ego. Piercing the corporate veil is not itself a cause of action, but a means to impose personal liability on shareholders and corporate officers who otherwise would be shielded from liability for corporate obligations and liabilities. *Shandong Yinguang Chem. Industrs. Joint Stock Co. v. Potter*, 607 F.3d 1029, 1035 (5th Cir. 2010).

The Texas Supreme Court held in *Castleberry v. Branscum*, 721 S.W.2d 270 (Tex. 1986), that the corporate fiction could be disregarded if the corporate form was used as a sham to perpetrate a fraud, and found that constructive fraud was sufficient to prove such a sham. The Legislature rejected that view in certain cases, taking a stricter approach to disregarding the corporate structure by statute. *SSP Partners v. Gladstrong Inv. (USA) Corp.*, 275 S.W.3d 444, 455 (Tex. 2008); *see also Willis v. Donnelly*, 199 S.W.3d 262, 271-72 (Tex. 2006) (noting that the business community was displeased with the flexible approach to piercing the corporate veil embraced in *Castleberry*, and in response the Legislature in 1989 narrowly prescribed the circumstances under which a shareholder can be held liable for corporate debts by enacting Texas Business Corporations Act article 2.21). The 1996 Bar Committee Comment to Article 2.21 stated that "while questionable in the context of tort claims, the use of constructive fraud as a means of piercing the corporate veil created a cloud on the sanctity of contract and the public policy of recognizing corporations as separate entities apart from their shareholders," so the Legislature amended the statute "to establish a clear legislative standard under which the liability of a shareholder for the obligations of a corporation is to be determined in the context of contractual obligations and all matters relating thereto." *Willis*, 199 S.W.3d at 272 n.12.

In 1993, the statute was revised to state that no contractual liability could be found under alter ego or similar theories unless there were additional findings of actual fraud and personal benefit to the individual corporate agent. *Menetti v. Chavers*, 974 S.W.2d 168 (Tex. App.–San Antonio 1998, no pet.); Act of May 7, 1993, 73d Leg., R.S., ch. 215 § 2.05(a)(2), 1993 Tex. Gen. Laws 418, 446. The statute was again amended in 1997 to expand its scope to "all contractual obligations of the corporation or any matter relating to or arising from the

obligation." *Menetti*, 974 S.W.2d at 174 (citing Act of May 1, 1997, ch. 375, § 7). As the *Menetti* court noted, this additional language "appears to blur the distinction between contractual obligations and other claims," because previously all claims that were not contractual were governed by *Castleberry. Menetti*, 974 S.W.3d at 173-74. However, the *Menetti* court concluded that tort claims for fraud, DTPA, and negligence based on veil piercing theories are subject to the statute when they relate to or arise from a contractual obligation. *Id.* at 174.

In its current form, codified at Texas Business and Organizations Code § 21.223(a), the statute protects members of corporations and LLCs[9] from liability "to the corporation or its obligees with respect to . . . any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, beneficial owner, subscriber, or affiliate is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory." TEX. BUS. ORGS. CODE § 21.223. However, § 21.223(b) further provides that a holder, beneficial owner, subscriber, of affiliate is not shielded from liability if he "caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate." *Id.* § 21.223(b).

Thus, § 21.223(b) allows a plaintiff to hold corporate shareholders, beneficial owners, and others responsible for corporate obligations by piercing the veil if they can show the individual committed actual fraud for his direct personal benefit. Further, the statute pre-empts

---

[9] Although it refers to corporations, "[t]he principles applicable to piercing the corporate veil apply equally to limited liability companies." *U.S. KingKing LLC v. Precision Energy Servs., Inc.*, 555 S.W.3d 200, 213 (Tex. App.–Houston [1st Dist.] 2018, no pet.); *Spring Street Partners v. Lam*, 730 F.3d 427, 443 (5th Cir. 2013 ("Veil-piercing and 'alter ego' principles apply equally to corporations and LLCs."); TEX. BUS. ORGS. CODE § 101.002(a) (subject to § 101.114, § 21.223 applies to an LLC and the company's members, owners, assignees, affiliates, and subscribers).

any common-law veil piercing theories, stating that liability "for an obligation that is limited by Section 21.223 is exclusive and preempts any other liability imposed for the obligation under common law or otherwise." TEX. BUS. ORGS. CODE § 21.224. Section 21.225 then provides "exceptions to limitations," stating that Section 21.223 or 21.224 "does not limit the obligation of a holder, beneficial owner, subscriber, or affiliate to the obligee of the corporation if that person: (1) expressly assumes, guarantees, or agrees to be personally liable to the obligee for the obligation; or (2) is otherwise liable to the obligee for the obligation under this code or other applicable statute." *Id.* § 21.225.

However, apart from any veil piercing theory seeking vicarious liability, it has long been established that "a corporation's employee is personally liable for tortious acts which he directs or participates in during his employment." *Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 375 (Tex. 1982) (recognizing rule and holding employee individually liable for penning a libelous letter in the course and scope of his employment); *see also Miller v. Keyser*, 90 S.W.3d 712, 717 (Tex. 2002) (noting Texas's longstanding rule that a corporate agent is personally liable for his own fraudulent or tortious acts). "The law is well-settled that a corporate agent can be held individually liable for fraudulent statements or knowing misrepresentations even when they are made in the capacity of a representative of the corporation." *Kingston v. Helm*, 82 S.W.3d 755, 759 (Tex. App.–Corpus Christi 2002, pet. denied).

With some exceptions, this rule of individual liability applies to intentional torts as well as negligence, but for negligence claims, corporate officers and agents are subject to personal liability for their actions within the employment context only when they breach an independent duty of care to the injured party separate and apart from the employer's duty. *Leitch v. Hornsby*,

935 S.W.2d 114, 117 (Tex. 1996) (recognizing that a corporate officer or agent can be liable to others for his own negligence, but only when he breaches an independent duty of care).[10] "If a corporate officer knowingly participates in a tortious act, there is no need to pierce the corporate veil in order to impose personal liability." *Walker v. F.D.I.C.*, 970 F.2d 114, 122 (5th Cir. 1992); *Sanchez v. Mulvaney*, 274 S.W.3d 708, 712 (Tex. App.–San Antonio 2008, no pet.); *Walker v. Anderson*, 232 S.W.3d 899, 918 (Tex. App.–Dallas 2007, no pet.) ("It is not necessary to pierce the corporate veil in order to impose personal liability, as long as it is shown that the corporate officer knowingly participated in the wrongdoing.").

These two distinct methods of holding corporate agents acting within the scope of their employment personally liable have co-existed for decades, with plaintiffs asserting direct tort claims against individuals who personally participated in the torts (direct individual capacity claims) and asserting veil piercing theories for contract claims and tort claims for which the corporation was liable but in which the individual corporate agent may or may not have personally participated (vicarious liability veil piercing claims). Veil piercing claims for contractual obligations of the corporation or matters relating to or arising therefrom were governed by § 21.223, while direct individual-liability tort claims and other veil piercing claims (those not encompassed by the statute) were governed by common law.

---

[10] The Texas Supreme Court has also held that a corporate officer may not be held liable for inducing the corporation to violate a contractual obligation as long as he or she acts in good faith on the corporation's behalf. *Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex. 1995); *see also ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 432 (Tex. 1997). That is because the alleged interference is committed by an individual who is also the lawful representative of the contracting party and tests the limits of the rule barring tortious interference claims when the inducing and breaching party are one and the same. *Holloway*, 898 S.W.2d at 795. Thus, individual liability will attach only when the defendant acted in a fashion so contrary to the corporation's best interests that his actions could only have been motivated by personal interests. *Id.*

However, recent cases have muddled this distinction. In *Texas-Ohio Gas, Inc. v. Mecom*, 28 S.W.3d 129, 137 (Tex. App.–Texarkana 2000, no pet.), the Texarkana court of appeals first used the statute to preclude what may have been direct individual-liability tort claims, though the case is not entirely clear. The plaintiff sued the individual defendant officers of a corporation alleging fraud, fraudulent inducement, negligent misrepresentation, and tortious interference with a contract "based on its allegation that the defendants participated individually and as co-conspirators in a fraudulent scheme that induced [plaintiff] to sell gas to the Olympic entities, which the defendants knew to be insolvent." *Id.* at 134. The Texarkana court found that that the individual defendants were "within the class protected by the statute and that this statute is the exclusive means for Texas-Ohio to recover in the present case" because all of the claims were "attempting to hold shareholders personally liable for a 'matter relating to or arising from' a contractual obligation of the corporation." *Id.* The court held that a negligent misrepresentation claim, on its face, was barred by the statute because such a claim "is not in the nature of an actual fraud claim." It held that the fraud, fraudulent inducement, and tortious interference claims were groundless based on the alleged facts because "Texas-Ohio is not alleging that either of [the individual defendants] *personally* committed actual fraud, but rather Texas-Ohio is alleging that they participated in a conspiracy and thus should be held liable for the alleged fraudulent statements made by their co-conspirators." *Id.* (emphasis in original). Thus, this case uses some unclear language, but it appears to apply the statute because the claims were essentially vicarious liability claims for torts committed by the corporation rather than by the individuals personally, and thus not direct personal liability claims based on the defendants' own tortious conduct.

In *Kingston v. Helm*, 82 S.W.3d 755 (Tex. App.–Corpus Christi 2002, pet. denied), the court of appeals expressly considered an individual defendant's assertion that § 21.223 subsumes claims for *direct individual liability* when the claims arise out of or relate to contractual obligations of the corporation. The individual defendant argued that the statute (then article 21.21) "reversed the caselaw [concerning individual liability for personally participating in torts] and effectively eliminated individual liability for corporate officers and agents who are shareholders in the corporation absent evidence that the corporation itself was specifically used for the purpose of perpetrating a fraud." *Id.* at 764. Thus, the defendant argued, the statute would apply not only to veil-piercing claims, but also to direct claims attempting to hold a corporate agent individually liable for the agent's own tortious conduct when the tort claim related to or arose from the corporation's contractual obligation.

The court held that the plaintiff "was not required to pierce the corporate veil to hold [the individual defendant] liable in his individual capacity." *Id.* at 761. It concluded that the statute was aimed at traditional veil piercing theories, which seek to hold shareholders and beneficial owners liable merely based on their status as an owner or shareholder, and did "not believe that this article was intended to shield a corporate officer or agent who commits tortious conduct merely because the officer or agent also possesses an ownership interest in the corporation." *Id.* at 765. "In other words," it said, "the statute applies to suits which attempt to impose individual liability on a corporate shareholder *not* on the basis of the shareholder's own actions, but rather on the basis of the shareholder's status as a shareholder," and alter ego and "similar theories" refer to the various theories of veil piercing. *Id.*

Although the statute would include claims "relating to or arising from a corporation's contractual obligations," thus including certain tort claims, extending the statute to apply to claims against an individual tortfeasor for his own torts such as fraud, fraudulent inducement, negligent misrepresentation, and DTPA claims "extends the statute beyond its intended and logical reach" and would "add a layer of protection to any corporate officer or agent who commits a tort merely because he or she also possesses an ownership interest in the corporation." *Id.* The court could not "imagine that the Legislature intended such a departure from the general principle that an agent is always liable for his or her own tortious conduct." *Id.* at 766. Thus, because the claim sought to hold an agent of a corporation liable for his own individual conduct, the fact that he was also a shareholder or owner or officer of the corporation did not invoke the protections of the statute or affect whether he could be held individually liable for his own conduct in light of longstanding law. *Id.* at 766-67. The court cited a few cases in support, but cited *Texas-Ohio* with a "but see" and a parenthetical that the court held that suit against the vice president and manager of a corporation for fraud, fraudulent inducement, negligent misrepresentation, and tortious interference with contract was subject to article 21.21.

Some courts have agreed with and followed the Corpus Christi Court of Appeals' conclusion in *Kingston v. Helm* in finding that the statute does not apply to direct individual liability claims. In 2008, the San Antonio Court of Appeals cited *Kingston* in finding that the plaintiff could hold the individual defendants individually liable for their own tortious acts without having to pierce the corporate veil. *Sanchez v. Mulvaney*, 274 S.W.3d 708 (Tex. App.–San Antonio 2008, no pet.). In *Thule Drilling ASA v. Schimberg*, 290 F. App'x 745, 747 (5th Cir. 2008), the Fifth Circuit also indicated that, given the longstanding rule that an agent whose

personal conduct is tortious is subject to liability, "Texas courts have accordingly concluded that suits in tort do not always require piercing the corporate veil," citing *Kingston*. In 2010, it analyzed the elements of a direct fraud and fraudulent inducement claim against a corporation's owner for misrepresentations he personally made during negotiations, and separately analyzed the plaintiff's claim to impose the corporations' contract liability onto the owner by piercing the corporate veil under the statute. *Shandong Yinguang Chem. Industrs. Joint Stock Co. v. Potter*, 607 F.3d 1029, 1035 (5th Cir. 2010). Thus, the Fifth Circuit has continued to view the two routes to individual personal liability as separate even in cases involving contracts.

However, some recent cases have disagreed with *Kingston* and have held that the statute applies to *all* tort claims – both direct liability and vicarious liability veil piercing claims – so long as they arise from or relate to a contractual obligation of the corporation. In *Saeed v. Bennett-Fouch Associates, LLC*, No. 3:11-CV-01334-F, 2012 WL 13026741 (N.D. Tex. Aug. 28, 2012), the Northern District of Texas rejected *Kingston*, purportedly based on the plain language of the statute, without considering the long-standing line of cases concerning direct personal liability or the distinction between direct personal liability and veil piercing claims. In rejecting *Kingston*, the *Saeed* court claimed that *Kingston* "even goes so far as to contend that § 21.223 does not apply to torts at all." *Id.* at *3. But *Kingston* did not hold that § 21.223 does not apply to tort claims brought under a veil piercing theory; it only held that the statute did not alter the long-standing rule for direct personal liability tort claims. The *Saeed* court further cited *Texas-Ohio Gas v. Mecom* as finding "fraudulent inducement claims to be within the purview of §21.223." *Id.* at *3. While that is true, as noted, the *Mecom* court appeared to hold that veil

piercing tort claims were within the statute, and did not clearly differentiate between veil

piercing and direct liability claims. Thus, the Court does not find *Saeed* persuasive.

In a recent opinion, the Fourteenth Court of Appeals found that § 21.223 applied to a

direct liability claim against a corporation's owner and president for common-law fraud. In

*TecLogistics, Inc. v. Dresser-Rand Group, Inc.*, 527 S.W.3d 589 (Houston [14th Dist.] 2017, no

pet.), the court acknowledged that "the evidence established that Treurniet is the agent through

which TecLogistics acted to defraud Dresser-Rand" and that she admittedly created false

invoices and personally signed the invoices incorporating the knowing misrepresentations, but

found that for Treurniet to be individually liable, Dresser-Rand had to satisfy the requirements

of § 21.223 *Id.* at 596-98. The court concluded that "Dresser-Rand's claim that Treurniet

provided fabricated documents is a claim 'relating to [or] arising from' TecLogistic's

contractual obligations to Dresser-Rand." *Id.* The court then found that "[b]ecause all five of §

21.223(a)(2)'s requirements have been satisfied, the statute's terms barring individual liability

apply to Dresser-Rand's fraud claim against Treurniet." *Id.* at 598.

Dresser-Rand argued that the common-law governed, and pointed to a number of cases

that "appear[ed] to hold an individual liable with respect to a matter relating to or arising from

a corporate obligation even when the requirements of section 21.223(a)(2) have been satisfied."

*Id.* at 599. The court stated that "[m]ost of these apparent inconsistencies are explained by the

statute's history." *Id.* It noted that the statute did not expressly preempt the common law until

1993, and that it did not reach its "current breadth" until 1997, when "the legislature expanded

the scope of the statute's protection so that covered persons were protected from liability not

only for the corporation's contractual obligations but also for 'any matter relating to or arising

from the obligation,'" and that it also enlarged the class of protected persons to include "not only shareholders, subscribers, and owners of beneficial interests in shares, but also 'any affiliate thereof or of the corporation,'" which began to shield those with a right to control the corporation, even if they had no actual or beneficial ownership interest. *Id.*

Dresser-Rand argued that the statute limits liability "only for a corporation's debts or contractual obligations," thus pointing out that it applies to veil-piercing vicarious liability claims, not direct personal liability claims, and cited *Willis v. Donnelly*, 199 S.W.3d 262, 271-72 (Tex. 2006). The court dismissed that citation to *Willis* on the basis that the Texas Supreme Court's statement that "the Legislature in 1989 narrowly prescribed the circumstances under which a shareholder can be held liable for corporate debts" was a correct statement of the law in 1989, but "the statute provides much more robust protection today." *TecLogistics*, 527 S.W.3d at 600. But although that particular statement was about 1989, *Willis* was decided in 2006, and *Willis* states that the "bedrock principle of corporate law" is that a legitimate purpose for forming a corporation is to limit individual liability for the corporation's obligations. *Willis*, 199 S.W.3d at 271; *see also SSP Partners v. Gladstrong Invests. Corp.*, 275 S.W.3d 444, 455 (Tex. 2008) (same). It noted that "liability of a shareholder for a contractual corporate debt under this statute 'is exclusive and preempts any other liability imposed for that obligation under common law or otherwise." *Willis*, 199 S.W.3d at 272. These statements show that the Court regarded the statute as applying to vicarious liability veil piercing theories in 2006. [11]

---

[11] Other cases also refer to the statute as applying to veil piercing theories. In *Thrift v. Hubbard*, 44 F.3d 348 (5th Cir. 1995), the Fifth Circuit stated that "[t]he liability imposed under article 2.21 concerns 'shareholder liability for *acts of the corporation in connection with contract claims.*" (emphasis in original). In *Shook v. Walden*, 368 S.W.3d 604 (Tex. App.–Austin 2012, pet. denied), the court noted that article 2.21 was amended in response to *Castleberry* "to partially codify and limit judicial application of corporate veil-piercing principles" and noting that "in the absence of affirmative jury findings on any direct liability theories against [the individual,] the district court's

The *TecLogistics* court then noted that cases permitting DTPA claims against individual officers were the result of § 21.225, which provides that Sections 21.223 and 21.224 do not provide protection when the individual is otherwise liable to the obligee for the obligation under another applicable statute. The *TecLogistics* court next noted that, "[o]f the remaining cases relied upon by Dresser-Rand as support for its position that Treurniet can be held personally liable, most do not mention section 21.223 or its predecessor." *TecLogistics*, 527 S.W.3d at 601. These cases include *Miller v. Keyser*, 90 S.W.3d 712 (Tex. 2002) (corporate agent may be held personally liable for his representations made in the course of employment under the DTPA); *Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369 (Tex. 1984); *Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191 (Tex. App.—Houston [1st Dist.] 2014, pet. denied); *Physio GP, Inc. v. Naifeh*, 306 S.W.3d 886 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *Sanchez v. Mulvaney*, 274 S.W.3d 708 (Tex. App.—San Antonio 2008, no pet.); *Graham Land & Cattle Co. v. Indep. Bankers Bank*, 205 S.W.3d 21 (Tex. App.—Corpus Christi 2006, no pet.); *Morris v. Kohls–York*, 164 S.W.3d 686 (Tex. App.—Austin 2005, pet. dism'd)[12]; *Cimarron Hydrocarbons Corp. v. Carpenter*, 143 S.W.3d 560 (Tex. App.—Dallas 2004, pet. denied); *Gore v. Scotland Golf, Inc.*, 136 S.W.3d 26 (Tex. App.—San Antonio 2003, pet. denied) (op. on reh'g); *Holberg v. Teal Constr. Co.*, 879 S.W.2d 358 (Tex. App.—Houston [14th Dist.] 1994, no writ).

---

judgment imposing liability against him rests entirely upon the three alternative findings relating to alter-ego, single-business-enterprise, and 'sham' theories for disregarding S&J's separate existence – a/k/a 'piercing its veil' – and imposing the company's obligations under the Construction Contract on him individually."

[12] This is a personal jurisdiction case, and thus not particularly applicable. However, it recognizes the rule that the fiduciary shield doctrine does not protect a corporate employee from the exercise of specific jurisdiction as to fraudulent activities or torts for which the employee may be held individually liable. 164 S.W.3d at 697.

Many of these cases are inconsistent with the *TecLogistics* court's holding because they continue to differentiate between direct personal liability claims and vicarious liability veil piercing claims even when the claims arise from a contractual relationship, and conclude that the statute or veil piercing law applies only to the latter. In *Nwokedi*, the First Court of Appeals applied the common-law rule that a corporate officer who knowingly participates in a tort may be held individually liable for fraud when he participated in contract negotiations, instructed another on which contract terms to modify, and personally made representations to plaintiff's representatives, and noted that because there was evidence to hold him individually liable for fraud, it did not need to address whether he was the alter ego of the corporation. 428 S.W.3d at 201-201 & n.1. The San Antonio Court of Appeals held the same in *Sanchez*, noting the difference between individual liability and veil piercing claims. 274 S.W.3d at 712.[13] The Fourteenth Court's prior opinion in *Physio GP* did not involve a contract, but even there the court acknowledged the difference between individual and alter ego liability. 306 S.W.3d at 888-89 (employee cannot be held individually liable under *Sabine Pilot* because the employee does not owe an independent duty to another employee, and thus there can be no individual liability absent an alter ego finding). The Dallas Court of Appeals in *Cimarron Hydrocarbons* also distinguished individual liability claims from veil piercing claims, stating that the plaintiff "was not suing Carpenter as the owner or agent of the C.D. Companies, but as an independently responsible actor" such that the claims "are based on Carpenter's own allegedly tortious or

---

[13] In *Menetti v. Chaver*, 974 S.W.2d 168 (Tex. App.–San Antonio 1998, no pet.), the San Antonio court did apply the statute to tort claims, but the plaintiff in that case asserted only veil-piercing theories of liability and made no arguments about direct personal liability. Similarly, in *Hidden Values v. Wade*, No. 3:11-CV-1917-L, 2012 WL 1836087 (N.D. Tex. 2012), the court applied the statute to alter ego veil piercing claims based on tort theories.

fraudulent acts" even though there was a contract between the plaintiff and the C.D. Companies. 143 S.W.3d at 564-65.

The Court has also located additional cases that are inconsistent with the *TecLogistics* court's holding that the statute governs direct liability claims, including: *O'Hare v. Graham*, 455 F. App'x 377 (5th Cir. 2011) (noting that LLC managers could be individually liable for fraudulently inducing other board members to enter into a settlement agreement and "that the promises were made by corporations is no shield for the agents who acted on the corporation's behalf"); *Thule Drilling v. Schimberg*, 290 F. App'x 745, 747 (5th Cir. 2008) (discussed above); *In re Arnette*, 454 B.R. 663 (N.D. Bankr. Tex. 2011) (noting that Texas courts are split on whether § 21.223 applies to tort theories for piercing the corporate veil and not deciding the issue, but also noting that the plaintiff could hold the individual personally liable for his own fraudulent or tortious acts in the form of misrepresentations made in connection with the parties' contractual business dealings); *Alexander v. Kent*, 480 S.W.3d 676 (Tex. App.—Fort Worth 2015, no pet.) (plaintiff sued company and its owner for breach of contract and fraud in the course of performance of a construction contract and after company went bankrupt, maintained his fraud claim against the owner individually; court rejected his argument that he could not be individually liable because he signed the contract only in his corporate capacity as president, citing the general rule that one is personally liable for their own tortious acts and noting that "[i]n an action seeking to hold an officer liable for his own fraudulent statements, the corporate veil is not required to be pierced," citing *Kingston* and *Sanchez*); *Khan v. GBAK Properties*, 371 S.W.3d 347 (Tex. App.–Houston [1st Dist.] 2012, no pet.) (finding president of corporation faced individual liability for the torts he directed and participated in regardless of whether they

were performed in his capacity of president and regardless of the fact that company and plaintiff had a contractual relationship from which claims arose).

The *TecLogistics* court disagreed with the Corpus Christi court's *Kingston v. Helm* opinion, finding that "it reached its conclusion that the statute has only limited application by relying on cases that predated the relevant statutory amendments, or that dealt with liability imposed by another statute." 527 S.W.3d at 602. It further rejected *Walker v. Anderson*, 232 S.W.3d 899, 918 (Tex. App.–Dallas 2007, no pet.)'s statement that it is not necessary to pierce the corporate veil to impose personal liability when the corporate officer knowingly participated in the wrongdoing, finding it dicta because liability in that case was based on the statute. *TecLogistics*, 527 S.W.3d at 602. But *Walker*'s statement is not dicta, as the court relied on those principles and the "long-standing Texas rule that corporate agents are not shielded by agency law for their own tortious conduct" to affirm the trial court's conclusion that article 2.21 "did not require the Andersons to pierce the corporate veil to hold Walker individually liable." *Id.* at 919. Thus, *TecLogistics* is not persuasive.

More recent cases fail to demonstrate any consensus. The Fourteenth Court of Appeals has followed its *TecLogistics* opinion in *Hong v. Havey*, 551 S.W.3d 875 (Tex. App.—Houston [14th Dist. 2018, no pet.). In *Argent Holdings LLC v. East El Paso Physicians Med. Ctr., LLC*, No. EP-17-CV-00199-ATB, 2018 WL 3328416 (W.D. Tex. Jan. 16, 2018) and 2018 WL 548676 (W.D. Tex. Jan. 23, 2018), the court applied the longstanding rule that a corporate agent is personally liable for his own fraudulent or tortious acts, even when acting in the course and scope of his employment, to conclude that an individual could be personally liable for fraud, negligent misrepresentation, and conversion if the claims were sufficient. The court held that §

21.223 and *TecLogistics* did not establish that the individual could not be personally liable for his fraud because "[t]hese authorities involve contractual obligations, rather than tort liability," and cited *Walker v. Anderson* for the proposition that a corporate officer may be personally liable in cases involving tortious or fraudulent conduct by that officer. 2018 WL 548676 at *2.

In *In re Technicool Systems, Inc.*, No. 15-34435, 2018 WL 5780250 (S.D. Tex. Bankr. Oct. 31, 2018), the individual defendant argued that he was shielded from a fraud claim by § 21.223(a)(2) and the plaintiff responded "that the overwhelming weight of precedent in Texas requires that a corporate actor be held liable for their individual tortious conduct." The Bankruptcy Court held that the fraud claim "regarding Furlough's purported fraud as a corporate officer fits squarely within the plain language of § 21.223(a)(2), which was specifically enacted to shield corporate officers from fraud allegations absent a showing of direct, personal benefit." But, citing the common-law rule and *Miller v. Keyser*, it held that § 21.223 "is inapplicable to shield Furlough against NOV's allegations of individual fraudulent conduct." *Id.*

At this point, the Court will follow *Kingston v. Helm* and will permit COFS to pursue common-law tort claims against Naumann individually based on his own personal tortious conduct. The Court disagrees with *TecLogistics* that the common-law rule of direct personal liability for a corporate agent's own tortious conduct is superseded by § 21.223 when the tort claim is related to a contractual obligation of the corporation or LLC. The history of the statute and the statutory language indicate that it applies to veil piercing theories (for both contract and related tort claims), but not to direct liability claims for an individual's own tortious conduct. The protection of subsection (a)(2) applies to "any contractual obligation *of the corporation* or any matter relating to or arising *from the obligation*," § 21.223(a)(2) (emphasis added),

indicating that it applies to claims holding a shareholder or owner liable for a contract-related *corporate obligation* (both contract and tort), the classic veil piercing scenario. Further, it bars claims seeking to hold a shareholder or owner liable for a corporate obligation on the basis that the individual "is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory." *Id.* As used here, alter ego, actual and constructive fraud, and sham to perpetrate a fraud are veil piercing theories under Texas common law. *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986).

"Other similar theory" would include other veil piercing theories under Texas common law, of which there are several. *See O'Connor's Texas Causes of Action* Ch. 38, § F ("Vicarious liability can be imposed on a defendant for certain acts of a corporation under any one of seven theories for disregarding the corporate form, commonly referred to as 'piercing the corporate veil.'"). But "other similar theory" would not appear to include direct, individual liability claims based on personal conduct, which have always been separate from veil piercing theories. While *TecLogistics* and *Saeed* focus on the language that the statute applies to "any matter relating to or arising from the [corporate contractual] obligation," neither focuses on the *theory of liability* language, which indicates that the statute applies to veil-piercing theories of liability, not direct liability theories. Accordingly, the Court will not apply the statute to any direct personal liability claims, and will simply examine those claims to determine whether COFS has sufficiently pled a claim.

With regard to COFS's veil-piercing allegations, COFS alleges that "Naumann is using the corporate form of ELC to perpetrate a fraud on COFS, and adherence to the corporate fiction would promote injustice and lead to an inequitable result." TAC ¶ 94. Naumann has invoked the

protections of § 21.223. The tort claims relate to or arise from ELC's contractual obligations, and COFS does not contend that the statute is inapplicable. To hold Naumann vicariously liable for the torts of ELC under § 21.223, COFS must allege that Naumann "caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on [COFS] primarily for the direct personal benefit of" Naumann. TEX. BUS. ORGS. CODE § 21.223(b). Naumann contends that COFS fails to allege that he perpetrated the fraud primarily for his direct personal benefit, and the allegation that he is the sole principal of ELC is insufficient. In response, COFS contends that Naumann "was intricately intertwined in the events at issue which give rise to both fraud and other tortious liability" and again asserts that Naumann is the only principal.

The Court concludes that COFS has not sufficiently pled facts demonstrating that the fraud was primarily for Naumann's direct personal benefit. The allegations all refer to "ELC/Naumann" as one, and they state that unauthorized disbursements were transferred to "ELC" or placed in "ELC/Naumann's personal checking account." While "primarily for the direct personal benefit" of the individual is not defined, most cases finding the requirement to have been met had evidence showing that "funds derived from the corporations' allegedly fraudulent conduct were pocketed by or diverted to the individual defendant." *TecLogistics*, 551 S.W.3d at 885 (listing cases). When the funds were used for the corporation's benefit, that has been held insufficient, even where it indirectly benefits the corporate officers and agents because the corporation is "able to live another day due to its ability to satisfy some demands" or because their ownership interest retains its value, and this appears true even where the individual is the sole shareholder and where corporate formalities are disregarded. *Morgan v. Fuller*, No. 07-15-00314, 2016 WL 2766106, at *2-3 (Tex. App.–Amarillo 2016, no pet.); *Transpecos Banks v.*

*Strobach*, 487 S.W.3d 722 (Tex. App.–El Paso 2016, no pet.). Because the allegations either state that money was given to ELC or to ELC/Naumann (TAC ¶ 70, 71, 75, 83) or were placed into "ELC/Naumann's personal checking account" or "ELC/Naumann's high-interest money market account," the pleadings fail to demonstrate a basis for finding that the fraud was primarily for Naumann's direct personal benefit.

Accordingly, the Court dismisses any veil piercing claims against Naumann, subject to repleading by COFS to attempt to state such a claim.

2. fraud/fraudulent inducement and conspiracy to commit fraud

Naumann argues that COFS fails to plead fraud or fraudulent inducement with sufficient particularly under Federal Rule of Civil Procedure 9(b). The Court reaches the same conclusion as it did with regard to ELC, above.

3. theft and conspiracy to commit theft/Texas Theft Liability Act

Naumann argues that the complaint fails to state a claim against him for theft because it does not identify the section of the Texas Penal Code that forms the basis of this claim and does not identify which Defendant took which action alleged to violate the Penal Code, and these deficiencies require dismissal. Docket no. 82 at 8. The Court reaches the same conclusion as it did with regard to ELC, and denies the motion to dismiss this claim.

4. breach of fiduciary duty

Naumann argues that the complaint fails to state a claim against him for breach of fiduciary duty because it alleges that "ELC/Naumann" owe fiduciary duties "as escrow agents under the Escrow Agreement," (TAC ¶ 152), but Naumann is not a party to the Agreement or an escrow agent under that Agreement, and COFS alleges no facts that would render him an

escrow agent in his personal capacity. Naumann argues that COFS complains only of (1) failing to release the funds to COFS in accordance with the terms of the Escrow Agreement, (2) failing to disclose activity in and related to the escrow account, and (3) failing to pay the funds only to COFS, who is entitled to the funds. TAC ¶ 154. Naumann asserts that each of these alleged actions relate to duties that arise out of COFS's deposit of funds with ELC and the terms of the Escrow Agreement, not to actions taken by Naumann in an individual capacity, and COFS has failed to allege facts sufficient to cause Naumann to be personally liable for breach of fiduciary duty. Naumann notes that this Court previously dismissed COFS's claims against Naumann individually based on these exact allegations.

The Court has found that a corporate agent may still be liable for his own personal tortious activity, even if acting within the course of his corporate agency, and that applies to breach-of-fiduciary duty claims. Thus, the fact that Naumann was acting in his capacity as principal for ELC does not alone preclude liability for his torts. However, questions remain as to whether a fiduciary duty arose as a matter of law as between Naumann individually and COFS, and whether such a duty is actionable separate and apart from the duty owed by ELC. These issues are beyond the scope of this motion to dismiss. The Court denies the motion to dismiss predicated on the argument that Naumann cannot be held individually liable for breach of fiduciary duty because his actions were taken in his capacity as principal for ELC.

5. <u>negligent misrepresentation</u>

Naumann contends that the complaint fails to state a claim against him for negligent misrepresentation because individual liability for negligence "arises only when the officer or agent owes an independent duty of reasonable care to the injured party apart from the employer's

duty," and COFS fails to allege the existence of any relationship between Naumann and COFS independent of the relationship between COFS and ELC and fails to allege the existence of any independent duty. Docket no. 82 at 9 (citing *Leitch v. Hornsby*, 935 S.W.2d 114, 117 (Tex. 1996)). Naumann further argues that dismissal is required because the allegations impermissibly lump the various Defendants together, alleging that each provided unspecified false information. TAC ¶ 158 (citing *Washington*, 2016 WL 3081060, at *3; *Del Castillo*, 2016 WL 3745953, at *13). The Court agrees that COFS has failed to allege an independent duty, rendering the negligent misrepresentation claim against Naumann barred under the rule of *Leitch v. Hornsby* and the economic loss rule. The negligent misrepresentation claim against Naumann is dismissed.

      6.   <u>equitable accounting</u>

Naumann argues that the complaint fails to state a claim for an equitable accounting because such relief is not available from a party with which the plaintiff has no contractual or fiduciary relationship. Docket no. 82 at 10 (citing *Hunt Oil Co. v. Moore*, 656 S.W.2d 634, 642 (Tex. App.–Tyler 1983, writ ref'd n.r.e.)). Naumann notes that this claim was previously dismissed as to him, and the claim by its own terms does not seek relief against Naumann individually. Naumann further contends that this claim fails on the merits because COFS does not allege that the information it seeks is complex or that it would be unable to obtain the information through discovery. Docket no. 82 at 10.

With regard to the merits, the Court has already concluded that COFS states a claim sufficient for the Court to order an equitable accounting. COFS argues that it can obtain an equitable accounting from Naumann based on the existence of a fiduciary duty, and the Court

finds that dismissal of the claim against Naumann is premature before a determination of whether Naumann individually owed any fiduciary duties as a matter of law. Thus, the motion to dismiss the claim is denied at this time.

7. <u>restitution or money had and received</u>

Naumann contends that the complaint fails to state a claim against him for restitution or money had and received. The elements of a cause of action for money had and received are that the defendant holds money that belongs to the plaintiff in equity and good conscience. *Staats v. Miller*, 243 S.W.2d 686, 687-88 (Tex. 1951). The sole inquiry is whether the defendant received money that rightfully belongs to the plaintiff. *Id.* Naumann asserts that COFS's TAC merely recites this standard, but includes no allegations from the TAC to support the claim against Naumann individually because it "has failed to identify what money Mr. Naumann actually received individually and why, exactly, that money belongs to COFS." Docket no. 82 at 11. Naumann contends that no allegation places COFS's money in Naumann's pocket or that Naumann personally received anything belonging to COFS. COFS responds only that it has shown that Naumann has taken and held money that in equity and good conscience belongs to COFS. The Court agrees that COFS fails to allege facts showing that Naumann individually received money. As discussed above with regard to the veil piercing allegations, COFS never differentiates between money received by ELC and money received by Naumann individually. This claim is dismissed as to Naumann subject to repleading.

8. <u>attorney's fees</u>

To the extent Naumann moves to dismiss the claim for attorney's fees, any issue of attorneys' fees will be taken up post-judgment.

### III.  Defendant Stanley P. Bates

The Court notes that Defendant Stanley P. Bates does not appear to have been served as required by Rule 4. The original lawsuit was brought by Bates Energy as plaintiff against COFS and Sam Taylor as defendants. COFS filed a First Amended Counterclaim, asserting counterclaims against Bates Energy and adding Naumann and ELC as defendants. COFS later moved for leave to file a Third Amended Counterclaim to join Unlimited Frac Sand (FSU), David Bravo, Lorena Silvistri Bravo, individually and d/b/a Bravo Consulting Services, Mark Sylla, Howard Resources, Tier 1 Sands, and the Rosenblatt Law Firm as additional counter-defendants. Docket no. 67.  No Second Amended Counterclaim had been filed (or was ever filed). Although the motion for leave did not mention adding Stanley P. Bates as a counter-defendant, the proposed Third Amended Counterclaim did include him. And, after leave was granted, COFS filed the proposed Third Amended Counterclaim including Stanley P. Bates as a counter-defendant. As COFS acknowledges, it never filed a Second Amended Counterclaim. Thus, Stanley Bates first appears as a party in the Third Amended Counterclaim. Nevertheless, COFS did not request summons for Stanley Bates and has not served him. COFS is therefore directed to show cause why Stanley Bates should not be dismissed for failure to serve pursuant to Rule 4(m).

### Conclusion

Mark Sylla's motion to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction (docket no. 86) is DENIED.

Dwayne D. Naumann's motion to dismiss pursuant to Rule 12(b)(6) (docket no. 82) is GRANTED IN PART and DENIED IN PART as discussed herein.

Equity Liaison Company's motion to dismiss pursuant to Rule 12(b)(6) (docket no. 83) is GRANTED IN PART and DENIED IN PART as discussed herein.

If COFS desires to amend to address the pleading deficiencies noted herein, COFS should file a motion for leave to file an amended pleading that sets forth, with citation to legal authority, specifically how the amended pleading cures each of the noted deficiencies, along with a copy of any proposed amended pleading, no later than **February 4, 2019**.

COFS is further directed to show cause why counter-defendant Stanley P. Bates should not be dismissed pursuant to Rule 4(m) no later than **January 23, 2019**.

SIGNED this 14th day of January, 2019.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE