IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| BATES ENERGY OIL & GAS, LLC, § | |
| § | |
| *Plaintiff,* § | |
| § | |
| v. § | Civil Action No.  SA-17-CV-808-XR |
| § | |
| COMPLETE OIL FIELD SERVICES, ET § | |
| AL., § | |
| § | |
| *Defendants*. § | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

On this date, the Court considered Counter-Defendant Mark B. Sylla's Motion for Summary Judgment (docket no. 119) and Counter-Plaintiff Complete Oil Field Services' Motion to Strike Evidence (docket no. 123) and Motion for Leave to File Sur-reply (docket no. 126).

BACKGROUND

This lawsuit stems from a contract for the purchase of frac sand between Bates Energy Oil & Gas ("Bates Energy") and Complete Oilfield Services ("COFS"). Except as otherwise cited, the facts below are undisputed.

COFS was created in 2017 for the purpose of supplying frac sand to ProPetro, a pressure pumping and fracking company. Pursuant to an agreement between ProPetro and COFS, ProPetro agreed to deposit $4 million into an escrow account to pay COFS's eventual sand supplier for the purchase and delivery of specific types of frac sand. COFS began looking for sand suppliers and was introduced to Stanley Bates, principal and CEO of Bates Energy. Relying on Bates's representations about Bates Energy's ability to deliver 80,000 tons of frac

sand, COFS entered into a Memorandum of Understanding ("MOU") with Bates Energy in April 2017. Under the MOU, Bates Energy was to deliver specific amounts and types of frac sand to one of seven rail terminals in Texas on specific due dates, the first being a delivery of 10,000 tons by May 10, 2017. Docket no. 124-5 (Ex. D) at 48; docket no. 124-10 (Ex. I) at 14.

COFS, Bates Energy, and Equity Liaison Company ("ELC") entered into an Escrow and Distribution Agreement ("the Escrow Agreement") in April 2017. One million of ProPetro's money was placed into an escrow account at Chase Bank with ELC acting as the escrow agent. COFS alleges that the agreements required that disbursements from the ELC escrow account needed the joint instruction of both COFS and Bates Energy. COFS later learned that DeWayne Naumann, the principal of ELC, was a close associate of Bates. Unbeknownst to COFS, the account managed by ELC was a pre-existing Bates Energy escrow account that ELC was already handling for Bates Energy, and thus the $1 million was immediately commingled with funds already in the account.

After Bates promised that sand was on its way but no sand was delivered, COFS became concerned about Bates Energy's ability to deliver the quantity and quality of frac sand they had contracted for. Sam Taylor, COFS's principal, went to Wisconsin on or about May 9, 2017 to investigate Bates Energy's purported mines and other frac sand sources and to ensure that sand was being loaded. The parties agree that Taylor met with Mark Sylla, whom COFS characterizes as an independent contractor for Bates Energy. Sylla does not state in what capacity he was acting when he met with Taylor in Wisconsin to look at the mines. Sylla and Taylor drove around, and Sylla pointed out various mining operations in Wisconsin.

According to Taylor, Sylla told him "that there was no way they [Bates Energy] could hit 80,000 ton right now, less – or 40,000 ton." Docket no. 124-4 (Ex. C) at 90. Taylor testified Sylla "puts me in his truck and we drive down the road" and "he's supposed to give me a tour of some mines." *Id.* Taylor testified that he was not interested in seeing the mine owner or talking to the mine operator, he "just wanted to see the mine and how they operated at different levels." *Id.* at 90-91. Taylor stated that as they drove down the road, Sylla would point at a mine, and Taylor would ask him if they bought from that mine, and Taylor would say, "No." *Id.* at 91. Taylor stated that they stopped on the road because one of them had to use the restroom and "I'm being told after the fact that we were parked over LaPrairie, CSI's mine." *Id.* Taylor stated that they were "sitting there talking" and Taylor was trying to come up with ways to help and he asked "Mark, do you know an Eric String [*sic*]." *Id.* Taylor states he then called Eric Strang, a representative from the CSI mine, on "both of his cell phones," which he had from talking to him in January or February. *Id.* at 92. Taylor states that Strang called him the next day as he was headed to the airport, and they discussed COFS's need for sand, and Strang told Taylor that CSI could deliver sand "very soon." *Id.*

According to Sylla, they visited the Wisconsin White Sands Site in Tomah, the High Crush site in Independence, the CSI Sand Wisconsin site in Arcadia, and the Industrial Sands site in New Auburn. Docket no. 119-1 at 2. Sylla states that they "stopped at three of the sites." *Id.* Sylla told Taylor that none of those sites had the capacity to deliver the quantities of sand that Bates had promised to deliver. Sylla Aff. ¶ 7 ("I informed Sam Taylor that none of those sites had the capacity to deliver quantities in the amount he was seeking.").

The parties agree that, during the Wisconsin visit, Taylor contacted Eric Strang by phone and Taylor and Strang made an arrangement for sand delivery. COFS contends that this was "a separate arrangement directly with" CSI. Docket no. 124 at 4. Sylla contends that he is entitled to a commission for the sand delivery from CSI of $1 per ton.

COFS alleges that, on May 11 or 12, 2017, Sylla and Bates's girlfriend Audra Vega created a new company, Unlimited Frac Sand d/b/a Frac Sand Unlimited ("FSU"), a Texas LLC. David Bravo testified that FSU was a company that he owned with Mark Sylla as partner to sell and procure frac sand. Docket no. 124-6 (ex. E) at 179. COFS also provides screenshots from FSU's website when it was operational, which show David Bravo as President/Managing Partner and Mark Sylla as Chief Operations Officer/Partner. Docket no. 124-8 (Ex. G(1)).

Sylla denies any involvement with FSU, docket no. 119-1 at 2 ("I did not manage or have any involvement in Frac Sand Unlimited."), but he acknowledges that he is listed as a manager on the LLC formation documents, docket no. 124-8 at 9 (Ex. G(2)). Sylla asserts that he "was working with David Bravo on other completely unrelated prospective transactions, which transactions were not consummated." Docket no. 119-1 at 3. COFS alleges that FSU was used as a key part of the conspiracy among all the Defendants to fraudulently funnel COFS's escrow funds to persons outside the MOU contract. Docket no. 124 at 5. COFS alleges that FSU was the payee of most of the fraudulent payments totaling over $600,000 for frac sand that COFS alleges was never delivered. *Id.*; docket no. 124-9 (Ex. H) at 19.

Pursuant to the arrangement with CSI for a delivery of sand, on June 15, 2017, there was an authorized disbursement of $1 million from the escrow account, shown as a "flat fee" "one time transfer" of $1 million "For: CSI Sand Wisconsin, LTD." Docket no. 124-7 (Ex. F).

Bates signed the disbursement authorization and sent it to Taylor and Janis Kline of COFS, stating, "Here is the Disbursement letter for our team to used [sic] $1,000,000 of the escrowed fund towards Eric's mine at LaPrairie 'CSI Sand Wisconsin, LTD.'" *Id.* COFS contends that none of its authorizations permitted disbursements, fees, or commissions to Bates, Sylla, or anyone else besides CSI based on the quantity of sand delivered or the amount paid to CSI. Docket no. 124 at 4.

The parties do not dispute that, in June and July 2017, Sylla received three wire transfers of $10,000, $5,000, and $7,500, totaling $22,500, from COFS's escrow account with ELC. Docket no. 119-1 at 3. Sylla contends these payments were a typical 1% fee "for locating, disclosing and introducing the site from which the compliant frac sand was delivered," as was reasonable and customary in the frac sand industry. *Id.* Sylla asserts that 22,500 tons of frac sand was delivered from CSI, and thus $22,500 represents his fee. Docket no. 119-1 at 2-3.[1]

On June 15, ELC paid out a total of $60,50 in escrow funds to Sylla, David Bravo, ELC, and Howard Resources. The June 15, 2017 "distribution of funds" authorization letter is signed by Stan Bates, and lists a "flat fee" payment to Sylla of $10,000, "flat fee" payments to David Bravo, ELC, and Bates Energy, and $1 per ton ($5,050) to Howard Resources.[2] Docket no. 124-11 (Ex. J(1)) at 2. The specific disbursement authorization to Sylla is signed by Stan

---

[1] COFS's motion to strike Sylla's affidavit testimony in this regard is denied. Although it is true that Sylla does not demonstrate personal knowledge of how much sand was delivered, he is competent to testify that he believed that he was receiving payments totaling $1 per ton. The amount of sand that was actually delivered is readily verifiable from other sources, and COFS contends that only 12,000 tons of sand were acquired from CSI.

[2] Austin Howard of Howard Resources testified that he was to receive $1 per ton commission on sand that Bates delivered to COFS. Docket no. 124-10 at 13.

5

Bates via "electronic signature added under authorization by Frac Sand Unlimited, LLC." Docket no. 124-11 at 3.

The June 30, 2017 distribution authorization letter is signed by Bates and also shows a "flat fee" of $5,000 to Sylla, as well as "flat fee" payments to Bravo, ELC, and Bates Energy. Docket no. 124-11 at 8. The specific disbursement authorization is signed by Bates with "electronic signature added under authorization by Frac Sand Unlimited, LLC" and states the amount to disburse as "$5000.00 exactly Additional Liquidated Damages COS." *Id.* at 12.[3] And the July 19, 2017 distribution shows a "flat fee" of $7,500 to Sylla and a $6,500 "flat fee" to Howard Resources and "flat fee" payments to Bravo, Bates Energy, and ELC. Docket no. 124-11 at 15. Other than the $1 per ton payment to Howard Resources, ELC's notations on the wire transfers characterize them as "flat fees" and state they are "liquidated damages and administration fees" rather than commission payments. Sylla asserts that he had no control over or involvement in how ELC characterized the payments.

COFS contends it never authorized the payments to Sylla and had no knowledge of them at the time they were made. COFS argues that Sylla was not entitled to compensation because COFS's relationship with CSI pre-existed Taylor's visit to Wisconsin and there is no evidence that COFS ever agreed to pay Sylla or anyone associated with Bates Energy a commission in relation to the CSI sand delivery. *See* docket no. 124-11. In addition, COFS asserts that it never authorized any distributions to Sylla, as required by the Escrow Agreement. Sylla claims he was unaware of the requirement that COFS authorize the

---

[3] A July 5, 2017 disbursement of $87,037.08 to CSI Sands was signed by Naumann and Kline (on behalf of COFS). A matching transfer of funds from the Amegy escrow account to the ELC Chase escrow account was also signed by Kline and Naumann.

6

disbursement of escrow funds and that COFS never demanded return of the money or claimed it was improperly paid until the filing of this lawsuit. Docket no. 119-1 at 3.

COFS brings the following claims against Sylla: conspiracy to commit fraud, theft, conspiracy to commit theft, restitution or money had and received, and conversion. Sylla moves for summary judgment on all claims.

## Analysis

### A. Legal Standard

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the non-moving party's claim or defense, or, if the crucial issue is one for which the non-moving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the non-movant's claim or defense. *Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990). Once the movant carries its initial burden, the burden shifts to the non-movant to show that summary judgment is inappropriate. *See Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991).

In order for a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the non-movant, or, in other words, that the evidence favoring the non-movant is insufficient to enable a reasonable jury to return a verdict for the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the court may not make credibility

determinations or weigh the evidence, and must view all facts in the light most favorable to the non-moving party. *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009).

### A. Conspiracy to Commit Fraud

COFS alleges that Sylla participated in a conspiracy by combining with Bates Energy, FSU, and others to misrepresent Bates Energy's delivery capabilities and to induce COFS to enter into the MOU and Escrow Agreement and gain access to the escrow funds. Docket no. 126-1 at 5. COFS argues that "Sylla was part of a conspiracy to cause COFS to believe Bates Energy could and would deliver 80,000 tons of frac sand to COFS, when the co-conspirators knew they could not or would not perform, and to further deprive COFS of its escrow funds, from which Sylla personally benefitted." Docket no. 124 at 10. In this case, COFS alleges that all Counter-Defendants conspired in "the fraudulent actions towards COFS leading to the taking and retention of COFS's funds."

In Texas, civil conspiracy requires: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result. *Angel v. La Joya Indep. Sch. Dist.*, 717 F. App'x 372, 379 (5th Cir. 2017) (citing *Tri v. J.T.T.*, 152 S.W.3d 552 (Tex. 2005)). Because conspiring alone is not actionable conduct, and the goal of a conspiracy allegation is to extend liability in tort beyond the active wrongdoing to others who planned, assisted, or encouraged the wrongdoing, a plaintiff must show that at least one of the named defendants was liable for the underlying tort of fraud. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). COFS alleges that Sylla conspired in the fraud perpetrated by Bates Energy, ELC,

8

Naumann, FSU, David Bravo, and Howard Resources to funnel funds out of the ELC escrow account.

Sylla contends that he did not commit fraud insofar as he made no material false representations to COFS, and in fact informed Taylor in May 2017 that Bates Energy was not doing business with any of the mines they toured and that Bates Energy could not deliver the contracted-for sand amounts. Sylla further asserts that COFS cannot establish a meeting of minds between Sylla and any co-conspirator or that Sylla was aware of any intended harm or proposed wrongful conduct at the outset of the conspiracy.[4]

COFS correctly argues that its conspiracy claim does not require it to show that Sylla personally made any false misrepresentations to it; it must show only that one of the conspirators is guilty of fraud and that Sylla joined in the conspiracy. While Sylla's statements to Taylor in May 2017 are certainly some evidence that he was not involved in this conspiracy, other circumstantial evidence ties him to the conspiracy and is sufficient to create a material fact issue as to whether Sylla was involved in the entire fraudulent scheme. Specifically, Sylla's role in the conspiracy is inferred from his alleged involvement with FSU and his status as an independent contractor for Bates Energy. Docket no. 124 at 5.  Although Sylla denies involvement with FSU, Plaintiff has some evidence to create a fact issue on Sylla's involvement, and COFS claims the conspirators used FSU as a "conduit to funnel COFS's escrow funds to persons outside the MOU contract," thereby unlawfully obtaining payment for sand that was never delivered. Docket no. 124 at 5.

---

[4] These arguments were raised for the first time in Sylla's Reply brief. Docket no. 125. COFS's motion for leave to file a Sur-reply to respond to these arguments is granted. COFS contends that Sylla waived these bases for summary judgment by failing to raise them in his initial motion and brief. The Court agrees that this issue should have been raised in the initial motion. In any event, however, the Court finds that summary judgment on this issue should be denied.

9

Further, although there is no direct evidence of Sylla's agreement to participate in the conspiracy from its inception, intent can be proven by circumstantial evidence and reasonable inference. *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 858 (Tex.1968). Agreement may be proved by evidence of a course of conduct from which a tacit agreement to act in concert may be inferred. Conspiracy agreements "need not be formal, the understanding may be a tacit one, and it is not essential that each conspirator have knowledge of the details of the conspiracy." *Bourland v. State*, 528 S.W.2d 350, 354 (Tex. App.—Austin 1975, writ ref'd n.r.e.).

The Court finds that there are genuine issues of material fact on COFS's claim of conspiracy to commit fraud. Specifically, a reasonable factfinder might find that Sylla's alleged involvement with FSU, his relationship with Bates Energy, and his receipt of funds from the COFS escrow account are sufficient evidence of a meeting of the minds for conspiracy. Such a factfinder might also find that these facts point to Sylla's knowledge of the object to be accomplished by the conspiracy. Summary judgment on this claim is therefore DENIED.

### B. Theft Claim

By this claim, COFS seeks to hold Sylla accountable for theft of the $22,500 wired to him. The Texas Theft Liability Act permits civil recovery for damages resulting from theft. TEX. CIV. PRAC. & REM. CODE § 134.003(a). It defines "theft" as "unlawfully appropriating property . . . as described by Section 31.03" of the Texas Penal Code. *Id.* § 134.002(2). Section 31.03 of the Texas Penal Code states the following:

> (a) A person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property.

>    (b) Appropriation of property is unlawful if:
>
>    (1) it is without the owner's effective consent; [or]
>
>    (2) the property is stolen and the actor appropriates the property knowing it was stolen by another . . . .

TEX. PENAL CODE § 31.03(b). "Appropriate" means "to bring about a transfer or purported transfer of title to or other nonpossessory interest in property" or "to acquire or otherwise exercise control over property other than real property." *Id.* § 31.01(4). The definition of "property" includes money. *Id.* § 31.01(5)(C). The Texas Court of Criminal Appeals has held that an electronic transfer between bank accounts may be an appropriation of property for purposes of § 31.01 as a transfer of a nonpossessory interest in property. *Coats v. State*, 712 S.W.2d 520, 521-23 (Tex. Ct. Crim. App. 1986).[5] Further, if a party appropriates property with the consent of a fiduciary whom the third party knows is acting with an intent to unlawfully deprive the owner of his property, the consent is not effective. *Compass Bank v. Villarreal*, No. L-10-8, 2011 WL 1740270, at *14 (S.D. Tex. May 5, 2011).

COFS contends that Sylla unlawfully appropriated its escrow funds when he received three wire transfers totaling $22,500 and then retained the funds. Docket no. 124 at 12; docket no. 119-1 at 3. Thus, the elements of its cause of action for theft are: (1) COFS had a possessory right to the escrow funds; (2) Sylla unlawfully appropriated the funds by taking them without COFS's effective consent; (3) Sylla appropriated the funds with the intent to

---

[5] *See also In re Okedokun*, 593 B.R. 469, 541 (S.D. Bkr. 2018) ("The Texas Court of Criminal Appeals has held that an electronic transfer between bank accounts is an appropriation of property for purposes of [Texas Penal Code] § 31.01."); *Compass Bank v. Villarreal*, No. L-10-8, 2011 WL 1740270, at *14 (S.D. Tex. May 5, 2011) (same); *Bailey v. State*, 885 S.W.2d 193, 198 (Tex. App.–Dallas 1994, writ ref'd) (holding that intangible property such as a bank balance can be appropriated by the exercise of control over that property under Texas Penal Code § 31.01).

deprive COFS of them; and (4) COFS sustained damages as a result of the theft. COFS contends that Sylla admits appropriating the funds, as he admits that he acquired and retained the three payments totaling $22,500, and he knew that he was retaining funds from the COFS escrow account. Sylla challenges whether he unlawfully appropriated the money.

Sylla argues that he had no involvement in the establishment of the escrow relationship, had no involvement in the disbursements from the escrow account, and that he provided the requisite assistance to COFS to obtain compliant frac sand and was compensated for that service on terms that are usual and customary in the frac sand industry. Docket no. 119-7 at 9. While Sylla may not have personally wired out the money from the escrow account, one can infer that he had some involvement in the wire transfer and at least provided account information to ELC. A reasonable fact finder might find that Sylla's purported connections to FSU and Bates Energy, as well as his receipt of the transfers and retention of the funds, indicate that he had some role in "bring[ing] about a transfer" of the money. TEX. PENAL CODE § 31.01(4)(A).

Sylla claims that "COFS did submit disbursement authorizations" for the payments and that he "had no involvement in the description of the distribution requests or approval of the distribution authorization." Docket no. 125 at 4-5. But Sylla points to a disbursement authorization signed only by Stan Bates authorizing up to $1,000,000 in escrowed funds to be paid for sand provided by CSI. Docket no. 125 at 5 (citing docket no. 124-7). None of the disbursement authorizations to Sylla contain a signature or any mention of authorization by COFS. In contrast, the disbursement to CSI is signed by Janis Kline on behalf of COFS.

Docket no. 124-11 at 13. Thus, fact issues exist as to whether the money was transferred to and retained by Sylla unlawfully and without COFS's effective consent.

Further, intent to deprive can be inferred from the surrounding circumstances. *McCullough v. Scarbrough, Medlin & Assocs.*, 435 S.W.3d 871, 906 (Tex. App.–Dallas 2014, pet. denied). It is undisputed that Sylla has retained the wired funds. Sylla points to no agreement or other authorization by COFS for payment of a commission for the CSI sand delivery. His defense that he believed only that he was receiving authorized disbursements as a commission for the CSI sand delivery involves credibility determinations best left for trial. A genuine issue of material fact therefore exists as to whether Sylla unlawfully appropriated $22,500 of COFS's escrow funds, and summary judgment on this claim is denied.

### C.  Conspiracy to Commit Theft

COFS asserts that Sylla combined with Bates, FSU, and others to facilitate the unauthorized transfer of funds from COFS's escrow account. Docket no. 124 at 12-13. This claim is targeted at both the $22,500 transferred to Sylla and the entire amount of funds allegedly stolen from the escrow account. Docket no. 124 at 12 n.7.

As explained previously, civil conspiracy requires: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result. *Angel v. La Joya Indep. Sch. Dist.*, 717 F. App'x 372, 379 (5th Cir. 2017) (citing *Tri v. J.T.T.*, 152 S.W.3d 552 (Tex. 2005)). The first three elements of the conspiracy claim are once again inferred by COFS from Sylla's alleged connection to FSU and Bates Energy and his status as a recipient of escrow funds. The last two elements, COFS argues, are met by the funds actually being

transferred without COFS's consent, together with its resulting financial loss. Docket no. 124 at 13. For the same reasons fact issues exist as to the theft claim, fact issues exist on the conspiracy claim. Although Sylla contends that no unlawful act occurred because COFS authorized a payment of $1,000,000, fact issues exist as to whether COFS authorized any of the alleged unlawful transfers. Because material fact issues exist, summary judgment on this claim is denied.

### D. Restitution or Money Had and Received Claim

The elements of a cause of action for money had and received are that the defendant holds money that, in equity and good conscience, belongs to the plaintiff. *Staats v. Miller*, 243 S.W.2d 686, 687-88 (Tex. 1951). The sole inquiry is whether the defendant received money that rightfully belongs to the plaintiff. *Id.*

COFS argues that the $22,500 transferred to Sylla rightfully belongs to it. Docket no. 124 at 14. Sylla claims that, in equity and good conscience, it belongs to him as compensation for facilitating the shipment of sand from CSI in Wisconsin. Docket no. 119-7 at 10; docket no. 119-1 at 2. COFS contends that Sylla has no proof any agreement to pay a finder's fee or commission, and even if Sylla could claim an equitable right to such a fee, Sylla was not the finder as to CSI, since Taylor had a pre-existing relationship with Eric Strang.

As discussed previously, fact issues exist as to whether COFS authorized the wire transfers to Sylla. Furthermore, Sylla's role in finding CSI as a supplier is debated. Thus, whether Sylla was entitled to compensation for facilitating the relationship is a genuine issue of material fact. Summary judgment on this claim is denied.

### E. Conversion

The elements of conversion under Texas law are: (1) the plaintiff owned, had legal possession of, or was entitled to possession of the property; (2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's rights; and (3) the defendant refused the plaintiff's demand for the return of the property. *City Bank v. Compass Bank*, 717 F. Supp. 2d 599, 611 (W.D. Tex. 2010). Persons acting together in effecting a conversion may be held jointly and severally liable. *Norton Refrigerated Express, Inc. v. Ritter Bros. Co.*, 552 S.W.2d 910, 913 (Tex. Civ. App.—Texarkana 1977, writ ref'd n.r.e.). "[A]n action for conversion of money arises only where the money can be identified as a specific chattel, meaning it is '(1) delivered for safe keeping; (2) intended to be kept segregated; (3) substantially in the form in which it is received or an intact fund; and (4) not the subject of a title claim by the keeper.'" *Lawyers Title Co. v. J.G. Cooper Dev., Inc.*, 424 S.W.3d 713, 718 (Tex. App.–Dallas 2014, pet. denied) (quoting *Entm't Merch. Tech., L.L.C. v. Houchin,* 720 F. Supp. 2d 792, 799 (N.D. Tex. 2010) (considering conversion claim as to funds held in escrow account); *see also Hernandez v. Sovereign Cherokee National Tejas*, 343 S.W.3d 162, 175 Tex. App.–Dallas 2011, pet. denied) (funds held in trust in IOLTA account subject to conversion); *Dixon v. Texas*, 808 S.W.2d 721 (Tex. App.–Austin 1991, writ dism'd w.o.j.) ("A party can sue for conversion of money if the money is delivered to another party for safekeeping, the keeper claims no title, and the money is required and intended to be kept segregated, either substantially in the form in which it was received or as an intact fund.").

Sylla contends in a conclusory manner that there is no evidence of conversion and further contends that COFS has failed to demand return of the $22,500 paid to Sylla. In his reply, he argues that COFS has failed to show that he exercised dominion and control over the $22,500 in an unlawful and unauthorized manner.

A formal demand and refusal are often required in bailment relationships or where a defendant's initial possession of the property is otherwise lawful. *See Buffet Partners, L.P. v. Sheffield Square, L.L.C.*, 256 S.W.3d 920, 924 (Tex. App.—Dallas 2008, no pet.); *Lopez v. Lopez*, 271 S.W.3d 780, 784 (Tex. App.—Waco 2008, no pet.); *Paschal v. Great W. Drilling, Ltd.*, 215 S.W.3d 437, 457 (Tex. App.—Eastland 2006, pet. struck). However, this element is generally not necessary if other evidence establishes an act of conversion such as when there is a "clear repudiation of the owner's rights." *Loomis v. Sharp*, 519 S.W.2d 955, 958 (Tex. Civ. App.—Texarkana 1975, writ dism'd); *Permian Petr. Co. v. Petroleos Mexicanos*, 934 F.2d 635, 651 (5th Cir. 1991) ("formal demand and refusal are not necessary when the circumstances and the acts of the possessor authorize a finding ... of a clear repudiation of the owner's rights and are tantamount to a refusal after demand"); *Presley v. Cooper*, 284 S.W.2d 138, 141 (Tex. 1955).

COFS claims that Sylla converted $22,500 from the escrow account when he received it by wire transfer and retained it. *See* docket no. 124 at 17. Here, neither party disputes that these funds are specific chattel for purposes of a conversion claim—they were entrusted to ELC through the Escrow Agreement and were intended by COFS to be kept segregated for frac sand purchasing. Despite Sylla's arguments to the contrary, the evidence also raises a fact issue as to whether COFS agreed to the payments as commission. There is thus a genuine issue

of material fact as to whether he exercised unauthorized dominion or control over the funds. Further, fact issues exist as to whether Sylla's actions would amount to a clear repudiation of COFS's rights to the escrow funds, such that demand and refusal would not be necessary. Because a reasonable factfinder could find from these facts that conversion occurred, summary judgment on this claim is DENIED.

## CONCLUSION

COFS's Motion to Strike (docket no. 123) is DENIED.

COFS's Motion for Leave to File a Sur-Reply (docket no. 126) is GRANTED.

Sylla's Motion for Summary Judgment (docket no. 119) is DENIED.

SIGNED this 5th day of September, 2019.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE