# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

**BATES ENERGY OIL & GAS, LLC,** *et al.*

      **Plaintiffs,**

**v.**

**COMPLETE OIL FIELD SERVICES, LLC,** *et al.*

      **Defendants.**

**Case No. 5:17-cv-808 (RCL)**

## MEMORANDUM OPINION

### (Trial Findings and Conclusions)

This case boasts a convoluted set of facts and a diverse cast of characters. Before engaging in an in-depth review of who did what and when, the Court will outline a nutshell summary as a prelude to the more complicated details. Current or former parties to this litigation will be designated by bolded text.

**Complete Oil Field Services ("COFS")** was formed in 2017 to provide frac sand[1] to an affiliated company. Austin Howard of **Howard Resources** introduced COFS to **Stanley Bates** of **Bates Energy**. COFS contracted with Bates Energy, with Bates Energy agreeing to source the sand that COFS would provide to its affiliate. The two companies entered into an escrow agreement, with a company called **Equity Liaison Company ("ELC")** to serve as the escrow agent. As it turns out, the principal of ELC was **Dewayne Naumann**, a close associate of Stanley Bates. After COFS contracted with Bates Energy, certain of Stanley Bates' affiliates created a company called **Frac Sand Unlimited ("FSU")**. Two of Stanley Bates' associates—**Mark Sylla**

---

[1] "Frac sand" is a necessary ingredient in hydraulic fracturing, a common method of extracting subterranean oil and natural gas.

and **David Bravo**—were listed as the managers of FSU along with Bates' girlfriend, Audra Vega. Unbeknownst to COFS, Bates Energy directed payments out of the escrow account and into the pockets of Stanley Bates and his associates. Bates Energy also unilaterally directed escrow funds to an account under the name of David Bravo's wife, **Lorena Bravo**, and made a sand purchase from a company called **Tier 1 Sands**. Bates Energy sued COFS and its principal **Sam Taylor**, and COFS filed a counterclaim and removed to federal court. COFS amended its counterclaim to ultimately encompass the parties above. Only Sylla responded to the counterclaim—other parties ceased appearing and had their pleadings struck, while others made rare appearances. COFS alleges that the Counter-Defendants wrongfully siphoned hundreds of thousands of dollars from the escrow account and made several attempts to cover it up along the way. Bates Energy's original claims against COFS and Taylor have since been dismissed. ECF Nos. 128, 147.

COFS, as Counter-Plaintiff, has settled its claims with Mark Sylla and the Rosenblatt Law Firm. Ex. 2, ECF No. 169-2. It dropped its claims against Stanley Bates. ECF No. 114. Other Counter-Defendants have failed to comply with court orders and have had their pleadings struck, including Bates Energy, ELC, and Howard Resources. ECF No. 132. The Court has entered default against these three Counter-Defendants and against Naumann. ECF No. ___. Default had also been entered against Tier 1 Sands, David Bravo, and Lorena Bravo. ECF No. 122. Because these three Counter-Defendants have since responded to court orders and resumed participation in the litigation, the entries of default were set aside by the Court. ECF No. ___. FSU is in the same posture as Tier 1 Sands and the Bravos in that it did not respond to the Fourth Amended Counterclaim but has since appeared in the litigation. Accordingly, COFS's motion for entry of default against FSU, ECF No. 160, was denied. ECF No. ___.

2

This Court conducted a bench trial on March 2–3, 2020, and now lays out its findings of fact, as well as its conclusions of law as to non-defaulting Counter-Defendants David Bravo, Lorena Bravo, FSU, and Tier 1 Sands. The appropriateness of default judgment as to the defaulting Counter-Defendants will be considered separately.

## I.      FINDINGS OF FACT

Having carefully reviewed the evidence and arguments presented at trial, the Court finds the following facts by a preponderance of the evidence:

1. Complete Oil Field Services, LLC ("COFS") was formed in early 2017 to provide frac sand to ProPetro Services, Inc., a pressure pumping and fracking company based in Midland, Texas. PTO 3;[2] CP-2;[3] Trial Tr. 44: 5–15, 46:5–15.[4] ProPetro contracted with COFS in order to procure sand under their Supply Agreement.; CP-2; PTO 12.

2. In COFS's search for sand, its principals connected with Austin Howard of Howard Resources, who introduced COFS to Stanley Bates of Bates Energy. PTO 13; Trial Tr. 87:7–24. Howard vouched for Bates, and Bates held himself out as an experienced dealer in the sand space. Trial Tr. 45:1–4, 88:9-12, 88:23–89:17. Bates specifically cited rights with mines in Wisconsin as further evidence of his company's capacity. PTO 13.

3. **April 12, 2017**: Relying on these representations, COFS contracted with Bates Energy under a Memorandum of Understanding ("MOU") agreeing to source the sand that COFS would provide to ProPetro. PTO 13; CP-4.5; Trial Tr. 89:18–24.

4. Under the MOU, Bates Energy was to deliver specific amounts and types of sand to rail terminals in Texas within a certain time frame. CP-4.5; PTO 13. Ten thousand tons were

---

[2] Citations to "PTO" refer to what effectively became the pre-trial order in this case, which is a redline of a proposed pre-trial order submitted by Counter-Defendant Mark Sylla. Exhibit B, ECF No. 150-2.
[3] Citations to "CP-##" refer to Counter-Plaintiff COFS's trial exhibits.
[4] Citations to "Trial Tr." refer to the March 2, 2020 trial transcript. Citations to "Trial Tr. (vol. 2)" refer to the March 3, 2020 trial transcript.

to be delivered between April 18 and May 10, 2017, and 80,000 tons altogether were to be delivered by or around July 10, 2017. CP-4.5 at 1. Per the terms of the MOU, COFS would pay Bates Energy $99 per ton of sand. *Id.*

5. Bates Energy was to provide receipts called bills of lading ("BOLs") to support all payments for sand deliveries under the MOU. *Id.* at 2. Bates Energy would be paid half the total purchase price of the sand when the sand was loaded and the other half upon delivery in West Texas. *Id.*; Trial Tr. 45:5–46:5.

6. **April 14, 2017**: The two companies entered into an escrow agreement ("the ELC Escrow Agreement"), with a company called Equity Liaison Company ("ELC") to serve as the escrow agent. CP-5; Trial Tr. 106:14–107:13. The principal of ELC was Dewayne Naumann, who unbeknownst to COFS was a close associate of Stanley Bates. PTO 13.

7. The ELC Escrow Agreement required the consent of both COFS and Bates Energy to act. Paragraph 1.3 of the ELC Escrow Agreement allowed payment of COFS's escrow funds only if both COFS and Bates Energy directed or instructed ELC to make such payment. CP-5 at 1. Paragraph 2.1(B) of the ELC Escrow Agreement obligated ELC to "immediately notify and convey to Buyer and Seller every request or other notice received from the other party or any other source regarding the subject escrow funds." *Id.* at 2. Paragraph 2.2 of the ELC Escrow Agreement limited ELC to act only in accordance with the provisions of Article I of the agreement. *Id.*

8. Paragraph 1.2 of the ELC Escrow Agreement specifically obligated ELC to deposit and maintain the funds in a separate escrow account under COFS's name. *Id.* at 1.

9. ELC/Naumann designated a Chase Bank account for the deposit of COFS's escrow funds, Account No. x2917. PTO 13–14. But, unbeknownst to COFS, Chase Account No. x2917 was a pre-existing Bates Energy escrow account that ELC/Naumann was already

4

handling for Bates Energy, and thus the $1 million deposit by COFS into that account

was immediately commingled with funds already in that account. *Id.*; CP-5 at 6, last page

last page ("Account Name Equity Liaison Company, LLC" "Nickname: Bates Energy

OAG" "Account No.: XXXXX2917").

10. **April 18, 2017**: Bates Energy and COFS entered into a second escrow agreement, with

Amegy Bank to serve as the escrow agent. CP-6. Amegy would hold $3 million and ELC

would hold $1 million. PTO 13; Trial Tr. 107:19–25; CP-6.

11. **April 19, 2017**: Once the funds were deposited, ELC issued a "Proof of Funds" letter to

David Bravo in his capacity as Chief Operating Officer of Bates Energy. CP-86. The

letter assured Bravo and Bates Energy that it had available for draw down nearly $5

million in accounts at JPMorgan Chase and Amegy Bank. *Id.* Naumann signed the letter

on behalf of ELC. *Id.* None of the escrow funds could have been lawfully available for

draw down without COFS's authorization.

12. After the ELC Escrow Agreement was signed, Bates texted COFS's CFO Janis Kline that

he was "ordering Trains and Paying for a tremendous amount of sand today and I wanted

to ensure of Wire transfer to Escrow and P/O being issued…just wanted that warm and

fuzzy that your money was safe in Escrow!" CP-8; *see also* Trial Tr. 50:9–51:6.

13. **May 9, 2017**: At ProPetro's insistence, COFS president Sam Taylor traveled to

Wisconsin to meet with Bates affiliate Mark Sylla and examine various sand resource

sites. Trial Tr. 86:14-23; 93:18–94: 7. PTO 14. Sylla took Taylor on a tour of multiple

frac sand sites in Wisconsin at the request of Bates and Bravo. PTO 14.

14. On the tour, Sylla told Taylor that Bates Energy could not deliver 80,000 tons of sand to

COFS, or even 40,000 tons. PTO 14. Sylla told Taylor that none of the Wisconsin mines

they had visited "had the capacity to deliver quantities in the amount [COFS] was seeking." PTO 14.

15. **May 10, 2017**: Bates Energy failed to meet its May 10, 2017 deadline to deliver 10,000 tons of sand to COFS. PTO 14. It gave excuses for failing to meet its first deadline; no sand at all had been delivered. PTO 20.

16. **May 12, 2017**: Two of Stanley Bates' associates—Mark Sylla and David Bravo—were listed as the managers of a newly created company called Unlimited Frac Sand, LLC d/b/a Frac Sand Unlimited, LLC ("FSU"), along with Bates' girlfriend, Audra Vega. CP-27; PTO 15. David Bravo was listed as the President and Managing Partner on FSU's website. CP-96.

17. **May 16, 2017**: Four days later, Stanley Bates was indicted for wire fraud, conspiracy to commit wire fraud, conspiracy to launder money, and securities fraud in connection with the Four Winds frac sand matter. Indictment, ECF No. 3, *United States Uresti* (W.D.Tex. May 16, 2020) (No. 5:17-CR-00381-DAE).

18. **June 15, 2017**: Due to Bates Energy's failure to deliver any sand, COFS took steps to acquire sand from another company, CSI, using COFS's escrow funds. PTO 14–15. COFS ultimately secured delivery of compliant sand from CSI. *Id.*; Trial Tr. 51:21–52:23, 91:4–23, 95:6–96:2; CP-130. Pursuant to the arrangement with CSI for a delivery of sand, on June 15, 2017, there was an authorized disbursement of $1 million from the escrow account, shown as a "flat fee" "one time transfer" of $1 million "For: CSI Sand Wisconsin, LTD." CP-33; *see also* Trial Tr. 53:17–54:7, 96:3–9. Shortly thereafter, CSI began delivering compliant sand to COFS. Trial Tr. 51:21–52:4. Altogether, CSI made 8 deliveries of sand to COFS. CP-130.

19. Stanley Bates and Naumann insisted that CSI be paid out of the ELC escrow funds, not the Amegy escrow funds. Trial Tr. 52:5–12. They further insisted that COFS reimburse the ELC escrow with Amegy escrow funds, which COFS agreed to do. *Id.* Despite missed deadlines, suspicious behavior, and little transparency, COFS continued to pump money into the ELC account. *See* CP-130 (identifying "reimbursements" of ELC account with money from Amegy account following CSI transactions).

20. The very same day, Bates Energy unilaterally authorized disbursement of ELC escrow funds to itself and its associates. Bates Energy directed ELC and Dewayne Naumann to disburse $70,050 from COFS's escrow funds without COFS's knowledge or authorization. Of that sum the following parties received the following amounts, after having delivered no sand to COFS:

    a.  Mark Sylla: $10,000

    b.  Lorena Silvistri Bravo d/b/a Bravo Consulting Services: $20,000

    c.  Equity Liaison Company, LLC: $15,000

    d.  Bates Energy Oil & Gas, LLC: $20,000

    e.  Howard Resources, LLC: $5,050

    CP-34 to CP-39; CP-66 at ELC 000179; *see also* Trial Tr. 54:12–24; Trial Tr. (vol. 2) 9:1–12. Despite the fact that Stanley Bates signed off on a $10,000 disbursement to ELC, CP-34, ELC actually wired itself $15,000, CP-37. The payments were notated as "liquidated damages." CP-35 to CP-39.

21. The Disbursement Authorizations were signed by Stanley Bates, and next to his signature was the statement "Electronic signature added under authorization by Frac Sand Unlimited, LLC." CP-34 to CP-39.

22. The Disbursement Authorization forms used by ELC/Naumann for the June 15 and subsequent disbursements all lacked a signature by COFS authorizing disbursement, and thus were not in accordance with ¶ 1.3 of the ELC Escrow Agreement between ELC and COFS. CP-5; CP-34 to CP-39; CP-41 to CP-44; CP-49 to CP-53.

23. The Disbursement Authorizations show the disbursements are from the Chase Bank escrow account which ELC/Naumann had designated for the COFS funds, Account No. x2917. CP-35 to CP-39; CP-5 at 6, last page ("Account Name Equity Liaison Company, LLC" "Nickname: Bates Energy OAG" "Account No.: XXXXX2917").

24. **June 30, 2017**: Stanley Bates directed another unauthorized disbursement of COFS's escrow funds to Counter-Defendants for a total of $28,500. This time ELC/Naumann disbursed a total of $28,500, as follows:

    a. Mark Sylla: $5,000

    b. Lorena Silvistri Bravo d/b/a Bravo Consulting Services: $7,500

    c. Bates Energy Oil & Gas, LLC: $8,500

    d. Equity Liaison Company: $7,500

    CP-41 to CP-45; *see also* Trial Tr. 57:6–58:18; Trial Tr. (vol. 2) 9:13–10:2. The payments were notated as "additional liquidated damages." CP-41 to CP-44.

25. COFS did not sign off on these disbursements and was not aware of them at the time they were made. Trial Tr. 57:6–58:18; CP-41 to CP-45; PTO 15. The Disbursement Authorizations were signed by Stanley Bates, and next to his signature was the statement "Electronic signature added under authorization by Frac Sand Unlimited, LLC." CP-41 to CP-44.

26. FSU contracted with Counter-Defendant Tier 1 Sands in an apparent attempt to source sand. Bates Energy directed payment from the escrow funds to FSU for full payment to

Tier 1. PTO 15; Trial Tr. 127:14–129:23; Trial Tr. (vol. 2) 11:12–12-16. This is despite

the MOU's requirement of only half payment up front (with the remaining half paid on

delivery). CP-4.5 at 2; Trial Tr. 45:15–46:4.

27. **July 6, 2017**: At Bates Energy and FSU's direction, Naumann disbursed $155,232 of

COFS's escrow funds to Tier 1 to purchase 1,568 tons of sand. Trial Tr. (vol. 2) 15:17–

25, 18:13–21; CP-80; CP-101. On a Purchase Order to Tier 1, David Bravo listed Stanley

Bates as FSU's VP of Operations under Bates' alias, "Phillip Stanley." CP-46; Trial Tr.

(vol. 2) 23:19–21.

28. **July 7, 2017**: $1,000 in "admin fees" was transferred to Bates Energy in connection with

the Tier 1 transaction. CP-63, CP-66 at ELC000157.

29. **July 11, 2017**: Stanley Bates assured COFS that sand was on the way by delivering

BOLs—relying on these, COFS's CFO Janis Kline authorized a distribution of funds for

$39,191, But the sand was never delivered. PTO 2; CP-121; Trial Tr. 26:11–24, 56:2–

57:4.

30. **July 12, 2017**: Tier 1 invoiced FSU for $44,352 for 448 tons of sand. CP-48 at

ELC000079.

31. $6,500 in "admin fees" was transferred to Bates Energy. CP-63, CP-66 at ELC000157.

32. **July 18, 2017**: Bates Energy issued a Distribution of Funds letter to ELC/Naumann

requesting that $44,352 of COFS's escrow money be sent to Tier 1 with no co-signature

by COFS. CP-48 at ELC000078. David Bravo, acting as CEO of FSU, separately issued a

Disbursement Authorization to ELC/Naumann authorizing a disbursement to Tier 1

Sands for $44,352 that same day. CP-48; CP-66 at ELC000149; CP-102. Pursuant to

these requests, ELC wired Tier 1 $44,352 on July 18. CP-102 at ELC000638; CP-66 at

ELC000147–49. Bravo has admitted he was aware that the funds used for this transaction came from the COFS escrow account. Trial Tr. (vol. 2) 12:1–16.

33. **July 19, 2017**: Stanley Bates directed another unauthorized disbursement of COFS's escrow funds to Counter-Defendants. This time ELC/Naumann disbursed a total of $69,000 on July 19, 2017, as follows:

   a. Mark Sylla: $7,500

   b. Lorena Silvistri Bravo d/b/a Bravo Consulting Services: $20,000

   c. Bates Energy Oil & Gas, LLC: $20,000

   d. Howard Resources, LLC: $6,500

   e. Equity Liaison Company: $15,000

Once again, although the Disbursement Authorizations were signed by Bates, next to his signature was the statement "Electronic signature added under authorization by Frac Sand Unlimited, LLC." Trial Tr. 59:25–61:1; Trial Tr. (vol. 2) 10:3–13; CP-49 through CP-54; CP-77; PTO 16. The payments were notated as "liquidated damages." CP-49 to CP-53.

34. **July 20, 2017**: The following day, Bates Energy sued COFS in state court. PTO 18.

35. **July 26, 2017**: Bates Energy took additional escrow funds to pay its lawyers, demanding that ELC and Naumann execute a Distribution of Fund letter "ASAP" for $5,000. CP-105 at ELC000597–98. Bates Energy also paid an additional $15,000 to its counsel for legal fees using COFS's escrow funds for prosecuting its lawsuit against COFS. CP-105 at ELC000603. ELC/Naumann made those disbursements out of COFS's escrow funds. CP-66 at ELC000187. This document (CP-66), showing payments of $5,000 and $15,000, has been redacted by Naumann/ELC—the Court finds the dates match the supporting documents representing that Naumann used COFS's own escrow funds to fund Bates Energy and to litigate against COFS in the suit it brought against COFS.

36. **August 11, 2017**: Instead of providing COFS with the 1,979 tons of sand purchased from

    Tier 1 using COFS's escrow funds in the July 6 and July 18 transactions, *see supra* ¶¶ 27

    and 32, Stanley Bates and David Bravo resold it to Anadarko. Trial Tr. (vol. 2) 18:13–

    19:13; CP-131; CP-94.

37. **August 14, 2017**: Janis Kline of COFS exchanged messages with Dewayne Naumann

    requesting an accounting of the funds in escrow, which Naumann effectively refused

    while promising to get around to it "[j]ust as quick as humanly possible." CP-59.

38. **August 15, 2017**: COFS formally terminated the MOU with Bates Energy, and

    demanded that it immediately return the remaining funds from the ELC account. CP-61;

    CP-105; Trial Tr. (Vol. 2) 35:10–12.

39. Soon after, Stanley Bates emailed both Dewayne Naumann and David Bravo,

    > It's NOW or NEVER!

    CP-105.

40. **August 21, 2017**: Stanley Bates and Naumann exchanged emails, with Stanley Bates

    stating,

    > OK? We have no money to buy Sand, much less Railcars, Legal fees, Rent, and
    > Food?

    Naumann responded,

    > So we are giving up? WTF!

    Bates then said,

    > NO just bigger problems and right in our face problems. Man! Stressed the F out

CP-105.

41. **August 23, 2017**: The case was removed to federal court. ECF No. 1.

42. Stanley Bates issued a Distribution of Funds letter to ELC for payment to Bates Energy the sum of $140,541.85 for "demurrage" charges. CP-62 at ELC000095. Bates Energy also sent ELC an accompanying invoice for the same amount, with demurrage charges for three sets of BOLs for a total of 1,979.97 tons of sand. *Id.* at ELC000094. There were no underlying supporting documents. *See id.*

43. This was the same tonnage of sand that Bates Energy, David Bravo, and ELC/Naumann sold on August 11, 2017 to Anadarko Petroleum for $204,266.97, and that FSU had previously acquired from Tier 1 using COFS's escrow funds—1,979.97 tons. CP-94 at ELC000669; CP-131; *see supra* ¶¶ 27 and 32.

44. The same day, the Rosenblatt Law Firm wrote a demand letter to Dewayne Naumann and ELC alleging Naumann had rejected paying its client Bates Energy for the $140,541.85 in demurrage costs. The law firm demanded that Naumann and ELC use COFS's escrow funds to pay that amount to Bates Energy, copying its "client" on the letter. CP-62 at ELC000093.

45. Naumann wired $140,541.85 of COFS's escrow funds to Bates Energy within the day. CP-66 at ELC0000156.

46. ELC-related bank statements show disbursement of COFS's escrow funds. PTO 16; CP-66 at ELC000156–58

47. **September 13, 2017**: As part of its TRO in favor of COFS, this Court (Judge Rodriguez) ordered Naumann and ELC to "immediately provide a detailed accounting of . . . the current balance in the [escrow] account" and other details. Order 16, ECF No. 16. The

Court further ordered ELC and Naumann to appear at the September 25, 2017 hearing on COFS's motion for preliminary injunction. *Id.*

48. **September 25, 2017**: In response to the court order, ELC/Naumann produced an accounting of the COFS's escrow account. Trial Tr. 64:7–18; CP-63.

49. COFS's Janis Kline prepared a spreadsheet showing the accounting of what went through both the Amegy and ELC escrow accounts. Trial Tr. 68:9–71:20; CP-130.

50. A total of $47,500 of COFS's escrow funds were wired into a bank account under Lorena Bravo's name. *Supra* ¶¶ 20, 24, 33. COFS has not established that Lorena Bravo was involved with or aware of the actions of Bates Energy, FSU, and her husband with regards to COFS. Trial Tr. 124:3–17. The money was apparently wired into this account pursuant to David Bravo's instructions as a means for David Bravo to receive his portion of the COFS escrow funds. Trial Tr. (vol. 2) 8:8–9:19.

51. COFS first learned in September 2017 that ELC/Naumann had disbursed some of COFS's escrow funds without its authorization. Trial Tr. 63:23–65:1; CP-63.

52. ELC and Naumann had given excuses to obscure how much money was in the ELC escrow account, claiming that "company policy" was "to do a reconciliation for year end only," and that Naumann could not "drop everything at one time and simply focus on a singular account and let all others languish." CP-55. ELC/Naumann made these statements to COFS's CFO Janis Kline on July 28, 2017, eight days after Bates Energy had sued COFS. *Id.*

53. Ultimately ELC failed to notify or convey to COFS every request or notice it or Naumann received from Bates Energy or any other source regarding the subject escrow funds. The only requests or notices provided by ELC to COFS consisted of (i) agreed payment requests to CSI for sand shipments, and (ii) a payment of $39,191 from Bates,

supported by purported bills of lading, for sand that was never shipped. This is despite

the fact that ELC/Naumann received multiple disbursement requests unilaterally

submitted by Bates Energy. *See supra* ¶¶ 21, 25, and 32–33.

54. Bates Energy never delivered any sand to COFS. Trial Tr. 51:19–20; Trial Tr. 89:25–

90:3; Trial Tr.108:2–4.

55. Tracking the exact time and nature of disbursements of COFS's escrow funds is difficult

because ELC/Naumann regularly shuffled funds between the multiple bank accounts they

managed. *See* CP-66 at ELC000156–58 (showing deposits and withdrawals from

Account No.: XXXXX2917). However, $1 million was initially deposited in the ELC

escrow account. CP-66 at ELC000002. Much of that $1 million was used to purchase

sand from CSI, and was replenished in full from the Amegy bank account. *Supra* ¶¶ 18–

19. Of the original $1 million, $347,853.78 was deposited with the registry of the court

and eventually returned to COFS. ECF No. 62. That leaves $652,146.22 that was

deposited with ELC, was not used to obtain sand for COFS, was disbursed out of the

account, and has not been returned to COFS.

## II.    CONCLUSIONS OF LAW

This Court has diversity jurisdiction under 28 U.S.C. §§ 1332(a) and 1441(a). Diversity

of citizenship exists between the parties to this action pursuant to the requirements of 28 U.S.C.

§ 1332. The amount in controversy exceeds $75,000.00. There is no unresolved jurisdictional

question.

Only the claims against non-defaulting Counter-Defendants David Bravo, Lorena Bravo,

FSU, and Tier 1 Sands are considered below. Claims against defaulting Counter-Defendants

Bates Energy, Dewayne Naumann, ELC, and Howard Resources will be addressed by separate

order resolving COFS's motions for default judgment, ECF Nos. 171–72.

## A. Damages

In a series of poor choices, COFS trusted a shady businessman to procure sand for it, and then entrusted $1 million to the businessman's suggested escrow agent. While COFS approved payment of up to $1 million to CSI once Bates Energy failed to deliver sand, each CSI payment that was made out of the ELC escrow account was promptly reimbursed by COFS out of the Amegy escrow account. It remains unclear to the Court as to why COFS felt obliged to keep ELC funded with an even million after the approved payments to CSI. Because the authorized ELC payments to CSI were balanced out by the reimbursements from the Amegy account, those funds do not factor into COFS's damages sum. That is, the CSI payments were a wash and ELC remained responsible for the $1 million remainder. While COFS's decisions were unwise, the conduct of the Counter-Defendants was tortious.

COFS has since received some of that money back. Disbursements of $308,662.65 and $39,191.13 were returned from the registry of the court, for a total of $347,853.78. ECF No. 62. Subtracting from $1,000,000, that leaves $652,146.22 of the original funds outstanding. What's more, Bates Energy's breach of contract forced COFS to return to market in search of another who could supply sand. COFS says that its deal with CSI cost more than its deal with Bates Energy under the MOU, to the tune of $107,914.44. CP-130. Its reconciliation does not clarify how it arrived at that figure. In one table, COFS calculates the would-be cost under the Bates Energy MOU by multiplying the tonnage by the $99 per ton rate, then adding taxes to arrive at $1,058,010.59. Without explanation, the next line item jumps up to $1,112,081.37. That number is $107,914.44 cheaper than COFS's represented costs under the CSI deal, which accounts for a higher per ton price and transload costs. Another table seemingly breaks out the $1,112,081.37 sum into component calculations, but only by estimating a $104.50 per ton fee rather than the $99 used in the other table. The Court is aware of no documentation in the record substantiating

COFS's return-to-market damages claim of $107,914.44. Both the spreadsheet, CP-130, and the bank statements, CP-66, show a total of $984,755.26 paid to CSI. The "reconciliation" table within the spreadsheet, however, claims a total cost of $1,219,995.81 associated with CSI. CP-130. The testimony of COFS CFO Janis Kline offers little more clarity on the reconciliation, Trial Tr. 68:9–71:7, and COFS did not supplement its calculations in its July 27, 2020 Advisory to the Court. ECF No. 174.

In fact, COFS's Advisory may have further confused the damages inquiry. In its proposed findings of fact, COFS sought what remained of the $1 million—after reimbursements from the court registry plus the additional cost incurred from the CSI deal—for a total damages figure of $760,060.66. ECF No. 169. In the Advisory, however, COFS adopts a calculation method that builds up to $878,309.47—the prior figure is not even mentioned. Presumably, the discrepancy relates to COFS's claim that it is owed profits from the unauthorized resale of sand intended for COFS, which is listed as a "receivable" on the accounting document prepared by ELC/Naumann. CP-63. But that figure, $204,266, still does not balance the $118,248.81 step-up in damages sought.

The number of bank accounts, transactions, parties, and missing information in this case prohibits a bottoms-up, line-by-line build up of an accurate damages figure. Rather than engage a Special Master to conduct a forensic accounting, the Court will adopt COFS's more approachable method of ascertaining damages as laid out in COFS's proposed findings of fact. ECF No. 169. Considering the evidence in the record, COFS will be entitled to collect its actual damages of $652,146.22, calculated above.

### B. Causes of Action

The Court now examines COFS's causes of action against the non-defaulting Counter-Defendants and assesses their liability based on the Court's findings from trial.

## COUNTS 1 & 2: FRAUD AND CONSPIRACY TO COMMIT FRAUD (David Bravo and FSU)

The elements of fraud in Texas are (1) the defendant made a material representation that was false; (2) the defendant knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied upon the representation and suffered injury as a result. *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018). A false representation is material if a reasonable person would attach importance to and be induced to act on the information. *Shandong Yinguang Chem. Indus. Joint Stock Co. Ltd. v. Potter*, 607 F.3d 1029, 1033 (5th Cir. 2010) (quoting *Citizens Nat'l Bank v. Allen Rae Invs.*, 142 S.W.3d 459, 478–79 (Tex. App.— Fort Worth 2004)). COFS pursues this claim against non-defaulted Counter-Defendants David Bravo and FSU.

Bates Energy led a fraudulent scheme to milk COFS of money. It made a series of false representations to COFS: that it was qualified to perform the work specified in the MOU, PTO 52; that it had access to an allocation of 370,000 tons of frac sand per month ready for delivery, and that it was already delivering 88,000 tons every 45 days to other customers, and that it could deliver 80,000 tons of compliant frac sand to COFS, PTO 53, 54, 57; that it had access to railcars, PTO 55; that it had the ability to obtain compliant and sufficient amounts of sand from mines, PTO 56; that it would not direct escrow funds without consent from COFS, PTO 58; that accurate BOLs would accompany all attempts to seek disbursement of escrow funds, PTO 59;

that Naumann and ELC were highly regarded, competent, and experienced with respect to providing escrow services, PTO 63. Bates Energy intended COFS to act on the representations. COFS relied on the representations and suffered injury as a result.

"In Texas, a civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means." *Firestone Steel Products Co. v. Barajas*, 927 S.W.2d 608, 614 (Tex. 1996). "The essential elements are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983) (citations omitted).

As co-conspirators with Bates Energy, David Bravo and FSU are likewise liable. The scheme was relatively straightforward—induce COFS to entrust their money to Naumann, and have Naumann redirect the cash into the pockets of the conspiracy's enablers. Bravo was the chief operating officer ("COO") of Bates Energy, which received escrow payouts from Naumann. *See supra* ¶¶ 20, 24, and 33. Bravo himself received payouts under his wife's name. Trial Tr. (vol. 2) 9:1–19. He was the CEO of FSU, which knowingly facilitated unilateral draws from the escrow account. *See supra* ¶ 27. The fraudulent Disbursement Authorizations were notated with: "Electronic signature added under authorization by Frac Sand Unlimited, LLC." *See supra* ¶¶ 21, 25, 33. Bravo listed Stanley Bates as FSU's VP of Operations under Bates' alias, "Phillip Stanley." *See supra* ¶ 27. Bravo knew that FSU was funded by the COFS escrow account. Trial Tr. (vol. 2) 12:1–10. For all of these payments, COFS never received a grain of sand from Bates Energy, FSU, or David Bravo.

David Bravo testified at trial. There, he claimed he construed the "NOW or NEVER" email to mean it was time for himself, Bates, and the team to actually comply with the MOU and find sand for COFS and get the deal done ASAP, or else the parties would part ways. Trial Tr.

117:11–118: 24. The Court is not persuaded. Bravo and Bates had not delivered any sand at all by August 15, 2017, and the MOU by its terms was supposed to be fully completed, i.e., all 80,000 tons of sand were supposed to have been delivered to COFS by no later than mid-July, CP-4.5. Such a construction is also untenable in the face of receiving COFS's unconditional termination letter and its demand for the immediate return of prepayment escrow funds. CP-105.

Bravo also testified that he was not COO of Bates Energy. But Bravo had already represented to a judge at a hearing in state court that he was COO, Trial Tr. (vol. 2) 6:24–7:12, and was addressed as COO in a proof of funds letter from Naumann, CP-86. He testified that he did not realize that Stanley Bates, under his "Phillip Stanley" alias, was holding himself out as a "Vice President/Member" of FSU. Trial Tr. (vol. 2) 24:22–26:7. But Bates was described as just that on FSU's own website. CP-96. He testified that he did not know until after the second unauthorized payment that the funds came from the COFS escrow account. Trial Tr. 120:12–22. But he does not explain how Naumann, the escrow agent on the COFS account, could have obtained Bravo's wife's name and wire information as early as the first payment. He testified that he did help to procure sand in West Texas, but that the sand was refused by COFS. Trial Tr. 128:1–10. But he does not provide any documentary evidence for such a bold and potentially vindicating claim.

David Bravo was not an innocent, incidental beneficiary of the naked scheme to defraud COFS. Much more likely, he and Stanley Bates mutually made up their minds to take advantage of their mark. Bravo communicated with Bates frequently and established a money-siphoning shell company. He received candid emails from Stanley Bates, including Bates' panicked "It's NOW or NEVER!" message when it appeared the escrow spigot was about to run dry. CP-105. As the President and Managing Partner of FSU, David Bravo's knowledge is imputed to the company. CP-96; *see United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 848 F.3d 366,

372 (5th Cir. 2017) ("A corporation cannot act or have a mental state by itself, and thus, under the common law, the acts and mental states of its agents and employees will be imputed to the corporation where such natural persons acted on behalf of the corporation.") (quotations omitted). Bravo and FSU are jointly and severally liable for the Bates fraud described above by way of their participation in the conspiracy.

### COUNT 4: THEFT AND CONSPIRACY TO COMMIT THEFT (David Bravo, Lorena Bravo, and FSU)

Under the Texas Theft Liability Act, "theft" means "unlawfully appropriating property . . . as described by Section 31.03 . . . [of the Texas] Penal Code." TEX. CIV. PRAC. & REM. Code § 134.002(2). Section 31.03 of the Penal Code provides:

> (a) A person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property.
>
> (b) Appropriation of property is unlawful if:
>
>> (1) it is without the owner's effective consent;
>>
>> (2) the property is stolen and the actor appropriates the property knowing it was stolen by another[.]

TEX. PENAL CODE § 31.03.

COFS pursues this claim against non-defaulted Counter-Defendants David Bravo, Lorena Bravo, and FSU. Lorena Bravo and FSU both received direct payments from the escrow funds. Because Bates Energy did not have authority to direct payments unilaterally, any funds that it directed without COFS's consent were stolen. Liability turns on whether these Counter-Defendants knew the funds were stolen.

David Bravo and FSU certainly knew. The Court has already articulated the weight of evidence that stacks against the notion that the Bravo was in the dark. As the President and

Managing Partner of FSU, David Bravo's knowledge is imputed to the company. CP-96; *see*

*Kellogg Brown & Root, Inc.*, 848 F.3d at 372. FSU drew funds from ELC for unauthorized

middleman work and to obscure Bates' rotten reputation. *See supra* ¶ 26. Neither contributed to

COFS receiving any sand. These actions were part of an in furtherance of a conspiracy to take

COFS's escrow funds. David Bravo and FSU are thus liable for their shares of the stolen funds.

COFS has not established that Lorena Bravo knew the funds were stolen or that she was

involved in any way other than being the name on an account that received stolen funds. She is

not liable under Count 4.

### COUNT 5: BREACH OF FIDUCIARY DUTY AND CONSPIRACY TO COMMIT
### BREACH OF FIDUCIARY DUTY (David Bravo and FSU)

COFS pursues this claim against non-defaulted Counter-Defendants David Bravo and

FSU. The elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between

the plaintiff and defendant, (2) a breach by the defendant of his fiduciary duty to the plaintiff,

and (3) an injury to the plaintiff or benefit to the defendant as a result of the defendant's breach.

*Lundy v. Masson,* 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008).

COFS has not established—and has hardly even argued—that David Bravo or FSU owed

it a fiduciary duty. The Court will not craft that argument for them. Claim 5 fails as to David

Bravo and FSU.

### COUNT 7: RESTITUTION OR MONEY HAD AND RECEIVED (David Bravo,
### Lorena Bravo, FSU, and Tier 1 Sands)

Money had and received is an equitable doctrine to prevent unjust enrichment. To

establish a claim, all that a "plaintiff need show is that [the] defendant holds money which in

equity and good conscience belongs to him." *Staats v. Miller*, 243 S.W.2d 686, 687 (Tex. 1951).

Actions for money had and received are "not premised on wrongdoing, but look[] only to the

justice of the case and inquire[] whether the defendant has received money which rightfully belongs to another." *Amoco Prod. Co. v. Smith*, 946 S.W.2d 162, 164 (Tex. App.—El Paso 1997).

COFS pursues this claim against non-defaulted Counter-Defendants David Bravo, Lorena Bravo, FSU, and Tier 1 Sands. Only Lorena Bravo (by account name) and David Bravo (by admission) were direct recipients of the three most overt rounds of unauthorized disbursement. Payments from June 15, June 30, and July 19, 2017—totaling $47,500.00—were disbursed to an account with Lorena Bravo's name that David Bravo took responsibility for at trial. Trial Tr. (vol. 2) 9:1–19. This money does not belong to the Bravos, but to COFS. Accordingly, both Bravos are liable under this count for the $47,500.00.

COFS has not, however, established that FSU holds money that COFS is entitled to. FSU is thus not liable to COFS as to Count 6.

Finally, COFS argues that Tier 1 Sands is liable under this count for accepting stolen funds as payment, knowingly or unknowingly. Tier 1's liability is thus a pure legal question—COFS offered to address the issue more directly but did not follow up with briefing. Trial Tr. (vol. 2) 42:8–9. According to Texas courts, "[i]t is well settled that legal title to money passes with delivery to a person who acquires it in good faith *and for valuable consideration.*" *H.E.B., L.L.C. v. Ardinger*, 369 S.W.3d 496, 508 (Tex. App. 2012) (emphasis in original). "In examining the 'good conscience' element" of a money had and received claim, "courts have concluded that, 'one who receives money which has been illegally obtained by a third party in due course of business, in good faith, and for valuable consideration, can keep it without liability to him from whom it was stolen.'" *GE Capital Commercial, Inc. v. Wright & Wright, Inc.*, No. 3:09-CV-572-L, 2011 WL 124237, at *6 (N.D. Tex. Jan. 13, 2011) (quoting *Sinclair Houston Fed. Credit Union v. Hendricks*, 268 S.W.2d 290, 295 (Tex. Civ. App. 1954)).

The record does not suggest that Tier 1 misbehaved or acted in bad faith, and COFS does not dispute that Tier 1 delivered sand to the purchaser. COFS has thus not established liability over Tier 1.

### COUNT 8: CONVERSION (David Bravo, Lorena Bravo, and FSU)

The elements of conversion under Texas law are: (1) the plaintiff owned, had legal possession of, or was entitled to possession of the property; (2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's rights; and (3) the defendant refused plaintiff's demand for the return of the property. *D'Onofrio v. Vacation Publications, Inc.*, 888 F.3d 197, 212 (5th Cir. 2018) (citing *Cuidado Casero Home Health of El Paso, Inc. v. Ayuda Home Health Care Servs.*, LLC, 404 S.W.3d 737, 748 (Tex. App.—El Paso 2013).

COFS pursues this claim against non-defaulted Counter-Defendants David Bravo, Lorena Bravo, and FSU. The Court is unaware of any portion of the record that establishes that these Counter-Defendants refused COFS's demand for the return of the funds. However slim the likelihood of an amicable return may have been, it remains COFS's burden to establish each element. Having failed to do that, COFS may not collect from the non-defaulting Counter-Defendants under Count 8.

### COUNT 10: ATTORNEY'S FEES

Given the complex posture of this case, the number of parties, and COFS's stated intention to submit a separate motion for attorney's fees following a judgment, Trial Tr. (vol. 2) 36:12–14, the Court will consider fees awards at a later date.

## III.   CONCLUSION

This case has it all: corruption and incompetence; red flags and paper trails; bad decisions and bad actors. Stanley Bates ran a grift that most of the Counter-Defendants sought to capitalize

on. They lied, cheated, and stole their way into this Court. This opinion does not memorialize every bad deed Bates and his cadre pulled off, but it does translate the Counter-Defendants' misbehavior into liability.

The joint and several liability of the defaulting Counter-Defendants and the non-defaulting Counter-Defendants will be addressed in today's order resolving COFS's motions for default judgment.

For the foregoing reasons, David Bravo and FSU will be held jointly and severally liable to COFS in the amount of $652,146.22, less any amount received in settlement from other parties thus far. *See Ratner v. Sioux Natural Gas Corp.*, 719 F.2d 801, 803 (5th Cir. 1983).

Further, David and Lorena Bravo will be held jointly and severally liable for $47,500 of money had and received. Because COFS suffered a single financial injury of $652,146.22, and the money had and received claim against the Bravos pertains to that injury, Texas's one-satisfaction rule applies. *See Ashmore v. JMS Constr., Inc.*, No. 05-15-00537-CV, 2016 WL 7217256, at *14–15 (Tex. App.—Dallas, Dec. 13, 2016, no pet.) (citing *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000)). Accordingly, judgments against the Bravos will be entered for $47,500, but COFS is entitled to a judgment of $652,146.22 in the maximum, aggregate amount. *See id.*

Pursuant to Federal Rule of Civil Procedure 54(d)(2)(A)–(B), the Counter-Plaintiff shall submit briefing on the question of entitlement to and amount of attorney's fees and other related nontaxable expenses no later than fourteen (14) days after the entry of judgment, and any response by the Counter-Defendants who participated at trial due no more than ten (10) days thereafter.

SIGNED this 11th day of August, 2020.

Royce C. Lamberth
United States District Judge